BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
BRIAN D. NETTER
Deputy Assistant Attorney General
JOSHUA REVESZ
Counsel, Office of the Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
DANIEL SCHWEI
Special Counsel
**LISA NEWMAN (TX Bar No. 24107878)**
ANNA DEFFEBACH
EMILY NESTLER
Trial Attorneys
JULIE STRAUS HARRIS
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 514-5578
lisa.n.newman@usdoj.gov

*Counsel for Plaintiff*
United States of America

[Additional counsel listed below]

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>THE STATE OF IDAHO,<br><br>　　　　　　Defendant. | Case No. 1:22-cv-329<br><br>**COMPLAINT** |

　　　　The United States of America, by and through its undersigned counsel, brings this civil action

for declaratory and injunctive relief, and alleges as follows:

**PRELIMINARY STATEMENT**

1. Under federal law, hospitals that receive federal Medicare funds are required to provide necessary stabilizing treatment to patients who arrive at their emergency departments while experiencing a medical emergency. Under the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, if a person with an "emergency medical condition" seeks treatment at an emergency department at a hospital that accepts Medicare funds, the hospital must provide medical treatment necessary to stabilize that condition before transferring or discharging the patient. Crucially, "emergency medical conditions" under the statute include not just conditions that present risks to life but also those that place a patient's "health" in "serious jeopardy" or risk "serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part."

2. In some circumstances, medical care that a state may characterize as an "abortion" is necessary emergency stabilizing care that hospitals are required to provide under EMTALA. Such circumstances may include, but are not limited to, ectopic pregnancy, severe preeclampsia, or a pregnancy complication threatening septic infection or hemorrhage.

3. The State of Idaho, however, has passed a near-absolute ban on abortion. Once the Idaho law takes effect on August 25, 2022, Idaho Code § 18-622 will make it a felony to perform an abortion in all but extremely narrow circumstances. The Idaho law would make it a criminal offense for doctors to comply with EMTALA's requirement to provide stabilizing treatment, even where a doctor determines that abortion is the medical treatment necessary to prevent a patient from suffering severe health risks or even death.

4. Under the Idaho law, once effective, any state or local prosecutor can subject a physician to indictment, arrest, and prosecution merely by showing that an abortion has been performed, without regard to the circumstances. The law then puts the burden on the physician to prove an "affirmative defense" at trial. Idaho Code § 18-622(3) (2022). Nothing protects a physician

from arrest or criminal prosecution under Idaho's law, and a physician who provides an abortion in Idaho can avoid criminal liability only by establishing that "the abortion was necessary to prevent the death of the pregnant woman" or that, before performing the abortion, the pregnant patient (or, in some circumstances, their parent or guardian) reported an "act of rape or incest" against the patient to a specified agency and provided a copy of the report to the physician. *Id.* Beyond care necessary to prevent death, the law provides no defense whatsoever when the health of the pregnant patient is at stake. And, even in dire situations that might qualify for the Idaho law's limited "necessary to prevent the death of the pregnant woman" affirmative defense, some providers could withhold care based on a well-founded fear of criminal prosecution.

5. Idaho's abortion law will therefore prevent doctors from performing abortions even when a doctor determines that abortion is the medically necessary treatment to prevent severe risk to the patient's health and even in cases where denial of care will likely result in death for the pregnant patient. To the extent Idaho's law prohibits doctors from providing medically necessary treatment, including abortions, that EMTALA requires as emergency medical care, Idaho's new abortion law directly conflicts with EMTALA. *See* 42 U.S.C. § 1395dd(f) (EMTALA preempts State laws "to the extent that the requirement directly conflicts with a requirement of this section"). To the extent Idaho's law renders compliance with EMTALA impossible or stands as an obstacle to the accomplishment of federal statutes and objectives, EMTALA preempts the Idaho law under the Supremacy Clause of the United States Constitution.

6. In this action, the United States seeks a declaratory judgment that Idaho's law is invalid under the Supremacy Clause and is preempted by federal law to the extent that it conflicts with EMTALA. The United States also seeks an order preliminarily and permanently enjoining Idaho's restrictive abortion law to the extent it conflicts with EMTALA.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

8. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because Defendant resides within this judicial district and because a substantial part of the acts or omissions giving rise to this action arose from events occurring within this judicial district.

9. Pursuant to D. Idaho Civ. R. 3.1, venue is proper in the Southern Division because Defendant legally resides in Ada County, Idaho, and because that is where the claim for relief arose.

## PARTIES

10. Plaintiff is the United States of America.

11. Defendant, the State of Idaho, is a State of the United States. The State of Idaho includes all of its officers, employees, and agents.

## SUPREMACY OF FEDERAL LAW

### I. The Supremacy Clause and Preemption

12. The Supremacy Clause of the U.S. Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

13. "[S]tates have no power . . . to retard, impede, burden, or in any manner control the operations of the Constitutional laws enacted by [C]ongress to carry into effect the powers vested in the national government." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317 (1819). "There is no doubt Congress may withdraw specified powers from the States by enacting a statute containing an express preemption provision," and a State law is invalid if it conflicts with such a provision. *Arizona v. United States*, 567 U.S. 387, 399 (2012). Likewise, a State law is invalid if compliance with the state

and federal law is impossible or if the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

## II. The Emergency Medical Treatment and Labor Act (EMTALA)

14. Medicare, enacted in 1965 as Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, is a federally funded program, administered by the Secretary of the Department of Health and Human Services (HHS), that pays health care providers or insurers for health care services under certain circumstances.

15. Medical providers' participation in Medicare is voluntary. When providers agree to participate in Medicare, they submit provider agreements to the Secretary of HHS. *See* 42 U.S.C. § 1395cc. Hospitals submitting such agreements agree that they will "adopt and enforce a policy to ensure compliance with the requirements of [EMTALA] and to meet the requirements of [EMTALA]." *Id.* § 1395cc(a)(1)(I)(i).

16. Under EMTALA, hospitals participating in Medicare are generally required to provide stabilizing health care to all patients who arrive at an emergency department suffering from an emergency medical condition. *See* 42 U.S.C. § 1395dd.

17. Specifically, EMTALA requires these hospitals to "screen" patients who request treatment at the hospital's emergency department and provide "necessary stabilizing treatment," including an appropriate transfer to another facility that is able to provide stabilizing care not available at the originating hospital, for any "emergency medical condition" the hospital identifies. 42 U.S.C. § 1395dd.

18. The screening requirement necessitates that hospitals act "to determine whether or not an emergency medical condition" exists. *Id.* § 1395dd(a); *see also* 42 C.F.R. § 489.24(a) (noting that EMTALA requires "an appropriate medical screening examination within the capability of the hospital's emergency department").

19. Congress defined an "emergency medical condition" in EMTALA as:

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-

> (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
>
> (ii) serious impairment to bodily functions, or
>
> (iii) serious dysfunction of any bodily organ or part …

(B) with respect to a pregnant woman who is having contractions-

> (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or
>
> (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.

42 U.S.C. § 1395dd(e)(1).

20. If the hospital determines an individual has an emergency medical condition, "the hospital must provide either" (1) "further medical examination and such treatment as may be required to stabilize the medical condition," or (2) "transfer of the individual to another medical facility in accordance with" certain requirements. *Id.* § 1395dd(b)(1); *see also* 42 C.F.R. § 489.24(a)(1)(i)-(ii). The hospital may also "admit[] th[e] individual as an inpatient in good faith in order to stabilize the emergency medical condition." 42 C.F.R. § 489.24(d)(2)(i).

21. EMTALA defines "to stabilize" to mean "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). The term "transfer" is defined to include "discharge" of a patient. *Id.* § 1395dd(e)(4).

22. A hospital may not transfer (including by discharging) an individual with an emergency medical condition who has not been stabilized, unless, *inter alia*, the individual requests a transfer or a

6

physician certifies that the benefits of a transfer to another medical facility outweigh the increased risks to the patient. *Id.* § 1395dd(c).

23.     In short, when an emergency medical condition exists, EMTALA requires participating hospitals to provide "stabilizing" treatment, as determined by the particular hospital's facilities and the treating physician's professional medical judgment.

24.     As relevant here, there are some pregnancy-related emergency medical conditions—including, but not limited to, ectopic pregnancy, severe preeclampsia, or a pregnancy complication threatening septic infections or hemorrhage—for which a physician could determine that the necessary stabilizing treatment is care that could be deemed an "abortion" under Idaho law.[1] In that scenario, EMTALA requires the hospital to provide that stabilizing treatment. *See* Dep't of Health and Human Servs., *Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, CENTERS FOR MEDICARE & MEDICAID SERVICES (July 11, 2022), https://www.cms.gov/files/document/qso-22-22-hospitals.pdf; *see also Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, CENTERS FOR MEDICARE & MEDICAID SERVICES (Sept. 17, 2021), https://www.cms.gov/files/document/qso-21-22-hospital.pdf.

25.     EMTALA contains an express preemption provision, which preempts State laws "to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f).

---

[1] Termination of an ectopic pregnancy—which can never lead to a live birth and poses inherent danger to pregnant patients—is not considered an abortion by medical experts. However, the termination of an ectopic pregnancy appears to fall within Idaho's broad definition of abortion. *See* Idaho Code § 18-604(1).

**IDAHO'S ABORTION LAW**

26. In 2020, Idaho enacted a law that severely restricts abortions and threatens criminal prosecution against anyone who performs an abortion. The law, codified at Idaho Code § 18-622, is currently set to take effect on August 25, 2022, which is 30 days after issuance of the judgment in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). *See* Idaho Code § 18-622(1)(a).

27. Under Idaho's abortion law, "[e]very person who performs or attempts to perform an abortion . . . commits the crime of criminal abortion." *Id.* § 18-622(2). The crime of "criminal abortion" is a felony, punishable by two to five years imprisonment. *Id.*

28. Idaho's law also requires that "[t]he professional license of *any* health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense." *Id.* (emphasis added).

29. The Idaho law defines "[a]bortion" to mean "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." *Id.* § 18-604(1).

30. The *prima facie* criminal prohibition in Idaho's law does not contain any exceptions for when the pregnant patient's health or life is endangered. Thus, the mere performance of an abortion—even in an emergency, life-saving scenario—would subject a provider to criminal prosecution and require the provider to raise one of the law's narrow affirmative defenses at trial.

31. Idaho's abortion law provides for only two affirmative defenses, either of which the provider must prove by a preponderance of the evidence. In other words, once a prosecutor or licensing authority proves the *prima facie* case of an abortion having been performed, an accused physician may try to avoid conviction, incarceration, and loss of license by raising one of two

affirmative defenses, but bears the burden of proving the defense to a jury, along with the expense and uncertainty that flow from that burden.

32. Specifically, the accused physician would have to prove to a jury: (1) that "[t]he physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman," or (2) in cases of rape or incest, that the woman, or, if a minor, the woman or her parent or guardian, "has reported the act of rape or incest to a law enforcement agency" and the physician, prior to performing the abortion, received a copy of a police report (or, in the case of a minor, a police report or report to child protective services) regarding "the act of rape or incest." Idaho Code § 18-622(3)(a)(ii), (b)(ii)-(iii).

33. There is no affirmative defense applicable in circumstances where an abortion is necessary to ensure the health of the pregnant patient—even where the patient faces serious medical jeopardy or impairment—if the care is not "necessary to prevent the death" of the patient.

34. In addition, it is a requirement for both affirmative defenses, and thus the physician would have to prove, that the physician "performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman." *Id.* § 18-622(3)(a)(iii), (b)(iv).

## IDAHO'S ABORTION LAW CONFLICTS WITH EMTALA

35. Within the State of Idaho, there are approximately 43 hospitals that voluntarily participate in Medicare. Approximately 39 of those hospitals have emergency departments that are required to comply with EMTALA.

36. Idaho's criminal prohibition of all abortions, subject only to the statute's two limited affirmative defenses, conflicts with EMTALA. Idaho's criminal prohibition extends even to abortions that a physician determines are necessary stabilizing treatment that must be provided under EMTALA.

37. In particular, EMTALA's definition of an emergency medical condition—for which the hospital would be required to facilitate stabilizing treatment—is broader than just those circumstances where treatment is "necessary to prevent . . . death" under Idaho law. For example, EMTALA requires stabilizing treatment where "the health" of the patient is "in serious jeopardy," or where continuing a pregnancy could result in a "serious impairment to bodily functions" or a "serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A)(i)-(iii). Idaho has criminalized performing abortions in those circumstances, even when a physician has determined that an abortion is the necessary stabilizing treatment for a patient's emergency medical condition. The Idaho law therefore conflicts with federal law and is, in this respect, preempted.

38. The Idaho law also conflicts with EMTALA because the only limited protection it affords for even life-saving abortions is in the form of an affirmative defense where the provider bears the burden of proof at trial. Idaho's law subjects every provider who performs an abortion to the threat of indictment, arrest, and criminal prosecution. The law likewise subjects every provider and employee who performs or assists in performing an abortion to potential loss of their medical license. By threatening providers with criminal prosecution and license revocation proceedings for *every* abortion, regardless of whether it was "necessary to prevent . . . death," the Idaho law will deter physicians from performing abortions they have determined are medically necessary and thus must be provided under federal law. This is true even in the limited situations in which the abortions could be deemed defensible at a physician's criminal trial. "Where a prosecution is a likely possibility, yet only an affirmative defense is available," there "is a potential for extraordinary harm and a serious chill" upon protected conduct. *Ashcroft v. ACLU*, 542 U.S. 656, 670-71 (2004). Here, the law's obvious

chilling effect on providers' willingness to perform abortions, even when abortions are determined to be necessary medical treatments, is itself an impediment to the accomplishment of EMTALA's goal of ensuring that patients receive emergency care. The Idaho law is therefore preempted.

## IDAHO'S ABORTION LAW CAUSES INJURY TO FEDERAL INTERESTS

39. The Idaho abortion law will become effective on August 25, 2022.

40. Following the Supreme Court's decision in *Dobbs*, the Governor of Idaho issued a press release stating that "Idaho has been at the forefront of enacting new laws" to restrict abortion, and specifically referencing § 18-622 as a bill that the Governor "signed into law" and "will go into effect later this summer."[2]

41. Before filing this lawsuit, on July 29, 2022, the United States sent a letter to the State of Idaho, expressing the United States' view that § 18-622 was contrary to federal law. The United States did not receive a substantive response.

42. Once the law goes into effect on August 25, 2022, providers will immediately be subject to the threat of arrest, imprisonment, criminal liability, and loss of license for providing federally required care.

43. Severe harm will result from Idaho's law, which violates the Supremacy Clause. *See New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 366-67 (1989) (assuming that irreparable injury may be established "by a showing that the challenged state statute is flagrantly and patently violative of . . . the express constitutional prescription of the Supremacy Clause" (citation omitted)).

**I.   Idaho's Abortion Law Threatens Severe Public Health Consequences**

44. If Idaho's abortion law is allowed to take effect, physicians in Idaho will be threatened with prosecution under a state law that prohibits them from providing necessary stabilizing medical

---

[2] https://gov.idaho.gov/pressrelease/gov-little-comments-on-scotus-overrule-of-roe-v-wade/

treatment required by EMTALA. Physicians will be faced with an untenable choice—either to withhold critical stabilizing treatment required under EMTALA or to risk criminal prosecution and potential loss of their professional licenses. As a result of Idaho's physicians being placed in this position, patients will suffer—including by having their care delayed or losing access to necessary health care that is guaranteed under federal law. Particularly in emergency circumstances, or when dealing with considerations of risk to an individual's life or health, delayed health care can pose serious harms and is exactly what EMTALA's requirements are designed to prevent. In short, the Idaho law threatens severe public health consequences.

45. For example, pregnant patients sometimes arrive at a hospital's emergency department with an emergency medical condition for which physicians reasonably determine that the appropriate stabilizing treatment is an emergency abortion. Physicians facing a threat of criminal prosecution for performing an emergency abortion may be reluctant to perform the procedure—even when their medical judgment leads them to conclude that the procedure is necessary. The loss of that necessary treatment will result in irreversible damage to the health of a pregnant patient in some instances, and in other cases could lead to death.

46. The Idaho law will deprive pregnant patients of necessary treatment required by EMTALA notwithstanding the Idaho law's affirmative defense for abortions "necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(3)(a)(ii). Because that defense is available only during criminal prosecution or licensing proceedings, the law still subjects providers to the threat of criminal prosecution and potential loss of license for performing a life-saving abortion. And even the law's affirmative defense does not allow for abortions in emergency situations where pregnancy can reasonably be expected to place the health of the pregnant patient in serious jeopardy, seriously impair the pregnant patient's bodily functions, or cause serious dysfunction of any bodily part or organ.

**II.  Idaho's Law Interferes with EMTALA Obligations under the Federal Medicare Program**

47. As discussed above, Idaho's abortion law directly conflicts with the important federal policy reflected in EMTALA, 42 U.S.C. § 1395dd, through which Congress codified a guarantee of necessary stabilizing medical treatment for patients with emergency medical conditions, including pregnant patients, who seek care at emergency departments. *See id.* § 1395dd(a), (b), (e)(1), (g).

48. Congress intended EMTALA to govern nationwide in every hospital that accepts Medicare funds, as confirmed by its express preemption of conflicting State laws. *Id.* § 1395dd(f). Idaho's law frustrates Congress's objective of guaranteeing nationwide emergency medical care at Medicare hospitals, because Idaho law prohibits a particular form of medical treatment—even when that treatment is necessary to stabilize a patient experiencing an emergency medical condition. The United States has a strong sovereign interest in ensuring that States may not disrupt the federal objectives embodied in EMTALA, particularly when States seek to hold physicians criminally liable for providing stabilizing emergency treatment required under federal law.

49. The United States has an interest in protecting the integrity of the funding it provides under Medicare and ensuring that hospitals who are receiving Medicare funding will not refuse to provide stabilizing treatment to patients experiencing medical emergencies. From 2019 to 2020, HHS paid approximately 74 million dollars for emergency department care in Idaho hospitals enrolled in Medicare. A condition of hospitals' enrollment in Medicare is that they agree to comply with EMTALA. *See id.* § 1395cc(a)(1)(I)(i). Thus, part of the United States' bargain when it agrees to provide Medicare reimbursement to hospitals is that those hospitals will, in return, provide all forms of stabilizing treatment to emergency department patients, consistent with EMTALA.

50. Idaho's law prevents the United States from receiving the benefit of its bargain, however, by affirmatively prohibiting Idaho hospitals from complying with certain obligations under EMTALA. Thus, Idaho's law undermines the overall Medicare program and the funds that the United

13

States provides in connection with that program, by precluding the United States from receiving one of the benefits to which it is entitled under the Medicare program.

51. Idaho's law also improperly interferes with the United States' pre-existing agreements with hospitals under Medicare. Under these agreements, each hospital (including those in Idaho) must certify that it "agrees to conform to the provisions of section 1866 of the Social Security Act and applicable provisions in 42 CFR," CMS Form 1561, and those referenced provisions likewise include obligations to comply with EMTALA.[3]

52. Approximately 43 hospitals in Idaho have signed Medicare agreements, and approximately 39 of those hospitals have emergency departments that must comply with EMTALA. Compliance with Idaho's law would force these hospitals to violate their agreements with the United States because Idaho criminalizes the provision of stabilizing medical services required by EMTALA, and thus Idaho's law likewise interferes with the United States' interests.

53. Waiting to initiate federal enforcement actions directly against physicians or hospitals would likely have significant negative consequences on public health, including because such actions could be pursued only after physicians or hospitals had first denied emergency care to an individual in need. Unless the action is filed against a state-run hospital, the State would not be a party to a federal enforcement action, and the State's absence would further delay the resolution of this issue. Meanwhile, patients would be denied important life-saving and stabilizing medical care, resulting in needless suffering and even loss of life. Physicians and hospitals should not be placed in the untenable position of risking criminal prosecution under state law or subjecting themselves to enforcement actions under federal law. Pregnant patients who arrive at an emergency department are entitled to the stabilizing emergency care ensured under federal law when experiencing life- or health-threatening conditions.

---

[3] https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/downloads/cms1561.pdf

54. The law likewise stands as an obstacle to Congress's goal of ensuring that patients receive effective emergency care by threatening the professional license of *any* health care professional who "assists" in performing or attempting to perform an abortion. Idaho Code § 18-622(2). In particular, the law threatens a six-month suspension of the license of any health care professional who assists in an abortion or, on a second offense, threatens to permanently bar these providers from their professional practice. A pregnant patient who arrives in the emergency department with an emergency condition is likely to encounter not just emergency department physicians but also triage nurses, scrub nurses, lab techs, radiologists, anesthesiologists, and others whose role in any procedure could constitute "assisting" in the performance of an abortion. By threatening the license of other hospital employees whose care is critical to providing emergency department care, Idaho's law impedes EMTALA's goal of ensuring that patients receive effective emergency care.

## CLAIM FOR RELIEF

### Preemption Under the Supremacy Clause and EMTALA

55. Plaintiff hereby incorporates paragraphs 1 through 54 as if fully set forth herein.

56. The Supremacy Clause provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

57. EMTALA expressly preempts State laws "to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). Idaho Code § 18-622 violates the Supremacy Clause and is preempted to the extent it is contrary to EMTALA.

58. The law imposes requirements that are contrary to EMTALA and impedes the accomplishment and execution of the full purposes and objectives of federal law and is therefore preempted.

59. The Idaho law therefore violates the Supremacy Clause and is preempted under federal law to the extent that it conflicts with EMTALA.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests the following relief:

a. A declaratory judgment stating that Idaho Code § 18-622 violates the Supremacy Clause and is preempted and therefore invalid to the extent that it conflicts with EMTALA;

b. A declaratory judgment stating that Idaho may not initiate a prosecution against, seek to impose any form of liability on, or attempt to revoke the professional license of any medical provider based on that provider's performance of an abortion that is authorized under EMTALA;

c. A preliminary and permanent injunction against the State of Idaho—including all of its officers, employees, and agents—prohibiting enforcement of Idaho Code § 18-622(2)-(3) to the extent that it conflicts with EMTALA;

d. Any and all other relief necessary to fully effectuate the injunction against Idaho Code § 18-622's enforcement to the extent it conflicts with EMTALA;

e. The United States' costs in this action; and

f. Any other relief that the Court deems just and proper.

| | |
|---|---|
| Dated: August 2, 2022 | Respectfully submitted, |
| SAMUEL BAGENSTOS<br>General Counsel | BRIAN M. BOYNTON<br>Principal Deputy Assistant Attorney General |
| PAUL R. RODRÍGUEZ<br>Deputy General Counsel | BRIAN D. NETTER<br>Deputy Assistant Attorney General |
| DAVID HOSKINS<br>Supervisory Litigation Attorney | JOSHUA REVESZ<br>Counsel, Office of the Assistant Attorney General |
| JESSICA BOWMAN<br>MELISSA HART<br>Attorneys<br>Department of Health and Human Services<br>200 Independence Ave., SW<br>Washington, DC  20201 | ALEXANDER K. HAAS<br>Director, Federal Programs Branch<br><br>DANIEL SCHWEI<br>Special Counsel<br><br>*/s/ Lisa Newman*<br>LISA NEWMAN (TX Bar No. 24107878)<br>ANNA DEFFEBACH<br>EMILY NESTLER<br>Trial Attorneys<br><br>JULIE STRAUS HARRIS<br>Senior Trial Counsel<br><br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch<br>1100 L Street, N.W.<br>Washington, D.C. 20005<br>Tel: (202) 514-5578<br>lisa.n.newman@usdoj.gov<br><br>*Counsel for Plaintiff* |