BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
BRIAN D. NETTER
Deputy Assistant Attorney General
JOSHUA REVESZ
Counsel, Office of the Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
DANIEL SCHWEI
Special Counsel
**LISA NEWMAN (TX Bar No. 24107878)**
ANNA DEFFEBACH
EMILY NESTLER
CHRISTOPHER A. EISWERTH
Trial Attorneys
JULIE STRAUS HARRIS
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 514-5578
lisa.n.newman@usdoj.gov

*Counsel for Plaintiff*
United States of America

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO
## SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 1:22-cv-329-BLW |
| v. | **MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION** |
| THE STATE OF IDAHO, | |
| Defendant. | |

## Table of Contents

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

I.   Federal Law ...............................................................................................................2

     A.   Supremacy of Federal Law ..............................................................................2

     B.   The Emergency Medical Treatment and Labor Act (EMTALA)........................3

     C.   Idaho Hospitals' Participation in Medicare and Their Agreements to Comply
          with EMTALA Obligations ..............................................................................5

II.  Idaho's Abortion Law ................................................................................................6

STANDARD OF REVIEW ...................................................................................................7

ARGUMENT ......................................................................................................................8

I.   The United States is Likely to Succeed in Demonstrating that EMTALA Preempts
     Idaho's Abortion Law ................................................................................................8

     A.   EMTALA Requires Participating Hospitals to Provide Stabilizing Treatment,
          Which Includes Abortions for Some Medical Conditions ...................................8

     B.   Idaho's Near-Absolute Abortion Ban Conflicts with EMTALA .......................14

II.  The Equitable Balance Supports Entry of a Preliminary Injunction .........................17

CONCLUSION ..................................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*AK Futures LLC v. Boyd St. Distro, LLC,*
   35 F.4th 682 (9th Cir. 2022) ................................................................................ 8

*All. For Wild Rockies v. Pierson,*
   550 F. Supp. 3d 894 (D. Idaho 2021) .............................................................. 20

*Arizona v. United States,*
   567 U.S. 387 (2012) ......................................................................................... 16

*Arrington v. Wong,*
   237 F.3d 1066 (9th Cir. 2001) ..................................................................... 3, 11

*Beltran v. Myers,*
   677 F.2d 1317 (9th Cir. 1982) ........................................................................ 18

*Biden v. Missouri,*
   142 S. Ct. 647 (2022) ........................................................................................ 3

*Bostock v. Clayton Cnty.,*
   140 S. Ct. 1731 (2020) .................................................................................... 11

*Buckman Co. v. Plaintiffs' Legal Comm.,*
   531 U.S. 341 (2001) ......................................................................................... 16

*Burditt v. HHS,*
   934 F.2d 1362 (5th Cir. 1991) ........................................................................ 14

*California v. United States,*
   No. 05-cv-328, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008) ........................ 13

*Chamber of Com. Of U.S. v. Bonta,*
   13 F.4th 766 (9th Cir. 2021) ........................................................................... 15

*Cox v. Cabell Huntington Hosp., Inc.,*
   863 F. Supp. 2d 568 (S.D. W. Va. 2012) ....................................................... 15

*Cummings v. Premier Rehab Keller, PLLC,*
   142 S. Ct. 1562 (2022) ...................................................................................... 3

*Cyan, Inc. v. Beaver Cnty. Employees Ret. Fund,*
   138 S. Ct. 1061 (2018) .................................................................................... 13

*Draper v. Chiapuzio,*
   9 F.3d 1391 (9th Cir. 1993) ................................................................... 5, 14, 15

*Hardy v. N.Y.C. Health & Hosp. Corp.,*
   164 F.3d 789 (2d Cir. 1999) .......................................................................5

*Harris v. McRae,*
   448 U.S. 297 (1980) ...............................................................................12

*Harry v. Marchant,*
   291 F.3d 767 (11th Cir. 2002) ..................................................................5

*Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1,*
   469 U.S. 256 (1985) ...............................................................................20

*Matter of Baby K,*
   16 F.3d 590 (4th Cir. 1994) .............................................................. 11, 14

*M'Culloch v. Maryland,*
   17 U.S. (4 Wheat.) 316 (1819) ..................................................................2

*Merce v. Greenwood,*
   348 F. Supp. 2d 1271 (D. Utah 2004) .....................................................15

*Morin v. E. Maine Med. Ctr.,*
   780 F. Supp. 2d 84 (D. Me. 2010) ..................................................... 12, 13

*Murphy v. NCAA,*
   138 S. Ct. 1461 (2018) .............................................................................3

*New York v. U.S. Dep't of Health & Hum. Servs.,*
   414 F. Supp. 3d 475 (S.D.N.Y. 2019) .....................................................12

*Nken v. Holder,*
   556 U.S. 418 (2009) ...............................................................................17

*Puerto Rico v. Franklin Calif. Tax-Free Tr.,*
   579 U.S. 115 (2016) .................................................................................3

*Rodde v. Bonta,*
   357 F.3d 988 (9th Cir. 2004) ..................................................................18

*Root v. New Liberty Hosp. Dist.,*
   209 F.3d 1068 (8th Cir. 2000) ................................................................14

*Rubin v. Islamic Republic of Iran,*
   138 S. Ct. 816 (2018) .............................................................................12

*United States v. Alabama,*
   691 F.3d 1269 (11th Cir. 2012) ..............................................................19

*United States v. Mackby*,
    339 F.3d 1013 (9th Cir. 2003) ............................................................. 19

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) .................................................... 15, 17, 18

*Vargas By & Through Gallardo v. Del Puerto Hosp.*,
    98 F.3d 1202 (9th Cir. 1996) .......................................................... 16, 17

*Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*,
    529 U.S. 765 (2000) ............................................................................. 19

## Constitutions

U.S. Const. art. VI, cl. 2 ........................................................................... 2

## Statutes

10 U.S.C. § 1093 ....................................................................................... 12

20 U.S.C. § 1688 ....................................................................................... 12

22 U.S.C. § 5453 ....................................................................................... 12

22 U.S.C. § 7704 ....................................................................................... 12

25 U.S.C. § 1676 ....................................................................................... 12

42 U.S.C. § 238n ....................................................................................... 12

42 U.S.C. § 280h-5 ................................................................................... 12

42 U.S.C. § 300a-6 ................................................................................... 12

42 U.S.C. § 300a-7 ................................................................................... 12

42 U.S.C. § 300a-8 ................................................................................... 12

42 U.S.C. § 300z-10 ................................................................................. 12

42 U.S.C. § 1395 *et seq.* ............................................................................ 3

42 U.S.C. § 1395cc ........................................................................... *passim*

42 U.S.C. § 1395dd ........................................................................... *passim*

42 U.S.C. § 1397ee ................................................................................... 12

42 U.S.C. § 2996f ..................................................................................... 12

42 U.S.C. § 12584a ...................................................................................................12

42 U.S.C. § 18023 .....................................................................................................11

Consolidated Appropriations Act, 2022,
    Pub. L. No.  117-103, 136 Stat. 49 (2022) ........................................................12

Idaho Code § 18-604 (2021) ................................................................................. 7, 16

Idaho Code § 18-622 (2020) ............................................................................. *passim*

Idaho Code § 54-1401 (2014) ..................................................................................16

Idaho Code § 54-1718 (2021) ..................................................................................16

Idaho Code § 54-1810 (2019) ..................................................................................16

Idaho Code § 54-1810A (2019) ...............................................................................16

**Legislative Materials**

131 Cong. Rec. S13892  ...........................................................................................14

151 Cong. Rec. H177 (Jan. 25, 2005) ......................................................................12

Consolidated Omnibus Reconciliation Act of 1985, H.R. 3128, 99th Cong. § 124 (1985) ..................12

H.R. Rep. No. 99-241 (1985) ................................................................................. 3, 5

**Regulations**

42 C.F.R. § 489.24(a)(1)(i) ............................................................................... 4, 9, 11

**Other Authorities**

CMS, Form 855
https://perma.cc/84T6-S2DP ......................................................................................6

CMS, Form 1561
https://perma.cc/5EPE-YLRE .....................................................................................6

HHS, Medicare Enrollment Application; CMS Form 855,
https://perma.cc/84T6-S2DP ......................................................................................6

Idaho Dep't of Health & Welfare, 2010-2020 Idaho Resident Births, VS Natality –
Data Results, 2010-2020,
https://www.gethealthy.dhw.idaho.gov/idaho-births-vital-statistics ........................18

## INTRODUCTION

Federal law requires certain hospitals receiving federal Medicare funds to offer treatment to individuals experiencing medical emergencies. Under the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, individual patients must be provided "stabilizing care" when they seek treatment at a covered hospital for an "emergency medical condition." An emergency medical condition exists when a patient's "health" is in "serious jeopardy" or the patient risks "serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A). Some patients who experience these medical emergencies are pregnant, and in some situations the necessary stabilizing treatment for such a pregnant patient involves termination of the pregnancy. In those circumstances, EMTALA requires that hospitals offer that stabilizing treatment to the patient, who can then decide whether to proceed.

In direct conflict with this federal requirement, the State of Idaho has enacted a near-absolute ban on abortion that is scheduled to go into effect on August 25, 2022. *See* Idaho Code § 18-622 (2020). Under Idaho's law, any physician who terminates a pregnancy can be indicted, arrested, and prosecuted on felony charges, regardless of the medical need for the procedure. A physician may avoid criminal liability only by proving a narrow "affirmative defense"—as relevant here, that the abortion was "necessary to prevent the death of the pregnant woman." *Id.* § 18-622(3)(a)(ii). That defense is far narrower than the circumstances in which EMTALA requires providing stabilizing treatment. Where EMTALA's standard is met but the treatment is not strictly "necessary to prevent the death" of the patient, it is impossible for a physician to comply both with the obligations of EMTALA and § 18-622. And even in cases where termination of the pregnancy is necessary to prevent the patient's death, the Idaho law requires a physician to risk arrest and prosecution for each abortion performed because the law affords only an "affirmative defense" that the physician must prove at trial. By threatening physicians with criminal prosecution—even when they provide treatment in emergency, life-

threatening situations as federal law requires—Idaho's law penalizes and discourages such treatment, and thereby conflicts directly with federal law. In these respects, federal law preempts § 18-622.

If allowed to go into effect, the Idaho law will cause significant irreparable harm, including to the public health of patients across Idaho. As the declaration of Dr. Lee A. Fleisher (attached as Ex. A) demonstrates, there are emergency conditions affecting pregnant individuals for which the medically necessary treatment involves termination of the pregnancy. But § 18-622 criminalizes providing such treatment, despite the extremely serious risk that, for example, a patient with an ectopic pregnancy might bleed to death, an infection could turn into sepsis and cause organ failure, or seizures caused by eclampsia might prove uncontrollable. Physicians practicing within Idaho likewise confirm that, if § 18-622 takes effect, pregnant patients experiencing emergency conditions will suffer. *See* Decls. of Dr. Emily Corrigan, Dr. Kylie Cooper, and Dr. Stacy T. Seyb (attached hereto as Exs. B-D). These facts establish clear irreparable harm and a strong public interest in enjoining § 18-622 from going into effect as applied to EMTALA-mandated care. The Court should grant the United States' motion for a preliminary injunction.

## BACKGROUND

### I. Federal Law

#### A. Supremacy of Federal Law

The Supremacy Clause of the U.S. Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Pursuant to that principle, "states have no power . . . to retard, impede, burden, or in any manner control the operations of the Constitutional laws enacted by [C]ongress to carry into effect the powers vested in the national government." *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 317 (1819).

When "Congress enacts a law that imposes restrictions or confers rights on private actors," and "a state law confers rights or imposes restrictions that conflict with the federal law," the "federal law takes precedence and the state law is preempted." *Murphy v. NCAA*, 138 S. Ct. 1461, 1480 (2018). If a "statute contains an express pre-emption clause, we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Calif. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (citation omitted).

**B.      The Emergency Medical Treatment and Labor Act (EMTALA)**

Medicare is a federally funded program, administered by the Secretary of Health and Human Services (HHS), that generally pays health care providers for health care services under certain circumstances. *See* 42 U.S.C. § 1395 *et seq.* Participation in Medicare is voluntary, and each provider must submit an agreement to the Secretary promising to comply with certain conditions in return for receipt of Medicare funding. *See id.* § 1395cc. Although Medicare generally does not contemplate Federal employees "exercis[ing] any supervision or control over the practice of medicine or the manner in which medical services are provided," 42 U.S.C. § 1395, that does not prevent the Federal Government from establishing and enforcing conditions of participation in Medicare, *see Biden v. Missouri*, 142 S. Ct. 647, 654 (2022), nor does it eliminate Congress's "broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1568 (2022).

Congress enacted EMTALA in 1986, based on "a growing concern about the provision of adequate emergency room medical services to individuals who seek care, particularly as to the indigent and uninsured." H.R. Rep. No. 99-241, Part 3, at 5 (1985); *see also Arrington v. Wong*, 237 F.3d 1066, 1073-74 (9th Cir. 2001) ("The overarching purpose of EMTALA is to ensure that patients, particularly the indigent and underinsured, receive adequate emergency medical care." (alterations and citations

omitted)). EMTALA applies to every hospital that has an emergency department and participates in Medicare, *see* 42 U.S.C. § 1395dd(e)(2), regardless of whether any particular patient qualifies for Medicare. Congress has statutorily required that hospitals participating in Medicare agree to comply with EMTALA as a condition of receiving federal funding. *See id.* § 1395cc(a)(1)(I)(i).

Under EMTALA, when a patient arrives at an emergency department and requests treatment, the hospital must provide an appropriate medical screening examination "to determine whether or not an emergency medical condition" exists. *Id.* § 1395dd(a); *see also* 42 C.F.R. § 489.24(a)(1)(i). Congress defined an "emergency medical condition" as:

> (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-
> > (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
> > (ii) serious impairment to bodily functions, or
> > (iii) serious dysfunction of any bodily organ or part …
>
> (B) with respect to a pregnant woman who is having contractions-
> > (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or
> > (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.

42 U.S.C. § 1395dd(e)(1). If a hospital determines that an individual has an emergency medical condition, "the hospital must provide either (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility in accordance with" certain requirements. *Id.* § 1395dd(b)(1); *see also* 42 C.F.R. § 489.24(a)(1)(ii). The hospital may also "admit[] th[e] individual as an inpatient in good faith in order to stabilize the emergency medical condition." 42 C.F.R. § 489.24(d)(2)(i). Under EMTALA, "to stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual

from a facility." 42 U.S.C. § 1395dd(e)(3)(A). "[T]ransfer" is defined to include discharge of a patient. *Id.* § 1395dd(e)(4). A hospital satisfies its obligations under EMTALA if, after being informed of the risks and benefits of treatment, the patient (or the patient's representative) does not consent to the treatment. *Id.* § 1395dd(b)(2).

In short, EMTALA requires that hospitals offer stabilizing treatment where "the health" of the patient is "in serious jeopardy," or where a condition could result in a "serious impairment to bodily functions" or a "serious dysfunction of any bodily organ or part." *Id.* § 1395dd(e)(1)(A)(i)-(iii). The hospital may also "transfer" such an individual, but only if the transfer meets certain requirements, *e.g.*, that the medical benefits of the transfer outweigh the risks. *Id.* § 1395dd(c)(1)(A)(ii).

EMTALA contains an express preemption provision, preserving state laws "except to the extent that the requirement directly conflicts with a requirement of this section." *Id.* § 1395dd(f). The intent of this provision was to preserve "stricter state laws," *i.e.*, state laws requiring emergency care *beyond* what EMTALA mandates. H.R. Rep. No. 99-241, Part 1, at 4 (1985); *see also* H.R. Rep. No. 99-241, Part 3, at 5 (1985) (expressing a desire to add "federal sanctions" as a supplement to state law duties "to provide necessary emergency care"); *Harry v. Marchant*, 291 F.3d 767, 773-74 (11th Cir. 2002). For purposes of EMTALA, "[a] state statute 'directly conflicts' with federal law in either of two cases: first, if 'compliance with both federal and state regulations is a physical impossibility,' or second, if the state law is 'an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993) (citations omitted) (per curiam); *accord Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999).

### C. Idaho Hospitals' Participation in Medicare and Their Agreements to Comply with EMTALA Obligations

As noted, a hospital participating in Medicare must comply with EMTALA as a condition of receiving federal funds. *See* 42 U.S.C. § 1395cc(a)(1)(I)(i). Additionally, hospitals enter into written agreements with the Secretary confirming they will comply with EMTALA.

Hospitals apply to become certified under Medicare by submitting a Centers for Medicare & Medicaid Services (CMS) Form 855, *see* Decl. of David R. Wright (attached hereto as Ex. E) ¶ 2, in which the provider "agree[s] to abide by the Medicare laws, regulations and program instructions that apply." CMS Form 855, § 15, ¶ A.3 (pg. 48), https://perma.cc/84T6-S2DP. If approved for Medicare certification, the hospital must then sign CMS Form 1561, Wright Decl. ¶ 4, in which the provider likewise "agrees to conform to the provisions of section of 1866 of the Social Security Act [42 U.S.C. § 1395cc] and applicable provisions in 42 CFR." https://perma.cc/5EPE-YLRE. Finally, each fiscal year, a Medicare-participating hospital must submit a cost report, pursuant to which "the Chief Financial Officer or hospital Administrator must certify that he or she is 'familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations,' which include EMTALA." Wright Decl. ¶ 6; *see also* Decl. of Barbara Shadle (attached hereto as Ex. F) ¶¶ 2-5.

Within Idaho, there are 52 Medicare-certified hospitals, at least 39 of which provide emergency services. Wright Decl. ¶ 8. Of the 52 hospitals, 16 are government-owned, and at least 15 of those provide emergency services. *Id.* ¶ 9. These 52 hospitals in Idaho received approximately $3.4 billion in federal Medicare funds during fiscal years 2018-2020; by rough estimate, approximately $74 million was attributable to these hospitals' emergency departments. Shadle Decl. ¶ 6. That funding was conditioned on compliance with EMTALA. Wright Decl. ¶ 14.

## II.   Idaho's Abortion Law

In 2020, Idaho enacted a law that severely restricts abortion and threatens criminal prosecution against anyone who performs the procedure. The law, codified at Idaho Code § 18-622, is set to take effect August 25, 2022. *See* Idaho Code § 18-622(1)(a).

Under § 18-622, "[e]very person who performs or attempts to perform an abortion . . . commits the crime of criminal abortion," a felony punishable by two to five years imprisonment. *Id.*

§ 18-622(2). The law also requires that "[t]he professional license of any health care professional who performs or attempts to perform an abortion or who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense." *Id.* Idaho law defines "[a]bortion" to mean "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." *Id.* § 18-604(1).[1]

The *prima facie* criminal prohibition and license suspension provisions in Idaho's law do not contain any exceptions, including for when the pregnant patient's health or life is endangered. *See id.* § 18-622(2). Thus, the performance of an abortion—even in an emergency, life-saving scenario— would subject a provider to criminal prosecution and require the provider to assert one of the law's "affirmative defense[s]" at trial. *Id.* § 18-622(3). As relevant here, the accused physician would have to prove to a jury, by a preponderance of the evidence, that "[t]he physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman," and that the physician "performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman." *Id.* § 18-622(3)(a)(ii)-(iii).

## STANDARD OF REVIEW

The United States seeks a preliminary injunction against § 18-622's enforcement as applied to

---

[1] This definition of "abortion" in the Idaho Code is broad and covers some procedures that may not be characterized as an abortion in the medical community, including some circumstances in which a pregnancy is nonviable or termination of pregnancy is necessary to treat a pregnant patient's medical condition. *See* Fleisher Decl. ¶ 32, Ex. A-B. For purposes of this case, the United States uses the term "abortion" as it is defined under the Idaho Code.

EMTALA-mandated care. To obtain such preliminary relief, "a party must show: (1) it will likely succeed on the merits, (2) it will likely suffer irreparable harm in the absence of preliminary relief, (3) the balance of the equities tips in its favor, and (4) the public interest favors an injunction." *AK Futures LLC v. Boyd St. Distro, LLC*, 35 F.4th 682, 688 (9th Cir. 2022) (citation omitted).

## ARGUMENT

### I.     The United States is Likely to Succeed in Demonstrating that EMTALA Preempts Idaho's Abortion Law

The United States has a clear likelihood of success on its claim. EMTALA requires hospitals with emergency departments to provide stabilizing treatment for emergency conditions. Physicians treating emergency conditions will sometimes determine that the medically necessary treatment involves or will result in the termination of a pregnancy. Idaho's law conflicts with EMTALA by subjecting physicians to criminal prosecution for terminating *any* pregnancy, irrespective of the medical circumstances. The law also imposes felony criminal liability on physicians who provide abortions, unless the physician is able to prove through an affirmative defense that (as relevant here) the abortion was "necessary to prevent the death of the pregnant woman"—which is far narrower than the standard EMTALA requires for the provision of medically necessary care. Thus, Idaho's abortion law conflicts directly with EMTALA, and is preempted in the context of EMTALA-mandated care.

### A.     EMTALA Requires Participating Hospitals to Provide Stabilizing Treatment, Which Includes Abortions for Some Medical Conditions

Under EMTALA, hospitals that receive Medicare funds are generally required (barring an appropriate transfer to another medical facility) to offer and provide "stabilizing treatment" to all patients who arrive at their emergency departments while experiencing an "emergency medical condition." 42 U.S.C. § 1395dd(b)(1). For such patients, hospitals are required to provide "further medical examination and such treatment as may be required to stabilize the medical condition." *Id.*

§ 1395dd(b)(1)(A); *see also* 42 C.F.R. § 489.24(a)(1)(i)-(ii).

Congress explicitly contemplated that pregnant patients would be among those arriving at an emergency department experiencing an "emergency medical condition." *Id.* § 1395dd(e)(1)(A)(i), (B). A number of conditions can arise during, or can be exacerbated by, pregnancy that may constitute "emergency medical conditions." For some patients, a physician will determine that the stabilizing treatment for the patient's emergency condition is termination of the pregnancy. Fleisher Decl. ¶¶ 12-27; Corrigan Decl. ¶¶ 8-30; Cooper Decl. ¶¶ 5-11; Seyb Decl. ¶¶ 6-12. For example, a pregnant patient may arrive at an emergency department with bleeding, pelvic pain, or severe abdominal pain that is being caused by an ectopic pregnancy, a condition in which a nonviable embryo implants outside the uterus, often in a fallopian tube, which can never lead to a live birth. Fleisher Decl. ¶ 13. This is an "emergency medical condition" because it could cause the fallopian tube to rupture, and the patient could bleed to death. *Id.* In most cases, the physician cannot reasonably know when that rupture will occur—rupture can occur within minutes, hours, or days of an ectopic-pregnancy diagnosis—but without immediate treatment it is reasonably probable that the patient's condition will continue to deteriorate. *Id.* Given the "serious risk of unknown imminence," and the inevitability that the patient's condition will deteriorate, the "appropriate stabilizing treatment is nearly always" termination of the pregnancy through surgery or medication. *Id.*

To take another example, a patient may arrive at an emergency room with nausea and shortness of breath, leading to a diagnosis of pre-eclampsia. Fleisher Decl. ¶ 17. Pre-eclampsia can "quickly progress to eclampsia, with the onset of seizures," that can result in a coma, pneumonia, kidney failure, stroke, or cardiac arrest. *Id.* In many cases, pre-eclampsia and eclampsia can be managed with medications that allow the fetus to mature. But in other cases (*e.g.*, situations in which the seizures cannot be controlled), a physician exercising her medical judgment will conclude that termination of the pregnancy is the necessary stabilizing treatment. *Id.* As Dr. Corrigan described, pre-eclampsia for

one patient caused "water on the lungs," which required an immediate termination of the pregnancy. Corrigan Decl. ¶¶ 27-29; Cooper Decl. ¶¶ 6-7 (pre-eclampsia placed patient at risk for stroke, seizure, and pulmonary edema); Seyb Decl. ¶¶ 9-10. A woman may also arrive at the emergency department with an infection after the amniotic sac surrounding the fetus ruptures. Fleisher Decl. ¶ 19. This condition can progress quickly into sepsis, at which point a patient's organs may begin to fail; like the other conditions discussed above, there are some circumstances in which termination of the pregnancy is the medically necessary treatment. *Id.*; Corrigan Decl. ¶¶ 11-17; Seyb Decl ¶¶ 7-8.

As a further example, a patient may arrive at the hospital with chest pain or shortness of breath, at which point a doctor discovers longstanding elevated blood pressure or a blood clot. Fleisher Decl. ¶ 15. Pregnancy can substantially exacerbate these conditions, and for some patients with severe symptoms, termination is the necessary treatment under EMTALA because there is a high probability of severe impairment of the lungs, heart, and kidneys without treatment. *Id.* Similarly, a patient may arrive at the hospital with vaginal bleeding caused by a placental abruption. *Id.* ¶ 20; Corrigan Decl. ¶¶ 21-25; Seyb Decl. ¶¶ 11-12. If the bleeding is uncontrollable, a physician may conclude that the stabilizing treatment includes termination of the pregnancy, in order to prevent the patient from going into shock which can result in organ dysfunction such as kidney failure. Fleisher Decl. ¶¶ 20-21.

These are just some of the emergency conditions that can place a pregnant patient's health in serious jeopardy or threaten bodily functions or organs. *Id.* ¶ 22. Despite these conditions' serious risks, it may not be possible for a physician to know whether treatment for any particular condition is "necessary to prevent the death" of the pregnant patient. *Id.* ¶¶ 13-21. Absent the stabilizing treatment EMTALA requires, however, the risk is extremely serious that, for example, a patient with an ectopic pregnancy might bleed to death, an infection could turn into sepsis and cause organ failure, seizures from eclampsia might prove uncontrollable, or a blood clot could lead to kidney failure. *Id.*

For each of these emergency medical conditions, where a physician determines that abortion

is the stabilizing treatment, EMTALA's plain text requires that treatment be offered and provided upon informed consent. Once a physician identifies that a pregnant individual suffers from an emergency medical condition, that individual must be offered "such treatment as may be required to stabilize the medical condition." 42 U.S.C. § 1395dd(b)(1)(A); *see also* 42 C.F.R. § 489.24(a)(1)(ii) ("If an emergency medical condition is determined to exist," the hospital must "provide any necessary stabilizing treatment[.]"). The only reasonable interpretation of EMTALA's text is that it requires hospitals to offer stabilizing treatment when medically necessary.

Nothing in EMTALA creates a different rule for circumstances in which the treatment results in termination of a pregnancy. The statute's text does not exempt any particular treatment (abortion or otherwise) from the ambit of stabilizing treatment. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020) ("[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule."); *In the Matter of Baby K*, 16 F.3d 590, 596 (4th Cir. 1994) (finding no "statutory language or legislative history [in EMTALA] evincing a Congressional intent to create an exception to the duty to provide stabilizing treatment"). And any contrary interpretation—*i.e.*, that a hospital need not perform an abortion even when medically necessary to stabilize an emergency medical condition—would undermine EMTALA's overall purpose of ensuring "that patients . . . receive adequate medical emergency care." *Arrington*, 237 F.3d at 1073-74 (citation omitted).

Any argument that EMTALA does not encompass abortions is foreclosed by the specific Affordable Care Act (ACA) provision addressing abortion. *See* 42 U.S.C. § 18023. The ACA allows States to prohibit abortion coverage in certain health plans, *id.* § 18023(a)(1), but the same provision contains a cross-reference to EMTALA and makes explicit that "[n]othing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including section 1867 of the Social Security Act (popularly known as 'EMTALA.')" *Id.* § 18023(d). Congress therefore left no doubt that EMTALA encompasses abortion services and

that a State may not override that requirement.

The Weldon Amendment, which is a frequently enacted appropriations provision that prohibits discrimination against certain entities that do not perform abortions, reflects the same understanding. The Weldon Amendment's sponsor, when confronted with a concern that "women will die because they will not have access to an abortion needed to save the life of the mother," expressly referenced EMTALA as addressing that concern: "Hyde-Weldon does nothing of the sort. It ensures that in situations where a mother's life is in danger a health provider must act to save the mother's life. In fact, Congress passed [EMTALA] forbidding critical-care health facilities to abandon patients in medical emergencies, and requires them to provide treatment to stabilize the medical condition of such patients—particularly pregnant women." 151 Cong. Rec. H177 (Jan. 25, 2005) (statement of Rep. Weldon).

More generally, when Congress creates special rules for abortion—or excludes abortion care from otherwise-applicable rules—it does so expressly.[2] "Had Congress likewise intended" to exempt abortions from EMTALA, "it knew how to say so." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 826 (2018). Indeed, the very same legislation through which Congress considered EMTALA included a separate program that *did* expressly carve out abortion. *Compare* Consolidated Omnibus Reconciliation Act of 1985, H.R. 3128, 99th Cong., 1st Sess., § 124 (language that became EMTALA), *with id.* § 302(b)(2)(B) (expressly excluding abortion from a different program's authorized activities). Courts have also previously understood EMTALA to require abortion-related services. *See, e.g.*, *New York v. U.S. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 538 (S.D.N.Y. 2019); *Morin v. E. Maine Med.*

---

[2] Examples of these abortion-specific provisions include 10 U.S.C. § 1093; 20 U.S.C. § 1688; 22 U.S.C. §§ 5453(b), 7704(e)(4); 25 U.S.C. § 1676; 42 U.S.C. §§ 238n, 280h-5(a)(3)(C), 300a-6, 300a-7, 300a-8, 300z-10, 1397ee(c)(7), 2996f(b)(8), and 12584a(a)(9). Congress has also routinely enacted a similar provision in appropriations laws, commonly referred to as the "Hyde Amendment." *See, e.g.*, Consolidated Appropriations Act, 2022, Div. H, Tit. V, §§ 506, 507, Pub. L. No. 117-103, 136 Stat. 49, 496 (2022); *cf. Harris v. McRae*, 448 U.S. 297, 302 (1980).

*Ctr.*, 780 F. Supp. 2d 84, 96 (D. Me. 2010); *California v. United States*, No. 05-cv-328, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008). Thus, both EMTALA's text and the surrounding statutory scheme confirm that EMTALA includes termination of the pregnancy as a potential stabilizing treatment.

To be sure, EMTALA separately provides that a pregnant person may have an "emergency medical condition" in circumstances in which "the health of [the] . . . unborn child . . . [is] in serious jeopardy." 42 U.S.C. § 1395dd(e)(1)(A)(i). That provision ensures that a hospital's EMTALA obligations extend to a scenario where the "unborn child's" health (and not the pregnant patient's health) is threatened. But nothing in the statutory text indicates that Congress intended to limit the EMTALA-mandated care to pregnant patients, or to require a provider to prioritize the fetus's health over the life or health of the pregnant patient. Instead, when a pregnant patient has an emergency medical condition and a physician concludes that stabilizing treatment would require termination of the pregnancy, EMTALA's text leaves that balancing to the pregnant patient—who may decide, after weighing the risks and benefits, whether to accept or refuse the treatment. *See id.* § 1395dd(b)(2) (acknowledging that "the individual" with an emergency medical condition, after being informed "of the risks and benefits" of treatment, may "refuse[] to consent to the . . . treatment"). There is therefore no conflict between EMTALA's provision respecting a pregnant patient and an "unborn child."

The statutory context further refutes any alternative interpretation that EMTALA's reference to "unborn child" *forecloses* abortion as a stabilizing treatment. That interpretation would mean that every time a hospital emergency room terminated a pregnancy to save a pregnant patient's life, the hospital committed an EMTALA violation—contrary to the consistent Congressional understanding reflected above. Moreover, that interpretation would mean that Congress, when enacting EMTALA in 1986, intended to prohibit hospitals from performing abortions, but only those abortions involving a threat to the pregnant patient's life or health. "Congress does not hide elephants in mouseholes," *Cyan, Inc. v. Beaver County Employees Ret. Fund*, 138 S. Ct. 1061, 1071-72 (2018), and the notion that

13

Congress intended EMTALA to forbid necessary medical care is fundamentally at odds with the statute's aim of guaranteeing—not prohibiting—emergency medical care. *See, e.g.*, 131 Cong. Rec. S13892 ("We cannot stand idly by and watch those Americans who lack the resources be shunted away from immediate and appropriate emergency care whenever and wherever it is needed.") (statement of Sen. Durenberger). In sum, Idaho cannot meaningfully dispute that EMTALA's requirement to offer stabilizing treatment includes abortion when a provider determines that treatment is medically necessary.

**B.      Idaho's Near-Absolute Abortion Ban Conflicts with EMTALA**

Because Idaho's law makes it a crime to perform an abortion even when a physician concludes that such a procedure is the necessary stabilizing treatment under EMTALA, Idaho's law is preempted.

As EMTALA provides, "any State or local law requirement" is preempted "to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). This preemption provision encompasses both impossibility and obstacle preemption. *Draper*, 9 F.3d at 1393. Applying these principles to a state law that entitled physicians to forgo medical treatment that EMTALA would otherwise require, the Fourth Circuit found the analysis to be straightforward: "[T]o the extent that [the state law] exempts treating physicians in participating hospitals from providing care [under specified circumstances], it is preempted—it does not allow the physicians . . . to refuse to provide her with [stabilizing treatment]." *Matter of Baby K*, 16 F.3d at 597. Numerous courts have likewise found state laws preempted when they stood as obstacles to EMTALA's civil liability provisions. *See Root v. New Liberty Hosp. Dist.*, 209 F.3d 1068, 1070 (8th Cir. 2000) (Missouri state law preempted to the extent it sought to shield its state-operated hospitals from EMTALA liability); *Burditt v. HHS*, 934 F.2d 1362, 1373-74 (5th Cir. 1991) (physician could not avoid EMTALA liability by relying on state law contract principles, because "[w]e recognize no reason for conditioning the applicability of EMTALA's civil penalty provision on the vagaries of the several state laws"); *see also,*

*e.g.*, *Cox v. Cabell Huntington Hosp., Inc.*, 863 F. Supp. 2d 568, 572 (S.D. W. Va. 2012); *Merce v. Greenwood*, 348 F. Supp. 2d 1271, 1277 (D. Utah 2004). Consistent with these decisions, Idaho's abortion law conflicts with EMTALA, and therefore is preempted, for three independent reasons.

First, Idaho law flatly prohibits—and attaches criminal penalties and loss of license to—medical care that EMTALA requires. It is thus impossible for Idaho medical providers to comply with both Idaho and federal law. The Idaho law establishes an affirmative defense for abortions "necessary to prevent the death of the pregnant woman," Idaho Code § 18-622(3)(a)(ii), but EMTALA requires necessary stabilizing treatment for any "emergency medical condition," which is broader than just those treatments necessary to prevent death. *See* 42 U.S.C. § 1395dd(e)(1)(A) (defining "emergency medical condition" to include conditions that "plac[e] the health of the individual . . . in serious jeopardy," threaten "serious impairment to bodily functions," or risk "serious dysfunction of any bodily organ or part"). Serious medical conditions exist that meet EMTALA's criteria but for which an abortion might not be necessary to prevent death. *See* Part I.A, *supra*; Fleisher Decl. ¶¶ 12-27. Because Idaho law criminalizes terminating a pregnancy in these circumstances, but federal law requires physicians to offer and provide such stabilizing treatment when medically necessary, it is impossible for physicians to comply with both laws; the Idaho law is therefore preempted. *See, e.g.*, *Chamber of Com. of U.S. v. Bonta*, 13 F.4th 766, 781 (9th Cir. 2021) ("An arbitration agreement cannot simultaneously be 'valid' under federal law and grounds for a criminal conviction under state law"); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1028 (9th Cir. 2013) (state law was preempted because it allowed "individuals [to] be prosecuted for conduct that Congress specifically sought to protect").

Second, even in circumstances for which Idaho offers an affirmative defense—where the procedure is "necessary to prevent the death of the pregnant woman," Idaho Code § 18-622(3)(a)(ii)—the affirmative defense structure *itself* "is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Draper*, 9 F.3d at 1394. The Idaho law allows physicians to be

15

prosecuted for performing *any* abortion, regardless of circumstances. Even where the affirmative defense would be satisfied, the Idaho law would still allow for indictment, arrest, and criminal prosecution of physicians each and every time a pregnancy is terminated—including when the physician determined that the procedure was necessary stabilizing treatment under EMTALA. Relegating any exception from criminal liability to an affirmative defense itself poses an obstacle to EMTALA's "overarching purpose of ensuring that patients . . . receive adequate emergency medical care," *Vargas By & Through Gallardo v. Del Puerto Hosp.*, 98 F.3d 1202, 1205 (9th Cir. 1996), because exposure to criminal prosecution will render physicians less inclined or entirely unwilling to risk providing treatment. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350-51 (2001) (holding that fear of being "expose[d] . . . to unpredictable civil liability" under state law, for conduct condoned by federal law, was sufficient for preemption); *Arizona v. United States*, 567 U.S. 387, 408 (2012) (preempting a state law authorizing the arrest of aliens, because "[t]he result could be unnecessary harassment of some aliens . . . who federal officials determine should not be removed").

Third, the Idaho law conflicts with EMTALA by threatening the licenses of medical professionals who perform or assist in providing an abortion. Fleisher Decl. ¶ 27; Corrigan Decl. ¶¶ 32-34; Cooper Decl. ¶ 12; Seyb Decl. ¶¶ 13-14. Specifically, beyond the physician who performs the abortion, *see* Idaho Code § 18-604(12), the Idaho law mandates that any "health care professional . . . who assists in performing or attempting to perform an abortion in violation of this subsection shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense." *Id.* § 18-622(2). This provision could apply to a number of personnel involved in emergency care, including nurses, pharmacists, physicians' assistants, and anesthesiologists. *Cf. id.* §§ 54-1401 (nursing licensure), 54-1718 (pharmacists), 54-1810 (physicians), 54-1810A (physicians' assistants).

Notably, these professionals' licenses can be revoked even for someone else's conduct,

because in any "disciplinary action by an applicable licensing authority," they must likewise prove the elements of the affirmative defense: that the physician appropriately determined the necessity of the abortion and the appropriate manner to perform it. *See* Idaho Code § 18-622(3)(a)(ii)-(iii). The obvious effect will be to discourage medical professionals from participating in *any* abortions. Even if a doctor *tells* a nurse, for example, that an abortion is necessary to prevent death or serious bodily harm, the nurse could still be subject to disciplinary action for assisting in the abortion, and potentially have their license revoked based on the disciplinary board's determination that the *doctor* erred in making a "good faith medical judgment" about how to treat the pregnant patient. *Id.* Thus, the Idaho law penalizes and deters medical professionals from participating in medically necessary abortions, contrary to EMTALA's "overarching purpose of ensuring that patients . . . receive adequate emergency medical care," *Vargas*, 98 F.3d at 1205.

For each of these reasons, § 18-622 conflicts directly with EMTALA, and the United States has demonstrated a likelihood of success on its preemption claim. Section 18-622 is therefore preempted to the extent it allows Idaho to initiate criminal prosecutions against, attempt to revoke the license of, or seek to impose any other form of liability on, medical providers with respect to EMTALA-covered care.

## II. The Equitable Balance Supports Entry of a Preliminary Injunction

The remaining factors all support entry of a preliminary injunction, because allowing the Idaho law to take effect would result in irreparable harm to the public and to the United States' sovereign interests. *Cf. Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that, in suits involving the United States, the balance of equities and "public interest . . . factors merge").

First and most fundamentally, allowing the Idaho law to go into effect would threaten severe harm to pregnant patients in Idaho, who would no longer be guaranteed the critical emergency care to which they are entitled under federal law. *See Valle del Sol*, 732 F.3d at 1029 ("It is clear that it would

not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available." (modifications omitted)). As discussed above, numerous pregnancy-related conditions could require emergency care including abortion, and these conditions have occurred and will inevitably occur again within Idaho. Corrigan Decl. ¶¶ 8, 15, 23, 29; Cooper Decl. ¶¶ 5, 6, 8, 10, 12; Seyb Decl. ¶¶ 6, 7, 9, 11, 13. To take just one example, in Idaho, Medicaid has covered treatment for approximately 100 ectopic pregnancies each year. Fleisher Decl. ¶ 36. Medical literature also confirms that other diagnoses qualifying as "emergency medical conditions" for pregnant individuals also occur frequently. *Id.* ¶¶ 28-38. And Idaho-based physicians have personally treated patients with these types of conditions. Corrigan Decl. ¶ 8 (anticipating that "the number will increase"); Seyb Decl. ¶ 6 (treating "a dozen" per year); Cooper Decl. ¶ 5.

Given that Idaho has approximately 22,000 births per year,[3] and a large number of high-risk pregnancies due to surrogacy, it is virtually guaranteed that these emergency medical conditions will occur for a sizeable number of pregnant patients within Idaho. Corrigan Decl. ¶¶ 8, 19; Fleisher Decl. ¶¶ 36-38. Allowing the law to go fully into effect would discourage physicians from providing necessary care in emergency circumstances, resulting in significant and irreparable harm to numerous pregnant patients within Idaho. Every day that the law is in effect, there is a likelihood that some pregnant persons suffering medical emergencies will face irreversible health consequences, such as strokes and organ failure, and some are likely to die. *See* Fleisher Decl. ¶¶ 36-38; Corrigan Decl. ¶¶ 8, 17, 23-24, 29; Cooper Decl. ¶ 6, 8, 10, 12; Seyb Decl. ¶ 7, 9, 11, 13; *see also Rodde v. Bonta*, 357 F.3d 988, 999 (9th Cir. 2004) (irreparable harm "includes delayed and/or complete lack of necessary treatment, and increased pain and medical complications"); *Beltran v. Myers*, 677 F.2d 1317, 1322 (9th Cir. 1982) ("Plaintiffs have shown a risk of irreparable injury, since enforcement of the California rule may deny

---

[3] Idaho Dep't of Health & Welfare, *2010-2020 Idaho Resident Births*, *VS Natality – Data Results, 2010-2020*, https://www.gethealthy.dhw.idaho.gov/idaho-births-vital-statistics (attached as Ex. G-C).

them needed medical care.").

Indeed, patients in Idaho are already facing dire situations. Dr. Corrigan treated a patient who, after initially being denied care, arrived at the hospital two weeks later with an infection in her uterus, at risk of sepsis, and termination was necessary to preserve her life. Corrigan Decl. ¶¶ 12-15. And Dr. Seyb recently received a call from a physician whose patient was "clear[ly]" "in danger" due to severe bleeding, but the physician feared the ramifications of providing medically necessary care. Seyb. Decl. ¶ 13. Had § 18-622 been in effect, the life-saving treatment these patients received could have been further delayed or denied. Corrigan Decl. ¶¶ 31-35; Cooper Decl. ¶ 12; Seyb Decl. ¶¶ 13-14.

Moreover, Idaho's law also interferes with the United States' sovereign interest in ensuring the proper administration of federal law and the Medicare program. *See, e.g.*, *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations."); *cf. Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000). The United States has agreed to provide federal Medicare funds to hospitals in Idaho, in return for those hospitals promising (among other things) to comply with EMTALA for all patients, not just for Medicare beneficiaries. *See* 42 U.S.C. § 1395cc(a)(1)(I). But the Idaho law seeks to disrupt the program and deprive the United States of the benefit of its bargain by prohibiting Idaho hospitals from performing EMTALA-mandated services, notwithstanding that hospitals' receipt of Medicare funds is conditioned on them doing so. Thus, the Idaho law threatens "harm to the administration and integrity of Medicare," *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003), because payments to hospitals will no longer guarantee the availability of services that Congress mandated. Wright Decl. ¶¶ 14, 16. This harm is substantial: the United States provided over $3 billion in Medicare funding to hospitals within Idaho over fiscal years 2018-2020, with approximately $74 million attributable to emergency departments. Shadle Decl. ¶¶ 6-8.

The Idaho law also interferes with the written agreements that the United States has entered

into with hospitals pursuant to Medicare. These Spending Clause agreements likewise require hospitals to comply with EMTALA. *See* Background, Part I.C, *supra*. It is well-settled that third parties may not interfere with the terms of Spending Clause legislation, *see Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 270 (1985), but here, the State of Idaho is directly interfering with the agreements between the United States and the 52 hospitals within Idaho that are receiving Medicare funds. Thus, irreparable harm exists on this basis as well.

Finally, on the other side of the ledger, the State of Idaho will suffer no cognizable harm as a result of the requested preliminary relief. Idaho's abortion law is not currently in effect, has never been in effect, and therefore enjoining it from going into effect, as applied to EMTALA-mandated care, would simply preserve the status quo during the short period necessary for further litigation. *See All. for Wild Rockies v. Pierson*, 550 F. Supp. 3d 894, 898 (D. Idaho 2021) ("The purpose of a preliminary injunction is to preserve the status quo and prevent the 'irreparable loss of rights' before a final judgment on the merits[.]"). Given the significant harms that would result if the Idaho law were to go into effect to prohibit EMTALA-mandated care—both for pregnant individuals as well as the United States' sovereign interests—and the corresponding lack of harm to the State of Idaho from a temporary injunction against certain applications of its law, the equitable factors plainly favor entry of preliminary relief against the Idaho law's enforcement.

## CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction prohibiting the State of Idaho—including all of its officers, employees, and agents—from enforcing Idaho Code § 18-622(2)-(3) as applied to EMTALA-mandated care.

Dated: August 8, 2022

SAMUEL BAGENSTOS
General Counsel

PAUL R. RODRÍGUEZ
Deputy General Counsel

DAVID HOSKINS
Supervisory Litigation Attorney

JESSICA BOWMAN
MELISSA HART
Attorneys
U.S. Department of Health & Human Servs.
200 Independence Ave., SW
Washington, DC  20201

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

JOSHUA REVESZ
Counsel, Office of the Assistant Attorney
General

ALEXANDER K. HAAS
Director, Federal Programs Branch

DANIEL SCHWEI
Special Counsel

*/s/ Lisa Newman*
LISA NEWMAN (TX Bar No. 24107878)
ANNA DEFFEBACH
EMILY NESTLER
CHRISTOPHER A. EISWERTH
Trial Attorneys

JULIE STRAUS HARRIS
Senior Trial Counsel

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 514-5578
lisa.n.newman@usdoj.gov

*Counsel for Plaintiff*