EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

　　　　　　Plaintiff,

v.

THE STATE OF IDAHO,

　　　　　　Defendant.

Case No. 1:22-cv-329

## DECLARATION OF LEE A. FLEISHER, M.D.

I, Lee A. Fleisher, M.D., of the Centers for Medicare & Medicaid Services (CMS), declare that the following statements are true and correct to the best of my knowledge and belief, and that they are based on my personal knowledge as well as information provided to me in the ordinary course of my official duties.

1.　　I am employed by the United States Department of Health and Human Services (HHS) in CMS. I am the Chief Medical Officer and Director of the Center for Clinical Standards and Quality for CMS. In this capacity, I am responsible for executing all national clinical, quality, and safety standards for all Medicare and Medicaid-certified healthcare facilities and providers, as well as establishing coverage determinations for items and services that improve health outcomes for Medicare beneficiaries.

2.　　I am also currently a Professor Emeritus of Anesthesiology and Critical Care at the University of Pennsylvania Perelman School of Medicine and continue to provide anesthesia care approximately three times per month at the Hospital of the University of Pennsylvania. From 2004 until 2020, I was the Robert D. Dripps Professor and Chair of Anesthesiology and Critical Care

1

and Professor of Medicine at the University of Pennsylvania and Chair of the Department of Anesthesiology and Critical at the Hospital of the University of Pennsylvania (HUP) and Penn Presbyterian Medical Center. Prior to joining the University of Pennsylvania, I was an attending anesthesiologist at The Johns Hopkins Hospital (JHH) from 1992-2003, where I provided obstetrical anesthesia and anesthesia for emergency surgical procedures. While at JHH, I was appointed in 1999 as the Clinical Director of Operating Rooms, a position I held until I moved to the University of Pennsylvania in 2004.

3.      In addition, I have held a number of other faculty, hospital, and administrative appointments, which are set forth in my curriculum vitae, which is attached hereto as Ex. A. Among other appointments listed on my CV, since 2007 I have served as an elected member of the National Academy of Medicine (NAM) (formerly Institute of Medicine), and between 2016 and 2018, I served as a member of NAM's Committee on Reproductive Health Services for Assessing the Safety and Quality of Abortion Care, and was an author of the 2018 report on The Safety and Quality of Abortion Care in the United States, available at https://www.ncbi.nlm.nih.gov/books/NBK507236/. My work with this committee on safety of abortion services was focused on risks to women both from the abortion procedure itself and from delays in obtaining abortion procedures. I was also the President of the Medical Board of HUP from 2014-16 and a member of the Board of Trustees of HUP from 2012-16, in which capacity I oversaw the review and approval of hospital policies and procedures including those pursuant to EMTALA. Additionally, I was Chair of the Credentials Committee of HUP from 2008-14, in which capacity I oversaw the evaluation and credentialing of all medical providers on the staff.

4.      I graduated with a B.A. from the University of Pennsylvania in Molecular Biology in 1981. I earned an M.D. from the State University of New York at Stony Brook in 1986. I

2

completed an internship in surgery at the University of Minnesota from 1986 to 1987, and a residency in anesthesiology at Yale University from 1987 to 1990.

5.     In my thirty-plus years as a medical doctor, I have had extensive experience providing anesthesia for obstetrical care, including through the provision of anesthesia for the treatment of pregnancy-related conditions that threaten the life and/or health of pregnant patients as well as review of complications of care in my role as Chair of the Department. For example, in my practice at JHH from 1992-2003, I provided emergency obstetrical care approximately 3 times per month. In my role as Clinical Director of the Operating Rooms at JHH, I evaluated and determined the urgency of proceeding to surgery for all emergency surgical cases, including ectopic pregnancies, and provided anesthetic care for many pregnant individuals requiring emergent care including vaginal bleeding and preeclampsia/eclampsia.

6.     In addition, through my official duties at CMS, I am familiar with federal Medicare and Medicaid requirements, as well as data and other information collected by CMS and HHS regarding medical risks related to pregnancy. And based on my role at CMS, my roles as a medical practitioner, and my leadership roles in several hospitals and medical organizations, I am experienced with the requirements of the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, including how they arise in the actual practice of medicine.

### IDAHO LAW AND EMTALA

7.     I understand that, if the Idaho law goes into effect on August 25, 2022, "[e]very person who performs or attempts to perform an abortion . . . commits the crime of criminal abortion" and that the crime of criminal abortion is a felony that is punishable by up to five years in prison and loss of medical license. Idaho Code § 18-622(2). I further understand that Idaho law defines "abortion" as "the use of any means to intentionally terminate the clinically diagnosable

3

pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." Idaho Code § 18-622. This definition of "abortion" in the Idaho Code covers some procedures that would not be characterized as an abortion in the medical community. In some circumstances in which a pregnancy is nonviable and/or termination of pregnancy is necessary to treat a pregnant patient's medical condition, physicians may not consider that treatment to be properly characterized as an abortion.

8.      I further understand that Idaho law includes an "affirmative defense" allowing physicians to avoid criminal liability only if they can prove, among other things, that an abortion was "necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(3)(a)(ii).

9.      In addition, I am aware of EMTALA's requirements for hospitals participating in Medicare. In particular, EMTALA requires that "[i]f any individual . . . comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—(A) with the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility" in accordance with certain requirements in subsection (c) of the statute. 42 U.S.C. § 1395dd. A hospital may not discharge or otherwise transfer a person with a medical condition who has not been stabilized unless the individual requests a transfer or a physician certifies that the benefits of a transfer to another medical facility outweighs the increased risks to the patient. 42 U.S.C. § 1395dd(c).

10.     I am aware that EMTALA defines "emergency medical condition" as: "(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the

4

woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or

(iii) serious dysfunction of any bodily organ or part; or (B) with respect to a pregnant woman who

is having contractions—(i) that there is inadequate time to effect a safe transfer to another hospital

before delivery, or (ii) that transfer may pose a threat to the health or safety of the woman or the

unborn child." 42 U.S.C. § 1395dd(1).

11.    I am aware that EMTALA defines "to stabilize" to mean "to provide such medical

treatment of the condition as may be necessary to assure, within reasonable medical probability,

that no material deterioration of the condition is likely to result from or occur during the transfer

of the individual from a facility." 42 U.S.C. § 1395dd(e)(3).

## EMERGENCY MEDICAL CONDITIONS IMPLICATED BY IDAHO LAW

12.    Based on my experience as a medical practitioner and as the Chief Medical Officer

at CMS, I know that pregnant patients experience a number of medical conditions that fall within

the definition of "emergency medical condition" set forth in EMTALA. This is because for these

medical conditions, "in the absence of immediate medical attention," which can include

monitoring, treatment, or both, the condition "could reasonably be expected to result in" the

patient's health being "plac[ed] . . . in serious jeopardy," "serious impairment to [the patient's]

bodily functions," or "serious dysfunction of any bodily organ or part [of the patient]," as described

more fully below.  I also know that the appropriate stabilizing treatment that is necessary to avoid

"serious jeopardy," "serious impairment," and "serious dysfunction," which would otherwise

result from those conditions, is very frequently—and in some cases nearly always—a form of

treatment that is covered by the definition of "abortion" set forth in the Idaho Code. EMTALA

requires providing such care independent of whether doing so is, or well before doing so becomes,

necessary to prevent the patient's death. As explained further below, in some cases where the

5

patient's health is unambiguously threatened, it may be less clear whether there is also a certainty of death without stabilizing treatment—and a physician may not ever be able to confirm whether death would result absent immediate treatment. EMTALA does not allow leaving the patient untreated when doing so would irreparably risk or harm their health, as with the conditions discussed below.

13.     For example, a pregnant individual may present to an emergency department with bleeding, pelvic pain or severe abdominal pain that, when evaluated, is determined to be caused by an ectopic pregnancy. An ectopic pregnancy is when an embryo or fetus grows outside of the uterus, frequently in a fallopian tube. An ectopic pregnancy in a fallopian tube is an emergency medical condition that places the patient's life in jeopardy because it will cause the fallopian tube to rupture and in the vast majority of cases cause significant and potentially fatal internal bleeding. In most cases, the physician cannot reasonably know when that rupture will occur—it could happen within minutes, hours or days of the physician's examination—but without immediate treatment it is reasonably probable that the patient's condition will continue to deteriorate. Accordingly, given this serious risk of unknown imminence, where a patient suffers from an ectopic pregnancy, especially in a fallopian tube, the appropriate stabilizing treatment is nearly always emergency surgery and removal of the involved fallopian tube, including the embryo or fetus, or administration of a drug to cause embryonic or fetal demise. One of these two treatments is necessary because of the inevitability that the fallopian tube will rupture absent surgery or intervention with medication that causes embryonic or fetal demise.  There is an extremely high risk that such rupture would result in the patient bleeding to death. Because a physician can determine with reasonable certainty that an ectopic pregnancy exists and that, depending upon the location, a rupture will occur as a result, but the physician cannot discern with reasonable certainty

6

the time at which that rupture will occur, it is necessary that an ectopic pregnancy be treated immediately or else the patient's life and health will likely continue to deteriorate and remain at constant and ongoing risk.

14.     Even though a physician at a hospital where EMTALA applies could conclude that this treatment is required for an ectopic pregnancy, particularly one involving a fallopian tube, Idaho law prohibits this treatment. Idaho's definition of abortion would include both the medical and surgical treatment described in ¶ 13, because both cause embryonic or fetal demise in a clinically diagnosable pregnancy. This treatment would be prohibited by Idaho law even though an ectopic pregnancy has no chance of maturing into a viable child. Additionally, despite the extremely serious risks posed by an ectopic pregnancy, particularly in a fallopian tube, and the inevitability of a rupture, which are apparent at the time when treatment is required to address those risks, a physician may not be able to establish or know, with certainty, that termination of the pregnancy is "necessary to prevent the death of the woman." However, that does not change the fact that the patient's condition will very likely deteriorate without the necessary treatment, and that failure to provide the necessary treatment will seriously jeopardize the patient's health and/or life in the process.

15.     As another example, a pregnant individual may present to the emergency room with chest pain and severe shortness of breath, requiring supplemental oxygen to keep their blood oxygen levels in reasonable range. The patient may be early in or mid-pregnancy and during the evaluation may be diagnosed with severe heart failure related to long-standing pulmonary hypertension (i.e., elevated blood pressure in the vessels to the lungs), or a massive pulmonary embolism (i.e., a blood clot to the lungs). For some patients, pregnancy can substantially exacerbate the heart failure and initially cause the patient to have difficulty breathing at rest that

7

can then turn into further complications from a lack of oxygen as well as a drop in blood pressure. Some pregnant patients may present to the emergency room when they are in extremis, and a physician will need to place the patient on a ventilator and prescribe medications to maintain the blood pressure. Severe heart failure, especially from pulmonary hypertension or a pulmonary embolism, can be an emergency medical condition because if left untreated, the patient's condition will continue to deteriorate and cardiac arrest or inability to oxygenate the patient could result, which places the patient's life, health, and bodily organs in jeopardy. In some circumstances, the appropriate stabilizing treatment for a patient suffering from severe heart failure is treatment of the heart and blood vessels through medications. In severe cases, the physician may determine that, despite other medical treatment, the patient continues to have worsening deterioration of blood oxygenation and maintenance of blood pressure. In such circumstances, the physician could conclude that termination of the pregnancy is medically necessary because, by virtue of the severity of the symptoms, there is a high probability of the pregnant patient's death or impairment or severe dysfunction of bodily organs (such as the lungs, heart, and kidneys) absent that termination.

16. Even though a physician at a hospital where EMTALA applies could conclude that this treatment is required for severe heart failure, Idaho law prohibits this treatment because it would cause embryonic or fetal demise. This treatment would be prohibited by Idaho law even though the pregnant individual with this condition would most likely not survive to carry the pregnancy materially further. Additionally, despite the extremely serious risks posed by severe heart failure, which are apparent at the time when treatment is required to address those risks, a physician may not be able to establish or know, with certainty, that termination of pregnancy is "necessary to prevent the death of the woman." However, that does not change the fact that the

8

patient's condition will very likely deteriorate without the necessary treatment, and that failure to provide the necessary treatment will seriously jeopardize the patient's health and/or life in the process.

17.     As a third example, a pregnant individual may present to the emergency department with nausea and shortness of breath, which an initial evaluation may diagnose as resulting from new onset of high blood pressure.  Pre-eclampsia is when high blood pressure and high levels of protein in the urine develop in a pregnant individual, usually midway through the pregnancy.  Pre-eclampsia can quickly progress to eclampsia with the onset of seizures, and a physician cannot discern when that progression to seizures will occur with reasonable medical certainty in all cases, especially when the blood pressure cannot be controlled. Pre-eclampsia and eclampsia are emergency medical conditions because they place the patient's life in jeopardy or can cause serious impairment to bodily functions. Without treatment for severe pre-eclampsia/eclampsia, the patient's condition is reasonably likely (indeed nearly certain) to deteriorate. Specifically, the seizures that characterize the transition from pre-eclampsia to eclampsia can cause coma, pneumonia from the aspiration of stomach contents, kidney failure, stroke and even cardiac arrest. While the only curative treatment for pre-eclampsia or eclampsia is delivery of the fetus, in most and many cases, the pregnant patient with pre-eclampsia will respond reasonably promptly to medications to control their blood pressure, reduce their chances of seizures, and mature the fetus' lungs to allow delivery as soon as possible. However, in some cases in which high blood pressure and/or the seizures of severe pre-eclampsia/eclampsia cannot be controlled, termination of the pregnancy is medically necessary. In such cases, absent termination of the pregnancy, death or severe bodily dysfunction of the pregnant patient is the reasonably probable outcome.

9

18.    Even though a physician at a hospital where EMTALA applies could conclude that this treatment is required for severe pre-eclampsia or eclampsia, Idaho law prohibits this treatment because the treatment would cause fetal demise. This treatment would be prohibited by Idaho law even though the pregnant individual with this condition would most likely not survive to carry the pregnancy materially further. Additionally, despite the extremely serious risks posed by this severe preeclampsia/eclampsia, which are apparent at the time when treatment is required to address those risks, a physician may not be able to establish or know, with certainty, that termination of pregnancy is "necessary to prevent the death of the woman." However, that does not change the fact that the patient's condition will deteriorate without the necessary treatment, and that failure to provide the necessary treatment will seriously jeopardize the patient's health and/or life in the process.

19.    As a fourth example, a pregnant individual may present to the emergency department with a life-threatening infection of the uterine contents. Such an infection may occur when there is premature rupture of the membranes (PROM), which is when the amniotic sac surrounding the embryo or fetus ruptures and the uterus or embryo/fetus can become infected. The infection can progress to sepsis wherein multiple body organs and functions can start failing including the heart, lungs and blood pressure, which could lead to death. Sepsis can progress quickly, and a physician cannot discern with reasonable medical certainty if or when the sepsis will resolve or result in organ failure or death without immediate treatment. Septic infection is an emergency medical condition because it places the patient's life and health in jeopardy or can cause serious impairment to bodily functions; if untreated, it can lead to kidney failure and even cardiac arrest. In many cases, the pregnant patient can respond to treatment with antibiotics and concurrently be administered medications to support their blood pressure. However, if the

antibiotics cannot control the infection, then removal of the source of the infection is necessary—and in circumstances in which the embryo or fetus is infected and is causing the sepsis, that necessary treatment could include removal of the embryo or fetus, which may result in embryonic or fetal demise. Absent this treatment for severe sepsis unresponsive to antibiotics and blood pressure support, the patient's condition will deteriorate, and death or severe bodily dysfunction of the pregnant patient is the reasonably probable outcome.

20.     Even though a physician at a hospital where EMTALA applies could conclude that this treatment is required for severe sepsis, Idaho law prohibits this treatment because the treatment would cause embryonic or fetal demise. This treatment would be prohibited by Idaho law even though the pregnant individual with this condition would most likely not survive to carry the pregnancy materially further. Additionally, despite the extremely serious risks posed by severe sepsis, which are apparent at the time when treatment is required to address those risks, a physician may not be able to establish or know, with certainty, that termination of pregnancy is "necessary to prevent the death of the woman." However, that does not change the fact that the patient's condition will deteriorate without the necessary treatment, and that failure to provide the necessary treatment will seriously jeopardize the patient's health and/or life in the process.

21.     As a fifth example, a pregnant individual may present to the emergency department with vaginal bleeding. Vaginal bleeding may occur in some of the previously described conditions, but it can also be a result of a placental abruption, which occurs when the placenta partly or completely separates from the inner wall of the uterus. Placental abruption with uncontrolled and catastrophic bleeding is an emergency medical condition that places the patient's life in jeopardy or can cause serious impairment to bodily functions. This is because catastrophic and/or uncontrolled bleeding can lead to shock, which can result in organ dysfunction such as kidney

11

failure, and even cardiac arrest. The placental abruption can be diagnosed in the emergency department by examination, including ultrasound, to check the location of the bleeding. If bleeding will not stop, then a physician could conclude that the necessary stabilizing treatment for the uncontrolled and catastrophic bleeding includes removal of the fetus or the entire uterus (*i.e.* a hysterectomy, which also results in termination of the pregnancy), which could result in fetal demise. Absent this treatment for placental abruption where indicated, the patient's condition will deteriorate and death or severe bodily dysfunction of the pregnant patient is the reasonably probable outcome.

22.     Even though a physician at a hospital where EMTALA applies could conclude that this treatment is required for placental abruption, Idaho law prohibits this treatment because termination would cause fetal demise. This treatment would be prohibited by Idaho law even though the pregnant individual with a placental abruption would most likely not survive to carry the pregnancy materially further. Additionally, despite the extremely serious risks posed by placental abruption with catastrophic or uncontrolled bleeding, which are apparent at the time when treatment is required to address those risks, a physician may not be able to establish or know, with certainty, that termination of pregnancy is "necessary to prevent the death of the woman." However, that does not change the fact that the patient's condition will deteriorate without the necessary treatment, and that failure to provide the necessary treatment will seriously jeopardize the patient's health and/or life in the process.

23.     The emergency medical conditions described in paragraphs 13-22 above are just some examples of those that present in pregnant patients, as to which the treating physician could, in the exercise of their professional medical judgment, determine that the stabilizing treatment would include termination of pregnancy. Myriad other medical conditions that present in pregnant

12

patients may cause acute symptoms that place the health of the pregnant patient in serious jeopardy, or else risk serious impairment to the pregnant patient's bodily functions or dysfunction of a bodily organ or part. How emergency conditions present in a pregnant patient will often vary depending on the patient's specific circumstances, and termination of pregnancy may be a necessary treatment to stabilize the patient based on their physical circumstances.

24.     For each of the medical conditions described above (as well as other emergency medical conditions that present in pregnant patients), in some cases, termination of pregnancy would be the only option to ensure that a pregnant patient will not die, or suffer a serious impairment to their bodily functions, or serious dysfunction of any bodily organ or part as a result of their emergency medical condition. In that regard, a physician could conclude that termination of the pregnancy is the only way to stabilize the pregnant patient as required by EMTALA.

25.     In other words, pregnancy termination may be necessary to ensure that "no material deterioration of the patient's condition is likely to result from or occur during the transfer [including discharge] from a facility," as is required by EMTALA. 42 U.S.C. § 1395dd(e)(3). Yet, under the Idaho abortion ban, physicians at hospital emergency rooms could be prosecuted for administering necessary stabilizing treatment to patients with these conditions despite knowing that the patients will suffer severe bodily impairment or serious jeopardy to their health without such treatment.

26.     Indeed, under the definition of "criminal abortion" in the Idaho law, this is true even in cases in which the physician knows that there is no chance that the pregnancy will result in a live birth. Because the Idaho law prohibits termination of any pregnancy that would "cause the death of the unborn child," a physician would be forbidden from administering treatment even if: (1) a patient presents with an emergency medical condition; (2) which will render it impossible

13

for the pregnancy to result in a live birth; but (3) embryonic or fetal demise has not yet occurred at the time the patient arrives at the hospital. Under those circumstances, a physician following Idaho law would be required to wait for embryonic or fetal demise before stabilizing the pregnant patient, causing the pregnant patient to suffer through the emergency medical condition, often with great pain and increased risk to their health and/or life.

27.     When stabilizing treatment is provided at a hospital that includes termination of the pregnancy (including "abortion" as defined under Idaho law), that procedure may require the participation of numerous personnel—not just the physician performing the procedure, but also frequently nurses, operating room technicians, anesthesiologists or certified registered nurse anesthetists, pharmacists, physician's assistants, or other medical health professionals.

## PREVALENCE OF EMERGENCY PREGNANCY CONDITIONS

28.     Based on my role at CMS and my experience in public health, I am aware of statistics regarding the prevalence of emergency pregnancy conditions, and I am experienced in identifying reliable data about those conditions. Data relating to health risks associated with pregnancy confirms that a significant percentage of pregnant patients experience emergency health conditions, including conditions as to which termination of pregnancy is the appropriate stabilizing treatment.

29.     According to the Centers for Disease Control and Prevention (CDC), the overall maternal mortality rate in the United States in 2020 was 23.8 maternal deaths per 100,000 live births. *See* Donna L. Hoyert, CDC, *Maternal Mortality Rates in the United States*, 2020 (Feb. 23, 2022), https://www.cdc.gov/nchs/data/hestat/maternal-mortality/2020/maternal-mortality-rates-2020.htm. That represents an increase from 17.4 and 20.1 maternal deaths per 100,000 live births

14

in 2018 and 2019, respectively. *See id.* The maternal mortality rates for Black women are significantly higher and have similarly increased between 2018 and 2020. *See id.*

30.     According to CDC, for each maternal death, more than 50 pregnant women suffer significant short- or long-term consequences to their health. *See* CDC, *Severe Maternal Morbidity: Rate per 10,000 Delivery Hospitalizations* (Feb. 10, 2020), https://www.cdc.gov/reproductivehealth/maternalinfanthealth/smm/rates-severe-morbidity-indicator.htm. These consequences include heart attacks, sepsis, eclampsia, and kidney failure. *Id.*

31.     Pregnant patients regularly come to hospitals with emergency medical conditions, including the conditions discussed above.

32.     I am aware that the American College of Obstetricians and Gynecologists (ACOG) has reported, for instance, that ectopic pregnancies account for approximately two percent of all pregnancies, though the incidence could be significantly higher given the lack of recent national surveillance data. *See* ACOG Practice Bulletin No. 193 (Mar. 2018) (attached as Exhibit B). I am also aware that data from 2011 to 2013 shows that ruptured ectopic pregnancies account for 2.7 percent of all pregnancy-related deaths and are the leading cause of hemorrhage-related maternal deaths. *See id.*

33.     I am also aware that CDC estimates that pre-eclampsia happens in 1 in 25 pregnancies. *See* CDC, *High Blood Pressure During Pregnancy* (May 6, 2021), https://www.cdc.gov/bloodpressure/pregnancy.htm  I am further aware that ACOG has reported that the rate of pre-eclampsia in the United States increased by 25 percent between 1987 and 2004. *See* ACOG Practice Bulletin No. 222 (June 2020) (attached as Exhibit C).

34.     I am also aware that ACOG has reported that cardiovascular disease— including as a result of hypertension—affects approximately one to four percent of pregnancies in the United

15

States per year and that cardiovascular disease accounts for 26.5 percent of pregnancy-related deaths in the United States. *See* ACOG Practice Bulletin No. 212 (May 2019) (attached as Exhibit D). ACOG additionally reports that hypertensive disorders affect up to ten percent of pregnancies and that, in those affected pregnancies, pregnant persons are eight to thirteen times more likely to suffer a myocardial infarction (heart attack).

35.     Further, I am aware that ACOG has reported that premature rupture of membranes (PROM) complicates two to three percent of pregnancies in the United States. *See* ACOG Practice Bulletin No. 217 (Mar. 2020) (attached as Exhibit E). ACOG has also reported that intraamniotic infection occurs in 15 to 25 percent of preterm PROM cases and postpartum infection occurs in 15 to 25 percent of cases, with the risk higher in cases involving earlier gestational ages.

36.     As described above, these conditions frequently require emergency care, including abortion, and given these nationwide numbers, it is not surprising that pregnant patients in Idaho are among persons who require treatment for medical conditions that frequently present as medical emergencies. For example, Idaho providers made claims to Medicaid and the Children's Health Insurance Program ("CHIP") for payment for: 98 ectopic pregnancies that were treated with pregnancy termination in 2018; 72 ectopic pregnancies were treated with pregnancy termination in 2019; 103 ectopic pregnancies were treated with pregnancy termination in 2020; and 108 ectopic pregnancies were treated with pregnancy termination in 2021. Notably, these numbers are based only on patients who are Medicaid or CHIP beneficiaries, not all patients in Idaho—which means the number of patients who presented with ectopic pregnancies in Idaho during those years is likely even higher overall.

37.     As discussed above, similar treatment for ectopic pregnancy will no longer be available under Idaho's new abortion law. Based on the consistent historical data, it is a near-

16

certainty that patients with ectopic pregnancies will continue to require emergency medical treatment that qualifies as a prohibited "abortion" under Idaho law—just like the hundreds of patients who have needed that treatment in recent years. Without access to that treatment, the inevitable result for those patients will be substandard care and dire consequences for their health.

38.     With respect to other emergency pregnancy conditions, including those described above in paragraphs 15-22, there is not similar readily available Medicaid/CHIP data. This does not reflect an absence of those conditions for patients in Idaho, but rather only the realities of how hospitals and other providers track diagnose/s and treatments, and how the federal government and private insurance companies reimburse for the costs of health care. However, based on my experience practicing medicine for more than 30 years, it is virtually certain that pregnant persons in Idaho present themselves in emergency rooms across the state each year with these emergency conditions and that the proper treatment in at least some cases would be termination of the pregnancy. Under the Idaho law, that treatment would be unavailable, and the consequence of denying that care to those patients will be tragic.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 8th day of August, 2022 in Philadelphia, PA.

Lee A. Fleisher, M.D.

17