# Exhibit B

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**
**SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>v.<br><br>THE STATE OF IDAHO,<br><br>      Defendant. | Case No. 1:22-cv-329<br><br>**DECLARATION OF**<br>**DR. EMILY CORRIGAN** |

## DECLARATION OF DR. EMILY CORRIGAN IN SUPPORT OF THE UNITED STATES' MOTION FOR A PRELIMINARY INJUNCTION

I, Emily Corrigan, being first duly sworn under oath, state and depose upon personal knowledge as follows:

1. I am a board-certified Obstetrician-Gynecologist ("Ob-Gyn") physician at Saint Alphonsus Regional Medical Center in Boise, Idaho. In that capacity, I specialize in, among other aspects of care, inpatient management of complicated pregnancies and emergency assessment and management of pregnant women. Saint Alphonsus Regional Medical Center is a tertiary care medical center with a trauma designation and a Level 3 Neonatal Intensive Care Unit. Thus, it is a regional referral center for complicated pregnancies and frequently cares for patients with traumatic injuries during pregnancy. I submit this declaration in support of the Motion for Preliminary Injunction filed by the United States in the above-captioned matter. Unless otherwise stated, the facts set forth herein are true of my own personal knowledge, and if called as a witness to testify in this matter, I could and would testify competently thereto.

1

2. I graduated from the University of California, San Francisco ("UCSF") School of Medicine in 2006 and subsequently completed my residency in Obstetrics and Gynecology at the University of Maryland Medical Center in 2011. I am Board Certified in General Obstetrics and Gynecology by the American Board of Obstetrics and Gynecology.

3. In 2019, I moved to Idaho after accepting my current employment position as an Obstetric Hospitalist at Saint Alphonsus Regional Medical Center in Boise, Idaho. I have subsequently been elected to the position of Vice Chair of the Department of Obstetrics and Gynecology.

4. My family and I were drawn to Idaho for its natural beauty—including vast mountains and beautiful forests and all the recreation opportunities incumbent therein—along with its desirable pace of life and friendly communities. I also came to Idaho, in part, to fill a serious need for physicians generally, and especially Ob-Gyns, in the state.

5. There are zero residency programs in Obstetrics and Gynecology in the State of Idaho, meaning that all Ob-Gyns must be recruited from out of state. Idaho also has one of the fastest growing populations in the country. This dynamic has created a significant shortage of Ob-Gyns in our state.

6. Over the course of my nearly 15-year career as a practicing Ob-Gyn, I have treated thousands of pregnant women and delivered thousands of healthy babies.

7. Although as physicians we work to help our patients to experience normal pregnancies, culminating in the delivery of a healthy baby, not all pregnancies are as simple and complication-free as physicians and patients would like.

8. At Saint Alphonsus Regional Medical Center, we do not perform purely elective abortions, which are abortions performed in pregnancies that do not seriously threaten the health

or life of the mother. However, there are situations where pregnancy termination in the form of an abortion is the only medical intervention that can preserve a patient's health or save their life. I will describe several recent examples of patients my colleagues and I have treated, which illustrate the dire circumstances that can make it medically necessary to terminate a pregnancy. Currently, our institution cares for patients in circumstances like these once every several months. However, I expect that this number will increase once Idaho Code § 18-622 goes into effect.

### Jane Doe 1

9.  Jane Doe 1 is a woman in her mid-20s who lives in a rural part of the state hundreds of miles away from Boise. I treated her and the facts I describe here were either personal observations I made or facts relayed to me for the purpose of treating Jane Doe 1.

10. Jane Doe 1 has two children of her own. Like many other women in our state, she decided to become a surrogate (also called gestational carrier) to provide additional income for her family and to help others who are unable to produce their own children. The intended parent and biological father of Jane Doe 1's pregnancy lives overseas.

11. When Jane Doe 1 was at 19-weeks' gestation, she was diagnosed with a pregnancy complication called preterm premature rupture of membranes ("PPROM"). PPROM is a premature breaking open of the amniotic sac. It increases the risk of life-threatening intra-amniotic infection (chorioamnionitis) and also increases the risk that the fetus will not develop normally due to a decrease in the amount of amniotic fluid.

12. Jane Doe 1 consulted with her personal obstetrician after the diagnosis of PPROM but was not advised that evacuation of the uterus was appropriate or necessary. Instead, she was incorrectly advised that terminating the pregnancy was illegal in Idaho following the Supreme

Court's decision in *Dobbs* (which had occurred one week prior) due to Idaho's trigger law (even though Idaho Code § 18-622 was not yet in effect).

13. As her condition worsened, Jane Doe 1 spent several days in consultation with her surrogacy agency to determine her options. Eventually, she drove to Boise and presented to the emergency department at another hospital in the area. At this point, Jane Doe 1 had been experiencing cramps and chills for three days—signs of infection. The treating physician gave her oral antibiotics and told her to return to her regular physician in a week.

14. Administration of oral antibiotics and discharge home is not the medically accepted standard of care for suspected chorioamnionitis. At this point, Jane Doe 1 was experiencing an increased risk of sepsis (a life-threatening condition) and a deepening infection of the uterus that, in addition to the deficient amniotic fluid, would have a direct negative impact on the fetus. In such cases, evacuation of the uterus and intravenous ("IV") antibiotics is the only medically acceptable form of treatment.

15. Eventually, Jane Doe 1 presented to the Labor and Delivery Unit at Saint Alphonsus Regional Medical Center, where I first met her. She had been diagnosed with PPROM almost two weeks prior to presentation and had been experiencing worsening uterine cramping and chills for the past three days. I informed Jane Doe 1 that although fetal cardiac activity was still present, termination of pregnancy was the necessary course of action to preserve her life. The overseas intended parent for whom Jane Doe 1 was carrying the baby agreed with Jane Doe 1 that terminating the pregnancy was the best course of action due to the serious risks to both Jane Doe 1's life and the health of his future child. I discussed with her medical and surgical options for uterine evacuation, and she chose a medical termination.

16.     Shortly after she was given medication to induce labor, Jane Doe 1 spiked a high fever. She delivered the fetus after several hours; however, the placenta would not detach from the uterus, causing her to start hemorrhaging. I transferred Jane Doe 1 to the operating room for a uterine curettage to remove the retained placenta. She was also given multiple medications to decrease the bleeding from her uterus. Still, she lost almost two liters of blood and required a blood transfusion. She was continued on IV antibiotics for another 24 hours and was discharged home in stable condition on hospital day number three.

17.     Had Jane Doe 1 not received medical care to terminate her pregnancy, her intraamniotic infection would likely have led to sepsis thereby significantly increasing her chance of death.

18.     If Idaho Code §18-622 was in effect when Jane Doe 1's case presented, I would have felt the need to consult with a lawyer in addition to the ethics and medical professionals I had already consulted in her case. This additional consultation would have further delayed Jane Doe 1's treatment in addition to taking me away from treating other patients in need.

19.     Jane Doe's case illustrates an additional reason why Idaho Code § 18-622 is especially dangerous: Idaho's status as a destination for surrogacy. In my experience, Idaho has a very significant number of women who carry babies as surrogates. The prevalence of surrogacy in Idaho means that many pregnancies in the state are initiated through in vitro fertilization ("IVF") and are likely to be high-risk pregnancies that carry an increased risk of serious health complications for both the mother and the fetus.

### Jane Doe 2

20.     One year and 8 months ago, Jane Doe 2 presented to an outlying hospital emergency department at 19-weeks' gestation experiencing significant bleeding. I eventually treated her and

the facts I describe here were either personal observations I made or facts relayed to me for the purpose of treating Jane Doe 2.

21. Jane Doe 2 was diagnosed with a placental abruption. This condition occurs when the placenta begins separating from the wall of the uterus before birth. Placental abruption decreases the blood and oxygen supply to the fetus and usually results in vaginal bleeding in the mother.

22. During the time she was under observation at the outside hospital, Jane Doe 2's condition worsened, and she developed disseminated intravascular coagulation ("DIC"). This is a dangerous condition that creates a high risk of death for the mother due to the rapid loss of large volumes of blood. Given that the outside hospital has minimal amounts of blood products in their blood bank, they requested to transfer Jane Doe 2 to Saint Alphonsus Regional Medical Center.

23. I first met Jane Doe 2 in the intensive care unit ("ICU") at Saint Alphonsus Regional Medical Center. The risk of her death at that point was imminent and the fetus still had a detectable heart rate by ultrasound. Although Jane Doe 2 was receiving multiple blood products at this point, her coagulation factors and anemia continued to worsen. The only medically acceptable action to preserve her life was immediate termination of the pregnancy.

24. An emergent dilation and evacuation procedure ("D&E") was advised, and Jane Doe 2 was taken to the operating room. The D&E procedure was uncomplicated. She remained intubated in the ICU overnight and continued to receive multiple blood products. By the next morning, the DIC had resolved and her anemia improved. Jane Doe 2 was transferred out of the ICU at that point and discharged from the hospital two days later.

25. Jane Doe 2's case illustrates the fact that some cases are so critical that there is simply no time to consult with a lawyer and debate, under the law, whether the proper medical standard of care should be used.

### Jane Doe 3

26. Ten months ago, Jane Doe 3 presented to the Emergency Department at an outside hospital at 17-weeks' gestation. She was suffering from shortness of breath and high blood pressure. Like Jane Doe 1, Jane Doe 3's pregnancy was the result of IVF. I did not personally treat Jane Doe 3, but I have studied her case in the normal course of my work as part of educational conferences in the Department of Obstetrics and Gynecology at Saint Alphonsus Regional Medical Center.

27. After ruling out other conditions including COVID-19, pneumonia, and a blood clot in her lungs, Jane Doe 3 was diagnosed with pleural effusions, sometimes called "water on the lungs," a condition that causes fluid to accumulate between the tissues that line the lungs and chest. Further examination revealed that Jane Doe 3's pleural effusions were being caused by a case of preeclampsia with severe features. Her fetus had detectable cardiac activity.

28. Preeclampsia is a dangerous pregnancy complication that can result in serious and potentially fatal complications to both the mother and the fetus. It rarely occurs before 20-weeks' gestation. When it occurs before 20-week's gestation, as it did for Jane Doe 3, it is typically severe and carries a high risk of maternal and fetal death.

29. The only medically acceptable standard of care for preeclampsia with severe features in Jane Doe 3's case was to terminate the pregnancy through evacuation of the uterus. She underwent an urgent D&E procedure. The pleural effusions and high blood pressure immediately

began to improve after the pregnancy termination, and she was discharged home in stable condition several days later.

30. Had Idaho Code § 18-622 been in effect, my colleague, Jane Doe 3's treating physician, would have been in the position of assessing her own legal liability instead of simply assessing the patient's best interest.

### Idaho Code § 18-622 and the Impact on Providers and Patients

31. Idaho Code § 18-622 is already harming women in Idaho. Specifically, in my experience as I describe above, the threat of criminal prosecution has already deterred doctors from providing medically necessary, life-saving care.

32. Idaho Code § 18-622 is also making it even more difficult to recruit Ob-Gyns to the State of Idaho. As I said, we already have a shortage of Ob-Gyns in Idaho. Idaho Code § 18-622 places physicians in a very difficult position because of a conflict between the State law and our ethical obligations to patients and our obligations under Federal law.  If an Ob-Gyn can practice in a state without these conflicts and risks, it is only natural that they would be deterred from practicing here. In fact, at least one of my colleagues has already decided to stop her part-time work at our hospital due to the stress of complying with this law.

33. In addition, in emergency situations, many of which present in the middle of the night, physicians often do not have time to consult with lawyers about whether a decision they believe is warranted by the standard of care and therefore in the best interest of their patient will result in a financially ruinous investigation into their practice or in criminal liability.  Also, time spent by physicians in court defending their medical decisions will keep them from their clinical duties for significant periods of time. This will add to the shortages in hospital and clinic coverage, increasing the workload of their practice partners as well as increasing wait times for patients.

34. The fact that a doctor can defend herself in a criminal prosecution does not give me any comfort about the way the law will negatively affect patient care. Having to defend against such a case alone would be incredibly burdensome, stressful, costly, and accordingly, means that the availability of a defense really does not solve the problems presented by the law.

35. Idaho Code § 18-622's threatens to criminalize abortion, even in many medically necessary circumstances, in a state where there is both a shortage of qualified physicians and a disproportionate number of high-risk pregnancies. This puts the health of Idaho women at significant risk.

I declare under penalty of perjury under the laws of the State of Idaho that the foregoing is to the best of my knowledge true and correct. Executed this 8th day of August 2022, in Boise, Idaho.

_8/8/22_
Date

Emily Corrigan, M.D.