# Exhibit D

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>v.<br><br>THE STATE OF IDAHO,<br><br>　　　　　　Defendant. | Case No. 1:22-cv-329<br><br>**DECLARATION OF<br>STACY T. SEYB, M.D.** |

## DECLARATION OF STACY T. SEYB, M.D., IN SUPPORT OF THE UNITED STATES' MOTION FOR A PRELIMINARY INJUNCTION

I, Stacy T. Seyb, M.D., being first duly sworn under oath, state and depose upon personal knowledge as follows:

1. I am a board-certified Obstetrician-Gynecologist ("Ob-Gyn") physician at St. Luke's Regional Medical Center in Boise, Idaho. In that capacity, I specialize in Maternal-Fetal Medicine. I submit this declaration in support of the Motion for Preliminary Injunction filed by the United States in the above-captioned matter. Unless otherwise stated, the facts set forth herein are true of my own personal knowledge, and if called as a witness to testify in this matter, I could and would testify competently thereto.

2. I graduated from University of Kansas and subsequently completed my residency in Obstetrics and Gynecology at the University of Colorado and fellowship in Maternal Fetal Medicine at Northwestern University Feinberg School of Medicine. I practiced as a general Ob-Gyn and served as teaching faculty before completing my fellowship specializing in high risk and abnormal pregnancy management.

1

3. I have practiced as a Maternal-Fetal Medicine provider in Idaho for 22 years working not only on the front lines treating complicated pregnancies but also as a consultant to general OB-Gyn providers and Family Medicine providers providing obstetric care primarily in Southwest Idaho as well as across the state. I worked over a decade with the Idaho March of Dimes improving programming support and updating providers on evolving practices to improve the health of women and children in our state. Currently I serve as a state liaison to Idaho for the Society for Maternal Fetal Medicine.

### Idaho Code § 18-622 and the Impact on Providers and Patients

4. Over the course of my nearly 35-year career as a practicing Ob-Gyn, I have treated thousands of pregnant women, delivered thousands of healthy babies, and managed a variety of life-threatening conditions in pregnancy.

5. Although as physicians we work to help our patients to experience normal pregnancies, culminating in the delivery of a healthy baby, not all pregnancies are as simple and complication-free as physicians and patients would like.

6. In the practice of Ob-Gyn, there are situations where pregnancy termination is the only medical intervention that can preserve a patient's health or save their life. Abortion is a very important tool that has contributed to the reduction of the maternal mortality rate from nearly 800 to 25 deaths per 100,000 live births across the United States in the last century. Obstetrics & Gynecology: November 2019 - Volume 134 - Issue 5 - p 1105-1108. I will describe examples of patients my colleagues and I have treated, which illustrate the dire circumstances that can make it medically necessary to terminate a pregnancy. My colleagues and I encounter these pregnancy-related emergencies approximately a dozen times per year.

### Jane Doe 1

7. A 22-year old woman at 18 weeks of her pregnancy presented to the Emergency Department and a Medical Screening Exam was remarkable for fever, tender uterus, elevated heart rate and evidence of an intrauterine infection without other obvious sources of infection. Her history was also suspicious, she may have ruptured her bag of water 10 days prior, and ultrasound confirmed both a fetal heartbeat as well as no fluid around the baby confirming that she has a condition termed Septic Abortion. While antibiotics are important for treating severe infections, a general tenet of medicine is that without drainage or removal of infected tissue the infection is unlikely to improve.

8. Had Jane Doe 1 not received both antibiotics and termination of the fetus to allow removal of the infected tissue, the chance of her progressing to severe sepsis and dying was very high. If she survived, other risks of not removing the infection include infertility or hysterectomy, as well as other sequala of sepsis including renal failure and clotting disorder, also known as Disseminated Intervascular Coagulation (DIC). The national standard for treating this condition is both antibiotics and emptying the contents of the uterus.

### Jane Doe 2

9. A 35-year old woman presented to the Emergency Department with headache, vision changes, and feeling poorly for a few days. A Medical Screening Examination revealed severe range blood pressures, and laboratory values that were consistent with a pregnancy condition known as pre-eclampsia with severe features. Ultrasound revealed a fetal heartbeat but the fetus was small for dates and the placenta was large, consistent with what is termed a partial molar pregnancy.

10. The only medically acceptable action to preserve her life was termination of the pregnancy. Not only was the pregnancy ultimately not viable due to the nature of the molar pregnancy but removal of the placenta, i.e., delivery was the only cure to reverse the severe pre-eclampsia.

### Jane Doe 3

11. A 25-year old woman in her 19th week of pregnancy presented to the Emergency Department after she started bleeding very heavily per vagina. The Medical Screening Examination indicated hypovolemic shock due to her blood loss. Initial resuscitation improved her condition but she continued to bleed in an uncontrolled manner. Although there was a fetal heartbeat present, without further treatment the bleeding was likely to continue. A Dilation and Evacuation (D and E) was performed, terminating the pregnancy.

12. The only medically available tool to stop the bleeding was termination of the pregnancy. If left untreated the risks of life-threatening shock, even with blood replacement were very high.

13. Idaho Code § 18-622 threatens to criminalize abortion, without clear definition of medically necessary circumstances. The assertion that "prevent the death of the pregnant woman" is clear to the medical community is not useful to medical providers because this is not a dichotomous variable.

In the three cases above, the medical standard was clear and if the trigger law goes into effect, providers will likely delay care for fear of criminal prosecution and loss of licensure. For example, as a high-risk pregnancy consultant, I recently received a call from an outside institution where the provider encountered a woman at 20-weeks of gestation, with severe bleeding similar to the one described above, and wanted to transfer her. He was qualified but was afraid of the potential

4

ramifications of his actions if he proceeded with termination. It was clear that the mother was in danger and that treatment could not be delayed. This situation was clear that termination was the only option, and I reassured this provider and recommended that management. This is one example that providers do not have a clear guide as to what situations will place their livelihood in danger. Providers from all over the state are voicing that they cannot rely upon their medical judgment or best practices for handling pregnancy complications.

14. Idaho Code § 18-622 threatens to make it difficult to recruit Ob-Gyns to the State of Idaho, where we have no in-state training for this specialty. In emergency situations, physicians may delay the medically necessary care because they fear a financially ruinous investigation or criminal liability. If an Ob-Gyn can practice in a state without these conflicts and risks, it is only natural that they would be deterred from practicing here.

I declare under penalty of perjury under the laws of the State of Idaho that the foregoing is to the best of my knowledge true and correct. Executed this 8th day of August 2022, in Boise, Idaho.

8/8/2022
Date

Stacy T. Seyb, M.D.

5