**Shannon Rose Selden** (*pro hac vice*)
**Leah Martin** (*pro hac vice*)
**Adam Aukland-Peck** (*pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Ave.
New York, NY 10022
Tel.: 212-909-6000
srselden@debevoise.com
lmartin@debevoise.com
aauklandpeck@debevoise.com

***Counsel for* Amici**

**Jeffrey B. Dubner** (*PHV forthcoming*)
**Skye L. Perryman** (*PHV forthcoming*)
**John T. Lewis** (*PHV forthcoming*)
**Maher Mahmood** (*PHV forthcoming*)
DEMOCRACY FORWARD FOUNDATION
655 15th St. NW, Ste 800
Washington, D.C. 20005
Tel.: (202) 448-9090
jdubner@democracyforward.org
sperryman@democracyforward.org
jlewis@democracyforward.org
mmahmood@democracyforward.org

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO
# SOUTHERN DIVISION

|  |  |
|---|---|
| | Case No. 1:22-cv-329 |
| UNITED STATES OF AMERICA,<br><br>*Plaintiff,*<br><br>*vs.*<br><br>THE STATE OF IDAHO,<br><br>*Defendant.* | **BRIEF OF AMERICAN COLLEGE OF EMERGENCY PHYSICIANS, IDAHO CHAPTER OF THE AMERICAN COLLEGE OF EMERGENCY PHYSICIANS, AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, AMERICAN MEDICAL ASSOCIATION, SOCIETY FOR MATERNAL-FETAL MEDICINE, NATIONAL MEDICAL ASSOCIATION, NATIONAL HISPANIC MEDICAL ASSOCIATION, AMERICAN ACADEMY OF PEDIATRICS, AMERICAN ACADEMY OF FAMILY PHYSICIANS, AND AMERICAN PUBLIC HEALTH ASSOCIATION AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

## TABLE OF CONTENTS

I.   INTERESTS OF AMICI CURIAE ............................................................1

II.  PRELIMINARY STATEMENT .............................................................2

III.   ARGUMENT .........................................................................................5

  A.   **The Idaho Law Is Contrary to the Legal and Clinical Standards for Emergency Medicine.**.............................................................................5

    1.   Caring for Pregnant Patients is an Essential Component of Emergency Medicine..................................................................................................5

    2.   EMTALA Enshrines Physicians' Commitment to Treating and Stabilizing Patients.................................................................................9

    3.   The Idaho Law Conflicts with the Care EMTALA Requires Physicians to Provide. ....................................................................................................13

    4.   The Idaho Law Will Have a Disproportionately Negative Impact on Rural, Minoritized, and Poor Pregnant Patients.........................................16

  B.   **The Idaho Law Is Inconsistent with Federal Law and Undermines Principles of Medical Ethics**....................................................................19

IV.   CONCLUSION.....................................................................................20

i

# TABLE OF AUTHORITIES

***Statutes***

42 U.S.C. § 1395dd ("EMTALA") ............................................................2, 10, 11

Idaho Code § 604(1)...................................................................................13

***Other Authorities***

*2019 National Healthcare Quality and Disparities Report*, AGENCY FOR HEALTHCARE RESEARCH AND QUALITY (Dec. 2020) ............................................18

ACEP, *Code of Ethics for Emergency Physicians* (Jan. 2017) .................................7, 17, 19

ACEP, *EMTALA Fact Sheet* ............................................................................10

ACEP, Policy Statements, *Definition of Emergency Medicine* (Jan. 2021),.........................6

ACEP, *Public Opinion on the Value of Emergency Physicians* (Aug. 26, 2021)...............12

ACOG Clinical Consensus No. 1, *Pharmacologic Stepwise Multimodal Approach for Postpartum Pain Management* (Sept. 2021) ....................................................5

ACOG Committee Opinion No. 586, *Health Disparities in Rural Women* (Feb. 2014, reaff'd 2021).......................................................................................18

ACOG Committee Opinion No. 667, *Hospital-Based Triage of Obstetric Patients* (July 2016, reaff'd 2020)...........................................................................7, 12

ACOG Committee Opinion No. 815, *Increasing Access to Abortion* (Dec. 2020) ..............5

ACOG Obstetric Care Consensus, *Placenta Accreta Spectrum* (July 2012, reaff'd 2021) ...5

ACOG Practice Bulletin No. 183, *Postpartum Hemorrhage* (Oct. 2017 .............................5

ACOG Practice Bulletin No. 190, *Gestational Diabetes Mellitus* (Feb. 2018) ....................5

ACOG Practice Bulletin No. 193, *Tubal Ectopic Pregnancy* (Mar. 2018, reaff'd 2022)......8

ACOG Practice Bulletin No. 198*, Prevention and Management of Obstetric Lacerations at Vaginal Delivery* (Sept. 2018, reaff'd 2022 ....................................................5

ACOG Practice Bulletin No. 200, *Early Pregnancy Loss* (Nov. 2018, reaff'd 2021).....8, 13

ACOG Practice Bulletin No. 217, *Prelabor Rupture of Membranes*, at e80 (Mar. 2020) ....8

ACOG Practice Bulletin No. 222, *Gestational Hypertension and Preeclampsia* (Dec. 2018) .............................................................................................................................5

ACOG, *Code of Professional Ethics* (Dec. 2018)...............................................................20

ACOG, *Facts are Important: Understanding Ectopic Pregnancy* ..................................4, 14

AMA, *Code of Ethics* § 1.1.1............................................................................................20

Anthony Mazzeo et. al, *Delivery of Emergency Care in Rural Settings* (2017)................17

Carolyn A. Miller et al., *Patient Experiences With Miscarriage Management in the Emergency and Ambulatory Settings*, 134(6) OBSTETRICS AND GYNECOLOGY, 1285 (Dec. 2019)..........................................................................................................................8

Centers for Medicare & Medicaid Services "CMS" *Rural Health Strategy* (2018)............17

Cleveland Clinic, *High-Risk Pregnancy* .............................................................................11

CMS, *Advancing Rural Maternal Health Equity* (May 2022)......................................18, 19

CMS, *Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss* (July 11, 2022) ................................................................19

Donna Hoyert, *Maternal Mortality Rates in the United States, 2020*, NAT'L CTR. FOR HEALTH STAT. (Feb. 2022).................................................................................................11

Healthcare Cost and Utilization Project, *Emergency Department and Inpatient Utilization and Cost for Pregnant Women: Variation by Expected Primary Payer and State of Residence, 2019* (Dec. 14, 2021) ........................................................................................8

Juanita Chinn, et al., *Health Equity Among Black Women in the United States*, 30(2) J. WOMEN'S HEALTH 212 (2021)....................................................................................18, 19

Katherine Tucker et al. *Delayed Diagnosis and Management of Second Trimester Abdominal Pregnancy*, BMJ CASE REP. (Aug. 2017).........................................................7

Kimberly Kilfoyle et al., *Nonurgent and Urgent Emergency Department Use During Pregnancy: An Observational Study* 216(2) AM. J. OF OBSTETRICS AND GYNECOLOGY (Feb. 2017) .......................................................................................................................12

Letter from The Idaho Coalition for Safe Reproductive Health Care ("ISCRHC") (2022) 14

Lyndsey S. Benson et al., *Early Pregnancy Loss in the Emergency Department*, J. AM. C. OF EMERGENCY PHYSICIANS OPEN (2021) ...............................................8, 16, 17, 18, 19

March of Dimes, *Maternity Care Desert: Idaho* (June 2021) ...........................................17

Michael S. Beeson et al., *The Model of the Clinical Practice of Emergency Medicine*, AM. BOARD OF EMERGENCY MED., (2019) ...............................................................................9

Nancy Ochieng et al., *How Many Physicians Have Opted-Out of the Medicare Program?* KFF (Oct. 22, 2020) .......................................................................................................10

P.J. Hajenius *et. al. Interventions for Tubal Ectopic Pregnancy*, COCHRANE DATABASE OF SYSTEMATIC REVIEWS (2007)...........................................................................................14

Robert W. Neumar, *The Zerhouni Challenge: Defining the Fundamental Hypothesis of Emergency Care Research.* 49(5) ANN. EMERGENCY MED.  696–697 (May 2007) ..........7

Roosa Tikkanen et al., *Maternal Mortality and Maternity Care in the United States Compared to 10 Other Developed Countries*, THE COMMONWEALTH FUND, (Nov. 18, 2020) ...............................................................................................................................5

*The Diagnosis of Ectopic Pregnancy*, 12018/021 HEALTHCARE SAFETY INVESTIGATION BRANCH (Mar. 2020)...........................................................................................................7

*Trends in the Utilization of Emergency Dep't Servs., 2009-2018*, OFFICE OF THE ASSISTANT SECRETARY FOR PLANNING AND EVALUATION, HHS (Mar. 2021)...................................18

U.S. Census Bureau, *2010 Urban 2010 and Rural Classification and Urban Area Criteria* (Oct. 8, 2021) ................................................................................................................17

### Regulations

42 C.F.R. 413 .....................................................................................................................6

42 C.F.R. 482 .....................................................................................................................6

42 C.F.R. 489 .....................................................................................................................6

## I.  INTERESTS OF AMICI CURIAE[1]

*Amici curiae* are leading medical and public health societies representing physicians and other clinicians and public health professionals who serve patients in Idaho and nationwide.  They include the American College of Emergency Physicians ("ACEP"), the leading advocate for emergency physicians; the American College of Obstetricians and Gynecologists ("ACOG"), the nation's leading organization of physicians who provide health services unique to people seeking obstetric or gynecologic care; and the American Medical Association ("AMA"), the largest professional association of physicians, residents, and medical students in the country.  *Amici*, their members, and their patients are deeply affected by Idaho Code § 18-622 (the "Idaho Law").  By law and by oath, ACEP's members must care for all patients seeking emergency medical treatment and are united in the belief that emergency physicians must be able to practice high quality, objective evidence-based medicine without legislative, regulatory, or judicial interference in the physician-patient relationship; ACOG is a leader in the effort to confront the maternal mortality crisis in the United States and committed to ensuring access for all people to the full spectrum of evidence-based quality reproductive health care, including emergency abortion care.[2]

---

[1]  Plaintiff consents to the filing of this brief.  Defendant takes no position.  Pursuant to Fed. R. App. P. 29(a)(4)(E) (as made applicable here by the Court's Amended Order, ECF 12), counsel for *amici curiae* authored this brief in whole; no party's counsel authored, in whole or in part, this brief; and no person or entity other than *amici* and their counsel contributed monetarily to preparing or submitting this brief.  *Amici*'s mission statements can be found in their Motion for Leave to File (ECF 50).

[2]  The identities and interests of each *amicus* are explained in more detail in *amici*'s accompanying Motion for Leave.

*Amici* believe that all patients are entitled to prompt, complete, and unbiased emergency health care that is medically and scientifically sound, and is provided in compliance with the federal Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd ("EMTALA"). *Amici* submit this brief to highlight for the Court the ways in which Idaho's near-complete ban on abortion will undermine Idaho physicians' ability to provide appropriate emergency care, will conflict with obligations imposed under federal law, will be inconsistent with longstanding principles of medical ethics, and will have a devastating impact on the health and safety of pregnant patients[3] in the state.

## II.    PRELIMINARY STATEMENT

The Idaho Law directly interferes with federal law ensuring that all patients in emergency settings receive medical treatment based on their individual health care needs. For nearly four decades, EMTALA has provided the foundation for the emergency care safety net. EMTALA requires physicians, hospitals, and other medical facilities to provide stabilizing treatment to any patient presenting with an emergency medical condition that has the potential to cause serious harm to the patient or that endangers their life. Emergency treatment by definition requires physicians to act quickly, often with limited information, to treat and stabilize the patient. Timing is essential, and patients' conditions can deteriorate rapidly and with little or no warning.

The Idaho Law is unworkable in an emergency medicine setting. Well-established clinical guidelines for the treatment of pregnant patients in emergency conditions require

---

[3]    *Amici* use the term "women" and "she/her" inclusively and recognize that people with female anatomy who do not identify as women can also become pregnant and need emergency care.

treatment that the Idaho Law would prohibit as abortion.  This arises, for example, in the emergency department in contexts where a patient's pregnancy is presenting urgent risks to the pregnant patient's life or health but where the Idaho Law would prevent medically indicated care that includes terminating the pregnancy.  Indeed, the Idaho Law goes so far as to prevent the termination of a pregnancy in an emergency circumstance where the fetus will otherwise not survive and where the pregnant patient's health and life are at risk in the absence of terminating the nonviable pregnancy.  Withholding this care is directly contrary to EMTALA's mandate and to bedrock principles of medical ethics.  If applied to emergency medical care, the Idaho Law would force physicians to disregard their patients' clinical presentations, their own medical expertise and training, and their obligations under EMTALA—or risk criminal prosecution. By criminalizing necessary, medically indicated care in emergency situations, the Idaho Law will have devastating consequences for patients.

One central danger of the Idaho Law is delay in care.  The law disregards standard medical practice and purports to force physicians to delay care until a patient's medical condition deteriorates to the point of becoming life-threatening.  Delays in medical care can be traumatic and devastating to patients, and can make it impossible to provide the optimal treatment for preventing a harmful, or sometimes fatal outcome.  For example, if the Idaho Law is allowed to require physicians to delay treatment until the patient's life is in immediate danger, patients presenting with ectopic pregnancies will be at risk for rupture and massive internal bleeding, requiring urgent surgery and risking death, because under the Idaho Law physicians may not feel they can prescribe methotrexate—the most

commonly indicated drug for treating ectopic pregnancy—to expel the nonviable pregnancy. An ectopic pregnancy is always life threatening. An ectopic pregnancy occurs when a fertilized egg implants and grows in a location that cannot support the pregnancy. As the pregnancy grows, the structure where it is implanted can burst, or rupture, causing major internal bleeding and requiring emergency surgery.[4] Under the Idaho Law, a patient risks becoming septic because physicians will be compelled to wait until signs of infection are present when a patient is suffering from a premature rupture of the amniotic sac that is incompatible with continuing a pregnancy to term. Patients with uterine hemorrhage will be forced to wait until their blood loss is deemed sufficient to elevate their status firmly into "life threatening" territory under the Idaho Law, and even at that point, physicians will only have an affirmative defense to a felony charge, forcing them to risk the reputational, professional, and financial burdens of being arrested, indicted, and prosecuted for following federal law and their professional obligations by saving the patient's life. In providing emergency care, physicians must act swiftly to implement a treatment plan based on their best medical judgment—judgment which necessarily has been honed by over a decade of medical education, training, and fellowship and must follow evidence-based guidelines and ethical obligations to meet the patient's individual health care needs. By forcing physicians to delay or forego care that they have been trained and are ethically required to provide, the Idaho Law creates substantial risks for patients and physicians alike.

---

[4]     ACOG, *Facts are Important: Understanding Ectopic Pregnancy*, available at: https://www.acog.org/advocacy/facts-are-important/understanding-ectopic-pregnancy.

Even under the best of circumstances, pregnancy and childbirth impose significant physiological changes that can exacerbate underlying preexisting conditions and can severely compromise health.[5]   When those risks create emergency situations that jeopardize the patient's health and life, the patient is entitled to and should receive health- and life-saving medical care like anyone else in this country, and the physicians who provide that care consistent with clinical best practices and longstanding federal law should not be criminally sanctioned.[6]   In short, the Idaho Law is not just bad law, it is bad medicine, particularly in light of the nation's maternal health crisis.[7]

## III.   ARGUMENT

### A.   The Idaho Law Is Contrary to the Legal and Clinical Standards for Emergency Medicine.

#### 1.   Caring for Pregnant Patients is an Essential Component of Emergency Medicine.

---

[5]   *See e.g.* ACOG Practice Bulletin No. 190, *Gestational Diabetes Mellitus* (Feb. 2018); ACOG Practice Bulletin No. 222, *Gestational Hypertension and Preeclampsia* (Dec. 2018); ACOG Practice Bulletin No. 183, *Postpartum Hemorrhage* (Oct. 2017); ACOG Obstetric Care Consensus, *Placenta Accreta Spectrum* (July 2012, reaff'd 2021); ACOG Practice Bulletin No. 198*, Prevention and Management of Obstetric Lacerations at Vaginal Delivery* (Sept. 2018, reaff'd 2022); ACOG Clinical Consensus No. 1, *Pharmacologic Stepwise Multimodal Approach for Postpartum Pain Management* (Sept. 2021).

[6]   *See generally* ACOG Committee Opinion No. 815, *Increasing Access to Abortion* (Dec. 2020), available at: https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2020/12/increasing-access-to-abortion.

[7]   *See* Emily E. Petersen et al., *Vital Signs: Pregnancy-Related Deaths, Untied States, 2011-2015, and Strategies for Prevention, 13 States, 2013-2017,* 68(18) MORBIDITY AND MORTALITY WKLY. REP. 423-429 (May 10, 2019); Roosa Tikkanen et al., *Maternal Mortality and Maternity Care in the United States Compared to 10 Other Developed Countries,* THE COMMONWEALTH FUND, https://www.commonwealthfund.org/publications/issue-briefs/2020/nov/maternal-mortality-maternity-care-us-compared-10-countries (Nov. 18, 2020), ("The U.S. has the highest maternal mortality rate among developed countries.")

"Emergency medicine is the medical specialty dedicated to the diagnosis and treatment of unforeseen illness or injury."[8] Emergency care is not limited to treatment provided in the emergency department ("ED"), but is practiced in a broad variety of settings both within the hospital and in other locations.[9] It includes "initial evaluation, diagnosis, treatment, coordination of care among multiple clinicians or community resources, and disposition of any patient requiring expeditious medical, surgical, or psychiatric care."[10] Emergency physicians identify and treat conditions when patients first present, and it is emergency physicians who often make the difficult determination of what care is necessary in a time-sensitive situation, including by involving specialists. Because of the complexities inherent in most health emergencies, physicians must use their best medical judgment—honed through years or decades of medical education, training, and experience—to provide evidence-based care, consistent with clinical guidance, and responsive to the patient's individualized needs. For pregnant patients, that means

---

[8]     ACEP, Policy Statements, *Definition of Emergency Medicine* (Jan. 2021), available at: https://www.acep.org/patient-care/policy-statements/definition-of-emergency-medicine/ ("ACEP, *Definition of Emergency Medicine*").

[9]     *Id.*; *see also* Clarifying Policies Related to the Responsibilities of Medicare-Participating Hospitals in Treating Individuals with Emergency Medical Conditions, 68 Fed. Reg. 53221, 53229 (Nov. 10, 2003) (codified at 42 C.F.R. 413, 482, and 489) ("CMS believes that EMTALA requires that a hospital's dedicated emergency department would not only encompass what is generally thought of as a hospital's 'emergency room,' but would also include other departments of hospitals, such as labor and delivery . . . ").

[10]    ACEP, *Definition of Emergency Medicine*.

emergency care may be provided in the ED or in labor and delivery units, by obstetrician-gynecologists, and by any number of other medical specialists.[11]

In an emergency, speed is critical. It is axiomatic that rapid treatment improves patient outcomes, while delays increase the risk of complications, permanent injury, or death.[12] Rapid treatment is a core ethical responsibility for physicians in emergency scenarios: "Patients often arrive at the emergency department with acute illnesses or injuries that require immediate care . . . . emergency physicians have little time to gather additional data, consult with others, or deliberate about alternative treatments. Instead, there is a presumption for quick action guided by predetermined treatment protocols."[13] This includes treatment of pregnancy-related emergencies, such as ectopic pregnancy, where "[e]arly diagnosis and treatment are paramount in reducing maternal morbidity and mortality."[14]

---

[11] *Id.* ("Emergency medicine is not defined by location but may be practiced in a variety of settings including, but not limited to, hospital-based and freestanding emergency departments (EDs), urgent care clinics, observation medicine units, emergency medical response vehicles, at disaster sites, or via telehealth."); *see also* ACOG Committee Opinion No. 667, *Hospital-Based Triage of Obstetric Patients* (July 2016, reaff'd 2020).

[12] Robert W. Neumar, *The Zerhouni Challenge: Defining the Fundamental Hypothesis of Emergency Care Research*. 49(5) ANN. EMERGENCY MED. 696–697 (May 2007).

[13] ACEP, *Code of Ethics for Emergency Physicians*, at 4 (Jan. 2017) ("ACEP, *Code of Ethics*").

[14] Katherine Tucker et al. *Delayed Diagnosis and Management of Second Trimester Abdominal Pregnancy*, BMJ CASE REP. 1, 1 (Aug. 2017); *see also The Diagnosis of Ectopic Pregnancy*, 12018/021 HEALTHCARE SAFETY INVESTIGATION BRANCH, at para. 3.2.1 (Mar. 2020) ("A delay in or failure to diagnose ectopic pregnancy can be life-threatening to women.").

In virtually every shift (and often multiple times per shift), emergency physicians see pregnant patients presenting with abdominal pain, vaginal bleeding, or other pregnancy-related issues. [15]   While most do not require emergency intervention, emergencies involving pregnant patients are frequent and can quickly become dangerous with little to no warning without immediate intervention.  For example, some of the issues pregnant patients may present with include:

- **Ectopic pregnancy**, or pregnancy that occurs outside the uterine cavity, in which the fertilized egg cannot survive and the growing tissue may cause life-threatening bleeding if left untreated.  If identified early, this condition can be treated with surgery or methotrexate, but severe cases require immediate surgical intervention;[16]

- **Prelabor rupture of membranes**, where the amniotic sac ruptures before fetal viability, potentially leading to serious maternal infection and sepsis;[17]

- **Miscarriage** or early pregnancy loss ("EPL"), which is extremely common, occurring in approximately 10% of clinically recognized pregnancies. [18]   500,000–900,000 women seek care in the ED with miscarriage-related concerns each year.[19]

---

[15]   In 2019, over 3.5 million women visited EDs for reasons related to pregnancy, with an additional 216,000 pregnant women visiting for reasons not primarily related to their pregnancy. Healthcare Cost and Utilization Project, *Emergency Department and Inpatient Utilization and Cost for Pregnant Women: Variation by Expected Primary Payer and State of Residence, 2019*, at 30 (Dec. 14, 2021).

[16]   ACOG Practice Bulletin No. 193, *Tubal Ectopic Pregnancy,* at e91 (Mar. 2018, reaff'd 2022).

[17]   ACOG Practice Bulletin No. 217, *Prelabor Rupture of Membranes*, at e80 (Mar. 2020).

[18]   ACOG Practice Bulletin No. 200, *Early Pregnancy Loss*, at e197 (Nov. 2018, reaff'd 2021).

[19]   Carolyn A. Miller et al., *Patient Experiences With Miscarriage Management in the Emergency and Ambulatory Settings*, 134(6) OBSTETRICS AND GYNECOLOGY, 1285, 1285 (Dec. 2019); Lyndsey S. Benson et al., *Early Pregnancy Loss in the Emergency*

These are just a few examples. In the American Board of Emergency Medicine's Model of Clinical Practice of Emergency Medicine, the definitive source and guide to the core content found on emergency physicians' board examinations, nearly all conditions listed in the section devoted to "Complications of Pregnancy"[20] are graded as typically "critical" or "emergent," meaning that they "may progress in severity or result in complications with a high probability for morbidity if treatment is not begun quickly."[21] The Idaho Law shows no understanding of the nature of emergency care that pregnant patients require, or of the impact of timing on patient care. It willfully disregards what it means to pregnant patients—and their doctors—to be told that, alone among all patients seeking emergency care and contrary to medical guidelines and ethics, they must wait until their life is in jeopardy to receive treatment.

      2.      <u>EMTALA Enshrines Physicians' Commitment to Treating and Stabilizing Patients.</u>

Because of the unique nature of emergency medicine, federal law has, for over 35 years, required nearly all physicians and hospitals to meet a minimum standard of care. As described in the Complaint, that standard applies equally to emergency care during pregnancy.[22] EMTALA defines an emergency medical condition as "a medical condition

---

*Department*, J. AM. C. OF EMERGENCY PHYSICIANS OPEN, 1, 1–2 (2021) ("Benson, *EPL*").

[20] Michael S. Beeson et al., *The Model of the Clinical Practice of Emergency Medicine*, AM. BOARD OF EMERGENCY MED. (2019), *available at*: https://www.abem.org/public/resources/em-model.

[21] *Id.*

[22] *See Compl.* ¶¶ 19–24. All physicians and hospitals participating in government funded health care programs are subject to EMTALA—and only about 1% of non-pediatric physicians have opted out of Medicare. Nancy Ochieng et al., *How Many*

manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in placing the individual's health . . . in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of bodily organs."[23]   EMTALA requires that physicians provide treatment to *any* patient who presents with an emergency condition "until the emergency medical condition is resolved or stabilized."[24]   This mandate requires no more (and often less) than what physicians are taught to view as their ethical and professional responsibility.   Faced with a medical emergency, intervening and stabilizing the patient— what EMTALA requires—is the *bare minimum* care that physicians are ethically bound to provide.   Pregnant patients are equally entitled to the federal standard of care as any other patient under EMTALA.

EMTALA does not specify the particular treatment that should be provided in a given situation.   Instead, when a physician determines that an individual has an emergency medical condition, they must provide "*such treatment as may be required* to stabilize the medical condition." [25]   EMTALA properly defers to the medical judgment of the physician(s) responsible for treating the patient to determine how best to achieve the designated objective of stabilization.   That decision making, in turn, is informed by

---

*Physicians Have Opted-Out of the Medicare Program?* KFF (Oct. 22, 2020), available at: https://www.kff.org/medicare/issue-brief/how-many-physicians-have-opted-out-of-the-medicare-program.

[23]   Examination and Treatment of Emergency Medical Conditions and Women in Labor, 42 U.S.C. § 1395dd(e) (1986).

[24]   ACEP, *EMTALA Fact Sheet*, available at: https://www.acep.org/life-as-a-physician/ethics--legal/emtala/emtala-fact-sheet/.

[25]   42 U.S.C. § 1395dd(b)(1)(A) (1986) (emphasis added).

established clinical guidelines, developed and regularly updated according to the latest advancements in medical science. Just as EMTALA does not specify particular treatments, it also does not allow for physicians to withhold specific treatments from particular patients for non-medical reasons. Rather, if a treatment is "required to stabilize the medical condition," it must be provided—full stop.[26]

In rendering emergency care, *amici*'s members do not have the option to choose which patients to treat or not to treat—and have no control over the injuries or complications with which their patients will present. When faced with a pregnant patient suffering from an emergency medical condition, in order to comply with EMTALA, clinicians must promptly provide stabilizing treatment to that pregnant patient. It is essential for physicians providing emergency care to have access to the full suite of interventions and treatments, consistent with evidence-based clinical guidelines—and they must be able to act without hesitation. Given the risks associated with being pregnant,[27] emergency care providers regularly treat pregnant patients for the urgent medical conditions described above, as well as other trauma that may implicate the pregnancy's

---

[26]   *Id.*

[27]   The U.S. mortality rate associated with live births was a staggering 23.8 per 100,000 live births in 2020, up from 20.1 in 2019. Donna Hoyert, *Maternal Mortality Rates in the United States, 2020*, Nat'l Ctr. for Health Stat. (Feb. 2022). Pre-existing conditions and comorbidity with other illnesses further increase the likelihood of pregnancy complications. *See, e.g.*, Cleveland Clinic, *High-Risk Pregnancy,* available at: https://my.clevelandclinic.org/health/diseases/22190-high-risk-pregnancy (describing how preexisting conditions exacerbate the risks of the pregnancy).

safety or viability, like car accidents.[28]  Hospital-based obstetric units collaborate with EDs
because "labor and delivery units frequently serve as emergency units for pregnant
women." [29]  Hospitals structure these collaborative treatment efforts by establishing
protocols for cooperation and triage between delivery units and EDs, as well as for the
appropriate stabilization of pregnant patients in accordance with EMTALA.[30]  Because
pregnancy termination is part of the medically indicated treatment to stabilize patients in
certain emergency scenarios, physicians—to comply with EMTALA and the principles of
medical ethics—must, and do, consider abortion a necessary treatment option.

The American public places trust in physicians to provide emergency care
consistent with EMTALA and medical guidelines.  A recent study underscored that 93% of
those polled "trust an emergency physician to provide medical care in the event [they]
went to the emergency department."[31]  89% of adults also consider 24/7 access to an
emergency department to be just as essential to their communities as fire departments or
water utility services.[32]  And they place particular trust in a physician to lead care in the
ED, especially for more severe injuries and illnesses.[33]  This trust is the byproduct of the
demonstrated expertise of countless clinicians providing stabilizing medical care pursuant

---

[28]   Kimberly Kilfoyle et al., *Nonurgent and Urgent Emergency Department Use During
Pregnancy: An Observational Study* 216(2) Am. J. of Obstetrics and Gynecology,
1, 2 (Feb. 2017).

[29]   *See* ACOG Committee Opinion No. 667, *Hospital-Based Triage of Obstetric Patients*
(July 2016, reaff'd 2020), *supra* Note 11.

[30]   *Id.*

[31]   ACEP, *Public Opinion on the Value of Emergency Physicians* 1, 17 (Aug. 26, 2021).

[32]   *Id.* at 10.

[33]   *Id.* at 17–18.

to EMTALA with a singular dedication to treating any patient who presents with any emergency medical condition.  Continuing to provide prompt emergency care based on sound medical standards is paramount to the life and health of patients, and the trust they place in their physicians.

          3.          <u>The Idaho Law Conflicts with the Care EMTALA Requires Physicians to Provide.</u>

The Idaho Law unnecessarily and profoundly conflicts with a physician's ability to provide EMTALA-mandated stabilizing care.  The law is staggeringly broad.  It criminalizes any action that has the effect of "intentionally terminat[ing] the clinically diagnosable pregnancy of a woman."[34]  It forces physicians to delay or deny care, endangering patients' health and undermining patients' trust and confidence in the availability and fairness of emergency care.

In emergency medicine, what Idaho now defines as criminal abortion has long been understood as a necessary, standard, and evidence-based medical treatment.  As medically defined, abortion is a medical intervention provided to individuals who need to end the medical condition of pregnancy.  Abortion includes the administration of medication to women already experiencing a miscarriage to complete expulsion of pregnancy tissue, including an embryo or fetus.[35]  Abortion includes the removal of an embryo, fetus, and potentially a uterus as the result of infection arising from the preterm premature rupture of membranes.  An abortion is the critical treatment option for an ectopic pregnancy, which

---

[34]    Idaho Code § 604(1).

[35]    ACOG Practice Bulletin No. 200, *Early Pregnancy Loss*, at e197 (Nov. 2018, reaff'd 2021), *supra* Note 18.

always involves a nonviable pregnancy.[36]  And an abortion is the necessary treatment in the event of uncontrolled bleeding from, for example, placental abruption or an ongoing miscarriage, even when fetal cardiac activity may still be detectable.  In these and many similar circumstances, what Idaho Law defines as the criminal felony of abortion is—and has long been understood as—a standard, essential component of emergency medical care. If the Idaho Law takes effect, it will criminalize nearly all medical use of abortion, even in emergency situations where the embryo or fetus is nonviable, and endanger the lives, health, and mental and emotional well-being of patients and their families.[37]

In doing so, the Idaho Law is directly contrary to the standards of emergent care, including those set by federal law.  Where abortion is the medically indicated and necessary treatment to stabilize a pregnant patient suffering an emergency health issue, the Idaho Law compromises the patient-physician relationship and makes providing that stabilizing treatment a crime.  It also requires physicians to act contrary to their professional ethics and to the professional medical judgment they are compelled to use when determining the appropriate stabilizing treatment under EMTALA.  In effect, the Idaho Law requires physicians to disregard the best interests of the presenting patient and directly interferes with a physician's ability to evaluate and provide medically indicated

---

[36] ACOG, *Facts are Important: Understanding Ectopic Pregnancy*, *supra* Note 4; *see also* P.J. Hajenius *et. al. Interventions for Tubal Ectopic Pregnancy*, COCHRANE DATABASE OF SYSTEMATIC REVIEWS 1, 1, 2 (2007), (the recommended treatment for ectopic pregnancy is surgery or the administration of methotrexate).

[37] Letter from The Idaho Coalition for Safe Reproductive Health Care, available at: https://www.postregister.com/idaho-coalition-for-safe-reproductive-health-care-letter/pdf_4a332f4a-5e88-50ca-8ed6-046896b19dd9.html (2022) (an open letter signed by hundreds of Idaho physicians describing the dangerous effects of the Idaho Law on emergency care for pregnant patients).

treatment.  By criminalizing the provision of safe, essential, and life-saving care, the Idaho Law actively discourages physicians from employing sound medical judgment as mandated by EMTALA in favor of ascertaining their criminal liability and gathering evidence to exonerate themselves.

The Idaho Law's "life of the mother" affirmative defense is inadequate to protect patients and their providers or to mitigate the law's harm.  It is too narrow to apply to real-life medical situations.  It disregards the speed with which a complication may transition from "health-threatening" to "life-threatening," the difficulty of making that determination, and the devastating physical and emotional consequences of forcing physicians to tell patients and their families that they cannot receive urgently needed treatment unless and until they are close to death.[38]  No clinical bright line defines when a patient's condition becomes life-threatening.  At what point does the condition of a pregnant woman with a uterine hemorrhage deteriorate from health-threatening to life-threatening?  How many blood units does she have to have lose?  One?  Two?  Five?  How fast does she have to be bleeding?  Soaking through two pads an hour?  Three?  How low does her blood pressure need to be?  90 mm HG over 60 mm HG?  80 over 50?  And at what point in time does the condition of a pregnant woman with sepsis from a uterine infection deteriorate from health-threatening to life-threatening?  If the standard treatment of IV fluids does not stop her blood pressure from dropping, is her condition now life-threatening?  Is it when she is

---

[38]   Even if the affirmative defense covered EMTALA's mandate to provide stabilizing, but not necessarily life-saving, care, it would still be inadequate.  Physicians' abilities to comply with EMTALA are significantly obstructed via the burden of raising an affirmative defense, the accompanying burden and expense of prosecution defense, and the risk of conviction and loss of license.

unconscious and any further treatment has become more complex and fraught with risk and further complications?  It is physicians in the room with the patient, not lawmakers or courts, who are uniquely equipped to make these decisions.  There is simply no viable way to apply a "life-threatening" test in emergency medicine.

Life and health exist on a fragile and shifting continuum and in emergent situations physicians must and do act quickly to preserve it.  They cannot be expected, and should not be compelled, to delay stabilizing treatment until a legislatively imagined but medically nonexistent line has been crossed.

    4.  <u>The Idaho Law Will Have a Disproportionately Negative Impact on Rural, Minoritized, and Poor Pregnant Patients</u>

Pregnancy and childbirth can pose significant health risks and complications.  Even under the best of circumstances, conditions of pregnancy can exacerbate underlying preexisting conditions and can severely compromise health.  These risks can create emergency situations in which a pregnant person's health and life are in the balance.  The Idaho Law only exacerbates these health concerns and does so amidst a broader maternal health crisis in the country.

The consequences of the Idaho Law will be especially devastating for underserved populations, including patients living in rural areas, minoritized populations, and pregnant patients with low incomes.  As a result of structural inequities and social determinants, these  populations are "more likely to face barriers in accessing routine health care services," including to prenatal care.[39]  ED use has been "consistently increasing," with use

---

[39]  Benson, *EPL, at 2.*

by low-income populations and people of color rising at the highest rates.[40]  This is exacerbated by the lack of access in Idaho to maternity health care.[41]  In light of the socioeconomic constraints these populations already face in accessing health care services, EDs and "emergency physicians have been given a unique social role and responsibility to act as health care providers of last resort for many patients who have no other ready access to care."[42]

The nearly half a million (or 29.4% of) Idaho residents living in rural areas are particularly endangered by this law.[43]  "[R]ural Americans are more likely to be living in poverty, unhealthy, older, uninsured or underinsured, and medically underserved."[44]  Rural hospitals and EDs are "the safety net" for rural Americans, including rural pregnant patients.[45]  Rural women are "more likely to be poor, lack health insurance or rely substantially on Medicaid and Medicare" and "must travel longer distances to receive

---

[40]  *Id.*

[41]  March of Dimes, *Maternity Care Desert: Idaho* (June 2021) available at: https://www.marchofdimes.org/peristats/data?reg=99&top=23&stop=641&lev=1&slev=4&obj=9&sreg=16 (44.2% of Idaho counties are "maternity care deserts" and over 100,000 Idaho women live in counties with little or no maternal care).

[42]  ACEP, *Code of Ethics*, at 4; *see also* Benson, *EPL*, at 7 (EDs play a "vital role" in "caring for those who are socioeconomically vulnerable").

[43]  U.S. Census Bureau, *2010 Urban 2010 and Rural Classification and Urban Area Criteria* (Oct. 8, 2021), available at: https://www.census.gov/programs-surveys/geography/guidance/geo-areas/urban-rural/2010-urban-rural.html.

[44]  CMS, *CMS Rural Health Strategy*, at 2 (2018) ), available at: https://www.cms.gov/About-CMS/Agency-Information/OMH/Downloads/Rural-Strategy-2018.pdf.

[45]  Anthony Mazzeo et. al,  *Delivery of Emergency Care in Rural Settings*, ACEP 1, 1 (2017).

care."[46]  Pregnant rural patients accordingly are less likely to seek prenatal care,[47] and the

initiation of prenatal care in the first trimester is lower for rural pregnant women and girls

compared with those in suburban areas.[48]  It is therefore not surprising that "rural women

experience poorer maternal outcomes compared to their non-rural counterparts, including

high pregnancy-related mortality."[49]

  Women of color similarly will be disproportionately harmed by the Idaho Law.

People of color and people with low incomes generally have worse access to care and

higher rates of ED visits.[50]  Pregnant women of color are also less likely to receive prenatal

care, resulting in an increased risk for complex health issues occurring in pregnancy.[51]  As

a result, women of color experience higher rates of severe maternal morbidity and are more

---

[46] ACOG Committee Opinion No. 586, *Health Disparities in Rural Women*, at 2 (Feb. 2014, reaff'd 2021).

[47] *Id.*

[48] *Id.*

[49] CMS, *Advancing Rural Maternal Health Equity*, at1 (May 2022), available at: https://www.cms.gov/files/document/maternal-health-may-2022.pdf ("CMS, *Advancing Rural Maternal*").

[50] *2019 National Healthcare Quality and Disparities Report*,  AGENCY FOR HEALTHCARE RESEARCH AND QUALITY, A22 (Dec. 2020), available at: https://www.ahrq.gov/sites/default/files/wysiwyg/research/findings/nhqrdr/2019qdr-cx061021.pdf;  *Trends in the Utilization of Emergency Dep't Servs., 2009-2018*, OFFICE OF THE ASSISTANT SECRETARY FOR PLANNING AND EVALUATION, HHS 1, 22 (Mar. 2021), available at: https://aspe.hhs.gov/sites/default/files/migrated_legacy_files//199046/ED-report-to-Congress.pdf.

[51] Benson, *EPL*, at 2; *see also* Juanita Chinn, et al., *Health Equity Among Black Women in the United States*, 30(2) J. WOMEN'S HEALTH 212, 215 (2021) ("Chinn, *Health Equity*") (explaining that "Black women are at a disadvantage regarding the protective factor of the early initiation of prenatal care").

likely to die from pregnancy-related complications.[52]  Women of color are also more likely to experience EPL (or miscarriage), the standard treatment for which can include abortion, and to visit an ED for their EPL-related care.[53]

Each of these categories of women are therefore more likely to experience emergency medical conditions when pregnant, and thus more likely to need the critical care that the Idaho Law obstructs.

B.     **The Idaho Law Is Inconsistent with Federal Law and Undermines Principles of Medical Ethics**

EMTALA's requirement that a physician must provide "stabilizing treatment [to] prevent material deterioration" of all patients and must "act prior to the patient's condition declining"[54] codified what was already paramount in physicians' professional obligations. For example, ACEP's Code of Professional Ethics states that "[e]mergency physicians shall embrace patient welfare as their primary professional responsibility" and explains that it is unethical to deny or delay the provision of emergency care on the basis of "type of illness or injury."[55]  ACOG's Code of Professional Ethics similarly states that "the welfare of the patient must form the basis of all medical judgments" and that obstetrician-gynecologists should "exercise all reasonable means to ensure that the most appropriate

---

[52]   CMS, *Advancing Rural Maternal*, at 1; *see also* Chinn, *Health Equity*, at 215 (Black and Latina women "are at greater risk of poor pregnancy outcomes").

[53]    Benson, *EPL* at 5–7.

[54]   CMS, *Reinforcement of EMTALA Obligations Specific to Patients who are Pregnant or are Experiencing Pregnancy Loss* (July 11, 2022).

[55]   ACEP, *Code of Ethics*, at 4, 11.

care is provided to the patient."[56]  The AMA Code of Medical Ethics likewise places on physicians the "ethical responsibility to place patients' welfare above the physician's own self-interest or obligations to others."[57]  The Idaho Law's prohibition of medically indicated, emergency care without regard to circumstance violates long-established and widely accepted principles of medical ethics by (1) substituting legislators' opinions for the necessary medical course of action as determined by a physician or health care provider and  informed by clinical standards of care; and (2) compelling physicians and health care professionals to deny necessary emergency care in violation of  the age-old principles of beneficence and non-maleficence.

Laws that criminalize medical care even when EMTALA and medical ethics mandate that physicians provide it cannot be reconciled with the reality of the provision of emergency medicine or bedrock principles of medical ethics.

## IV.   CONCLUSION

For the foregoing reasons, and those set forth by the Government, this Court should grant the preliminary injunction preventing this dangerous law from taking effect as to emergency medical care.

---

[56]   ACOG, *Code of Professional Ethics*, at 2 (Dec. 2018) ("ACOG, *Code of Ethics*").

[57]   AMA, *Code of Ethics* § 1.1.1.

Dated: August 15, 2022

Respectfully submitted,

*s/*    Shannon Rose Selden
Shannon Rose Selden (*pro hac vice*)
Leah Martin (*pro hac vice*)
Adam Aukland-Peck (*pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Ave.
New York, NY 10022
Tel.: 212-909-6000
srselden@debevoise.com
lmartin@debevoise.com
aauklandpeck@debevoise.com

Jeffrey B. Dubner*
Skye L. Perryman
John T. Lewis*
Maher Mahmood*
DEMOCRACY FORWARD FOUNDATION
655 15th St. NW, Ste 800
Washington, D.C. 20005
Tel.: (202) 448-9090
jdubner@democracyforward.org
sperryman@democracyforward.org
jlewis@democracyforward.org
mmahmood@democracyforward.org

*Counsel for* Amici

*\* pro hac vice application forthcoming*