Wendy J. Olson, ISB #7634
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702-7705
Telephone: 208.389.9000
Facsimile: 208.389.9040
wendy.olson@stoel.com

Jacob M. Roth (DC #995090, *pro hac vice* pending)
Charlotte H. Taylor (DC #1024658, *pro hac vice* pending)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  202.879.3939
Facsimile:  202.626.1700
ctaylor@jonesday.com
yroth@jonesday.com

Amanda K. Rice (MI # P80460, *pro hac vice* pending)
JONES DAY
150 West Jefferson
Suite 2100
Detroit, MI 48226-4438
Telephone: 313.733.3939
Facsimile: 313.230.7997
arice@jonesday.com

*Attorneys for Amici Curiae*
*The American Hospital Association and*
*The Association of American Medical Colleges*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE STATE OF IDAHO,<br><br>Defendant. | Case No. 1:22-cv-00329-BLW<br><br>Hon. B. Lynn Winmill |

**BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTEREST OF AMICI CURIAE ........................................................................................ 1

INTRODUCTION ............................................................................................................... 3

ARGUMENT ....................................................................................................................... 4

I.  BY CRIMINALIZING MEDICAL JUDGMENTS, THE IDAHO STATUTE WILL CHILL
    THE PROVISION OF EMERGENCY MEDICAL CARE .................................................. 4

    A.  Criminal Statutes Impose Chilling Effects That Can Overdeter Lawful
        and Beneficial Conduct, Especially in Emergency Contexts ...................... 7

    B.  The Idaho Statute Threatens To Overdeter Medically-Necessary
        Emergency Care That Federal Law Actively Requires ............................... 9

II. EMTALA PROVIDES HOSPITALS THE CLARITY THEY NEED TO PROVIDE
    EMERGENCY CARE ............................................................................................... 12

CONCLUSION .................................................................................................................. 13

CERTIFICATE OF SERVICE .......................................................................................... 15

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF
AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED
STATES' MOTION FOR PRELIMINARY INJUNCTION

116452752.2 0099999-00006

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Atwater v. City of Lago Vista,*
    532 U.S. 318 (2001)........................................................................................8

*Conant v. Walters,*
    309 F.3d 629 (9th Cir. 2002) ....................................................................6, 9

*Dombrowski v. Pfister,*
    380 U.S. 479 (1965)........................................................................................8

*Graham v. Connor,*
    490 U.S. 386 (1989)........................................................................................8

*Martin v. Ohio,*
    480 U.S. 228 (1987)........................................................................................8

*Mullaney v. Wilbur,*
    421 U.S. 684 (1975)........................................................................................8

*Reno v. ACLU,*
    521 U.S. 844 (1997)........................................................................................7

*Ruan v. United States,*
    142 S. Ct. 2370 (2022).................................................................................8, 11

*Ryburn v. Huff,*
    565 U.S. 469 (2012) (per curiam) ..................................................................9

*United States v. Alvarez,*
    567 U.S. 709 (2012)........................................................................................7

*Vickers v. Nash Gen. Hosp., Inc.,*
    78 F.3d 139 (4th Cir. 1996) ...........................................................................3

*Virginia v. Hicks,*
    539 U.S. 113 (2003)........................................................................................7

STATUTES

Emergency Medical Treatment and Labor Act, 42 U.S.C. § 1395dd ...............1, 3, 5, 12

Idaho Code § 18-622 ............................................................................... *passim*

Idaho Code § 54-1805 ......................................................................................6

Idaho Code § 54-1805A ...................................................................................6

Idaho Code § 54-1806 ......................................................................................6

Idaho Code § 54-1814 ......................................................................................6

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF
AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED
STATES' MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF AUTHORITIES
(continued)

Page(s)

Idaho Code § 54-1815...................................................................................................6

OTHER AUTHORITIES

Pam Belluck, *They Had Miscarriages, and New Abortion Laws
Obstructed Treatment*, NEW YORK TIMES (July 17, 2022) ....................................10

Brandice Canes-Wrone & Michael C. Dorf, *Measuring the Chilling Effect*,
90 N.Y.U. L. REV. 1095 (2015)................................................................................9

David S. Cohen, et al., *The New Abortion Battleground*,
123 COLUMBIA L. REV. (forthcoming 2023).............................................................6

131 CONG. REC. E5520 (daily ed. Dec. 10, 1985) (statement of Rep. Stark)...........................12

Lisa H. Harris, *Navigating Loss of Abortion Services—A Large Academic
Medical Center Prepares for the Overturn of* Roe v. Wade,
386 NEW ENGLAND J. MED. 2061 (2022) ................................................................10

George Kovacs, MD, MHPE and Pat Croskerry, MD, PhD, *Clinical
Decision Making: An Emergency Medicine Perspective*,
ACADEMIC EMERGENCY MEDICINE (Sep. 1999) .......................................................10

Katie Shepherd & Frances Stead Sellers, *Abortion bans complicate access to
drugs for cancer, arthritis, even ulcers*, WASH. POST (Aug. 8, 2022)....................10

David M. Studdert, et al., *Defensive Medicine Among High-Risk Specialist
Physicians in a Volatile Malpractice Environment*, JAMA (2005).........................9

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF
AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED
STATES' MOTION FOR PRELIMINARY INJUNCTION

116452752.2 0099999-00006

## INTEREST OF AMICI CURIAE[1]

The American Hospital Association (AHA) represents nearly 5,000 hospitals, healthcare systems, and other healthcare organizations.  Its members are committed to improving the health of the communities that they serve, and to helping ensure that care is available to and affordable for all Americans.  The AHA educates its members on healthcare issues and advocates on their behalf, so that their perspectives are considered in formulating health policy.  One way in which the AHA promotes its members' interests is by participating as *amicus curiae* in cases with important and far-ranging consequences.  Virtually all of AHA's member-hospitals provide emergency room services.  Therefore, virtually all of AHA's member-hospitals are covered by the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd.  This includes 37 member-hospitals in the State of Idaho, from one of the nation's most remote hospitals in Salmon, Idaho, to tertiary facilities in Idaho Falls, Pocatello, and Boise.

The Association of American Medical Colleges (AAMC) is a nonprofit association dedicated to improving the health of people everywhere through medical education, health care, medical research, and community collaborations.  Its members comprise all 156 accredited U.S. medical schools; 14 accredited Canadian medical schools; approximately 400 teaching hospitals and health systems, including Department of Veterans Affairs medical centers; and nearly 80 academic societies.  Accredited medical schools prepare students to provide care to patients for the full range of services needed.  The University of Washington School of Medicine runs WWAMI, a multistate medical education program through which students engage in clinical

---

[1] No party or counsel for a party authored any portion of this brief or made any monetary contribution intended to fund its preparation or submission. The United States has consented to the filing of this brief.  The State of Idaho takes no position.

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION

-1-

training in Washington, Wyoming, Alaska, Montana and Idaho.  There are currently 40 Idaho WWAMI medical students in each class.  Students complete 84 credits in the Patient Care Phase Curriculum, including 12 credits in a required obstetrics and gynecology clerkship.

In *Amici*'s experience, EMTALA-mandated stabilizing care for pregnant patients sometimes requires the termination of a pregnancy.  *Amici* and their members thus have a direct and profound interest in the outcome of this case.  Absent judicial relief, physicians, nurses, and other qualified medical personnel at Idaho hospitals will face the intolerable threat of criminal liability for doing what federal law requires.  As the nation's largest association of hospitals, and as the leading voice representing American medical schools and teaching hospitals, *Amici* are uniquely positioned to provide this Court with important information about consequences of such liability for the provision of emergency healthcare in the State of Idaho.

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION

116452752.2 0099999-00006

## INTRODUCTION

Every day, pregnant patients arrive at hospital emergency rooms in the midst of grave health emergencies.  Physicians, nurses, and other qualified medical personnel must make split-second decisions about what care to provide to those patients, who are at risk not only of death or serious lifelong impairment, but also of tragically losing their pregnancies.  In some cases, there is no available treatment that will both save the life of the pregnant woman and allow her pregnancy to continue.  In these situations, physicians and nurses must rely on their experience, expertise, and medical judgment to deliver emergency care.  And federal law, as reflected in EMTALA, requires hospitals to do exactly that: exercise their medical judgment to provide "stabilizing" care to those experiencing an "emergency medical condition," including in situations where the health or safety of "a pregnant woman" or "her unborn child" is in "serious jeopardy." 42 U.S.C. § 1395dd(b)(1), (e); *see Vickers v. Nash Gen. Hosp., Inc*., 78 F.3d 139, 144 (4th Cir. 1996) ("[T]reatment based on diagnostic medical judgment … is precisely what EMTALA hoped to achieve—handling of patients according to an assessment of their medical needs.").

Idaho Code § 18-622, however, makes it a crime for healthcare providers to choose to terminate a pregnancy—no matter the circumstances.  To be sure, the statute provides a narrow affirmative defense if a provider can prove both that termination was "necessary to prevent the death of the pregnant woman" and that the provider's medical judgments "provided the best opportunity for the unborn child to survive."  Idaho Code § 18-622(3)(a)(ii)–(iii).  But the statute provides no such defense for treatment necessary to prevent serious and irreversible harm to the woman's organs or bodily functions, as EMTALA requires.  And even where the defense applies, the physician—not the prosecutor—must prove the validity of her medical judgment to avoid

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION

felony punishment.  As the United States argues in its Motion for Preliminary Injunction, those provisions of § 18-622 conflict with, and pose an obstacle to, federal law.

AHA and AAMC respectfully submit this *amicus* brief to explain, from an on-the-ground perspective, why this conflict between federal and state law carries profound consequences for Idaho hospitals, Idaho health systems, and the thousands of Idaho patients they serve. Notwithstanding the Idaho law's affirmative defense, its threat of criminal sanctions will interfere with the exercise of healthcare providers' expert judgment in the provision of medically necessary care.  And this sort of chilling effect is particularly troubling in the emergency room context, where providers must make life-or-death decisions in the heat of the moment—and where delay or restraint can make all the difference.

Hospitals and emergency room physicians need clarity about the legal regimes that govern the provision of care.  They need to know what treatments they may—and, in the context of EMTALA, *must*—provide.  The conflicting federal and Idaho frameworks, however, generate exactly the kind of uncertainty that is antithetical to the practice of sound emergency medicine. Accordingly, this Court should enjoin the enforcement of Idaho Code § 18-622 as applied to EMTALA-mandated care.

## ARGUMENT

### I. BY CRIMINALIZING MEDICAL JUDGMENTS, THE IDAHO STATUTE WILL CHILL THE PROVISION OF EMERGENCY MEDICAL CARE.

The determinative issue in this case is whether the Idaho statute can coexist with EMTALA, without contradicting its directives or standing in the way of its purposes.  It cannot. There is a clear conflict between federal and state law.

On the one hand, EMTALA directs covered hospitals to provide whatever "treatment" is "required to stabilize the medical condition" of any patient who arrives with an "emergency medical condition." 42 U.S.C. § 1395dd(b)(1). An "emergency medical condition" is defined to include any condition that, in the absence of immediate medical attention, places the patient's health in "serious jeopardy" or threatens "serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part." *Id.* § 1395dd(e)(1). Where a patient is pregnant, EMTALA directs providers to consider both "the health of the woman" and the health of "her unborn child." *Id.* § 1395dd(e)(1)(A)(i).

On the other hand, Idaho Code § 18-622 provides that every intentional termination of a pregnancy is "a felony," subject to "a sentence of imprisonment of no less than two (2) years and no more than five (5) years in prison." Idaho Code § 18-622(2). The operative criminal prohibition itself provides no exceptions for instances where termination is medically necessary to preserve the mother's life or stabilize her health.

The statute does authorize an affirmative defense, whereby the healthcare provider can seek to prove that termination "was necessary to prevent the death of the pregnant woman" and that the provider acted in the manner that "provided the best opportunity for the unborn child to survive." *Id.* § 18-622(3)(a)(ii)–(iii). But that defense does *not* apply where termination is necessary to prevent "serious" and potentially irreversible "impairment to bodily functions" or "dysfunction of a[] bodily organ or part," which qualify as emergency conditions under EMTALA. 42 U.S.C. § 1395dd(e)(1)(A)(ii)–(iii). And even where a provider correctly determines that termination is necessary to prevent death, that fact is not a bar to arrest and prosecution, nor does the prosecution bear any burden of showing otherwise. Rather, to avoid conviction, *the physician*

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION

must prove to a jury that termination "was necessary to prevent the death of the pregnant woman" and that the physician "provided the best opportunity for the unborn child to survive."  Idaho Code § 18-622(3)(a)(ii)–(iii).

Providers also face collateral consequences of § 18-622 prosecution.  The statute provides that any health care professional who performs or attempts to perform a prohibited abortion "shall be suspended by the appropriate licensing board for a minimum of six (6) months upon a first offense and shall be permanently revoked upon a subsequent offense."  Idaho Code § 18-622(2). Worse, those collateral consequences may ensue even if the professional *succeeds* in proving the affirmative defense.  The prosecution itself "could be reported to the provider's licensing board, which typically has broad discretion in governing provider ethics and standards of conduct." David S. Cohen, et al., *The New Abortion Battleground*, 123 COLUMBIA L. REV. (forthcoming 2023), Draft at 35, *available at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4032931; *see, e.g.*, Idaho Code §§ 54-1805, 54-1806, 54-1805A, 54-1814, 54-1815 (establishing Board of Medicine and delegating broad oversight powers, including with respect to professional discipline).  And "being named as a defendant too many times or being subject to a disciplinary investigation, even if the provider ultimately prevails, could result in licensure suspension, high malpractice insurance costs, and reputational damage."  Cohen, *supra* at 35.  As a result, "[a] physician's career can be effectively destroyed merely by the fact that a governmental body has investigated his or her practice."  *Conant v. Walters*, 309 F.3d 629, 640 n.2 (9th Cir. 2002) (Kozinski, J., concurring).

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION

-6-

116452752.2 0099999-00006

A.    **Criminal Statutes Impose Chilling Effects That Can Overdeter Lawful and Beneficial Conduct, Especially in Emergency Contexts.**

Although the difference between what Idaho law criminalizes and what EMTALA requires may seem technical or academic, it is incredibly consequential for hospitals and their emergency physicians.  By erecting a criminal prohibition for potentially life-saving stabilizing care, and then limiting the physician in that scenario to a mere affirmative defense, the Idaho statute imposes a severe chilling effect on the provision of medicine.  And that chilling effect is frostiest in the emergency room, where healthcare providers must make immediate medical decisions without the benefit of legal counsel.

Criminal prohibitions deter bad conduct.  But criminal statutes can also *overdeter* by chilling lawful conduct.  In some cases, that sort of chilling effect poses constitutional problems, such as by burdening the exercise of First Amendment rights.  In other cases, like this one, the chilling effect is problematic because it discourages conduct that federal law actively requires: the provision of stabilizing care consistent with the provider's medical judgment.

The Supreme Court has repeatedly recognized that a "criminal statute," because of its "opprobrium and stigma," as well as the penalty of "prison," causes an "increased deterrent effect," above and beyond the impact of ordinary "civil regulation."  *Reno v. ACLU*, 521 U.S. 844, 872 (1997); *see also, e.g.*, *Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (repeating that the risk that a law will "deter or 'chill'" conduct is heightened when the statute "imposes criminal sanctions"); *United States v. Alvarez*, 567 U.S. 709, 733 (2012) (Breyer, J., concurring in the judgment) (noting that the "threat of criminal prosecution" carries a powerful "chilling" effect and can "inhibit" lawful conduct).  The reason is simple:  In the case of any doubt or uncertainty, only "those hardy

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION

-7-

116452752.2 0099999-00006

enough to risk criminal prosecution" will plow ahead, whereas the rest will steer clear of the "protracted litigation" that may otherwise ensue. *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965).

This deterrent effect is heightened if the burden on the key disputed issue is shifted in the form of an affirmative defense. Affirmative defenses are "matters for the defendant to prove" and therefore need not be established by the prosecution beyond a reasonable doubt. *Martin v. Ohio*, 480 U.S. 228, 235 (1987). That makes a major practical difference. As the Supreme Court has explained, "where the defendant is required to prove the critical fact in dispute," that "increase[s] further the likelihood of an erroneous … conviction." *Mullaney v. Wilbur*, 421 U.S. 684, 701 (1975). That heightened risk of false conviction, in turn, means the individual will be *even more cautious* about acting in a way that might be misunderstood by a jury as violating the law. Put simply, shifting the burden from the prosecutor to the defendant, particularly on a matter of medical judgment, dramatically increases the risk of "'overdeterrence,' *i.e.*, punishing acceptable and beneficial conduct that lies close to, but on the permissible side of, the criminal line." *Ruan v. United States*, 142 S. Ct. 2370, 2377–78 (2022); *cf. id.* at 2377 (observing that the requirement that prosecutors prove *mens rea* "plays a 'crucial' role in separating innocent conduct—and, in the case of doctors, socially beneficial conduct—from wrongful conduct").

These considerations are at their apex in emergency contexts. In fast-moving, touch-and-go situations, the Supreme Court has emphasized the need for "breathing room" and warned against imposing retrospective liability based on uncertain standards. *Cf. Graham v. Connor*, 490 U.S. 386, 396–97 (1989) (reasoning that the law "must embody allowance for the fact that police officers are often forced to make split-second judgments," and do so "in circumstances that are tense, uncertain, and rapidly evolving"); *Atwater v. City of Lago Vista*, 532 U.S. 318, 347 (2001)

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION

-8-

(emphasizing that officers who must act "on the spur (and in the heat) of the moment" need "clear" rules).  Courts are not well equipped to "second-guess[]," with the "benefit of hindsight and calm deliberation," an "on the scene" professional assessment "of the danger presented by a particular situation." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam).

### B.   The Idaho Statute Threatens To Overdeter Medically-Necessary Emergency Care That Federal Law Actively Requires.

The factors described above converge to give Idaho Code § 18-622 a potent chilling effect in the context of emergency care.  Because that statute imposes criminal penalties and severe licensing consequences, and because the statute relegates questions surrounding an emergency caregiver's expert medical judgment into a mere affirmative defense, healthcare providers in Idaho will be forced to balance their own liberty and livelihood against the health and safety of their patients.

As numerous medical experts, judges, and scholars have recognized, subjecting doctors' clinical judgments to criminal liability will invariably chill the provision of lawful care.  *See, e.g.,* David M. Studdert, et al., *Defensive Medicine Among High-Risk Specialist Physicians in a Volatile Malpractice Environment*, JAMA (2005) (explaining that many physicians practice "defensive medicine" by, among other things, avoiding "procedures and patients that [a]re perceived to elevate the probability of litigation"); *Conant*, 309 F.3d at 640 n.2 (Kozinski, J., concurring) (quoting expert report for proposition that "physicians are particularly easily deterred by the threat of governmental investigation and/or sanction from engaging in conduct that is entirely lawful and medically appropriate").  And in the specific context of emergency termination, there is evidence that the threat of criminal sanctions may cause providers to hesitate to provide *other* necessary care to pregnant women.  *See, e.g.,* Brandice Canes-Wrone & Michael C. Dorf, *Measuring the*

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION

-9-

*Chilling Effect*, 90 N.Y.U. L. REV. 1095, 1114 (2015) (analyzing whether laws governing the pregnancy termination chill lawful behavior, and concluding that these laws "affect not only the unprotected conduct they (perhaps permissibly) target, but also discourage protected conduct outside of their direct ambit.  The chilling effect is real."); Lisa H. Harris, *Navigating Loss of Abortion Services—A Large Academic Medical Center Prepares for the Overturn of* Roe v. Wade, 386 NEW ENGLAND J. MED. 2061, 2063 (2022) ("Absent clear policies permitting it, doctors may hesitate to treat patients with ectopic pregnancy, inevitable miscarriage, or previability rupture of membranes when fetal cardiac activity remains."); Pam Belluck, *They Had Miscarriages, and New Abortion Laws Obstructed Treatment*, NEW YORK TIMES (July 17, 2022) (detailing stories of patients who received no care, less comprehensive care, or delayed intervention from providers while experiencing miscarriages after abortion bans took effect in certain states); Katie Shepherd & Frances Stead Sellers, *Abortion bans complicate access to drugs for cancer, arthritis, even ulcers*, WASH. POST (Aug. 8, 2022) ("Medicines that treat conditions from cancer to autoimmune diseases to ulcers can also end a pregnancy or cause birth defects. As a result, doctors and pharmacists in … states with strict abortion restrictions must suddenly navigate whether and when to order such drugs because they could be held criminally liable and lose their licenses for prescribing some of them to pregnant women.").  These considerations are most significant in the emergency room, where professionals must make on-the-spot, heat-of-the-moment judgment calls that carry grave consequences.  *See, e.g*., George Kovacs, MD, MHPE and Pat Croskerry, MD, PhD, *Clinical Decision Making: An Emergency Medicine Perspective*, ACADEMIC EMERGENCY MEDICINE 947 (Sep. 1999) ("The [emergency department] is a unique environment of uncontrolled patient volume and brief clinical encounters of variable acuity. The emergency physician … must

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION

often make complicated clinical decisions with limited information while faced with a multitude of competing demands and distractions.").

The consequences of this chilling effect for patients are staggering.  Imagine a physician or nurse who is confronted in the emergency room by a pregnant woman who was just in a car crash.  A stabilizing surgery would be medically necessary, but is likely to result in termination of the pregnancy.  Instead of exercising medical judgment and relying on experience in deciding how to proceed, an Idaho physician or nurse must now consider—even subconsciously—whether proceeding with the surgery could result in a criminal prosecution or loss of license.  And in any criminal case, the physician or nurse would have to convince an untrained jury that the surgery was necessary to save the woman's life and presented the least risks to her pregnancy.  In such circumstances, as the declarations submitted by the United States make clear, even the hardiest, most devoted emergency-room caregiver cannot help but be "overdeterred" from proceeding with a life-saving surgery that "lies close to, but on the permissible side of, the criminal line."  *Ruan*, 142 S. Ct. at 2378; *see, e.g.*, Seyb Decl. ¶ 13 (describing call from a physician who was forced to balance his "medical judgment or best practices for handling pregnancy complications" with the "ramifications of his actions if he proceeded with termination"); *id.* ¶ 14 ("In emergency situations, physicians may delay the medically necessary care because they fear a financially ruinous investigation or criminal liability."); Cooper Decl. ¶ 12 ("In the future, though I know what the appropriate medical treatment is for my patients, I would be hesitant to provide the necessary care due to the significant risk to my professional license, my livelihood, my personal security, and the well-being of my family.").

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION

## II.    EMTALA PROVIDES HOSPITALS THE CLARITY THEY NEED TO PROVIDE EMERGENCY CARE.

A decision holding that EMTALA preempts § 18-622 will ensure that emergency room providers have the clarity they need to provide necessary care in keeping with federal law.  As the United States explains in its Motion, EMTALA expressly provides that "any State or local law requirement" is preempted "to the extent that the requirement directly conflicts with the requirement of this section."   42 U.S.C. § 1395dd(f).   Courts have consistently applied that preemption clause to find state laws preempted when they prohibit medical treatment EMTALA would otherwise require, thereby providing clear, uniform rules for hospitals to follow when confronted with medical emergencies.  *See* U.S. Mot. 14–15 (citing cases).

But hospitals, physicians, nurses, and patients need clarity and protection from criminal prosecution *right now*.  Allowing § 18-622 to take effect before its interaction with EMTALA has been definitively adjudicated will disrupt Idaho's emergency rooms—drastically increasingly the likelihood that emergency caregivers will hesitate to provide medically-necessary treatment to their patients.  *See, e.g.,* Seyb Decl. ¶ 13 (recounting incident in which a physician wanted to transfer pregnant patient in need of termination because he "was afraid of the potential ramifications").  That is exactly the result EMTALA was enacted to prevent.  *See, e.g.,* 131 CONG. REC. E5520 (daily ed. Dec. 10, 1985) (statement of Rep. Stark) (citing multiple media reports of hospitals refusing to treat pregnant and other patients experiencing medical emergencies).   A preliminary injunction will preserve the status quo, appropriately respect the expert medical judgment of Idaho emergency caregivers like those who submitted declarations in this case, and ultimately protect patients who arrive at Idaho's hospitals at the most vulnerable moments of their lives, when they are in desperate need of emergency care.

## CONCLUSION

For the foregoing reasons, as well as those given by the United States, the Court should grant the United States' motion and enter a preliminary injunction prohibiting the enforcement of Idaho Code § 18-622 as applied to EMTALA-mandated emergency care.

Dated: August 16, 2022

Respectfully submitted,

/s/ Wendy J. Olson

Wendy J. Olson
STOEL RIVES LLP
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702-7705
Telephone: 208.389.9000
Facsimile: 208.389.9040
wendy.olson@stoel.com

Jacob M. Roth (*pro hac vice* pending)
Charlotte H. Taylor (*pro hac vice* pending)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
Telephone:  202.879.3939
Facsimile:  202.626.1700
ctaylor@jonesday.com
yroth@jonesday.com

Amanda K. Rice (*pro hac vice* pending)
JONES DAY
150 West Jefferson
Suite 2100
Detroit, MI 48226-4438
Telephone: 313.733.3939
Facsimile: 313.230.7997
arice@jonesday.com

*Counsel for Amici Curiae*
*The American Hospital Association and*
*The Association of American Medical Colleges*

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF
AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED
STATES' MOTION FOR PRELIMINARY INJUNCTION

116452752.2 0099999-00006

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 16th day of August, 2022, I filed the foregoing **BRIEF OF AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION** electronically through the CM/ECF system, which caused the following to be served by electronic means on all parties.

**ATTORNEYS FOR PLAINTIFF**

Brian David Netter
DOJ-Civ
Civil Division
950 Pennsylvania Avenue NW
Washington, DC 20530
Email: brian.netter@usdoj.gov

Daniel Schwei
DOJ-Civ
Federal Programs Branch
1100 L St NW
Ste 11532
Washington, DC 20530
Email: daniel.s.schwei@usdoj.gov

Julie Straus Harris
DOJ-Civ
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20530
Email: julie.strausharris@usdoj.gov

Lisa Newman
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Email: lisa.n.newman@usdoj.gov

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION

-15-

Anna Lynn Deffebach
DOJ-Civ
Civil Division- Federal Programs Branch
1100 L ST NW
Ste Lst 12104
Washington, DC 20005
Email: anna.l.deffebach@usdoj.gov

Christopher A. Eiswerth
DOJ-Civ
Federal Programs Branch
1100 L Street, NW
Ste 12310
Washington, DC 20005
Email: christopher.a.eiswerth@usdoj.gov

Emily Nestler
DOJ-Civ
1100 L Street
Washington, DC 20005
Email: emily.b.nestler@usdoj.gov

**<u>ATTORNEYS FOR DEFENDANT</u>**

Brian V Church
Office of the Attorney General, Civil
Litigation Division
954 W. Jefferson St., 2nd Floor
P.O. Box 83720
Boise, ID 83702-0010
Email: brian.church@ag.idaho.gov

Dayton Patrick Reed
Office of the Attorney General
PO Box 83720
Boise, ID 83720-0010
Email: dayton.reed@ag.idaho.gov

Ingrid C Batey
Office of the Attorney General - Civil
Litigation

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF
AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED
STATES' MOTION FOR PRELIMINARY INJUNCTION

954 W. Jefferson
Boise, ID 83720
Email: ingrid.batey@ag.idaho.gov

Megan Ann Larrondo
Office of the Attorney General
954 W. Jefferson- Second Floor
Boise, ID 83720
Email: megan.larrondo@ag.idaho.gov

Steven Lamar Olsen
OFFICE OF THE ATTORNEY GENERAL
POB 83720
Boise, ID 83720-0010
Email: steven.olsen@ag.idaho.gov

**ATTORNEYS FOR INTERVENOR
DEFENDANT**

**Speaker of the Idaho House of
Representatives Scott Bedke, Idaho Senate
President Pro Tempore Chuck Winder,
and the Sixty-Sixth Idaho Legislature**

Monte N Stewart
11000 Cherwell Court
Las Vegas, NV 89144
Email: monteneilstewart@gmail.com

Daniel W. Bower
MORRIS BOWER & HAWS PLLC
12550 W. Explorer Dr. Suite 100
Boise, ID 83713
Email: dbower@morrisbowerhaws.com

/s/ Wendy J. Olson
_____
Wendy J. Olson

*Counsel for Amici Curiae
The American Hospital Association and
The Association of American Medical
Colleges*

BRIEF OF THE AMERICAN HOSPITAL ASSOCIATION AND THE ASSOCIATION OF
AMERICAN MEDICAL COLLEGES AS AMICI CURIAE IN SUPPORT OF THE UNITED
STATES' MOTION FOR PRELIMINARY INJUNCTION

-17-