LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief, Civil Litigation Division

MEGAN A. LARRONDO, ISB #10597
BRIAN V. CHURCH, ISB #9391
ALAN W. FOUTZ, ISB #11533
INGRID C. BATEY, ISB #10022
Deputy Attorneys General
CLAY R. SMITH, ISB #6385
Special Deputy Attorney General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, ID  83720-0010
Telephone:  (208) 334-2400
Facsimile:  (208) 854-8073
megan.larrondo@ag.idaho.gov
brian.church@ag.idaho.gov

JOAN E. CALLAHAN, ISB #9241
NAYLOR & HALES, P.C.
Special Deputy Attorney General
950 W. Bannock Street, Ste. 610
Boise, ID 83702
Telephone No. (208) 383-9511
Facsimile No. (208) 383-9516
joan@naylorhales.com

*Attorneys for Defendant State of Idaho*

# UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>v.<br><br>THE STATE OF IDAHO,<br><br>                    Defendant. | Case No. 1:22-cv-329<br><br>**STATE OF IDAHO'S RESPONSE TO THE UNITED STATES' MOTION FOR A PRELIMINARY INJUNCTION (Dkt. 17)** |

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................1

BACKGROUND ............................................................................................................1

    I.     The Emergency Medical Treatment and Labor Act (EMTALA) ...............................2

    II.    Idaho Code § 18-622 ............................................................................................4

    III.   Post-*Dobbs* Developments ........................................................................................5

LEGAL STANDARDS ...................................................................................................6

ARGUMENT ...................................................................................................................7

    I.     The United States Has Not Established a Likelihood of Success in Its Facial
         Challenge to the Application of Idaho Code § 18-622 To EMTALA-Covered
         Abortions ..............................................................................................................9

         A.   The United States' Facial Preemption Challenge to Idaho
              Code § 18-622 Fails ........................................................................................ 9

              1.   Section 18-622 and the stabilization requirement ....................................11

              2.   Criminal liability and good-faith medical judgment
                  affirmative defense ..................................................................................14

    II.    Lack of Irreparable Harm ..................................................................................17

    III.   Balance of Equities and Public Interest ...................................................................18

CONCLUSION ...............................................................................................................20

# TABLE OF AUTHORITIES

**Cases**                                                                                   **Page**

*Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n,*
576 U.S. 787 (2015)................................................................20

*Armstrong v. Exceptional Child Center, Inc.,*
675 U.S. 320 (2015)..................................................................7

*Bryant v. Adventist Health Sys./West,*
8 F.3d 1162 (9th Cir. 2002) .......................................................8

*Cf. Alexander v. Sandoval,*
532 U.S. 275 (2001)..................................................................7

*Cherukuri v. Shalala,*
175 F.3d 446 (6th Cir. 1999) ...............................................13, 16

*Cipollone v. Liggett Group, Inc.,*
505 U.S. 504 (1992)................................................................14

*Dobbs v. Jackson Women's Health Organization,*
--- U.S. ---, 142 S. Ct. 2228 (2022).....................................*passim*

*Drakes Bay Oyster Co. v. Jewell,*
747 F.3d 1073 (9th Cir. 2014) ....................................................6

*Draper v. Chiapuzio,*
9 F.3d 1391 (9th Cir. 1993) ......................................................14

*Eberhardt v. City of Los Angeles,*
62 F.3d 1253 (9th Cir. 1995) ..................................................2, 15

*Gatewood v. Wash. Healthcare Corp.,*
933 F.2d 1037, 290 U.S.App.D.C. 31 (D.C. Cir. 1991) .....................2

*Gonzales v. Carhart,*
550 U.S. 124 (2007)................................................................11

*Harry v. Marchant,*
291 F.3d 767 (11th Cir. 2002) ..................................................16

*Hawker v. New York,*
170 U.S. 189 (1898)................................................................14

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
    959 F.3d 1201 (9th Cir. 2020), *cert. denied*, 142 S. Ct. 521 (2021) ...............................15

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010)...........................................................................................................10

*Kowalski v. Tesmer*,
    543 U.S. 125 (2004)..............................................................................................................7

*Maryland v. King*, 567 U.S. 1301,
    ### (2012).............................................................................................................................19

*Matter of Baby "K"*,
    16 F.3d 590 (4th Cir. 1994) ...............................................................................................13

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997)..............................................................................................................6

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)........................................................................................................8, 19

*Nken v. Holder*,
    556 U.S. 418 (2009)..............................................................................................................6

*Palomar Med. Ctr. v. Sebelius*,
    693 F.3d 1151 (9th Cir. 2012) .............................................................................................1

*Puente Arizona v. Arpaio*,
    821 F.3d 1098 (9th Cir. 2016) .............................................................................................6

*Roe v. Wade*,
    410 U.S. 113 (1973).........................................................................................................5, 16

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009)..............................................................................................................8

*United States v. Salerno*,
    48 U.S. 739 (1987).............................................................................................................6, 10

*United States v. Texas*,
    557 F. Supp. 3d 810 (W.D. Tex. 2021)................................................................................7

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008)....................................................................................................10, 11, 17

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................................ 6, 7, 17

*Wyeth v. Levine*,
  555 U.S. 555 (2009) ...................................................................................... 15

**Statutes**

Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. ............................... *passim*

  §§ 1395-1395lll ..................................................................................................1

  § 1395cc ............................................................................................................2

  § 1395dd ...........................................................................................................3

  § 1395dd(a) ...................................................................................................3, 18

  § 1395dd(b)(1) ..................................................................................................3

  § 1395dd(b)(1)(A) .............................................................................................3

  § 1395dd(b)(1)(B) .............................................................................................3

  § 1395dd(c) .......................................................................................................3

  § 1395dd(d) .......................................................................................................7

  § 1395dd(d)(2) ..................................................................................................8

  § 1395dd(e)(1) ..................................................................................................3

  § 1395dd(e)(3)(A) .............................................................................................3

  § 1395dd(f) ...........................................................................................1, 4, 9, 14

**Regulations**

42 C.F.R. § 489.24 ..........................................................................................................2

42 C.F.R. § 489.24(a)(ii) ...............................................................................................4

42 C.F.R. § 489.24(b) ....................................................................................................2

42 C.F.R. § 489.24(d)(2)(i) ...........................................................................................4

42 C.F.R. § 489.24(d)(2)(ii) ..........................................................................................4

**Idaho Statutes**

Idaho Code § 18-604(1) ..............................................................................................5, 9

Idaho Code § 18-622 .............................................................................................. *passim*

Idaho Code § 18-622(2) .......................................................................................... *passim*

Idaho Code § 18-622(3) ................................................................................................10

Idaho Code § 18-622(3)(a) ........................................................................................5, 10

Idaho Code § 18-622(3)(b) .............................................................................................5

Idaho Code § 18-622(4) ..................................................................................................5

S.B. 1385, 65th Leg., 2d Reg. Sess. (Idaho 2020) .........................................................4

**Other Authorities**

*FACT SHEET: President Biden Issues Executive Order at the First meeting of the Task Force
on Reproductive Healthcare Access* (Aug. 3 2022), THE WHITE HOUSE (Aug. 3, 2022),
https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/03/fact-sheet-
president-biden-issues-executive-order-at-the-first-meeting-of-the-task-force-on-
reproductive-healthcare-access-2/........................................................................6

Letter to Health Care Providers, SECRETARY OF HEALTH AND HUMAN SERVICES,
https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-
providers.pdf .......................................................................................................6

*Preventing Patient Dumping: Sharpening the COBRA's Fangs*, 61 N.Y.U. L. Rev. 1186,
1187-88 (1986)........................................................................................................2

Protecting Access to Reproductive Healthcare Services." Exec. Order No. 14,076,87 Fed. Reg. 42053-54 (2022), available at https://www.federalregister.gov/documents/2022/07/13/2022-15138/protecting-access-to-reproductive-healthcare-services ........................................................................................5

*Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, CENTERS FOR MEDICARE & MEDICAID SERVICES (July 11, 2022), https://www.cms.gov/files/document/qso-22-22-Hospitals.pdf (last visited Aug. 16 2022) ...............................................................................................6

*Remarks by President Biden on the Supreme Court Decision to Overturn Roe v. Wade*, THE WHITE HOUSE (June 24, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/06/24/remarks-by-president-biden-on-the-supreme-court-decision-to-overturn-roe-v-wade/ ...........................................................................................................5

## INTRODUCTION

The United States seeks here to undermine Idaho's policy choice of how to regulate abortion, as allowed by *Dobbs*, by wielding its substantial financial clout under the Medicare program to invalidate that choice. Rather than awaiting an actual instance of supposed conflict, it asks this Court for broad injunctive relief that far exceeds what settled legal principles countenance. The United States asks this Court to only partially read the Emergency Medical Treatment and Labor Act's preemption provision that says that "[t]he provisions of [EMTALA] do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). The United States' own declarations fail to demonstrate a direct conflict between EMTALA and Idaho Code § 18-622.

In sum, the United States seeks a far-reaching preliminary injunction—one manifestly inconsistent with the preemption provision in EMTALA—preventing the State, its officers, employees, and agents, from enforcing Idaho's abortion regulation when stabilizing treatment is required by EMTALA. But the United States has not met its burden for issuance of a preliminary injunction. It fails to satisfy the requirements of a facial challenge because it cannot demonstrate that all applications of Section 18-622 are inconsistent with EMTALA requirements. The other factors do not favor granting a preliminary injunction. The United States' motion for a preliminary injunction should be denied.

## BACKGROUND

The federal government allows hospitals to participate as providers in its Medicare program. 42 U.S.C. §§ 1395-1395lll. "Medicare is a federally funded health insurance program for aged and disabled persons." *Palomar Med. Ctr. v. Sebelius*, 693 F.3d 1151, 1154-55 (9th Cir. 2012). A hospital, as a provider of services under Medicare, is subject to various requirements as

part of its relationship with the federal government, which are expressed in a provider agreement. 42 U.S.C. § 1395cc. A particular set of requirements applies to a hospital with an emergency department, which are expressed in the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd. By regulation, the Centers for Medicare and Medicaid Services (CMS) has more specifically identified what the provider agreement requires of hospitals with respect to EMTALA. 42 C.F.R. § 489.24. In this litigation, the United States contends that there is a conflict between the requirements of EMTALA and the soon-to-be-effective Idaho Code § 18-622.

## I.    The Emergency Medical Treatment and Labor Act (EMTALA)

Congress enacted EMTALA in 1986 to address the then-growing concern about "patient dumping"—the transfer or discharge of expensive-to-treat uninsured patients for whom "hospitals have an economic incentive to dump." Note, *Preventing Patient Dumping: Sharpening the COBRA's Fangs*, 61 N.Y.U. L. Rev. 1186, 1187-88 (1986) (citation omitted). EMTALA was passed to require hospital emergency departments to provide "adequate emergency room medical services to individuals who seek care, particularly as to the indigent and uninsured." *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1255 (9th Cir. 1995) (citing H.R. Rep. No. 241, 99th Cong., 1st Sess. (1986)); *see also Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1039, 290 U.S. App. D.C. 31, 33 (D.C. Cir. 1991).

For hospitals with an emergency department,[1] if a person "comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition," EMTALA requires that the hospital provide an "appropriate medical screening

---

[1] Federal regulations identify this as a hospital that is licensed to have an emergency department, or holds itself out as providing, or actually provides (for at least one-third of all outpatient visits) "care for emergency medical conditions on an urgent basis without requiring a previously scheduled appointment," 42 C.F.R. § 489.24(b).

examination within the capability of the hospital's emergency department" to determine whether an emergency medical condition exists. 42 U.S.C. § 1395dd(a).[2]

If a hospital determines that the individual has an emergency medical condition, the hospital must offer to provide stabilizing treatment or transfer. *Id.* § 1395dd(b)(1). If the hospital offers stabilizing treatment, it must, "within the staff and facilities available at the hospital," provide "for such further medical examination and such treatment as may be required to stabilize the medical condition." *Id.* § 1395dd(b)(1)(A). If the hospital offers to transfer the individual to another medical facility, it must do so in accordance with 42 U.S.C. § 1395dd(c). *Id.* § 1395dd(b)(1)(B).

With respect to stabilizing treatment, to "stabilize" means "with respect to an emergency medical condition, to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility, or [for a pregnant woman who is having contractions] to deliver (including the placenta)." *Id.* § 1395dd(e)(3)(A).

---

[2] An emergency medical condition is defined by the statute, 42 U.S.C. § 1395dd(e)(1) to mean:
    (A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
            (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
            (ii) serious impairment to bodily functions, or
            (iii) serious dysfunction of any bodily organ or part; or
    (B) with respect to a pregnant woman who is having contractions—
            (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or
            (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.

A hospital's obligation to a patient in the emergency department with an emergency medical condition under EMTALA is not indefinite or unlimited. Rather, the requirement to provide stabilizing treatment *ends* when either: (1) the patient is stabilized within the limits of the capabilities of the staff and facilities of the hospital; or (2) the hospital transfers the person to another hospital in accordance with EMTALA's requirements. 42 C.F.R. § 489.24(a)(ii). Further, "EMTALA's stabilization requirement ends when an individual is admitted for inpatient care." *Bryant v. Adventist Health Sys./West*, 289 F.3d 1162, 1168 (9th Cir. 2002). Hence, a hospital or physician has satisfied its EMTALA obligation when a patient is admitted by the hospital in good faith to provide further treatment even where the patient has not yet been stabilized. 42 C.F.R. § 489.24(d)(2)(i). Moreover, EMTALA does not apply to an inpatient "who was admitted for elective (nonemergency) diagnosis or treatment." *Id.* § 489.24(d)(2)(ii).

EMTALA also contains a preemption provision to prevent overriding state laws that may regulate the same arena but do not directly conflict with EMTALA. That provision provides: "The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f).

## II.    Idaho Code § 18-622

In 2020, the Idaho Legislature enacted the Trigger Law. S.B. 1385, 65th Leg., 2d Reg. Sess. (Idaho 2020). This legislation was codified at Idaho Code § 18-622. The U.S. Supreme Court's July 26, 2022 judgment in *Dobbs* means Idaho Code § 18-622 will be effective 30 days from July 26, 2022.

Under Idaho Code § 18-622, performing or attempting to perform an abortion carries criminal and administrative penalties. Idaho Code § 18-622(2). "Abortion" is defined as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with

knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child . . . ." Idaho Code § 18-604(1).

Idaho Code § 18-622 provides two affirmative defenses to criminal prosecution and disciplinary actions by licensing authorities. The first applies when a physician determines, "in his good faith medical judgment and based on the facts known to the physician at the time," that "the abortion was necessary to prevent the death of the pregnant woman" and "provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman." Idaho Code § 18-622(3)(a). The second applies when, prior to the abortion, "the act of rape or incest [has been reported] to a law enforcement agency" and "a copy of such report" has been provided to the physician who will perform the abortion. *Id.* § 18-622(3)(b). Section 18-622 is not violated if medical treatment provided to a pregnant woman by a health care professional "results in the accidental death of, or unintentional injury to, the unborn child." *Id.* § 18-622(4).

### III.   Post-*Dobbs* Developments

On the day the Supreme Court released the *Dobbs* decision, the President remarked that his administration would take immediate action to counteract *Dobbs*.[3] A subsequent executive order required the Department of Health and Human Services (HHS) to consider updates to guidance regarding emergency conditions and stabilizing care.[4] HHS through CMS released

---

[3] *Remarks by President Biden on the Supreme Court Decision to Overturn Roe v. Wade*, THE WHITE HOUSE (June 24, 2022), https://www.whitehouse.gov/briefing-room/speeches-remarks/2022/06/24/remarks-by-president-biden-on-the-supreme-court-decision-to-overturn-roe-v-wade/.

[4] *Protecting Access to Reproductive Healthcare Services*, Exec. Order No. 14076, 87 Fed. Reg. 42053-54 (July 8, 2022), https://www.federalregister.gov/documents/2022/07/13/2022-15138/protecting-access-to-reproductive-healthcare-services.

STATE OF IDAHO'S RESPONSE TO THE UNITED STATES'
MOTION FOR A PRELIMINARY INJUNCTION (Dkt. 17) - 5

guidance suggesting that state laws prohibiting abortion but not including an exception for the life and health of the pregnant person were preempted.[5] Approximately three weeks later, the United States filed this suit.[6]

## LEGAL STANDARDS

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). A plaintiff seeking a preliminary injunction must establish: (1) a likelihood of success on the merits; (2) likely irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities weighs in favor of an injunction; and (4) that an injunction is in the public interest. *See id.* at 20. Because the government is a party, the last two factors are analyzed together. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

Under a preemption claim, a party pursuing a facial challenge "must show that 'no set of circumstances exists under which the Act would be valid.'" *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016) (citing *United States v. Salerno*, 481 U.S. 739, 746(1987)). Such a showing is a "high bar" that the plaintiff must overcome. *Id.*

---

[5] *Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss*, CENTERS FOR MEDICARE & MEDICAID SERVICES (July 11, 2022), https://www.cms.gov/files/document/qso-22-22-Hospitals.pdf (last visited Aug. 16 2022); *see also* Letter to Health Care Providers, SECRETARY OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-providers.pdf (last visited Aug. 16, 2022).

[6] *FACT SHEET: President Biden Issues Executive Order at the First meeting of the Task Force on Reproductive Healthcare Access*, THE WHITE HOUSE (Aug. 3, 2022), https://www.whitehouse.gov/briefing-room/statements-releases/2022/08/03/fact-sheet-president-biden-issues-executive-order-at-the-first-meeting-of-the-task-force-on-reproductive-healthcare-access-2/.

## ARGUMENT

This memorandum primarily focuses on whether the United States has established a likelihood of success with respect to a facial challenge to Idaho Code § 18-622 and whether the remaining *Winter* factors warrant a preliminary injunction. Plainly, it does not.

But Idaho is constrained to note that the complaint raises other questions of significant import that eventually may require resolution. First, does the Supremacy Clause create a right of action in the United States? Judicial attention to this issue subsequent to *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), is sparse and conclusory. *See United States v. Texas*, 557 F. Supp. 3d 810, 820 (W.D. Tex. 2021). Here, EMTALA creates a detailed remedial scheme for its enforcement by the federal government, 42 U.S.C. § 1395dd(d), and implication of a separate Supremacy Clause right of action is unnecessary. *Cf. Alexander v. Sandoval*, 532 U.S. 275, 289-90 (2001) (noting statutory enforcement provisions countered against implied right of action).

Next, if no such right of action exists, does the United States have Article III or prudential standing? The complaint alleges the injury that Section 18-622 purportedly will visit upon physicians and their patients when they are under the provisions of EMTALA, Compl. (Dkt. 1) ¶¶ 44-46, but fails to explain how it has third-party standing to redress that hypothetical injury. As the U.S. Supreme Court explained in *Kowalski v. Tesmer*, 543 U.S. 125 (2004), "[w]e have adhered to the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties'" with the narrow exception in circumstances where "the party asserting the right has a 'close' relationship with the person who possesses the right" and where "there is a 'hindrance' to the possessor's ability to protect his own interests." *Id.* at 129-30 (citation omitted). Physicians, of course, can represent their own interests if prosecuted under Section 18-622 or through a pre-enforcement challenge if they face an

imminent threat of prosecution or professional discipline. *See, e.g.*, *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). A patient injured by a hospital's violation of EMTALA has a damages remedy under the statute, 42 U.S.C. § 1395dd(d)(2), and/or a malpractice suit under state law. *Bryant*, 289 F.3d at 1166. Given these remedies, the United States lacks third-party standing.

Last, the complaint alleges that the United States "has an interest in protecting the integrity of the funding it provides under Medicare and ensuring that hospitals who are receiving Medicare funding will not refuse to provide stabilizing treatment to patients experiencing medical emergencies." Dkt. 1 ¶ 49. No doubt this is at least partially true. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 676 (2012) (Ginsburg, J., dissenting in part). But, here, the complaint does not allege that Idaho operates a hospital emergency department to which EMTALA applies. In fact, Idaho's sole State-operated hospital participating in Medicare lacks an emergency department. Randy Rodriquez Decl. Under these circumstances, it defies common sense to argue that Idaho has violated some contract-like commitment by adopting Section 18-622. The requisite injury-in-fact for Article III standing on a Medicare-contract theory is absent.

For present purposes, however, it is enough to defeat the United States' motion to apply straightforward, settled facial challenge principles. To the extent that the United States argues that compliance with both EMTALA's stabilization requirement and Section 18-622 is impossible, its own expert declarations tell a different story. Many EMTALA abortions are necessary to save the mother's life. The "impossibility" prong of conflict preemption is thus not satisfied. To the extent that the United States argues that mere possibility of prosecution under Section 18-622 will chill the willingness of physicians to provide abortions "to stabilize" a patient, it ignores the heavy burden placed on it to show a "direct[] conflict[]" with an EMTALA "requirement" (42 U.S.C.

§ 1395dd(f)) that warrants preemption of an otherwise valid state law—and especially one that implicates Idaho's core police power to regulate both abortion and the practice of medicine.

## I.     The United States Has Not Established a Likelihood of Success in Its Facial Challenge to the Application of Idaho Code § 18-622 to EMTALA-Covered Abortions

### A.     The United States' Facial Preemption Challenge to Idaho Code § 18-622 Fails

The United States contends that Idaho Code § 18-622 "conflicts with EMTALA by subjecting physicians to criminal prosecution for terminating *any* pregnancy, irrespective of the medical circumstances." Mem. In Supp. Of Mot. For a Prelim. Inj. (Dkt. 17-1), at 8. Unraveled, this conflict preemption claim has two independent prongs: the statute, in material part, (1) makes the performance of an abortion (as defined in Idaho Code § 18-604(1)) unlawful and (2) imposes criminal liability on the performing physician unless (s)he "determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman." The first alleged defect arises because EMTALA "does not exempt any particular treatment (abortion or otherwise) from the ambit of stabilizing treatment" and "any contrary interpretation—i.e., that a hospital need not perform an abortion even when medically necessary to stabilize an emergency medical condition—would undermine EMTALA's overall purpose of ensuring 'that patients . . . receive adequate medical emergency care.'" Dkt. 17-1, at 11. The second alleged defect arises because "[r]elegating any exception from criminal liability to an affirmative defense ... poses an obstacle to EMTALA's 'overarching purpose of ensuring that patients . . . receive adequate emergency medical care,'" and "will render physicians less inclined or entirely unwilling to risk providing treatment." Dkt. 17-1, at 16.[7]

---

[7] The United States additionally asserts that "the Idaho law conflicts with EMTALA by threatening the licenses of medical professionals who perform or assist in providing an abortion." Dkt. 17-1, at 16. This assertion similarly posits Section 18-622 "deters medical professionals from

The United States thus mounts a facial challenge to Section 18-622 with respect to any abortion performed to stabilize a medical emergency subject to EMTALA—even those when the abortion is necessary to save the mother's life. *See* Dkt. 17-1, at 20 (proposing an order "that the State of Idaho—including all of its officers, employees, and agents—[should be preliminarily enjoined] from enforcing Idaho Code § 18-622(2)-(3) as applied to EMTALA-mandated care.[8] As the Supreme Court stated in *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010), "[t]he important point [for facial challenge status] is that plaintiffs' claim and the relief that would follow ... reach beyond the particular circumstances of these plaintiffs" or, in this case, the particular circumstances of an abortion. And so even though the United States' brief at times uses "as-applied," Dkt. 17-1, at 2, 7, 20, it is apparent it alleges a conflict in all instances in which both EMTALA and Section 18-622 apply, and thus brings a facial challenge.

"[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' i.e., that the law is unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016) (Although "*Salerno's* applicability in preemption cases is not entirely clear[,] ... [w]ithout more direction, we have chosen to continue applying *Salerno*."). This daunting standard reflects the fact that "[f]acial challenges are disfavored" because, *inter alia*, "they raise the risk of 'premature interpretation of statutes on the basis of factually barebones records[]'" and "threaten to short circuit the democratic process by preventing

---

participating in medically necessary abortions, contrary to EMTALA's 'overarching purpose of ensuring that patients . . . receive adequate emergency medical care[.]'" *Id.* at 17.

[8] Section 18-622(3) establishes an affirmative defense for pregnancies resulting from rape or incest. The United States does not address that subsection discretely in its preemption argument.

laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange*, 552 U.S. at 450-51; *see Gonzales v. Carhart*, 550 U.S. 124, 168 (2007) ("We note that the statute here applies to all instances in which the doctor proposes to use the prohibited procedure, not merely those in which the woman suffers from medical complications. It is neither our obligation nor within our traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop.").

      1.    <u>Section 18-622 and the Stabilization Requirement</u>

The United States' declarants give both hypothetical and anecdotal examples of when the performance of an abortion to effect EMTALA-required stabilization was or would be medically appropriate. For example, Dr. Lee Fleisher provides generalized examples of illness that could jeopardize a pregnant woman's life or her health. Fleisher Decl. (Dkt. 17-3) ¶¶ 13 (ectopic pregnancy), 15 (pulmonary hypertension or embolism/severe heart failure), 17 (pre-eclampsia), 19 (uterine infection), 21 (placental abruption)). But the illnesses he references are those where a doctor could exercise good faith medical judgment to determine that the patient's life was in danger. *See* White Decl. ¶¶ 2-7 (explaining that ectopic pregnancy, ¶ 3; heart failure, ¶ 4; severe preeclampsia, ¶ 5; life-threatening infection, ¶ 6; and placental abruption accompanied by uncontrolled bleeding, ¶ 7; are all conditions, under the asserted facts, in which Dr. White could make a good faith medical judgment that an abortion was necessary to prevent the death of the pregnant woman). Further, despite Dr. Fleisher's decades of experience as a physician, he does not provide any specific examples of instances where a patient was suffering a non-life-threatening emergency medical condition under EMTALA that required an abortion. Significantly, Dr. Fleisher's discussions of the medical conditions that he identified often reference that a physician would have taken other measures first to control the patient's symptoms, such as antibiotics or

blood pressure support, and that it is after these measures have been unsuccessful that the abortion became necessary to prevent the reasonably probable outcome of death. Dkt. 17-3 ¶¶ 15, 17, 19. Hence, the United States fails to establish that even when a pregnant patient presents with one of these conditions that an abortion is always necessary; it will depend on the patient's condition and circumstances and responses to treatment.

The supporting declarations from the Idaho physicians also conclude that in the circumstances presented an abortion was necessary because of the high risk of death or to preserve or protect her life. Corrigan Decl. (Dkt. 17-6) ¶¶ 15, 22, 23, 28; Cooper Decl. (Dkt. 17-7) ¶¶ 7, 9, 11; Seyb Decl. (Dkt. 17-8) ¶¶ 8, 10, 12. Dr. Corrigan's declaration provides examples of three "Jane Doe" patients who required emergency abortions. Dkt. 17-6 ¶¶ 9-30. Jane Doe 1 suffered a "risk of life-threatening . . . infection," *id.* ¶ 11, and the termination of Jane Doe 1's pregnancy was "necessary" to "preserve her life." *Id.* ¶ 15. For Jane Doe 2, "the risk of her death . . . was imminent[.]" *Id.* ¶ 23. Jane Doe 3 suffered a "dangerous pregnancy complication that can result in serious and potentially fatal complications" carrying "a high risk of maternal and fetal death." *Id.* ¶¶ 27-28. As Dr. Corrigan explained, all of these examples are dire cases where the abortion was necessary to preserve the life of the pregnant woman. These cases simply do not fall within a zone of conflict between Section 18-622 and EMTALA. So, too, Drs. Cooper's and Seyb's declarations contain anecdotal "Jane Doe" examples, and each patient suffered from life-threatening conditions, with an abortion necessary to preserve her life. Dkt. 17-7 ¶¶ 6-11; Dkt. 17-8 ¶¶ 7-13. Dr. Seyb asserts in his declaration that he and his colleagues encounter such "pregnancy-related emergencies approximately a dozen times per year." Dkt. 17-8 ¶ 6. But if the examples cited in the United States' declarations are representative samples, those cases—dire as they may be—are simply not cases where Section 18-622 conflicts with EMTALA. In short, the United States merely

identifies circumstances when stabilizing treatment necessitated by EMTALA includes an abortion. However, it fails to articulate or establish an example where the Idaho statute makes that abortion unlawful. Rather, the medical doctors have given their medical opinions that each abortion described was necessary to prevent death based on an evaluation of the circumstances and the unsuccessful measures that were attempted. The United States itself thus negates the supposed conflict between EMTALA and Section 18-622 in myriad real-life medical emergencies.

Notably, these scenarios, and the medical opinions rendered about them, are inherently fact-based (as is expressly recognized in Section 18-622), which disagreements about appropriate medical care inherently are. Therefore, it is unsurprising that litigation over the application of the EMTALA stabilization mandate has arisen only in as-applied contexts, with a focus on whether a hospital or physician provided "medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility[.]" 42 U.S.C. § 1995dd(e)(3)(A). The Sixth Circuit accordingly has held that "the word 'stabilized' is defined, but the definition is not given a fixed or intrinsic meaning. Its meaning is purely contextual or situational. The definition depends on the risks associated with the transfer and requires the transferring physician, faced with an emergency, to make a fast on-the-spot risk analysis." *Cherukuri v. Shalala*, 175 F.3d 446, 449–50 (6th Cir. 1999). In sum, a claim that Section 18-622 conflicts with the stabilization mandate is only appropriate for an as-applied, not a facial, challenge, if one were even to arise. *See Matter of Baby "K,"* 16 F.3d 590, 597 (4th Cir. 1994) (State statute exempting a physician from providing care deemed medically or ethically inappropriate did "not allow the physicians treating Baby K to refuse to provide her with respiratory support.")

STATE OF IDAHO'S RESPONSE TO THE UNITED STATES'
MOTION FOR A PRELIMINARY INJUNCTION (Dkt. 17) - 13

2.      Criminal Liability and Good-Faith Medical Judgment Affirmative Defense

The United States' facial challenge to the criminal liability provisions in Section 18-622(2) and (3) similarly fails but for different reasons. Unlike many federal statutes, EMTALA not only specifically addresses the issue of preemption but also saves from preemption "any State or local law requirement, except to the extent that the requirement *directly conflicts* with a requirement of this section." 42 U.S.C. § 1395dd(f) (emphasis added). The Ninth Circuit has issued binding instructions on how to construe this savings provision.

"When Congress has considered the issue of preemption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with respect to state authority, there is no need to infer congressional intent to preempt state laws from the substantive provisions of the legislation." *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993) (per curiam). This Court therefore must "look only to this language and construe its preemptive effect as narrowly as possible." *Id.* (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992)). As for Section 1395dd(f), "[t]he key phrase is 'directly conflicts.' A state statute directly conflicts with federal law in either of two cases: first, if 'compliance with both federal and state regulations is a physical impossibility ... or second, if the state law is 'an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (citations omitted).

Here, the United States argues that the mere *possibility* of prosecution for an abortion performed for stabilization purposes, together with "the affirmative defense structure *itself*," Dkt. 17-1, at 15, gives rises to an impermissible obstacle because such possibility will chill the willingness of physicians (or assisting medical professionals) to provided EMTALA-covered services. This argument should be rejected for at least three reasons.

*First*, the EMTALA savings provision demands a "direct[] conflict[]" with an EMTALA "requirement." As demonstrated above, and confirmed in the declaration of Dr. White, there is no direct conflict in factual scenarios presented by the United States. A physician can satisfy EMTALA's requirement to provide the necessary stabilization and avoid liability under Section 18-622 because the abortion was also necessary to prevent death. Furthermore, the United States identifies no other "requirement." Rather, the United States characterizes it as a conflict with "EMTALA's 'overarching purpose of ensuring that patients ... receive adequate emergency medical care[.]'" But as the Ninth Circuit has recognized in another context, "[w]e may not interpret a saving clause as preserving a state law that would so conflict and interfere with a federal enactment that it would defeat the federal law's purpose or essentially nullify it." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 959 F.3d 1201, 1214 (9th Cir. 2020), *cert. denied*, 142 S. Ct. 521 (2021). The United States' abortion-centric argument mischaracterizes EMTALA's specific objective of preventing hospitals from dumping medically unstable patients (through discharge or transfer to another medical facility) because they were unable to pay. *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1255 (9th Cir. 1995). The range of emergency room services subject to EMTALA is immense, and as shown above, may even include abortions. To suggest that Section 18-622 would "essentially nullify" the federal law is thus no more than rhetorical flourish.

*Second*, it is settled that "[i]n all pre-emption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' ... we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (cleaned up). Regulation of the medical profession has long been recognized

as a quintessential state area of concern. *E.g.*, *Hawker v. New York*, 170 U.S. 189, 192-93 (1898) ("No precise limits have been placed upon the police power of a state, and yet it is clear that legislation which simply defines the qualifications of one who attempts to practice medicine is a proper exercise of that power."). As was abortion prior to *Roe v. Wade*, 410 U.S. 113 (1973). *See Dobbs*, 142 S. Ct. 2228, 2256 (2022) (noting that prior to *Roe* every single state had a law criminalizing abortion). Consequently, construing "any State . . . requirement" in Section 1395dd(f) to exclude generally applicable abortion statutes ignores this established tradition of deference to the state police power. The remedy for any alleged inconsistency between such a statute and EMTALA's stabilization mandate is an as-applied, not a facial, challenge by a physician.

*Third*, the United States' "chilling" preemption argument ignores the fact that EMTALA does not foreclose state law-based personal injury suits against physicians for allegedly negligent emergency room care. *See, e.g.*, *Harry v. Marchant*, 291 F.3d 767, 773 (11th Cir. 2002) ("EMTALA was not intended to establish guidelines for patient care, to replace available state remedies, or to provide a federal remedy for medical negligence."). It is hardly reasonable to argue that such civil remedies may not have a deterrent impact on the willingness of physicians to perform emergency room procedures—which often demand "a fast on-the-spot risk analysis." *Cherukuri*, 175 F.3d at 450. The United States' chilling argument, in short, proves too much.[9]

---

[9] The facial conflict-preemption claim predicated on possible loss of licensure by any health care professional "who assists in performing or attempting to perform [a criminal] abortion," Idaho Code § 18-622(2), fails for those reasons discussed immediately above. The United States simply cloaks its policy dissatisfaction with this aspect of the statute, and the speculative chilling effect provides no basis for finding that the provision would "essentially nullify" EMTALA's goal of eradicating "patient dumping."

In total, the United States fails to meet its burden to show on its facial challenge that no set of circumstances exists under which Section 18-622 can be lawfully applied. *Wash. State Grange,* 552 U.S. at 449. In fact, it has done the opposite and shown many circumstances in which EMTALA and Idaho's law can operate without conflict. Section 18-622 neither defeats nor nullifies EMTALA's purpose of ensuring that patients receive stabilizing care for an emergency medical condition, including those involving complications to pregnancy. The first, and most important, of the *Winter* factors weighs heavily in Idaho's favor.

## II.   Lack of Irreparable Harm

The United States first contends that "allowing the Idaho law to go into effect would threaten severe harm to pregnant patients in Idaho." Dkt. 17-1, at 17. But this assertion does not show irreparable harm to the United States. Nor does Idaho Code § 18-622 threaten harm to Idaho's pregnant women, as the examples provided by the United States' declarations from Drs. Corrigan, Cooper, and Seyb identified situations for which a doctor may exercise good faith medical judgment to determine that an abortion is necessary to preserve the life of the pregnant woman. The Idaho statute does not deprive persons coming to the emergency department "critical emergency care." Indeed, the United States identified approximately 100 cases of ectopic pregnancies in Idaho receiving *Medicaid* covered treatment, but it did not say how many of those were treatments subject to EMTALA; how many of those treatments were abortions; and why the abortions would not be covered under Idaho Code § 18-622's affirmative defense, given that ectopic pregnancy puts a "patient's life in jeopardy . . . and in the vast majority of cases [will] cause . . . potentially fatal internal bleeding." Dkt. 17-3 ¶ 13.

The United States asserts that "emergency medical conditions will occur for a sizeable number of pregnant patients within Idaho." Dkt. 17-1, at 18. It further speculates that physicians

will be discouraged "from providing necessary care in emergency situations." *Id.* It even asserts that "there is a likelihood that some pregnant [women] suffering medical emergencies will face irreversible health consequences," *id.*, but as discussed above, the examples provided by its doctors all fall within Idaho Code § 18-622's good faith medical judgment that abortion was necessary to prevent the death of the pregnant woman. The United States admits this point in just one of many examples (illustrating again why the facial challenge fails), where Dr. Corrigan determined that "termination [of the pregnancy] was necessary to preserve [the woman's] life." Dkt. 17-1, at 19.

Further, one fact that should be reiterated is that EMTALA's scope is narrow—it applies when a person "comes to the emergency department" and ends upon the hospital's provision of the stabilizing treatment or transfer. 42 U.S.C. § 1395dd(a)-(c). EMTALA does not apply to inpatients or outpatients; nor does EMTALA apply outside the context of hospital emergency room treatment—e.g., EMTALA does not apply to an abortion clinic. For this reason, the United States' attempts to assert "injury" unrelated to its claim under EMTALA does not show the need for a preliminary injunction.

## III.   Balance of the Equities and the Public Interest

The United States next contends its sovereign interest is harmed by Idaho regulating abortion—even though the U.S. Supreme Court concluded states were authorized to do just that. Dkt. 17-1, at 19. It says that Idaho is disrupting the Medicare program and depriving the United States of the benefits of its bargain with hospitals. *Id.* Not so. Idaho is regulating abortion through a criminal statute of general applicability, just as it regulates other aspects of offenses that it deems inimical to the public interest. Conversely, it is not regulating Medicare or the hospitals'

participation in Medicare.[10] And contrary to the United States' claim, Idaho is not prohibiting hospitals from "performing EMTALA-mandated services." *Id.*

Each sovereign operates within its own sphere of responsibility, and if Idaho attempts to invade the area marked out by EMTALA in a particular instance, an aggrieved party has recourse to challenge that alleged overreach. The mere fact that such a dispute may arise in the future does not establish some equitable entitlement to an injunctive net that captures a broad range of entirely lawful state conduct. The equities here are thus evenly balanced, with both governments rightly insisting on preserving their legitimate sovereign interests.

The United States' next contention, that the Idaho law interferes with the provider agreements with the 52 hospitals (although the United States admits only 39 have emergency departments), fares no better. *Id.* at 20. Idaho is not interfering with any terms of the agreements between the hospitals and the United States, as Idaho has simply exercised its police power to regulate abortion. Nothing in the text of Idaho Code § 18-622 purports to interact or interfere with hospitals' provider agreements with the United States.

And here, contrary to the United States' argument, it would be Idaho that would be injured if it were prevented, even in the narrow circumstances of EMTALA, from effectuating the statute enacted by its representatives of the people. *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Rehnquist, J., in chambers). Post-*Dobbs,* the balance of equities and public interest clearly lie in

---

[10] In fact, given that approximately $3.4 billion in Medicare funds went to Idaho hospitals between fiscal years 2018-2020, Dkt. 17-1, at 6, the United States' position that Idaho must alter *its* policy in favor of the United States' policy or have the hospitals risk such funds raises serious concerns that EMTALA's required stabilizing treatment, as interpreted by the United States and expressed in this litigation, is invalid as coercive spending clause legislation. *See Nat'l Fed. of Indep. Buss. v. Sebelius*, 567 U.S. 519, 575-87 (2012). This reason raises another point as to why the United States is not likely to succeed on the merits. But as discussed above, this memorandum focuses primarily on whether there is a direct conflict between the EMTALA and Idaho Code § 18-622, which there is not.

allowing Idaho to regulate abortion as its elected representatives determine best suit the citizenry.

*See Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015) ("This Court

has 'long recognized the role of the States as laboratories for devising solutions to difficult legal

problems.'").

## CONCLUSION

For these reasons, the United States' motion for a preliminary injunction should be

denied.

DATED this 16th day of August, 2022.

OFFICE OF THE ATTORNEY GENERAL


By: /s/ Brian V. Church
　　　STEVEN L. OLSEN
　　　MEGAN A. LARRONDO
　　　BRIAN V. CHURCH
　　　ALAN W. FOUTZ
　　　INGRID C. BATEY
　　　Deputy Attorneys General

　　　CLAY R. SMITH
　　　JOAN E. CALLAHAN
　　　Special Deputy Attorneys General

<u>**CERTIFICATE OF SERVICE**</u>

       I HEREBY CERTIFY that on this 16th day of August, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

BRIAN DAVID NETTER
DOJ-Civ
Civil Division
brian.netter@usdoj.gov

DANIEL SCHWEI
DOJ-Civ
Federal Programs Branch
daniel.s.schwei@usdoj.gov

JULIE STRAUS HARRIS
DOJ-Civ
Civil Division, Federal Programs Branch
julie.strausharris@usdoj.gov

LISA NEWMAN
DOJ-Civ
Civil Division, Federal Programs Branch
lisa.n.newman@usdoj.gov

ANNA LYNN DEFFEBACH
DOJ-Civ
Civil Division, Federal Programs Branch
anna.l.deffebach@usdoj.gov

CHRISTOPHER A. EISWERTH
DOJ-Civ
Federal Programs Branch
christopher.a.eiswerth@usdoj.gov

EMILY NESTLER
DOJ-Civ
emily.b.nestler@usdoj.gov

*Attorneys for Plaintiff United States of America*

LAURA ETLINGER
New York State Office
of the Attorney General
laura.Etlinger@ag.ny.gov

*Attorney for Amici States*
*California, New York, Colorado, Connecticut,*
*Delaware, Hawaii, Illinois, Maine, Maryland,*
*Massachusetts, Michigan, Minnesota,*

DANIEL W. BOWER
Morris Bower & Haws PLLC
dbower@morrisbowerhaws.com

MONTE NEIL STEWART
Attorney at Law
monteneilstewart@gmail.com

*Attorneys for Intervenors-Defendants*

JAY ALAN SEKULOW
sekulow@aclj.org

JORDAN A. SEKULOW
jordansekulow@aclj.org

STUART J. ROTH
Stuartroth1@gmail.com

OLIVIA F. SUMMERS
osummers@aclj.org

LAURA B. HERNANDEZ
lhernandez@aclj.org

*Attorneys for Amicus Curiae*
*American Center for Law & Justice*

WENDY OLSON
Stoel Rives LLP
wendy.olson@stoel.com

JACOB M. ROTH
Jones Day
jroth@jonesday.com

AMANDA K. RICE
Jones Day
arice@jonesday.com

*Attorneys for Amici Curiae*
*The American Hospital Association and the*

STATE OF IDAHO'S RESPONSE TO THE UNITED STATES'
MOTION FOR A PRELIMINARY INJUNCTION (Dkt. 17) - 21

*Nevada, New Jersey, New Mexico, North Carolina, Oregon, Pennsylvania, Rhode Island, Washington, and Washington, D.C.*

*Association of American Medical Colleges*

SHANNON ROSE SELDEN
Debevoise & Plimpton LLP
srselden@debevoise.com

ADAM B. AUKLAND-PECK
Debevoise & Plimpton LLP
Aaukland-peck@debevoise.com

LEAH S. MARTIN
Debevoise & Plimpton LLP
lmartin@debevoise.com

*Attorneys for Amici Curiae American College of Emergency Physicians, Idaho Chapter of the American College of Emergency Physicians, American college of Obstetricians and Gynecologists, Society for Maternal-Fetal Medicine, National Medical Association, National Hispanic Medical Association, American Academy of Pediatrics, American Academy of Family Physicians, American Public Health Association, and American Medical Association*

AND I FURTHER CERTIFY that on such date I served the foregoing on the following non-CM/ECF Registered Participant via email:

CHARLOTTE H. TAYLOR
Jones Day
ctaylor@jonesday.com

*/s/ Brian V. Church*
BRIAN V. CHURCH
Deputy Attorney General