BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
BRIAN D. NETTER
Deputy Assistant Attorney General
JOSHUA REVESZ
Counsel, Office of the Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
DANIEL SCHWEI
Special Counsel
**LISA NEWMAN (TX Bar No. 24107878)**
ANNA DEFFEBACH
EMILY NESTLER
CHRISTOPHER A. EISWERTH
Trial Attorneys
JULIE STRAUS HARRIS
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 514-5578
lisa.n.newman@usdoj.gov

*Counsel for Plaintiff*
United States of America

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO
## SOUTHERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | Case No. 1:22-cv-329-BLW |
| v. | **REPLY MEMORANDUM IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION** |
| THE STATE OF IDAHO, | |
| Defendant. | |

## Table of Contents

INTRODUCTION ..........................................................................................................1

ARGUMENT ..............................................................................................................2

I.  The United States Has Authority to Bring this Suit and Seek Injunctive Relief ......2

    A.  The United States Has Standing and a Cause of Action ...................................2

    B.  This Case Is Not a Facial Challenge, and As-Applied Relief Is Appropriate ..............4

II.  The United States Has Established a Likelihood of Success on Its Preemption Claim ..........5

    A.  There Is No Meaningful Dispute That, As A Legal Matter, EMTALA Sometimes Requires Abortions as Stabilizing Treatments ...........................6

    B.  Idaho's "Total Abortion Ban" Prohibits Care that EMTALA Requires ......................7

        1.  Idaho's Abortion Prohibitions Apply Even to Life-Saving Care ......................8

        2.  The Idaho Law's Affirmative Defense Is Narrower than EMTALA Because It Applies Only When Necessary to Prevent Death ........................10

        3.  Factually, the Affirmative Defense Does Not Cover All EMTALA-Protected Abortions ...........................13

    C.  Idaho Law Conflicts with EMTALA By Allowing Prosecution and Disciplinary Proceedings for All Abortions Regardless of Circumstances .................16

III.  The Equitable Balance Confirms an Injunction Is Warranted ...................................19

CONCLUSION ...........................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Armstrong v. Exceptional Child Ctr. Inc.,*
  575 U.S. 320 (2015) ..................................................................................................................4

*Arrington v. Wong,*
  237 F.3d 1066 (9th Cir. 2001) ................................................................................................17

*Biden v. Missouri,*
  142 S. Ct. 647 (2022) ................................................................................................................7

*Burditt v. Dep't of Health & Human Servs.,*
  934 F.2d 1362 (5th Cir. 1991) ..................................................................................................7

*Chamber of Commerce of U.S. v. Bonta,*
  13 F.4th 766 (9th Cir. 2021) ...................................................................................................19

*City of Pocatello v. Peterson,*
  473 P.2d 644 (Idaho 1970) ......................................................................................................11

*Draper v. Chiapuzio,*
  9 F.3d 1391 (9th Cir. 1993) ...............................................................................................16, 18

*Geier v. Am. Honda Motor Co.,*
  529 U.S. 861 (2000) ................................................................................................................17

*Idaho v. Barton,*
  297 P.3d 252 (Idaho 2013) ......................................................................................................17

*Idaho v. Clark,*
  484 P.3d 187 (Idaho 2021) ......................................................................................................11

*Idaho v. Murphy,*
  584 P.2d 1236 (Idaho 1978) ....................................................................................................17

*Idaho v. Segovia,*
  457 P.2d 905 (Idaho 1969) ......................................................................................................17

*Idaho v. Yager,*
  85 P.3d 656 (Idaho 2004) ........................................................................................................12

*In re Debs,*
  158 U.S. 564 (1895) ..................................................................................................................3

*Indep. Towers v. Washington,*
  350 F.3d 925 (9th Cir. 2003) ....................................................................................................6

*John Doe No. 1 v. Reed,*
  561 U.S. 186 (2010) ......................................................................................................5

*Jones v. Wake Cnty. Hosp. Sys., Inc.,*
  786 F. Supp. 538 (E.D.N.C. 1991) .................................................................................7

*Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1,*
  469 U.S. 256 (1985) ......................................................................................................3

*Nash v. Fla. Indus. Comm'n,*
  389 U.S. 235 (1967) ....................................................................................................19

*National Federation of Independent Business v. Sebelius,*
  567 U.S. 519 (2012) ......................................................................................................7

*Nat'l R.R. Passenger Corp. v. Su,*
  41 F.4th 1147 (9th Cir. 2022) ........................................................................................5

*Northport Health Servs. of Arkansas, LLC v. Dep't of Health & Hum. Servs.,*
  438 F. Supp. 3d 956 (W.D. Ark. 2020) ..........................................................................7

*Planned Parenthood Great Nw. v. Idaho,*
  --- P.3d ---, 2022 WL 3335696 (Idaho Aug. 12, 2022) .................................................7

*Puente Arizona v. Arpaio,*
  821 F.3d 1098 (9th Cir. 2016) ........................................................................................5

*Puerto Rico v. Franklin Calif. Tax-Free Tr.,*
  579 U.S. 115 (2016) ....................................................................................................18

*Rice v. Norman Williams Co.,*
  458 U.S. 654 (1982) ....................................................................................................19

*Sabri v. United States,*
  541 U.S. 600 ...............................................................................................................18

*South Dakota v. Dole,*
  483 U.S. 203 (1987) ......................................................................................................7

*United States v. Alabama,*
  691 F.3d 1269 (11th Cir. 2012) .................................................................................2, 4

*United States v. Arizona,*
  641 F.3d 339 (9th Cir. 2011), *rev'd in part on other grounds,* 567 U.S. 387 (2012) ......................... 2, 5, 20

*United States v. Arizona,*
  567 U.S. 387 (2012) ..................................................................................................2, 4

*United States v. Arlington Cnty.,*
  326 F.2d 929 (4th Cir. 1964) ................................................................................................3

*United States v. City of Arcata,*
  629 F.3d 986 (9th Cir. 2010) ........................................................................................2, 4, 17

*United States v. Colo. Supreme Ct.,*
  87 F.3d 1161 (10th Cir. 1996) ..............................................................................................4

*United States v. Mackby,*
  339 F.3d 1013 (9th Cir. 2003) ..............................................................................................3

*United States v. Marion Cnty. Sch. Dist.,*
  625 F.2d 607 (5th Cir. 1980) ................................................................................................3

*United States v. Mattson,*
  600 F.2d 1295 (9th Cir. 1979) ..............................................................................................3

*United States v. Sisson,*
  399 U.S. 267 (1970) ...........................................................................................................16

*United States v. South Carolina,*
  840 F. Supp. 2d 898 (D.S.C. 2011), *aff'd*, 720 F.3d 518 (4th Cir. 2013) .............................4

*United States v. Supreme Ct. of N.M.,*
  839 F.3d 888 (10th Cir. 2016) ..............................................................................................4

*United States v. Texas,*
  557 F. Supp. 3d 810 (W.D. Tex. 2021) ................................................................................4

*United States v. United Mine Workers of Am.,*
  330 U.S. 258 (1947) ...............................................................................................................4

*United States v. Washington,*
  142 S. Ct. 1976 (2022) ...........................................................................................................4

*Valiant Idaho, LLC v. JV LLC,*
  429 P.3d 168 (Idaho 2018) ...........................................................................................9, 10

*Verska v. Saint Alphonsus Reg'l Med. Ctr.,*
  265 P.3d 502 (Idaho 2011) ..................................................................................................10

*Vt. Agency of Nat. Res. v. U.S. ex rel Stevens,*
  529 U.S. 765 (2000) ...............................................................................................................2

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022) ...........................................................................................................6

*Worley Highway Dist. v. Kootenai Cnty.*,
  576 P.2d 206 (Idaho 1978) ........................................................................................ 9

*Wyandotte Transp. Co. v. United States*,
  389 U.S. 191 (1967) ................................................................................................... 2

**Statutes**

42 U.S.C. § 1395cc ....................................................................................................... 3

42 U.S.C. § 1395dd ............................................................................................... *passim*

Idaho Code § 18-101 ................................................................................................... 10

Idaho Code § 18-505 ............................................................................................... 8, 12

Idaho Code § 18-604 ............................................................................................. 8, 9, 12

Idaho Code § 18-617 ..................................................................................................... 9

Idaho Code § 18-622 ............................................................................................. *passim*

Idaho Code § 18-8801 ............................................................................................ 12, 13

Idaho Code § 18-8804 ............................................................................................. 8, 12

Idaho Code § 19-1108 .................................................................................................. 17

**Other Authorities**

*Necessary*, Merriam-Webster Dictionary Online, https://perma.cc/4DNK-AVJC ................................ 12

*Threatening*, Merriam-Webster Dictionary Online, https://perma.cc/TPH7-XPCE ............................ 12

*Idaho Vital Statistics - Induced Abortion 2020*, Idaho Department of Health and Welfare (Jan. 2022) .... 20

## INTRODUCTION

The conflict between Idaho's abortion ban and EMTALA is clear from the plain language of the Idaho law and the testimony from multiple local physicians explaining how Idaho's law will prevent critical medical care for pregnant patients in emergency conditions. Idaho could have designed a law allowing patients with emergency conditions to obtain necessary care. Instead, the State enacted a law that permits the prosecution of any physician who performs any abortion, even as a life-saving treatment. The State focuses on the law's affirmative defense, which can be raised only at trial, and only then if abortion is "necessary" to prevent death. But even where the affirmative defense seemingly applies, it does not eliminate the risk for physicians or their patients. And the scope of the affirmative defense is insufficient when compared to EMTALA's requirements. Without an injunction against § 18-622's enforcement, physicians will be faced with an untenable choice and pregnant patients in Idaho will be put in danger.

There is no dispute that EMTALA's requirement to offer "stabilizing treatment" applies to pregnant patients, nor is there any dispute that some pregnant patients will present at a hospital with an emergency medical condition for which pregnancy termination is the necessary stabilizing treatment. Both the State of Idaho and the Idaho Legislature have filed briefs and submitted declarations expressly acknowledging that EMTALA requires hospitals to offer termination of the pregnancy as potential stabilizing treatment under relevant circumstances.

Instead, Defendants argue that § 18-622 does not actually conflict with EMTALA's requirements. But Defendants' factual submissions—about how they understand the term "abortion" and how they believe doctors should decide when to perform an emergency abortion—cannot be reconciled with the Idaho law's statutory text, which criminalizes all abortions (no matter how medically necessary or life-saving), and allows medical professionals to avoid criminal liability only by proving an affirmative defense that is narrower than what EMTALA requires. Under well-settled

preemption principles, § 18-622 conflicts directly with EMTALA. And based on the significant irreparable harm that would be caused if § 18-622 were allowed to go into effect, particularly for pregnant individuals in Idaho and the United States' sovereign interests, the United States is entitled to a preliminary injunction against § 18-622's enforcement, as applied to EMTALA-mandated care.

## ARGUMENT

## I.    The United States Has Authority to Bring this Suit and Seek Injunctive Relief

Before turning to the preemption issues at the heart of this case, the State obliquely raises several threshold issues regarding the United States' authority to bring this suit. None has merit, and the standard for facial challenges is likewise no impediment to entering relief here.

### A.    The United States Has Standing and a Cause of Action

The State of Idaho alludes to "questions . . . that eventually may require resolution" regarding the United States' standing and cause of action for this suit, Idaho Br. at 7-8, but then expressly disclaims seeking a ruling on those arguments for purposes of this motion. Regardless, the State's arguments are meritless. It is "beyond doubt" that the United States suffers an "injury to its sovereignty arising from violation of its laws," *Vt. Agency of Nat. Res. v. U.S. ex rel Stevens*, 529 U.S. 765, 771 (2000), which is precisely what is alleged in this case with respect to § 18-622. And the Ninth Circuit has held that the United States has standing when a state or local law "proscribe[s] some activity encouraged by federal law." *United States v. City of Arcata*, 629 F.3d 986, 989 (9th Cir. 2010); *see also United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011) (holding, in the context of a Supremacy Clause claim, that "an alleged constitutional infringement will often alone constitute irreparable harm"), *rev'd in part on other grounds*, 567 U.S. 387 (2012). Section 18-622 interferes with Congressional policy as reflected in EMTALA, and the United States may sue to enforce those Federal interests. *See Wyandotte Transp. Co. v. United States*, 389 U.S. 191, 201 (1967) ("Our decisions have established, too, the general rule that the United States may sue to protect its interests."); *United States v. Alabama*, 691

F.3d 1269, 1301 (11th Cir. 2012); *United States v. Arlington Cnty.*, 326 F.2d 929, 931-32 (4th Cir. 1964).

Moreover, if § 18-622 is allowed to go fully into effect, it will have widespread public health consequences for countless pregnant patients within Idaho. *See* US Br., Dkt. 17-1 at 17-19; *see also* Dkt. 59 at 15-17 (discussing interstate harms). The Supreme Court long ago recognized the United States' authority to sue to redress injuries to the general welfare: "Every government, intrusted by the very terms of its being with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other[.]" *In re Debs*, 158 U.S. 564, 584 (1895). That is not a matter of third-party standing, *see* Idaho Br. at 7-8, but rather the United States asserting its own interest in preventing widespread public harm.

Idaho's law also deprives the United States of the benefit of its bargain in connection with Medicare funding provided to hospitals within Idaho. That funding was expressly conditioned on Idaho-based hospitals' compliance with EMTALA, *see* 42 U.S.C. § 1395cc(a)(1)(I)(i), and Idaho law now prohibits such compliance. Thus, § 18-622 harms "the administration and integrity of Medicare," *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003), which the State agrees is a cognizable injury. *See* Idaho Br. at 8. The State contends that there are no State-operated hospitals with an emergency department participating in Medicare, *see id.*, but the terms of Spending Clause legislation are enforceable against state laws that interfere with recipients' obligations. *See Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256 (1985) (holding that state law is preempted to the extent it interferes with third parties' compliance with conditions attached to federal funds); *cf. United States v. Marion Cnty. Sch. Dist.*, 625 F.2d 607, 609 (5th Cir. 1980) (recognizing that "the United States has an inherent right to sue for enforcement of the recipient's obligation in court"); *United States v. Mattson*, 600 F.2d 1295, 1299 n.6 (9th Cir. 1979). In any event, there are fifteen *county*-owned hospitals participating in Medicare that *do* have emergency departments. *See* Wright Decl., Dkt. 17-9 ¶ 9. Thus,

the United States can sue to enforce the benefit of its bargain under Medicare.

In terms of a cause of action, the State expresses uncertainty based on *Armstrong v. Exceptional Child Ctr. Inc.*, 575 U.S. 320 (2015), *see* Idaho Br. at 7, but *Armstrong* confirms the United States' cause of action here: there is an equitable cause of action allowing suit "to enjoin unconstitutional actions by state and federal officers," which is a "creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." 575 U.S. at 327. Nothing more is needed, as confirmed by the numerous recent lawsuits brought by the United States challenging state laws under the Supremacy Clause, none of which was dismissed for lack of a cause of action.[1]

Finally, the State suggests that EMTALA's "detailed remedial scheme" precludes a cause of action. But EMTALA does not contain a process for prospective enforcement against states that criminalize care required by federal law. Rather, the enforcement regime is after-the-fact, and pertains only to physicians and hospitals who have committed "negligent[]" or "gross and flagrant" violations of EMTALA's requirements. 42 U.S.C. § 1395dd(d)(1)(A), (B). Even where it does apply, nothing in EMTALA suggests that its enforcement scheme was intended to *circumscribe* the inherent authority of the United States to enforce its rights in equity. *See United States v. United Mine Workers of Am.*, 330 U.S. 258, 270-71 (1947) (even when statute limits remedies, that generally does not apply to the United States based on the "old and well-known rule that statutes which in general terms divest pre-existing rights or privileges will not be applied to the sovereign without express words to that effect").

### B.      This Case Is Not a Facial Challenge, and As-Applied Relief Is Appropriate

Idaho also attempts to portray the United States' preemption claim as a "facial challenge" to § 18-622, suggesting that the United States cannot meet that standard for relief. Idaho Br. at 10 (citing

---

[1] *See, e.g.*, *United States v. Washington*, 142 S. Ct. 1976 (2022); *Arizona*, 567 U.S. at 387; *City of Arcata*, 629 F.3d at 989; *United States v. Supreme Ct. of N.M.*, 839 F.3d 888, 899 (10th Cir. 2016); *Alabama*, 691 F.3d at 1301; *United States v. Colo. Supreme Ct.*, 87 F.3d 1161, 1165 (10th Cir. 1996); *United States v. South Carolina*, 840 F. Supp. 2d 898, 908 (D.S.C. 2011), *aff'd*, 720 F.3d 518 (4th Cir. 2013); *United States v. Texas*, 557 F. Supp. 3d 810, 820 (W.D. Tex. 2021).

*Puente Arizona v. Arpaio*, 821 F.3d 1098 (9th Cir. 2016), and *John Doe No. 1 v. Reed*, 561 U.S. 186 (2010)). But the United States is not asking this Court "to enjoin enforcement of all applications" of § 18-622 or "strike down the law[] in [its] entirety," "in all contexts as applied to all parties." *Puente Arizona*, 821 F.3d at 1105, 1108. To the contrary, the United States is seeking an injunction against the enforcement of § 18-622 only as applied to EMTALA-mandated care. *Cf.* Compl., Prayer for Relief. Moreover, the United States is not seeking relief "beyond the particular circumstances of these plaintiffs." *John Doe*, 561 U.S. at 194. Instead, the United States is seeking relief necessary to redress its *own* injuries— *i.e.*, relief to protect against the public harms caused by the inconsistency of § 18-622 and federal law.

In any event, even if the standard for facial challenges applied, the State offers no reason why the United States would be unable to meet it here with respect to the class of conduct at issue: EMTALA-mandated care. *See Arizona*, 641 F.3d at 345-46 (holding that the *Salerno* "formulation misses the point: there can be no constitutional application of a statute that, on its face, conflicts with Congressional intent and therefore is preempted by the Supremacy Clause"). Indeed, the Ninth Circuit has had no trouble applying typical (non-*Salerno*) preemption principles where, as here, the plaintiff attacks a statute as applied to a subset of conduct or individuals. *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Su*, 41 F.4th 1147, 1153 (9th Cir. 2022) ("As applied to [plaintiffs'] railroad employees, the [California] Act falls within RUIA's preemption clause."). Under typical preemption principles, Idaho cannot prohibit through § 18-622 medical care that is required to be provided under EMTALA, and § 18-622 is invalid in all of its applications as applied to that swath of conduct.

## II.     The United States Has Established a Likelihood of Success on Its Preemption Claim

Neither the State nor the Legislature meaningfully disputes that, as a legal matter, EMTALA sometimes requires abortion as a stabilizing treatment. The only question is whether Idaho law stands in the way of that federally mandated medical care. It plainly does. Under § 18-622, all abortions in Idaho expose physicians to criminal prosecution—even when provided in life-threatening situations.

Defendants nowhere grapple with the fact that subjecting medical providers to criminal prosecution for care that is required under federal law creates a direct conflict with that federal law. And while Defendants emphasize the law's affirmative defense—which does not eliminate this fatal flaw—even that affirmative defense is, by its plain text, narrower than EMTALA.

### A. There Is No Meaningful Dispute That, As A Legal Matter, EMTALA Sometimes Requires Abortions as Stabilizing Treatments

Both the State and the Legislature expressly acknowledge that EMTALA sometimes requires a physician to offer an abortion when it is the stabilizing treatment for an emergency medical condition. *See* Idaho Br. at 12-13 ("the United States merely identifies circumstances when stabilizing treatment necessitated by EMTALA includes an abortion"); Legisl. Br. at 10 ("'[I]n the emergency situations . . . anticipated by EMTALA, the subordination of the mother's life and health in favor of the unborn child by a physician has not and will not occur.'" (quoting French Decl., Dkt. 71-5 ¶ 9)); *see* US Br. at 8-14. Thus, there is no meaningful dispute here about what federal law requires.

Despite Defendants' (and their declarants') acknowledgment of what EMTALA requires, they refer without elaboration to "legal arguments" suggesting the United States' interpretation is incorrect. Legisl. Br. at 13; Idaho Br. at 19 n.10. These undeveloped arguments have been waived, *see Indep. Towers v. Washington*, 350 F.3d 925, 929-30 (9th Cir. 2003), and in any event are meritless.

First, the "major questions doctrine" is not implicated here because EMTALA is a requirement for emergency care that Congress itself imposed, over 35 years ago, on hospitals receiving federal funds. The major questions doctrine applies "in certain extraordinary cases" when there is an affirmative *agency* regulatory action involving "major policy decisions." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (describing "the major questions doctrine" as arising only in "extraordinary cases" involving "*agencies* asserting highly consequential power beyond what Congress could reasonably be understood to have granted" (emphasis added)). This case involves no assertion of agency authority, and instead the United States is enforcing a "policy decision[]" made by "Congress . . . itself[.]" *Id.*

Second, EMTALA does not violate the Spending Clause. Congress is free to attach conditions to federal funds, *see South Dakota v. Dole*, 483 U.S. 203 (1987), and there is nothing impermissibly coercive about this arrangement because "[o]nly hospitals that voluntarily participate in the federal government's Medicare program must comply with EMTALA." *Burditt v. Dep't of Health & Human Servs.*, 934 F.2d 1362, 1376 (5th Cir. 1991). A decision to participate in Medicare by an individual provider—the vast majority of which are private entities, for whom the "coercion" doctrine does not apply, *see Northport Health Servs. of Arkansas, LLC v. Dep't of Health & Hum. Servs.*, 438 F. Supp. 3d 956, 970–71 (W.D. Ark. 2020)—is fundamentally different from a State's participation in Medicaid, distinguishing this case from *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012); *see also Jones v. Wake Cnty. Hosp. Sys., Inc.*, 786 F. Supp. 538, 547 (E.D.N.C. 1991) (upholding EMTALA under the Spending Clause). And Congress's decision to condition Medicare participation on compliance with EMTALA is no different than numerous other longstanding conditions. *Cf. Biden v. Missouri*, 142 S. Ct. 647, 650-51 (2022). In sum, there is no meaningful dispute about what federal law validly requires—under EMTALA, when patients present to emergency departments with emergency medical conditions, covered hospitals must sometimes offer abortion as a stabilizing treatment.

## B.     Idaho's "Total Abortion Ban" Prohibits Care that EMTALA Requires

The Supreme Court of Idaho has described § 18-622 as a "Total Abortion Ban." *Planned Parenthood Great Nw. v. Idaho*, --- P.3d ---, 2022 WL 3335696, at *1 (Idaho Aug. 12, 2022). In attempting to argue that there is no direct conflict between a federal law that requires abortion care and Idaho's law criminalizing such care, both Idaho and the Legislature fail to recognize that § 18-622 contains *no* textual exception to its "crime of criminal abortion," for example, in medically necessary situations. That means that a prosecutor who indicts a physician for "criminal abortion" need not make any showing about medical necessity in order to support a felony conviction. The State equates the law's *affirmative defense* with an *exception* to the law's criminal prohibition, but these concepts are markedly

different. Under the Idaho law, any physician who provides any abortion is subject to disciplinary proceedings, criminal prosecution, and a burden of proof. That would not be the case under a law containing an exception from the prohibition itself. The State knows how to write a law allowing exceptions for some abortions but chose not to employ that structure here. *See* Idaho Code § 18-8804(1) (prohibiting certain abortions "except in the case of a medical emergency"); *id.* § 18-505 (similar); *id.* § 18-604(9) (defining "medical emergency"). Because Idaho's Total Abortion Ban contains no exceptions, EMTALA and § 18-622 directly conflict, and Defendants' attempt to rewrite the statute through litigation filings and factual declarations should be rejected.

Importantly, neither the State nor the Legislature disputes that, to the extent § 18-622 imposes criminal liability on conduct that federal law requires, § 18-622 is preempted. *See* US Br. at 15. Instead, both Defendants try to avoid that result by misconstruing Idaho law—suggesting that Idaho's criminal prohibitions do not apply to life-saving care, and implying that the affirmative defense is co-extensive with EMTALA's requirements. These arguments are incorrect both legally and factually.

### 1.    Idaho's Abortion Prohibitions Apply Even to Life-Saving Care

The Legislature (but not the State) argues that life-saving care is not considered an "abortion" under Idaho law, and therefore such care falls outside Idaho's criminal prohibitions. The Legislature presses this argument primarily for ectopic pregnancies, *see* Legisl. Br. at 6-7, but its declarants contend that life-saving care is *never* considered an abortion. *See* French Decl. ¶ 14; Reynolds Decl. ¶ 12.

To be clear, the United States agrees that treatments for ectopic pregnancy and other life-saving care are not considered "abortion" *in the medical community*. *See* US Br. at 7 n.1; Fleisher Decl., Dkt. 17-3 ¶ 3. What is material to this case, however, is how *Idaho law* defines "abortion" in the relevant statutes: "'Abortion' means the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child[.]" Idaho Code § 18-604(1). Neither the Legislature

nor its declarants ever address this statutory text, which contains no exceptions for pregnancy terminations necessary to save someone's life or where the pregnancy is nonviable. Regardless of what the medical community considers to be an abortion, therefore, the text of Idaho's abortion laws clearly extends to life-saving pregnancy terminations. *See Worley Highway Dist. v. Kootenai Cnty.*, 576 P.2d 206, 209 (Idaho 1978) ("This Court has consistently adhered to the primary canon of statutory construction that where the language of the statute is unambiguous, the clear expressed intent of the legislature must be given effect and there is no occasion for construction.").

Indeed, with respect to ectopic pregnancies specifically, there can be no doubt that they are included within the statutory definition of "abortion," given that Idaho law expressly defines "pregnancy" to mean "the reproductive condition of having a developing fetus *in the body* and commences with fertilization." Idaho Code § 18-604(11) (emphasis added). The statutory references to "the body" rather than "the uterus," and "fertilization" rather than "implantation," indicate that ectopic pregnancies are included. And the Legislature knows how to exclude an ectopic pregnancy when it wants to. *Id.* § 18-617(1)(a). Again, the Legislature has no answer to this statutory text.

The Legislature's only textual argument on this issue refers to § 18-622(4), which provides: "Medical treatment provided to a pregnant woman by a health care professional as defined in this chapter that results in the accidental death of, or unintentional injury to, the unborn child shall not be a violation of this section." *See* Legisl. Br. at 6-7 (contending that this provision "specifies the health of the woman is of primary importance"); French Decl. ¶¶ 15, 21. But this provision explicitly addresses only *accidental* or *unintentional* harm to a fetus; it does not address terminating a pregnancy for life-saving reasons, which even the Legislature's physicians agree is both medically necessary and will *intentionally* end the pregnancy. *See* Reynolds Decl. ¶ 14; French Decl. ¶ 17; White Decl. ¶ 3. This provision cannot be construed as a catch-all for life-saving care, particularly given the statute's more specific provision governing treatment to prevent death. *See* Idaho Code § 18-622(3)(a)(ii); *Valiant*

*Idaho, LLC v. JV LLC*, 429 P.3d 168, 177 (Idaho 2018) (noting the "basic tenet" that "the more specific statute or section addressing the issue controls over the statute that is more general").[2] Thus, § 18-622's text confirms that it extends to every termination of a pregnancy, regardless of whether the abortion is a life-saving one or whether the procedure would typically be considered an "abortion" within the medical community. The Legislature cannot avoid preemption by re-writing its laws in a legal brief to exclude certain actions from the criminal prohibitions. *See Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 265 P.3d 502, 508 (Idaho 2011) ("We must follow the law as written. If it is socially or economically unsound, the power to correct it is legislative, not judicial.").

Finally, Idaho's theory about how its law works in practice is belied by the actual experience of medical professionals in Idaho who regularly treat women in these situations: emergency care normally provided to pregnant patients is proscribed by § 18-622, which will hinder their ability to provide that care if the law goes into effect. *See* Corrigan Decl. ¶¶ 31-35; Cooper Decl. ¶12; Seyb Decl. ¶ 13. Tellingly, Defendants nowhere grapple with these practical realities. They merely point to declarants who state—without basis or support, and without regard for the plain text of Idaho's law— that no reasonable physician should fear prosecution in Idaho for performing emergency abortions.

### 2. The Idaho Law's Affirmative Defense Is Narrower than EMTALA Because It Applies Only When Necessary to Prevent Death

The United States' opening memorandum and declarations demonstrated that there are numerous emergency medical conditions under EMTALA for which a doctor might conclude that the necessary stabilizing treatment is termination of the pregnancy, but where termination would not

---

[2] Dr. French asserts that life-saving terminations of pregnancy cause only "unintentional" harm to the unborn child, because "the intent of the procedure is to save the life of the mother; it is an unintended consequence of the procedure that the baby dies." French Decl. ¶ 14. As this Court previously recognized, however, the scope of § 18-622 is a legal question, not a factual issue for which Dr. French's testimony is relevant. *See* Dkt. 73 at 3. And as a legal matter, Idaho criminal law generally does not require that a person specifically intend the consequences of their actions, only that they have "a purpose or willingness to commit the act" itself. Idaho Code § 18-101(1).

fall within the Idaho law's affirmative defense because it may not be "necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(3)(a)(ii); *see* US Br. at 9-11, 15; Fleisher Decl. ¶¶ 12-27. In response, both the State and the Legislature try to avoid a conflict between EMTALA and § 18-622 by arguing that every single one of those conditions was "life-threatening," such that it was permissible under Idaho law for the pregnancy to be terminated. *See* Idaho Br. at 11-13; Legisl. Br. at 7-8; White Decl. ¶ 2 ("It is my opinion that every one of the five examples provided by Dr. Fleisher present a life-threatening situation."); *see also* French Decl. ¶¶ 29-30; Reynolds Decl. ¶ 7.

As an initial matter, even if § 18-622's affirmative defense were understood to apply to "life-threatening conditions," that still would not resolve the obvious textual conflict between § 18-622's narrow defense and EMTALA's much broader definition of when treatment is required, *i.e.*, for an emergency medical condition that could result in "placing the health of the individual . . . in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A). That textual discrepancy alone is sufficient to conclude that the two statutes directly conflict and thus § 18-622 is preempted as to EMTALA-required care.

Even setting that aside, however, this argument fails on its own terms. The premise of the argument is that, under § 18-622, it is lawful to perform an abortion in response to a "life-threatening condition." But that is not what the statute's affirmative defense says—it applies when "the abortion was *necessary to prevent the death* of the pregnant woman." § 18-622(3)(a)(ii) (emphasis added). Neither the State nor the Legislature provides a basis for equating "necessary to prevent . . . death" with "life-threatening," and the phrases clearly have different meanings.

First, "necessary" is a definite term whereas "threatening" expresses a possibility. When engaging in statutory interpretation, the Idaho Supreme Court "begins with the dictionary definitions." *Idaho v. Clark*, 484 P.3d 187, 192 (Idaho 2021). As the Idaho Supreme Court has recognized, "'[n]ecessary' means 'indispensable.'" *City of Pocatello v. Peterson*, 473 P.2d 644, 648 (Idaho 1970) (citing

Black's Law Dictionary). Merriam-Webster similarly defines "necessary" as "absolutely needed: Required." *Necessary*, Merriam-Webster Dictionary Online, https://perma.cc/4DNK-AVJC. By contrast, the word "threatening"—as in the case of a "life-threatening" condition—is not nearly as definite. *See Life-Threatening*, Black's Law Dictionary (11th ed. 2019) ("Of, relating to, or involving illness, injury, or danger that could cause a person to die"); *Threatening*, Merriam-Webster Dictionary Online, https://perma.cc/TPH7-XPCE (defining "threatening" as "expressing or suggesting a threat of harm, danger"; "indicating or suggesting the approach of possible trouble or danger"). A condition that *threatens* a patient's life may not *necessarily* result in death in the absence of an abortion, which confirms that § 18-622's affirmative defense is narrower than the State's portrayal and EMTALA.

Indeed, the surrounding statutory context confirms that "necessary to prevent . . . death" was not intended to overlap with "life-threatening conditions," let alone EMTALA's scope. The Idaho Legislature has proven that when it wants to provide a broader exception for abortions—beyond just those "necessary to prevent . . . death"—it knows how to do so. For example, § 18-8804(1) prohibits certain abortions "except in the case of a medical emergency," which is defined to mean a condition "necessitat[ing] the immediate abortion of [a woman's] pregnancy to avert her death *or for which a delay will create a serious risk of substantial and irreversible impairment of a major bodily function*." Idaho Code § 18-8801(5) (emphasis added). Idaho's twenty-week ban on abortions contained a very similar exception, *see id.* § 18-505, as does the definition section applicable to § 18-622 itself. *See* Idaho Code § 18-604(9).

The Legislature's deliberate choice to allow for an affirmative defense only where "necessary to prevent the death" of the pregnant person—and not, for example, in a "medical emergency" as defined in § 18-604(9)—demonstrates that the Legislature intended for the affirmative defense in § 18-622 to apply in a narrower set of circumstances. *See Idaho v. Yager*, 85 P.3d 656, 666 (Idaho 2004) ("Where a statute with respect to one subject contains a certain provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different

intention existed."). Indeed, the Legislature conceded as much in its intervention motion—highlighting that § 18-8801(5) "has a broader definition of 'medical emergency' than does the 622 Statute," and the Legislature viewed that broader definition as being more in line with EMTALA, Dkt. 15-1 at 2, which means that the narrower version in § 18-622 does *not* align (and directly conflicts) with EMTALA.

Thus, the plain text of § 18-622's affirmative defense is narrower than EMTALA and does not even encompass care in "life-threatening situations" as the State suggests. In cases where a patient has a medical condition requiring abortion that seriously threatens the patient's health but is not yet *guaranteed* to result in their death, EMTALA requires such care whereas § 18-622 prohibits it, which means § 18-622 is preempted as applied to such care.

### 3. Factually, the Affirmative Defense Does Not Cover All EMTALA-Protected Abortions

Even if the affirmative defense extended to abortions provided in "life-threatening situations" as the State and Legislature suggest, § 18-622 would still conflict with EMTALA. Federal law authorizes stabilizing treatment—including, in some situations, abortions—not just when necessary to prevent death, but also where necessary to prevent "placing the health of the individual … in serious jeopardy," "serious impairment to bodily functions," or "serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A); *see* US Br. at 15. Both Defendants argue that the United States has failed to demonstrate that abortions are provided when there is a serious risk to health, bodily functions, or organs—but not to a pregnant person's life—and, thus, that there is no actual conflict between federal and state law. *See e.g.*, Idaho Br. at 12-13; Legisl. Br. at 7-8. But that is incorrect.

First, the State, the Legislature, and their declarants suggest that a bright line exists between an emergency medical condition where a patient's health or bodily functions are in danger and one where her life is at risk. *See, e.g.*, Idaho Br. at 12; Legisl. Br. at 7 (citing French Decl. ¶¶ 17-29, 30-55; Reynolds Decl. ¶ 7). But "[l]ife and health exist on a fragile and shifting continuum." Dkt. 62 at 16; *see*

*also* Fleisher Supp. Decl. ¶ 7, Ex. H; Corrigan Supp. Decl. ¶¶ 8-10, Ex. I. As Dr. Fleisher explained in his original declaration, "in some cases where the patient's health is unambiguously threatened, it may be less clear whether there is also a certainty of death without stabilizing treatment." Fleisher Decl. ¶ 12; *see also* Huntsberger Decl. ¶¶ 8-11, Ex. J. EMTALA requires stabilizing treatment based on that threat to health, *see* 42 U.S.C. § 1395dd(b)(1)(A), (e)(1)(A); but Idaho law requires the physician to wait until she is comfortable that there is sufficient evidence to convince a jury that termination of pregnancy is "necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(3)(a)(ii). That is a clear conflict between state and federal law, and "EMTALA does not allow leaving the patient untreated when doing so would irreparably risk or harm their health." Fleisher Decl. ¶ 12. When abortion is the stabilizing treatment, that care should be provided "rather than waiting to see if and/or when the patient's condition worsens to the point that they are about to die[.]" Fleisher Supp. Decl. ¶ 7; *see also* Huntsberger Decl. ¶¶ 12-15; Corrigan Supp. Decl. ¶¶ 8-13.

Second, Defendants are incorrect that, as a factual matter, interpreting the affirmative defense to mean "life-threatening" would cover all pregnancy terminations covered under EMTALA. *See* Idaho Br. at 11; Legisl. Br. at 8. Their declarants do not dispute that termination of pregnancy could be the appropriate stabilizing treatment for any example provided by the United States' declarants, *see* Part II.A, *supra*; rather, they assert that the abortions performed were necessary to save the patient's life. Setting aside these declarants' overbroad (and atextual) interpretation of the affirmative defense, their arguments disregard the actual statements in the declarations.

Dr. Fleisher, for example, described several conditions that—although they *could* be life-threatening for certain patients—may involve only threats to health, organs, or bodily functions for other patients. *See* Fleisher Decl. ¶ 15 (heart failure could threaten "impairment or severe dysfunction of bodily organs (such as the lungs, heart, and kidneys)"), ¶ 17 ("eclampsia can cause coma, pneumonia from the aspiration of stomach contents, kidney failure"), ¶ 19 (septic infection "can lead to kidney

failure"), ¶ 21 ("uncontrolled bleeding" can "result in organ dysfunction such as kidney failure"); *see also* Corrigan Supp. Decl. ¶ 8. The State's and Legislature's version of the affirmative defense—allowing treatment only in threats to *life*—still prohibits treatment that EMTALA requires, *i.e.*, when an emergency medical condition poses some of these threats to health but may not yet result in a threat to life. *Cf.* Fleisher Decl. ¶ 23 (discussing "[h]ow emergency conditions present in a pregnant patient will often vary depending on the patient's specific circumstances"). Indeed, Dr. Fleisher's supplemental declaration further elaborates on one such concrete example: a patient diagnosed with preterm premature rupture of membranes (PPROM), which currently threatens bodily functions and organs (*e.g.*, her uterus and future fertility), but which would not yet constitute a life-threatening condition. *See* Fleisher Supp. Decl. ¶ 6.

The Idaho providers, moreover, addressed similar situations. Dr. Cooper, for instance, described a situation in which Jane Doe 1 presented to the hospital with fetal triploidy and preeclampsia with severe features. Cooper Decl., Dkt. 17-7 ¶ 6. The patient was "at risk for stroke, seizure, pulmonary edema, [and] development of HELLP syndrome," but rather than wait for her life to be in jeopardy, Dr. Cooper recommended termination of the pregnancy "to stop her disease progression." *Id.* EMTALA permitted her to take that action when there was only a risk—at that moment in time—to her health, bodily functions, and organs; contrary to Defendants' position, she did not wait until the situation deteriorated further to become life-threatening, and EMTALA would not have allowed her to do so. *See also* Cooper Supp. Decl. ¶ 3, Ex. K.

Further, Dr. Cooper's and the other supplemental declarations make clear that, consistent with EMTALA, physicians in Idaho perform "abortions" before emergency medical conditions deteriorate into life-threatening ones. As with Dr. Fleisher, Dr. Cooper explains PPROM can initially present in a variety of different ways, some of which may only involve threats to health, organs, and bodily functions but which still require stabilizing treatment. Cooper Supp. Decl. ¶ 5. Similarly, the need to

treat preeclampsia "is not always to prevent death" but may be "to avoid further deterioration, physical harm, and threat to future fertility and long-term health." *Id.* ¶ 3. Dr. Huntsberger also explains that many ectopic pregnancies are treated by prescribing methotrexate to end the pregnancy without need of surgical intervention, because surgery greatly increases the risk of rupturing the fallopian tube and by extension decreasing fertility. Huntsberger Decl. ¶ 12. Predicting when an ectopic pregnancy will result in rupture of the fallopian tube is not ordinarily possible, and for that reason, physicians act immediately to resolve the emergency medical condition when it presents as a threat to the patient's health and organs rather than her life. *See id.* ¶¶ 11, 13.

Pregnant patients seek treatment for these emergency medical conditions in emergency departments throughout Idaho, and under federal law, covered hospitals must offer stabilizing treatment for conditions that endanger a patient's health. Idaho's affirmative defense does not extend to that care, however, even under Defendants' atextual and overbroad interpretation. Section 18-622 is accordingly in direct conflict with EMTALA by prohibiting care that EMTALA requires.

### C.   Idaho Law Conflicts with EMTALA By Allowing Prosecution and Disciplinary Proceedings for All Abortions Regardless of Circumstances

Additionally, § 18-622 directly conflicts with EMTALA because, regardless of the scope of the law's affirmative defense, that affirmative defense structure *itself* stands as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," in violation of EMTALA's preemption provision. *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993).

Notably, neither the State nor the Legislature disputes that § 18-622 allows medical professionals to be indicted, arrested, and criminally prosecuted for *every* abortion, regardless of the abortion's circumstances. The Legislature tries to salvage the law by resorting to notions of prosecutorial discretion. *See* Legisl. Br. at 9-10; Loebs Decl., Dkt. 71-6. But this argument concedes that § 18-622 criminalizes life-saving care, because the "necessary to prevent . . . death" standard has been relegated to an affirmative defense. *See, e.g., United States v. Sisson*, 399 U.S. 267, 288 (1970) ("It

has never been thought that an indictment, in order to be sufficient, need anticipate affirmative defenses."); *Idaho v. Barton*, 297 P.3d 252, 255 (Idaho 2013); *Idaho v. Segovia*, 457 P.2d 905, 908 (Idaho 1969). Thus, even though both the Legislature and State accept that termination of pregnancies is medically necessary for a range of conditions, they nonetheless concede that each time a physician performs that "heroic life-saving surgery," French Decl. ¶ 33, the physician remains subject to indictment, arrest, and criminal prosecution—a clear conflict with EMTALA's text and purpose of *requiring* such medical care. *Arrington v. Wong*, 237 F.3d 1066, 1073-74 (9th Cir. 2001). It is of little comfort to a physician, whose freedom and livelihood are on the line, that the Legislature claims in its briefing that some prosecutors may not fully enforce Idaho's much-touted new law. Corrigan Supp. Decl. ¶ 14; Huntsberger Decl. ¶ 20; Cooper Supp. Decl. ¶ 9.

Even on its own terms, the Legislature's reliance on prosecutorial discretion fails. The Legislature has submitted a single declaration from a single county prosecutor, who obviously lacks authority to bind any of the other 43 elected county prosecutors, let alone grand juries or citizens who might independently seek to initiate criminal proceedings, or any of the disciplinary boards that might pursue license revocation proceedings. *Cf.* Idaho Code § 19-1108 (grand juries); *Idaho v. Murphy*, 584 P.2d 1236, 1241 (Idaho 1978) (citizen complaints); § 18-622(2). More fundamentally, the Ninth Circuit has expressly held that officials' "promise of self-restraint does not affect our consideration of the ordinances' validity" under preemption doctrine. *City of Arcata*, 629 F.3d at 992; *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 882 (2000) ("[T]his Court's pre-emption cases do not ordinarily turn on such compliance-related considerations as whether a private party in practice would ignore state legal obligations . . . or how likely it is that state law actually would be enforced.").

The State, for its part, does not deny that every provider is subject to disciplinary proceedings and prosecution even when they provide life-saving care, and instead tries to defend the law indirectly. First, the State contends that there is no "direct conflict" because it remains possible for physicians to

comply with both § 18-622 and EMTALA. Idaho Br. at 15. But that is inconsistent with the Ninth Circuit's interpretation of EMTALA's preemption provision as extending to a "state law [that] is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Draper*, 9 F.3d at 1393. Here, § 18-622's affirmative defense structure poses an obstacle to EMTALA-required care—because even when federal law *compels* a physician to provide such care, the physician still risks indictment, arrest, pretrial detention, and a trial where the physician bears the burden of proof on this critical issue, all under threat of a felony conviction with a minimum two-year sentence. For those physicians "faced with the obligation to comply with [Idaho's] law and left only with an affirmative defense," before providing care they are forced to ask: "Is any risk of death sufficient? Must the risk be greater than 50%? 75%?" Corrigan Supp. Decl. ¶ 14. That alone frustrates EMTALA.

Second, the State argues for a presumption against preemption "in a field which the States have traditionally occupied." Idaho Br. at 15. But when a "statute contains an express pre-emption clause," as EMTALA does here, "we do not invoke any presumption against pre-emption." *Puerto Rico v. Franklin Calif. Tax-Free Tr.*, 579 U.S. 115, 125 (2016); *see also Sabri v. United States*, 541 U.S. 600, 608 n.* (2004) (federal spending power applies with equal force when Congress legislates "in an area historically of state concern").

Third, the State disputes the "chilling effect" experienced by medical providers, pointing out EMTALA's civil liability provisions. *See* Idaho Br. at 16. But those civil liability provisions apply only if a hospital *fails* to provide EMTALA-mandated care, *see* 42 U.S.C. § 1395dd(d)(2)(A), so it is unclear what relevance they have to evaluating the chill caused by § 18-622, which *prohibits* such care and exposes such care to criminal prosecution. If anything, those civil liability provisions only highlight the impossible position facing providers because of § 18-622. Moreover, the "chill" here is well-documented both factually and legally. Several Idaho-based providers have confirmed that, because of § 18-622, the threat of prosecution would interfere with the timely provision of medically necessary

and ethically appropriate care for their patients. *See* Corrigan Decl. ¶¶ 31-35; Corrigan Supp. Decl. ¶ 11; Cooper Decl. ¶ 12; Cooper Supp. Decl. ¶¶ 7, 9; Seyb Decl. ¶¶ 13-14; Huntsberger Decl. ¶¶ 19-20.[3] And legally, the threat of civil and criminal sanctions for engaging in conduct required by federal law is more than enough to establish obstacle preemption. *See Chamber of Commerce of U.S. v. Bonta*, 13 F.4th 766, 781 (9th Cir. 2021) ("much like a state may not 'prohibit[ ] outright'" conduct protected by federal law, a state likewise cannot "impose civil or criminal sanctions on individuals or entities for the act" encouraged by federal law); *see also Rice v. Norman Williams Co.*, 458 U.S. 654, 661 (1982) (state law is preempted if it "places irresistible pressure on a private party to violate [federal law] in order to comply with the statute"); *Nash v. Fla. Indus. Comm'n*, 389 U.S. 235, 239 (1967).

At bottom, § 18-622 represents a substantial obstacle to providing the emergency medical treatment required by EMTALA and is therefore preempted. The availability of an affirmative defense, to be proven at a criminal trial, by a preponderance of the evidence, does not alleviate this conflict.

## III.    The Equitable Balance Confirms an Injunction Is Warranted

As previously discussed, the balance of the equities underscores that preliminary injunctive relief is appropriate here. A preliminary injunction will prevent widespread harm to pregnant patients within Idaho, protect Congress's public policy choice, and preserve the integrity of the Medicare program. Meanwhile, § 18-622 is not (and never has been) in effect. Enjoining that law's application to a subset of federally mandated medical care will cause no tangible harm to Idaho.

Throughout its brief, the Legislature describes the threatened denial of medical care to patients as a mere "thimble" that is "empty." Legisl. Br. at 2-3, 8. Under federal law, however, *every* person is

---

[3] The Legislature tries to dispute the validity of this "chill" through Dr. Reynolds's declaration, in which she states that "[n]either I nor, in my opinion, any practicing Ob-Gyn would reasonably fear criminal prosecution under the 622 Statute" in circumstances that necessitate "an emergency medical procedure necessary to preserve the life of the mother." Reynolds Decl. ¶ 14. Dr. Reynolds—a Nevada-based doctor—is not competent to testify about Idaho-based physicians' fears of prosecution under Idaho law. *Cf.* Corrigan Supp. Decl. ¶ 3. And Dr. Reynolds nowhere acknowledges that § 18-622 contains only an *affirmative defense* for abortions necessary to prevent death.

guaranteed emergency care within EMTALA's scope, and § 18-622's prohibition of such emergency care—even if applicable only to a single person—is sufficient to establish a violation of the Supremacy Clause and, consequently, irreparable harm. *See Arizona*, 641 F.3d at 366 (recognizing that establishing a Supremacy Clause violation also establishes irreparable harm).

The Legislature relies on "statistics" purportedly showing that only five emergency abortions have occurred in recent years. *See* Legisl. Br. at 8. Of course, even that showing would be enough for irreparable harm. Regardless, as the Legislature admits, their statistical categories are so circumscribed that they say *nothing* about emergency medical conditions requiring termination of the pregnancy for the vast majority of individuals. *Cf. Idaho Vital Statistics - Induced Abortion 2020*, Idaho Department of Health and Welfare (Jan. 2022), Ex. L, at 10, 14 (confirming that the Legislature's statistical categories are essentially an empty set).

Finally, the State argues that it is simply "regulating abortion through a criminal statute of general applicability," which does not "regulat[e] Medicare or the hospitals' participation in Medicare." *Id.* at 18-19. Regardless of the validity of Idaho's law generally, however, it interferes with the integrity of Medicare by criminalizing medical care that, as a condition of receiving federal funding, covered hospitals are required to offer. And the generality of the State's law does not change that, with respect to EMTALA-required care, the law directly conflicts and therefore is invalid under the Supremacy Clause. Given the lack of any tangible harm to Idaho from a temporary injunction against § 18-622's enforcement as to EMTALA-required care, the equitable balance confirms that a preliminary injunction is warranted here.

## CONCLUSION

For the foregoing reasons, the Court should enter a preliminary injunction prohibiting the State of Idaho—including all its officers, employees, and agents—from enforcing Idaho Code § 18-622(2)-(3) as applied to EMTALA-mandated care.

Dated: August 19, 2022

SAMUEL R. BAGENSTOS
General Counsel

PAUL R. RODRÍGUEZ
Deputy General Counsel

DAVID HOSKINS
Supervisory Litigation Attorney

JESSICA BOWMAN
MELISSA HART
Attorneys
U.S. Department of Health & Human Servs.
200 Independence Ave., SW
Washington, DC  20201

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

JOSHUA REVESZ
Counsel, Office of the Assistant Attorney
General

ALEXANDER K. HAAS
Director, Federal Programs Branch

DANIEL SCHWEI
Special Counsel

*/s/ Lisa Newman*
LISA NEWMAN (TX Bar No. 24107878)
ANNA DEFFEBACH
EMILY NESTLER
CHRISTOPHER A. EISWERTH
Trial Attorneys

JULIE STRAUS HARRIS
Senior Trial Counsel

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 514-5578
lisa.n.newman@usdoj.gov

*Counsel for Plaintiff*