UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
SOUTHERN DIVISION


UNITED STATES OF AMERICA,     )
            )
       Plaintiff,     )
            )
   v.     )   Case No. 1:22-cv-00329-BLW
            )
THE STATE OF IDAHO,     )
            )
       Defendant.     )


**BRIEF OF INDIANA AND 16 OTHER STATES
AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT**

THEODORE E. ROKITA
Attorney General of Indiana

THOMAS M. FISHER*
Solicitor General

Office of the Attorney General
IGC South, Fifth Floor
Indianapolis, Indiana 46204
Tel: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov

*Counsel for Amici States*
*Admitted *pro hac vice*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................... ii

INTEREST OF *AMICI* STATES.................................................1

INTRODUCTION ...............................................................2

ARGUMENT ....................................................................4

I.    The United States Lacks a Cause of Action To Sue States Under
      the Supremacy Clause, Particularly To Enforce Conditions of Grants
      to Non-State Entities...................................................4

II.   EMTALA's Narrow Exemption from Its Anti-Preemption Clause
      Does Not Apply to Generally Applicable State Laws Governing
      Medical Services.......................................................9

III.  The Spending Power Does Not Give Congress the Authority To Pay
      Hospitals To Exempt Themselves from Generally Applicable State
      Laws Policing Medical Services........................................12

      A. The Supremacy Clause applies to federal law, not conditions
         on federal grants .................................................12

      B. Treating Medicare conditions as laws having preemptive effect
         risks violating the Tenth Amendment and the Republican Form
         of Government Clause ..............................................15

CONCLUSION .................................................................20

ADDITIONAL COUNSEL ........................................................21

CERTIFICATE OF SERVICE ....................................................22

i

# TABLE OF AUTHORITIES

## CASES

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ............................................................4

*Arizona v. United States*,
567 U.S. 387 (2012) .........................................................5, 6

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ............................................................5

*Ass'n des Éleveurs de Canards et d'Oies du Québec v. Bonta*,
33 F.4th 1107 (9th Cir. 2022) ...........................................9, 10

*Barnes v. Gorman*,
536 U.S. 181 (2002) .........................................................7, 12

*Cooper Indus., Inc. v. Aviall Servs., Inc.*,
543 U.S. 157 (2004) .........................................................5, 6

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
142 S. Ct. 1562 (2022) .....................................................7, 12

*Deanco Healthcare, LLC v. Becerra*,
365 F. Supp. 3d 1029 (C.D. Cal. 2019) ...............................10

*Democratic Party of Wis. v. Vos*,
966 F.3d 581 (7th Cir. 2020) .............................................19

*Dobbs v. Jackson Women's Health Organization*,
142 S. Ct. 2228 (2022) .....................................................1, 18

*Draper v. Chiapuzio*,
9 F.3d 1391 (9th Cir. 1993) ...............................................9

*Gebser v. Lago Vista Indep. Sch. Dist.*,
524 U.S. 274 (1998) ............................................................8

*Hernandez v. Mesa*,
140 S. Ct. 735 (2020) ..........................................................4

CASES [CONT'D]

*Hines v. Davidowitz*,
    312 U.S. 52 (1941)................................................................9

*In re T.D. Bank, N.A.*,
    150 F. Supp. 3d 593 (D.S.C. 2015) .................................11

*Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*,
    469 U.S. 256 (1985)......................................................11, 14

*Lewis v. Casey*,
    518 U.S. 343 (1996)................................................................6

*Linder v. United States*,
    268 U.S. 5 (1925)..................................................................16

*Midatlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*,
    474 U.S. 494 (1986)................................................................7

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)................................................13, 15, 16

*Newport v. Fact Concerts, Inc.*,
    453 U.S. 247 (1981)................................................................7

*New York v. United States*,
    505 U.S. 144 (1992)..............................................................19

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981)............................................................7, 12

*South Dakota v. Dole*,
    483 U.S. 203 (1987)..............................................................13

*United States Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*,
    570 U.S. 205 (2013)..............................................................13

*United States v. Butler*,
    297 U.S. 1 (1936)..........................................................3, 17, 18

CASES [CONT'D]

*United States v. California*,
  655 F.2d 914 (9th Cir. 1980) ....................................................4

*United States v. Doremus*,
  249 U.S. 86 (1919).................................................................16

*Wallace v. Kato*,
  549 U.S. 384 (2007)................................................................7

*Will v. Mich. Dep't of State Police*,
  491 U.S. 58 (1989).................................................................7

*Ziglar v. Abbasi*,
  137 S. Ct. 1843 (2017)..........................................................4, 5

STATUTES

42 U.S.C. § 1395dd..................................................................2

42 U.S.C. § 1395dd(f)............................................................9, 10

Idaho Code Ann. § 18-622(3)(a)(i)..............................................10

Idaho Code Ann. § 18-622(3)(a)(ii)...............................................2

OTHER AUTHORITIES

C.G. Addison, *A Treatise on the Law of Contracts* (11th ed. 1911) ........8

David Engdahl, *The Contract Thesis of the Federal Spending Power*,
  52 S.D. L. Rev. 496 (2007)....................................................13

David Engdahl, *The Spending Power*, 44 Duke L.J. 1 (1994) ...............8

Idaho Department of Health & Welfare, *Licensing & Certification:
  Hospitals* (2022), *available at*
  https://publicdocuments.dhw.idaho.gov/WebLink/DocView.aspx?i
  d=22375&dbid=0&repo=PUBLIC-DOCUMENTS...........................10

Philip Hamburger, *Purchasing Submission: Conditions, Power,
  and Freedom* (2021) ....................................................12, 14, 18, 19

**OTHER AUTHORITIES [CONT'D]**

U.S. Const. Article VI ...............................................................................12

W.W. Story, *A Treatise on the Law of Contracts* (5th ed. 1874) ............................8

## INTEREST OF *AMICI* STATES

The States of Indiana, Alabama, Arkansas, Kentucky, Louisiana, Mississippi, Montana, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Texas, Utah, West Virginia, and Wyoming respectfully submit this brief as *amici curiae* in support of the Defendant.

In the wake of *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), many States, like Idaho, prohibit abortion at all stages of pregnancy, with exceptions for the saving the life of the mother or preventing severe and irreversible harm to the mother. The *Amici* States have an interest in the rejection of the United States' untenable position that EMTALA preempts the law at issue here.

Furthermore, the United States has taken the remarkable position that it may seek a federal court injunction against a State any time it thinks a state law violates the conditions of a federal grant issued to a non-state entity. Such power would permit the Executive Branch to challenge all manner of state police-power regulations and fundamentally transform the relationships among citizens, their States, and the United States.

*Amici* States fully support the arguments of Idaho explaining why the United States lacks a cause of action and why in any event its law does not preclude use of abortion to stabilize a mother consistent with EMTALA. *Amici* submit this brief to expound on related arguments and explain why the Court should reject the position

1

of the United States at even more fundamental levels—because the United States cannot sue States to enforce grant conditions applicable to hospitals, because EMTALA's grant conditions are not "laws" with preemptive effect under the Supremacy Clause, and because concluding otherwise would call EMTALA into question under both the Tenth Amendment and the Republican Form of Government Clause.

## INTRODUCTION

Idaho criminalizes abortion but provides an affirmative defense where "[t]he physician determined . . . that the abortion was necessary to prevent the death of the pregnant woman." Idaho Code Ann. § 18-622(3)(a)(ii). The United States seeks to enjoin the abortion law under the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd, which requires hospitals participating in Medicare to provide stabilizing care to all patients who arrive at an emergency department suffering from an emergency medical condition. The United States hypothesizes that with "some pregnancy-related emergency conditions," such as ectopic pregnancy or severe preeclampsia, "a physician could determine that the necessary stabilizing treatment is care that could be deemed an 'abortion' under Idaho law." ECF No. 1, Complaint ¶ 24.

The existence of any conflict between EMTALA and Idaho's abortion law is highly suspect, as Idaho argues. But this case raises larger questions over whether the United States can sue a State directly under the Supremacy Clause and whether

2

Congress can preempt a State's use of its police power by way of conditions on federal grants. The position of the United States is not merely that Congress can sometimes preempt state law using the spending power, but that the federal government can, in effect, pay hospitals to violate state law with impunity. The Supreme Court has expressly stated, however, that the federal government may not establish a financial relationship directly with a regulated entity that both bypasses state officials and negates state police-power authority. *See United States v. Butler*, 297 U.S. 1, 77–78 (1936).

Indeed, such authority would radically restructure the relationships among the federal government, States, and citizens. With several other major federal grant programs, such as Medicaid, the State plays an intermediary role whereby it assents to grant conditions and modulates its governance of citizens accordingly. But here the United States offers the novel argument that the federal government may bypass the State entirely and establish a relationship directly with a citizen that, at the citizen's election, effectively immunizes the citizen from state police power authority.

A proper understanding of grant conditions and the federal spending power, not to mention the basic dual-sovereign structure of American constitutional government, does not permit such an arrangement. Rather, federal grant recipients continue to be governed by the state police power, which informs whether citizens can qualify for federal grants under specified grant conditions. In other words, the proper

question in this case is not whether the Idaho abortion law is preempted by federal law, but whether the Idaho law prevents its hospitals from qualifying for federal Medicare grants. The answer to that question is surely no (for reasons well explained by Idaho), but framing the question properly is critical to understanding and preserving the proper relationships among the federal government, States, and citizens.

## ARGUMENT

### I. The United States Lacks a Cause of Action To Sue States Under the Supremacy Clause, Particularly To Enforce Conditions of Grants to Non-State Entities

As a suit against a State under the Supremacy Clause to enforce conditions of federal grants to non-state entities, this case is, fundamentally, a non-starter.

To sue a State, "the federal government," "like any other plaintiff," "must first have a cause of action." *United States v. California*, 655 F.2d 914, 918 (9th Cir. 1980). But no constitutional or statutory provision expressly authorizes the United States to seek an injunction when state law prevents a private party from accepting a federal grant. And that authority cannot be inferred. As the Supreme Court has emphasized in recent years, gone is the "'*ancien regime*'" in which courts "assumed it to be a proper judicial function" to imply causes of action. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017); *see, e.g.*, *Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020); *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001). Now, the "watchword is caution." *Hernandez*, 140 S. Ct. at 742. If Congress "does not itself so provide, a

4

private cause of action will not be created through judicial mandate." *Ziglar*, 137 S. Ct. at 1856.

That is true even where federal and state law conflict. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015). *Armstrong* concerned an action by providers of residential habilitation services challenging Idaho's failure to amend existing Medicaid reimbursement rates. *Id.* at 323–24. The challengers argued that Idaho's rates were inconsistent with section (30)(A) of the Medicaid Act. *Id.* The Court held that the providers' lawsuit was barred because the Supremacy Clause does not create an "implied right of action." *Id.* at 327. It explained that the Supremacy Clause "creates a rule of decision," but not "any federal rights" or "a cause of action." *Id.* at 324–25. In other words, "[i]t instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* at 325. *Armstrong* thus directly forecloses a right of action directly under the Supremacy Clause—a holding that applies as much to the federal government as to a private entity. And because *this* case purports to be a Supremacy Clause case, ECF No. 1, Complaint ¶¶ 12–13, 56–59, a direct right of action is lacking.

On this point, *Arizona v. United States*, 567 U.S. 387 (2012), does not control. *Arizona* was decided before *Armstrong* and did not address the cause of action issue, so it does not control here. *See Cooper Indus., Inc. v. Aviall Servs., Inc.,* 543 U.S.

157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.") (internal quotation marks and citation omitted); *Lewis v. Casey*, 518 U.S. 343, 352 n.2 (1996) ("[T]he existence of unaddressed jurisdictional defects has no precedential effect.").

Furthermore, *Arizona* was predicated not on the Supremacy Clause so much as the structural limits on state power under the Constitution, which is not a mere "rule of decision." The Naturalization Clause affords Congress exclusive power over immigration and undermines unilateral state police power efforts to regulate immigration or enforce federal immigration law. *Arizona*, 567 U.S. at 394–95, 401–02. In that respect, *Arizona* at most implies a federal right of action directly under the Naturalization Clause—an area of substantive federal prerogative—not the Supremacy Clause.

Furthermore, unlike in *Arizona*, the source of the federal government's claim of preemption in this case is not a statute that directly authorizes or governs conduct, but one that does so only by agreement of individual grant recipients to follow grant conditions. The contractual nature of EMTALA and Medicare, and Idaho's status as a non-party to Medicare/EMTALA grant agreements, further undermines the existence of a cause of action here.

With all legislation, Congress legislates on the background of common-law principles, including contract law, and courts continue to apply the common law unless Congress has clearly displaced it. *See Midatlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 501 (1986) ("The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific."); *see, e.g.*, *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (looking to "common-law tort principles" to determine running of statute of limitations for Section 1983 action); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989) (explaining that in the Section 1983 context, the Supreme Court has long recognized that "members of the 42d Congress were familiar with common-law principles" and "likely intended these common-law principles to obtain, absent specific provisions to the contrary" (quoting *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 258 (1981)).

A federal grant authorized and conditioned by a statute enacted under the spending power is "a *contract*: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Accordingly, contract principles inform the operation, limits, enforcement, and remedies for those agreements. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1570 (2022) (explaining that general contract principles "limit[] 'the

7

scope of available remedies' in actions brought to enforce Spending Clause statutes" (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998))).

Under the common law, nonparties to a contract neither can sue to enforce, nor be compelled to comply with, that contract's terms. The common law has long held that "no stranger to the consideration" can "take advantage of a contract, though made for his benefit." W.W. Story, *A Treatise on the Law of Contracts* § 552 (5th ed. 1874). Because mutual agreement is required to bind the parties to a contract, *id.* § 490, "only a person who is a party to a contract can incur liability under it," C.G. Addison, *A Treatise on the Law of Contracts* 313 (11th ed. 1911). Accordingly, a third party is not bound by a contract's terms; only those in "privity" of contract are so bound. *See* Story, *supra*, § 573.

These principles apply to agreements to participate in federal programs under Congress's spending power. This case is, in effect, a lawsuit by one party to a contract against a stranger to the contract to enforce the contract's terms. Here, the hospital itself, not the State, opts to participate in the program and enters into the spending agreement directly with the federal government. Because the State is not a party, it cannot be bound by the terms of the agreement—including provisions requiring its laws to be overridden by federal law. *See* David Engdahl, *The Spending Power*, 44 Duke L.J. 1, 104 (1994) ("[T]hird-party rights . . . are 'secured' (if at all) not by any 'law,' but only by the contract between the recipient and the United States.").

The upshot is that, in addition to Supremacy Clause doctrine articulated by *Armstrong*, common-law contract principles foreclose a right of action by the United States to bring this suit, *i.e.*, to enforce its grant conditions against a State as a non-party.

## II.   EMTALA's Narrow Exemption from Its Anti-Preemption Clause Does Not Apply to Generally Applicable State Laws Governing Medical Services

Preemption "comes in three forms: express preemption, field preemption, and implied preemption." *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Bonta*, 33 F.4th 1107, 1113–14 (9th Cir. 2022). The United States argues that the Idaho abortion law is expressly preempted by EMTALA's preemption clause. ECF No. 17-1, Memorandum in Support of Motion for a Preliminary Injunction 14. But EMTALA's preemption clause provides that state laws are only preempted "to the extent that the requirement *directly* conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f) (emphasis added). The United States, relying on *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993), argues that the "preemption provision encompasses both impossibility and obstacle preemption." ECF No. 17-1, Pl.'s Mem. 14. But obstacle preemption, where state law is "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), is a type of implied preemption, which is not the fundamental argument advanced by the United States here.

Critically, EMTALA forecloses a broad understanding of obstacle preemption when it says that "[t]he provisions of this section *do not preempt* any State or local law requirement, *except* to the extent that the requirement *directly conflicts* with a requirement of this section." 42 U.S.C. § 1395dd(f) (emphasis added). Such text disclaims any broad concern with whether state law somehow imposes an "obstacle" to congressional objectives. Idaho need not show that its law is not an obstacle to Congress's purpose because "[t]he text of the statute is unambiguous that EMTALA would preempt state law only if the state requirement directly conflicted with the requirements of EMTALA." *Deanco Healthcare, LLC v. Becerra*, 365 F. Supp. 3d 1029, 1037 (C.D. Cal. 2019).

The Idaho abortion law does not directly conflict with EMTALA because compliance with both is possible. *See Bonta*, 33 F.4th at 1114. Not only does Idaho law permit abortion where necessary to stabilize a patient, *see* Idaho Code Ann. § 18-622(3)(a)(i), but regardless a hospital may comply with both state and federal law simply by turning down federal money. Some hospitals in Idaho are not Medicare providers. *See* Idaho Department of Health & Welfare, *Licensing & Certification: Hospitals* 1 (2022), *available at* https://publicdocuments.dhw.idaho.gov/WebLink/DocView.aspx?id=22375&dbid=0&repo=PUBLIC-DOCUMENTS (listing 53 hospitals, of which 51 are Medicare/Medicaid certified). Such hospitals do not violate

10

federal law even if they refuse a service that the Department of Justice deems required by EMTALA. Rejecting or being ineligible for a federal grant given the police-power requirements of state law does not amount to "violating" federal law.

Direct conflict, moreover, does not include the incidental implications of generally applicable exercises of the state police power. If a state legislature enacted a statute ordering that hospitals receiving federal grants need not stabilize patients, or must hand over a percentage of their federal grants to the State, that might qualify as a "direct conflict." *See Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 260–68 (1985) (declaring preemption of state law that channeled grants received by local governments in conflict with a federal statute). But Idaho's abortion law is a generally applicable law that does not target federal grants or a general requirement that hospitals stabilize patients. "Where the state and federal law are not in irreconcilable conflict, and the degree of interference impose by state law is merely incidental, preemption does not apply." *In re T.D. Bank, N.A.*, 150 F. Supp. 3d 593, 607 (D.S.C. 2015). Because any conflict between the Idaho abortion law and EMTALA is merely incidental, the Idaho law cannot be preempted.

III.   **The Spending Power Does Not Give Congress the Authority To Pay Hospitals To Exempt Themselves from Generally Applicable State Laws Policing Medical Services**

A. **The Supremacy Clause applies to federal law, not conditions on federal grants**

The Supremacy Clause provides that "the Laws of the United States . . . shall be the supreme law of the land." U.S. Const. art. VI. But conditions on federal grants are not "law." Historically, "regulation was traditionally a matter of public congressional enactment" and Congress was "reluctan[t] . . . to use conditions as a means of national domestic regulation." Philip Hamburger, *Purchasing Submission: Conditions, Power, and Freedom* 91 n.* (2021). Attaching conditions to federal grants affords a way to incent desired behavior without commanding it. "Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent," *i.e.*, the consent of the individual accepting a federal grant, as opposed to the consent of the people writ large. *Cummings v. Premier Rehab Keller*, 142 S. Ct. 1562, 1570 (2022) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16–17 (1981)).

The distinction is critical to a proper understanding of the spending power and its limits. In sum, "the 'legitimacy of Congress' power' to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on 'whether the [recipient] voluntarily and knowingly accepts the terms of th[at] contract.'" *Id.* (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)). In other words, "Congress'

12

*legislative* powers *cannot be avoided* by simply opting out," but "Congress' power to spend money is *not* a *legislative* power." David Engdahl, *The Contract Thesis of the Federal Spending Power*, 52 S.D. L. Rev. 496, 498 (2007). That limitation protects critical state interests. Thus, "unlike statutory provisions that are grounded in Congress' *legislative* powers, spending terms and conditions are obligatory and enforceable only if voluntarily accepted." *Id.* at 500. The "knowing acceptance" standard preserves the vertical balance of power between States and the federal government, "ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012) (opinion of Roberts, C.J., joined by Breyer and Kagan, JJ.).

For this reason, the Court has set limits on the conditions that Congress may impose on federal funding. For instance, Congress may impose "conditions that define the limits of the government spending program" but not "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *United States Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). And while Congress may financially induce States to accept policy changes, it may not impose conditions "so coercive as to pass the point at which pressure turns into compulsion." *NFIB*, 567 U.S. at 580 (quoting *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)).

Critically, a grantee need not accept a federal contract in the first instance, and if it does, the remedy for violation of its terms is a matter between the grantee and the United States. Thus, "when a federal statute does not directly require adherence to its provisions, but instead proposes them as terms of a contractual promise, it is not giving them the obligation of law." Hamburger, *supra*, 132. Because "conditions do not purport to bind . . . in the manner of law," "[n]o federal condition, by whatever means adopted, should be understood to defeat the obligation of contrary state law." *Id.* at 131. Otherwise, "[i]n shifting legislative power to . . . private decisions, conditions displace public representative self-government . . . with private barter." *Id.* at 92.

The United States cites only a single preemption case involving a federal grant, *see* ECF No. 17-1, Pl.'s Mem. 20, where the Court invalidated a state statute restricting how localities could spend federal grants authorized by Congress for "any" purpose. *See Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*, 469 U.S. 256, 260–68 (1985). But the Court did not squarely address whether grant conditions are properly understood to constitute "law" under the Supremacy Clause. And that case at most can be understood to preclude States from interfering with the relationship between an eligible federal grant recipient and the grantor—*i.e.*, not as a case precluding the State from enacting generally applicable police-power statutes that may preclude grant eligibility.

14

Treating grant conditions as "law" that trumps a generally applicable state exercise of the police power substitutes private barter for representative government. It threatens a fundamental alteration of the relationships among citizens, their States, and the federal government, whereby the federal government may induce citizens to violate state law with impunity. The Supreme Court has never countenanced such a capacious understanding of congressional power, and this Court should head it off by rejecting the federal government's preemption claim at its most fundamental level—that no "law" of the United States is even implicated.

### B. Treating Medicare conditions as laws having preemptive effect risks violating the Tenth Amendment and the Republican Form of Government Clause

By urging the Court to treat EMTALA's conditions on Medicare participation as "law" capable of preempting state abortion prohibitions, the United States embraces a model of general federal governance the Supreme Court has long rejected. In light of the Tenth Amendment, Congress cannot use the spending power to "undermine the status of the states as independent sovereigns in our federal system," *NFIB*, 567 U.S. at 577, but that is exactly what the United States proposes here.

Congress derives its spending power from the General Welfare Clause and the Appropriations Clause, which, as the Supreme Court has recognized in multiple cases, contain substantive limitations, lest they become a tool for unlimited Congressional government. *Id.* at 576–78. Critically, Congress may not use its spending

15

power to coerce States. *Id.* at 578. Coercion can arise in multiple ways. First, as in *NFIB*, Congress may coerce States by using federal spending programs to lure States into dependence and then radically changing the terms of the program. State hospitals that participate as Medicare providers subject to the conditions of EMTALA find themselves in such a position. They have become dependent on the Medicare program to provide services desired by state elected leaders, and then are threatened with deprivation if they refuse to violate generally applicable state law governing abortion. That is exactly the sort of "gun to the head" that the Court deemed unconstitutional in *NFIB*. *Id.* at 581.

But the Court has recognized another species of coercion that also runs afoul of the Tenth Amendment. That occurs where Congress uses its taxing-and-spending power to enter the arena of general police power and override contrary state laws. So, for example, in *Linder v. United States*, 268 U.S. 5 (1925), the Court rejected use of the power to tax for the general welfare to regulate the practice of medicine. It said that "[o]bviously, direct control of medical practice in the states is beyond the power of the federal government," which meant that "[i]ncidental regulation of such practice by Congress through a taxing act cannot extend to matters plainly inappropriate and unnecessary to reasonable enforcement of a revenue measure." *Id.* at 18; *see also United States v. Doremus*, 249 U.S. 86, 93 (1919) (invalidating a federal regulation of physicians predicated on the taxing power because it invaded the police

power of States and observing, "[o]f course Congress may not in the exercise of federal power exert authority wholly reserved to the states"). Here, as in those cases, the United States contends that Congress may derive a use of the General Welfare Clause to invade the regulation of medicine. Here, as in those cases, that argument should be rejected.

The Court applied *Linder* to a federal grant program under the Agricultural Adjustment Act in *United States v. Butler*, 297 U.S. 1 (1936), where it invalidated a plan to transfer payments from producing farmers to non-producing farmers. In the Court's view, "the act invades the reserved rights of the states. It is a statutory plan to regulate and control agricultural production, a matter beyond the powers delegated to the federal government." *Id.* at 68. And the grants were a critical part of that invasion: "The tax, the appropriation of the funds raised, and the direction for their disbursement, are but parts of the plan. They are but means to an unconstitutional end." *Id.* Critically for this case, any choice of the citizen to participate was irrelevant, because even so "[a]t best, it is a scheme for purchasing with federal funds submission to federal regulation of a subject reserved to the states." *Id.* at 72.

That is precisely what the United States advocates here—a purchase of citizen submission to federal regulation—with the added problem that such submission would (at least according to the federal government's theory) directly subvert state law on a matter reserved to the States. For there can be little doubt that, following

*Dobbs v. Jackson Women's Health Organization*, regulation of abortion constitutes a core state police power. 142 S. Ct. 2228, 2284 (2022) ("The Constitution does not prohibit the citizens of each State from regulating or prohibiting abortion."). And the Court in *Butler* was crystal-clear that using the spending power to undermine core state police powers at the election of the citizen is unconstitutional: "An appropriation to be expended by the United States under contracts calling for violation of a state law clearly would offend the Constitution." 297 U.S. at 73. The Court has thus rejected the position advanced here by the United States.

Furthermore, because the United States is attempting to use EMTALA to suspend state police power regulations without the State's consent, it undermines state sovereignty in a way that implicates the Republican Form of Government Clause. While the federal government may "induce the states to adopt policies that the Federal Government itself could not impose," it cannot induce citizens (corporate or otherwise) to violate state law. A "republican form of government" is one where the people are governed by legislatively enacted laws, not one where a different sovereign tempts some citizens to exempt themselves from state laws. Manifestly, "the purchase of submission is not what traditionally was understood as a republican form of government." Hamburger, *supra*, at 147. That observation is particularly apt where the submission is not undertaken by the State itself, but by a citizen being paid by the federal government to violate state law.

While the Supreme Court has never directly enforced the Guarantee Clause against the United States, it has observed that "perhaps not all claims under the Guarantee Clause present non-justiciable political questions." *New York v. United States*, 505 U.S. 144, 185 (1992). Where Congress (or the Executive Branch) "actively interfere in the states' republican self-governance," courts do not face unanswerable questions about how the United States itself should "guarantee" republican government. Hamburger, *supra*, at 147.

With the sort of active interference attempted by the United States in this case, courts can observe and declare violations using administrable standards, which averts the political question doctrine. *See Democratic Party of Wis. v. Vos*, 966 F.3d 581, 589 (7th Cir. 2020) ("We do not interpret *Rucho* or any other decision by the Supreme Court as having categorically foreclosed all Guarantee Clause claims as nonjusticiable, even though no such claim has yet survived Supreme Court review."). This Court should avoid the need to address such difficult questions by rejected the use of conditions on grants to non-state actors as "laws" enforceable under the Supremacy Clause. Otherwise, it should conclude that a scheme whereby the United States pays hospitals to violate state abortion laws constitutes a paradigm violation of the Republican Form of Government Clause.

## CONCLUSION

The Court should deny the Motion for Preliminary Injunction.

Respectfully submitted,

THEODORE E. ROKITA
Indiana Attorney General

By:  */s/ Thomas M. Fisher*
Thomas M. Fisher*
Solicitor General
*Admitted *pro hac vice*

Office of the Indiana Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov

## ADDITIONAL COUNSEL

STEVE MARSHALL
Attorney General
State of Alabama

LESLIE RUTLEDGE
Attorney General
State of Arkansas

DANIEL CAMERON
Attorney General
Commonwealth of Kentucky

JEFF LANDRY
Attorney General
State of Louisiana

LYNN FITCH
Attorney General
State of Mississippi

AUSTIN KNUDSEN
Attorney General
State of Montana

DOUG PETERSON
Attorney General
State of Nebraska

DREW WRIGLEY
Attorney General
State of North Dakota

JOHN M. O'CONNOR
Attorney General
State of Oklahoma

ALAN WILSON
Attorney General
State of South Carolina

MARK VARGO
Attorney General
State of South Dakota

HERBERT H. SLATERY III
Attorney General
State of Tennessee

KEN PAXTON
Attorney General
State of Texas

SEAN REYES
Attorney General
State of Utah

PATRICK MORRISEY
Attorney General
State of West Virginia

BRIDGET HILL
Attorney General
State of Wyoming

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Idaho by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Thomas M. Fisher*
Thomas M. Fisher
Solicitor General
*Admitted pro hac vice*

Office of the Indiana Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov

22