# EXHIBIT A

**Memorandum Opinion and Order**

**in**

**U.S. District Court**

**Northern District of Texas**

**Lubbock Division**

**Case No. 5:22-CV-185-H**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

STATE OF TEXAS, et al.,

     Plaintiffs,

v.                                                            No. 5:22-CV-185-H

XAVIER BECERRA, Secretary of Health
and Human Services, et al.,

     Defendants.

## MEMORANDUM OPINION AND ORDER

The Supreme Court's holding in *Dobbs* that the Constitution confers no right to an abortion caused a sea change, generating novel questions about the interplay of federal and state law. This case presents one such question: Does a 1986 federal law ensuring emergency medical care for the poor and uninsured, known as EMTALA, require doctors to provide abortions when doing so would violate state law? Texas law already overlaps with EMTALA to a significant degree, allowing abortions in life-threatening conditions and for the removal of an ectopic or miscarried pregnancy. But in *Dobbs*'s wake and in an attempt to resolve any potential conflict with state law, the Department of Health and Human Services issued Guidance purporting to remind providers of their existing EMTALA obligations to provide abortions regardless of state law. That Guidance goes well beyond EMTALA's text, which protects *both* mothers and unborn children, is silent as to abortion, and preempts state law only when the two directly conflict. Since the statute is silent on the question, the Guidance cannot answer how doctors should weigh risks to both a mother and her unborn child. Nor can it, in doing so, create a conflict with state law where one does not exist. The Guidance was thus unauthorized. In any event, HHS issued it without the required opportunity for public comment. As a result, the Court will preliminarily enjoin the Guidance's enforcement against the plaintiffs.

The Court will first explain how we got here and then detail why the plaintiffs have standing to challenge the Guidance. Turning from jurisdiction to the merits, the Court concludes that the Guidance extends beyond EMTALA's authorizing text in three ways: it discards the requirement to consider the welfare of unborn children when determining how to stabilize a pregnant woman; it claims to preempt state laws notwithstanding explicit provisions to the contrary; and it impermissibly interferes with the practice of medicine in violation of the Medicare Act. Because HHS's Guidance is a statement of policy that establishes or changes a substantive legal standard, it likewise was subject to notice-and-comment requirements—requirements unfulfilled here. In light of those conclusions, the Court enjoins the defendants from enforcing the Guidance and Letter's interpretation that Texas abortion laws are preempted by EMTALA. Additionally, the defendants may not enforce the Guidance and Letter's interpretation of EMTALA—both as to when an abortion is required and EMTALA's effect on state laws governing abortion—within the State of Texas or against AAPLOG's members and CMDA's members.

**1.    Background**

In *Dobbs v. Jackson Women's Health Organization*, the Supreme Court held "that the Constitution does not confer a right to abortion" and that "the authority to regulate abortion must be returned to the people and their elected representatives." 142 S. Ct. 2228, 2279 (2022). That decision had two effects that are relevant here. The first was the enactment, effectiveness, or reanimation of various state laws regulating abortion. The second was President Biden's Executive Order 14,076—"Protecting Access to Reproductive Healthcare Services." 87 Fed. Reg. 42,053 (July 8, 2022).

### A.    Texas's Regulation of Abortion

When *Dobbs* issued, scores of state laws sprang into effect.  Some of these laws were enacted in anticipation of abortion's return to state control; others predated *Roe* and had laid dormant for nearly fifty years.  Texas has laws falling into both categories.

The Human Life Protection Act lies in the first—a so-called "trigger law."  HLPA takes effect on the "30th day after . . . the issuance of a United States Supreme Court judgment overruling, wholly or partly, *Roe v. Wade*, 410 U.S. 113 (1973), as modified by *Planned Parenthood v. Casey*, 505 U.S. 833 (1992), thereby allowing the states of the United States to prohibit abortion."  Act of May 25, 2021, 87th Leg., R.S., ch. 800, 2021 Tex. Sess. Law Serv. 1887 (H.B. 1280) (to be codified at Tex. Health & Safety Code Ch. 170A).  The judgment in *Dobbs* triggered HLPA's 30-day clock, meaning it goes into effect on August 25, 2022.  Dkt. No. 23 at 13.

When it takes effect, HLPA will prohibit abortion unless:

(1)  the person performing, inducing, or attempting the abortion is a licensed physician;

(2)  in the exercise of reasonable medical judgment, the pregnant female on whom the abortion is performed, induced, or attempted has a life-threatening physical condition aggravated by, caused by, or arising from a pregnancy that places the female at risk of death or poses a serious risk of substantial impairment of a major bodily function unless the abortion is performed or induced; and

(3)  the person performs, induces, or attempts the abortion in a manner that, in the exercise of reasonable medical judgment, provides the best opportunity for the unborn child to survive unless, in the reasonable medical judgment, that manner would create:

   (A)  a greater risk of the pregnant female's death; or

   (B)  a serious risk of substantial impairment of a major bodily function of the pregnant female.

H.B. 1280 § 2 (to be codified at Tex. Health & Safety Code 170A.002(b)).

For HLPA's purposes, abortion "means the act of using or prescribing an instrument, a drug, a medicine, or any other substance, device, or means with the intent to cause the death of an unborn child of a woman known to be pregnant." Tex. Health & Safety Code § 245.002. But the term "does not include birth control devices or oral contraceptives." *Id*. And "[a]n act is not an abortion if the act is done with the intent to: (A) save the life or preserve the health of an unborn child; (B) remove a dead, unborn child whose death was caused by spontaneous abortion; or (C) remove an ectopic pregnancy." *Id*.

Texas's pre-*Roe* statutes remain on the books, too. In Texas, when the Supreme Court overruled *Roe*, these laws once again became enforceable. One such law criminalized abortion except when "procured or attempted by medical advice for the purpose of saving the life of the mother." *See* Tex. Rev. Civ. Stat. arts. 4512.1–.4, .6 (2010) (former Tex. Penal Code arts. 1191–94, 1196 (1925)).

For complicated reasons not relevant here, the enforceability of that statute is unclear. In short, HLPA reflects a more recent, more specific regulation of abortion and, normally, a more recent enactment governing the same subject supersedes prior enactments. But the Texas Supreme Court—the final arbiter of Texas law—is currently considering whether the pre-*Roe* statutes are enforceable. *In re Paxton*, No. 22-0527, Dkt. No. 1 (Tex. June 29, 2022). A state-court judge had enjoined their enforcement, but the Texas Supreme Court stayed that injunction. *In re Paxton*, No. 22-0527, Dkt. No. 8 (Tex. July 1, 2022). Although far from definitive, that is good enough for the Court's purposes: the Court will treat the pre-*Roe* statutes as enforceable until the Texas Supreme Court dissolves its stay of the injunction barring their enforcement.

### B.      The Administration's Response

*Dobbs*'s second effect was federal.  Two weeks after *Dobbs*, President Biden issued

Executive Order 14,076, requiring the Secretary of the Department of Health and Human

Services (HHS) to "identify[] potential actions . . . to protect and expand access to abortion"

and to "identify[] steps to ensure that . . . pregnant women . . . receive the full protections

for emergency medical care afforded under the law, including by considering updates to

current guidance on obligations specific to emergency conditions and stabilizing care under

the Emergency Medical Treatment and Labor Act, 42 U.S.C. 1395dd."  87 Fed. Reg.

42,053 (July 8, 2022).

Enacted in 1986, EMTALA prevents hospitals from discriminating against those

without the ability to pay for necessary emergency care—a phenomenon known as "patient

dumping."  Covered hospitals (those participating in Medicare with a dedicated emergency

department, 42 U.S.C. §§ 1395dd(a), (e)(2) & 1395cc(a)(1)(I); *see* 42 C.F.R. § 489.24(b)(4))

must either stabilize a patient presenting with an "emergency medical condition" or transfer

her to a hospital with facilities to do so.  § 1395dd(b)(1).  EMTALA defines "emergency

medical condition[s]" as those that manifest themselves "by acute symptoms of sufficient

severity (including severe pain) such that the absence of immediate medical attention could

reasonably be expected to result in":

> (i)   placing the health of the individual (or, with respect to a pregnant
>       woman, the health of the woman or her unborn child) in serious
>       jeopardy,
>
> (ii)  serious impairment to bodily functions, or
>
> (iii) serious dysfunction of any bodily organ or part; or
>
> (B)  with respect to a pregnant woman who is having contractions—

      (i)   that there is inadequate time to effect a safe transfer to another
             hospital before delivery, or

      (ii)   that transfer may pose a threat to the health or safety of the
             woman or the unborn child.

§ 1395dd(e)(1).

Violators face multiple sanctions.  HHS can seek monetary penalties against institutions and individuals who fail to provide stabilizing care.  § 1395dd(d)(1); 42 U.S.C. § 1320a-7a(c); *see also* 42 C.F.R. § 1003.500–20.  Dumped patients and their kin can bring suit against the hospitals, too.  § 1395dd(d)(2).  And both facilities and individual physicians who violate EMTALA can be excluded from participating in Medicare and other federally supported programs.  §§ 1395cc(b)(2) & 1320a-7(b)(5), (h).  Whistleblowers are protected from retaliation when they report violations.  § 1395dd(*i*).

Importantly, the statute contains a savings clause that notes its limited preemptive effect.  Only state laws directly conflicting with an EMTALA requirement are preempted: "The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." § 1395dd(f).

Pursuant to the Executive Order, the Centers for Medicare and Medicaid Services (CMS, a component of HHS) sent Guidance[1] to state healthcare-agency directors.  The same day, HHS Secretary Xavier Becerra sent a Letter[2] to healthcare providers.  The

---

[1] Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss, Centers for Medicare & Medicaid Services (July 11, 2022), https://www.cms.gov/files/document/qso-22-22-hospitals.pdf [hereinafter EMTALA Guidance or Guidance].

[2] HHS Secretary Letter to Health Care Providers About Emergency Medical Care, Department of Health and Human Services (July 11, 2022), https://www.hhs.gov/sites/default/files/emergency-medical-care-letter-to-health-care-providers.pdf [hereinafter EMTALA Letter or Letter].

Guidance and Letter direct hospitals and doctors, under EMTALA, to provide abortions under certain circumstances and that they must follow federal, not state, law when doing so.

The Guidance claims that it "restate[s] existing guidance for hospital staff and physicians regarding their obligations under [EMTALA], in light of new state laws prohibiting or restricting access to abortion."  Guidance at 2.  It contains a disclaimer that "[t]his memorandum is being issued to remind hospitals of their existing obligation to comply with EMTALA and does not contain new policy."  *Id.* at 1.  HHS states that the physician must determine whether an emergency medical condition (EMC) exists.  *Id.*; *see* § 1395dd(b)(1) (stating that "the hospital determines that the individual has an emergency medical condition").  And EMCs "may include a condition that is likely or certain to become emergent without stabilizing treatment."  Guidance at 1.  Pregnant women may experience EMCs including, but not limited to, "ectopic pregnancy, complications of pregnancy loss, or emergent hypertensive disorders, such as preeclampsia with severe features."  *Id.*  Just as the determination of whether a patient has an EMC rests with the physician, so too does the determination as to what course of treatment is necessary to stabilize the patient.  *Id.*  The Guidance states that "[s]tabilizing treatment could include medical and/or surgical interventions (e.g., methotrexate therapy, dilation and curettage (D&C), removal of one or both fallopian tubes, anti-hypertensive therapy, etc.)."  *Id.* at 4.

Critically for present purposes, the Guidance continues that, "[i]f a physician believes that a pregnant woman presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA, and that abortion is the stabilizing treatment necessary to resolve that condition, the physician *must* provide that treatment."  *Id.* at 1 (emphasis added).  "When a state law prohibits abortion and does not include an

exception for the life and health of the pregnant person—or draws the exception more
narrowly than EMTALA's emergency medical condition definition—that state law is
preempted." *Id.* Moreover, "[a] hospital cannot cite State law or practice as the basis for
transfer." *Id.* at 4. And "[f]ear of violating state law through the transfer of the patient
cannot prevent the physician from effectuating the transfer nor can the physician be shielded
from liability for erroneously complying with state laws that prohibit services such as
abortion or transfer of a patient for an abortion when the original hospital does not have the
capacity to provide such services." *Id.*

Leaning on EMTALA's preemption provision, the Guidance states that "[w]hen a
direct conflict occurs between EMTALA and a state law, EMTALA must be followed." *Id.*
As a result, individuals can use EMTALA "as a defense to a state enforcement action, in a
federal suit seeking to enjoin threatened enforcement, or, when a physician has been
disciplined for refusing to transfer an individual who had not received the stabilizing care
the physician determined was appropriate, under the statute's retaliation provision." *Id.* at
5. Likewise, "[a]ny state actions against a physician who provides an abortion in order to
stabilize an emergency medical condition in a pregnant individual presenting to the hospital
would be preempted by the federal EMTALA statute due to the direct conflict with the
'stabilized' provision of the statute." *Id.*

Secretary Becerra's Letter, for its part, references the Guidance and restates HHS's
positions on abortion as a stabilizing treatment under EMTALA. The Letter cites specific
conditions that qualify as emergency medical conditions. Letter at 1 (listing "ectopic
pregnancy, complications of pregnancy loss, or emergent hypertensive disorders, such as
preeclampsia with severe features"). It likewise cites abortion as a stabilizing treatment,

"irrespective of any state laws or mandates that apply to specific procedures." *Id.*

(mentioning "abortion, removal of one or both fallopian tubes, anti-hypertensive therapy,

methotrexate therapy etc."). And the Letter reaffirms HHS's position that a physician has

an obligation to perform an abortion under EMTALA despite any countervailing state

abortion laws:

> [I]f a physician believes that a pregnant patient presenting at an emergency
> department, including certain labor and delivery departments, is experiencing
> an emergency medical condition as defined by EMTALA, and that abortion is
> the stabilizing treatment necessary to resolve that condition, the physician must
> provide that treatment. And when a state law prohibits abortion and does not
> include an exception for the life and health of the pregnant person—or draws
> the exception more narrowly than EMTALA's emergency medical condition
> definition—that state law is preempted.

*Id.* at 1–2.

Again, the Letter states that a violation of the EMTALA obligations stated by HHS

could subject a hospital to "termination of its Medicare provider agreement and/or the

imposition of civil monetary penalties" and a physician to "[c]ivil monetary penalties" and

"exclusion from the Medicare and State health care programs." *Id.* at 2. And the Letter

confirms that "EMTALA's preemption of state law could also be enforced by individual

physicians in a variety of ways, potentially including as a defense to a state enforcement

action, in a federal suit seeking to enjoin threatened enforcement, or, when a physician has

been disciplined for refusing to transfer an individual who had not received the stabilizing

care the physician determined was appropriate, under the statute's retaliation provision."

*Id.*

## C.   This Suit

Texas and two organizational plaintiffs filed suit against various HHS officials

seeking to enjoin HHS from enforcing EMTALA in accordance with the terms of the

directives included in its Guidance and Letter.  Texas claims that the Guidance unlawfully requires abortions in situations where Texas outlaws them, thus infringing on Texas's rights to legislate and enforce its abortion laws.  Dkt. No. 18 ¶ 59.  The organizational plaintiffs are two groups of physicians opposed to elective abortions.  The American Association of Pro-Life Obstetricians and Gynecologists (AAPLOG) is an organization of 6,000 pro-life physicians, 300 of whom live in Texas.  *Id.* ¶ 3.  The Christian Medical and Dental Association (CMDA) is a nonprofit organization of Christian physicians, dentists, and allied healthcare professionals, with over 12,000 members nationwide.  *Id.* ¶ 4.  CMDA has 1,237 members in Texas, of whom 607 are practicing or retired physicians, and 35 are OB/GYNs.  *Id.*  Both groups oppose elective abortions on medical, ethical, and religious grounds.  *Id.* at 17, 19–20.  In their view, the Guidance coerces physicians into providing elective abortions in contravention of their constitutional and statutory rights.  *Id.* ¶ 80.

The plaintiffs' amended complaint alleges that the Guidance is rife with defects.  It exceeds EMTALA.  *Id.* at 21–24.  It should have gone through notice and comment.  *Id.* at 24–25.  It is arbitrary and capricious.  *Id.* at 25–26.  It transgresses the Spending Clause.  *Id.* at 27.  It violates the nondelegation doctrine.  *Id.* at 27–28.  It violates the Tenth Amendment.  *Id.* at 28–29.  It infringes on the Free Exercise Clause.  *Id.* at 29–30.  And it violates the Religious Freedom Restoration Act.  *Id.*  To remedy these defects, the plaintiffs ask the Court to set aside the Guidance, declare the defendants' actions in promulgating it unlawful, enjoin the Guidance's enforcement, and award the plaintiffs their costs and fees.

Three weeks after filing suit, the plaintiffs moved for a temporary restraining order and preliminary injunction barring the Guidance's enforcement.  Dkt. No. 22.  They request relief by August 25—the day HLPA takes effect.  Tr. at 144.  The defendants

appeared, responded, and moved to dismiss the suit.  Dkt. Nos. 26–27; 32; 38–41.  After the

plaintiffs replied (Dkt. No. 55), the Court held an evidentiary hearing on their motion (Dkt.

No. 56).  Several amici filed briefs on both sides, and the Court is grateful for their work.

### D.    The Preliminary Injunction Standard

Federal Rule of Civil Procedure 65(a) authorizes federal courts to issue preliminary

injunctions.[3]  "A preliminary injunction is an extraordinary remedy," requiring a "clear

showing" that the plaintiffs are entitled to such relief.  *Winter v. Nat. Res. Def. Council, Inc.*,

555 U.S. 7, 22, 24 (2008).  The purpose of a preliminary injunction is to preserve the status

quo and prevent irreparable injury until the court renders a decision on the merits.  *Canal

Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).  "In order to obtain a preliminary

injunction, a movant must demonstrate (1) a substantial likelihood of success on the merits;

(2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the

threatened injury outweighs any harm that will result if the injunction is granted; and

(4) that the grant of an injunction is in the public interest."  *Moore v. Brown*, 868 F.3d 398,

402–03 (5th Cir. 2017) (citing *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)).  The

Court takes each question in turn, but in the final analysis, "[l]ikelihood of success and

irreparable injury to the movant are the most significant factors."  *Louisiana v. Becerra*, 20

F.4th 260, 262 (5th Cir. 2021) (citing *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014)).

But, as always, the Court first turns to the question of its power to hear this case.

---

[3] Since the defendants responded and this order has issued, the plaintiffs' motion for a temporary
restraining order is moot.

## 2.    Jurisdiction

Federal courts have jurisdiction over cases and controversies only.  U.S. Const. art. III, § 2.  A plaintiff suing under the Administrative Procedure Act must demonstrate both constitutional and prudential standing before the Court can exercise any power. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). The defendants do not contest that the plaintiffs are "arguably within the zone of interests to be protected or regulated by" EMTALA.  *Id.*  But even if a plaintiff has standing, only "final agency action" is subject to challenge under the APA.  5 U.S.C. § 704.

### A.    Constitutional Standing

The "irreducible constitutional minimum of standing contains three elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan*, 504 U.S. at 560).  "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements."  *Id.* (citation omitted). "And standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021).  Further, "when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim."  *N. Cypress Med. Ctr. Operating Co. v. Cigna Healthcare*, 781 F.3d 182, 191 (5th Cir. 2015) (quoting *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007)); *FEC v. Cruz*, 142 S. Ct. 1638, 1647 (2022) ("For standing purposes, we accept as valid the merits of [plaintiffs'] legal claims.").

The first prong of the standing inquiry is injury.  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 578 U.S. at 339 (quoting *Lujan*, 504 U.S. at 560).  A concrete injury is one that must "actually exist"—it must be "real, and not abstract." *Id.* at 340.  Meanwhile, the particularity aspect requires that the plaintiff be affected in a "personal and individual way." *Id.* at 339 (quoting *Lujan*, 504 U.S. at 560 n.1).  Additionally, "under Article III, an injury in law is not an injury in fact.  Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court." *TransUnion*, 141 S. Ct. at 2205.  So a plaintiff who "is merely seeking to ensure a defendant's 'compliance with regulatory law'" does not have "grounds for Article III standing" absent some "physical, monetary, or cognizable intangible harm traditionally recognized as providing a basis for a lawsuit in American Courts." *Id.* at 2206 (quoting *Spokeo*, 578 U.S. at 345).

Because states are not normal litigants, the Court analyzes Texas's alleged injuries separately from AAPLOG and CMDA's. *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

### i.    Texas's Sovereign Injury

First, the Court finds that Texas plausibly alleges an injury to its sovereign interest based on the differences between the Guidance's interpretation of EMTALA and Texas's laws governing when abortions are permitted.  Although the defendants dispute this, the language of the Guidance and Texas's laws are not identical, and the differences are

material.  This mismatch creates areas where the Guidance claims to preempt state law—a type of sovereign injury.

          **a.**    **The Guidance construes EMTALA to require physicians to perform abortions in situations not permitted by Texas law.**

The Guidance leaves no doubt that, under its view of EMTALA, abortions will be required under certain circumstances:  "If a physician believes that a pregnant patient presenting at an emergency department is experiencing an emergency medical condition as defined by EMTALA, and that abortion is the stabilizing treatment necessary to resolve that condition, the physician must provide that treatment."  Guidance at 1; Letter at 1. EMTALA defines an emergency medical condition generally[4] as a medical condition that would result in placing the health of an individual in serious jeopardy, serious impairment to bodily functions, or serious dysfunction of any bodily organ or part.  § 1395dd(e)(1)(A). But the Guidance goes further than the statute to say that "[a]n emergency medical condition may include a condition that *is likely . . . to become emergent* without stabilizing treatment."  Guidance at 1 (emphasis added) (citing "emergent hypertensive disorders"), 4 (same), 6 ("emergent ectopic pregnancy"); Letter at 1 ("emergent hypertensive disorders"). So under the Guidance's interpretation, an abortion could be necessary if a physician determines it is necessary to stabilize a condition that is not yet emergent but is likely to become so.

On the other hand, Texas's Human Life Protection Act prohibits abortion unless a pregnancy-related "physical condition" is "life-threatening" and "places the female at risk of death or poses a serious risk of substantial impairment of a major bodily function."  H.B.

---

[4] "Emergency medical condition" has a more specific definition for a pregnant woman who is having contractions.  § 1395dd(e)(1)(B).

1280 § 2 (to be codified at Tex. Health & Safety Code 170A.002(b)(2)).[5]  Similarly, pre-*Roe*
Texas criminal laws prohibit abortion except when "procured or attempted by medical
advice for the purpose of saving the life of the mother."  *See* Tex. Rev. Civ. Stat. arts.
4512.1–.4, .6 (2010) (former Tex. Penal Code arts. 1191–94, 1196 (1925)).  So both Texas
civil and criminal laws prohibit abortion unless there is a threat to the life of the pregnant
woman.  And HLPA's language indicates that the life-threatening physical condition must
be present, rather than likely to be emergent.  *See* H.B. 1280 § 2 (noting that the abortion
prohibition does not apply if, among other things, the pregnant female "*has* a life-
threatening physical condition") (emphasis added).

Juxtaposing the Guidance's construction of EMTALA with Texas law shows that
the former is materially broader.

First, the Guidance says abortion may be required for emergency medical conditions
that are likely to become emergent, whereas HLPA requires the condition to be present.
*Compare* Guidance at 1 ("likely . . . to become emergent"), *with* H.B. 1280 § 2 ("has a life-
threatening physical condition").

Second, the Guidance states that EMTALA may require an abortion when the
health of the pregnant woman is in serious jeopardy.  Guidance at 1, 3.  Texas law, on the
other hand, limits abortions to when the medical condition is life-threatening, and HLPA
goes further to expressly limit the condition to a physical condition.  *See* H.B. 1280 § 2; Tex.
Rev. Civ. Stat. arts. 4512.1–.4, .6 (2010).

---

[5] Texas excludes from the definition of abortion acts done "with the intent to: (A) save the life or
preserve the health of an unborn child; (B) remove a dead, unborn child whose death was caused
by spontaneous abortion; or (C) remove an ectopic pregnancy."  Tex. Health & Safety Code
§ 245.002.

Third, the Guidance also indicates that EMTALA may require an abortion when an emergency medical condition "*could . . .* result in a serious impairment or dysfunction of bodily functions or any bodily organ." Guidance at 3, 1 (emphasis added). HLPA, by contrast, requires the life-threatening physical condition to pose a *serious risk* of substantial impairment of a *major* bodily function. H.B. 1280 § 2. So, in addition to requiring a physical threat to life, HLPA requires both a greater likelihood and a greater severity than the Guidance's interpretation of EMTALA does.

As the defendants recognize, the Guidance's reading of EMTALA theoretically allows for abortions in cases prohibited by Texas law. Tr. at 79. Nonetheless, the defendants assert that "Texas has failed to identify any particular respect in which Texas law would prohibit an abortion that EMTALA would require to be offered." Dkt. No. 39 at 24. Texas responds that an incomplete medication abortion is one such scenario. Dkt. No. 23 at 9, 17–18, 29; Tr. at 26.[6] Moreover, AAPLOG provides testimony from Dr. Donna Harrison that the Guidance "requires performing essentially an elective abortion where women present to an emergency room, having previously initiated medication abortions, but where the unborn child is still living and may still be preserved." Dkt. No. 23-1 at 19. Under those circumstances, she testifies, "the conditions covered by the Abortion Mandate are broader than life of the mother situations and include elective abortions where the woman's life is not at stake." *Id.* at 21. As a result, the Guidance "purports to require AAPLOG's members to perform, assist in, or refer for elective abortions in violation of

---

[6] Texas also cited mental-health emergencies as another situation where the Guidance would permit abortions, but Texas law would not. Tr. at 24–26.

Texas law, the pro-life laws of other states, and EMTALA itself which requires stabilization of the unborn child." *Id.*

The plaintiffs' focus on, and concern with, medication abortions are not unfounded. The Guidance itself cites an "incomplete medical abortion" as a potential emergency medical condition that may require abortion.  Guidance at 6.  Since the Guidance permits a physician to immediately complete a medical abortion—regardless of whether the unborn child is still alive and before it presents a threat to the life of the mother—it goes beyond Texas's law.

Even if a particular condition does present a threat to the life of the mother, Texas law requires the treating physician to "perform[], induce[], or attempt[] the abortion in a manner that, in the exercise of reasonable medical judgment, provides the best opportunity for the unborn child to survive unless, in the reasonable medical judgment, that manner would create: (A) a greater risk of the pregnant female's death; or (B) a serious risk of substantial impairment of a major bodily function of the pregnant female."  H.B. 1280 § 2. Thus, even when an abortion is necessary, Texas law requires procedures that maximize the chance for the unborn child to live, unless those procedures would themselves create a greater risk to the pregnant female.  *Id.*

> **b.**  **The Guidance interprets EMTALA to preempt any state law governing abortion in medical emergencies.**

In addition to requiring physicians to perform abortions in situations not permitted by Texas law, the Guidance also provides that any state law conflicting with its requirements is preempted:  "Any state that has a more restrictive definition of emergency medical condition or that has a definition that directly conflicts with any definition above is preempted by the EMTALA statute."  Guidance at 5; Letter at 1–2.  And the Guidance

makes clear that, in HHS's view, "[p]hysicians and hospitals have an obligation to follow the EMTALA definitions, even if doing so involves providing medical stabilizing treatment that is not allowed in the state in which the hospital is located." Guidance at 5. Even more, the Guidance states that a "hospital cannot cite State law or practice as the basis for [a] transfer" and that "[f]ear of violating state law" that restricts abortion cannot prevent the physician from fulfilling his or her EMTALA obligation to perform abortion. *Id.* at 4. The message is clear: Any state law that limits the manner and circumstances under which abortion may be performed in medical emergencies is preempted, and HHS's view of EMTALA alone controls.

###        c.        The Guidance injures Texas's sovereign interests.

States have an interest in "the exercise of sovereign power over individuals and entities within the relevant jurisdiction—this involves the power to create and enforce a legal code, both civil and criminal." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982); *Tex. Off. of Pub. Util. Couns. v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999). "Pursuant to that interest, states may have standing based on (1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015) (cleaned up and citations omitted), *aff'd by an equally divided court sub nom. United States v. Texas*, 136 S. Ct. 2271, 2272 (2016). These "intrusions are analogous to pressure to change state law." *Id.*; *see also Kentucky v. Biden*, 23 F.4th 585, 598–99 (6th Cir. 2022). The Court finds that the three situations injuring sovereign interests as outlined by *Texas* are presented here. 809 F.3d at 153.

First, the Guidance is a federal agency's assertion of authority to regulate matters that the states believed they controlled.  The Supreme Court in *Dobbs* returned "the authority to regulate abortion" to "the people and their elected representatives."  *Dobbs*, 142 S. Ct. at 2279.  With the federal constitutional bar removed, states like Texas naturally believed that they could limit abortion to emergency situations as they determined was proper.  *See* Dkt. No. 18 at 8, 12–14.  But the Guidance interprets EMTALA to supersede Texas law and to permit abortions in contexts beyond that permitted by Texas.  *Supra* Sections 2.A.i.a, b.  Nothing in the record suggests that EMTALA has ever been interpreted and applied to supersede state laws governing the permissibility of abortions in medical emergencies.  This is because, as the defendants concede, *Dobbs* created a new legal landscape concerning abortion.  Tr. at 120.  Assuming that the plaintiffs are correct that the Guidance is an impermissible expansion of federal authority into emergency-abortion regulation, the Court finds that the Guidance works an actual injury to Texas's sovereign interests.  *See Tex. Off. of Pub. Util. Couns.*, 183 F.3d at 417–18, 449 (finding Texas had sovereign standing to challenge an FCC regulation that prohibited Texas from imposing additional requirements on telecommunications carriers seeking universal service support).

Second, the Guidance interprets a federal statute to preempt state law.  An agency's formal position that a state law is preempted can injure a state's sovereign interests.  *See State of Ohio ex rel. Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 229, 233 (6th Cir. 1985) (holding that "[t]he effective enforcement of [an] Ohio statute . . . necessarily is endangered and rendered uncertain by" a DOT statement of policy that Ohio state laws are preempted by existing federal regulations); *see also Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1238–42 (10th Cir. 2008) (holding an ATF letter interpreting a federal statute to preempt

Wyoming state firearms laws worked sufficient injury upon Wyoming to challenge the letter); *Texas v. EEOC*, 933 F.3d 433, 437–40, 446–49 (5th Cir. 2019) (holding that Texas had standing to challenge EEOC guidance that deemed unlawful under Title VII Texas state agencies' across-the-board bans on hiring individuals with criminal records). Despite EMTALA's anti-preemption provision that leaves all matters not directly in conflict with EMTALA to the states, the Guidance construes EMTALA's preemptive effect broadly to preempt state laws governing the manner and circumstances under which abortion may be performed in medical emergencies. *Supra* Section 2.A.i.b; *see* § 1395dd(f). Because the Guidance constitutes an agency assertion that federal law preempts state law, Texas has shown an injury in fact.

Third, the Guidance constitutes federal interference with the enforcement of state law. "[A] State clearly has a legitimate interest in the continued enforceability of its own statutes." *Maine v. Taylor*, 477 U.S. 131, 137 (1986); *see Berger v. N.C. State Conf. of the NAACP*, 142 S. Ct. 2191, 2194 (2022). Because a state alone has the right to create and enforce its legal code, "only the State has the kind of 'direct stake'" necessary to satisfy standing "in defending the standards embodied in that code." *Diamond v. Charles*, 476 U.S. 54, 65 (1986) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 740 (1972)).

Here, the Guidance interferes with Texas's enforcement of its laws because it encourages its hospitals and doctors to violate Texas abortion laws under threat of EMTALA liability. The Guidance makes clear that state abortion laws cannot provide a basis for transferring a patient. Guidance at 4. And the Guidance interprets EMTALA to preempt state laws governing the permissibility of abortion in medical emergencies. *Supra* Section 2.A.i.b. Furthermore, the Guidance threatens to enforce these positions by

– 20 –

penalizing hospitals and physicians that fail to stabilize a patient by providing an abortion when required under EMTALA.  Guidance at 5 (describing potential exclusion from Medicare and other state healthcare programs as well as civil monetary penalties "on a hospital ($119,942 for hospitals with over 100 beds, $59,973 for hospitals under 100 beds/per violation) or physician ($119,942/violation)"); *see also* Letter at 2.

In doing so, the Guidance gives Texas hospitals and physicians license—much more, requires them—to violate Texas abortion laws if their medical judgment says an abortion is required to stabilize the patient in a situation prohibited by Texas law.  *See EEOC*, 933 F.3d at 447 ("The Guidance consequently encourages employers, to avoid liability, to deviate from state law when it conflicts with the Guidance.").  This harms Texas's legitimate interest in the continued enforceability of its abortion laws.  *See Taylor*, 477 U.S. at 137. And the encouraged disregard of Texas abortion laws also creates an "increased regulatory burden" on Texas to prosecute more violations of its laws.  *Contender Farms, LLP v. USDA*, 779 F.3d 258, 266 (5th Cir. 2015) ("An increased regulatory burden typically satisfies the injury in fact requirement.").  So the Guidance interferes with adherence to—and, therefore, enforcement of—Texas laws.

The Court finds that Texas has sufficiently pled an actual injury to its sovereign interests.

### ii.    Texas, AAPLOG, and CMDA's Procedural Injury

All three plaintiffs allege that they suffered a procedural injury when the defendants promulgated the Guidance without soliciting the public's feedback.  Dkt. Nos. 55 at 13; 23 at 22; 18 at 24–25.  A party has procedural injury "so long as the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his

standing." *Ctr. for Biological Diversity v. EPA*, 937 F.3d 533, 543 (5th Cir. 2019) (quoting

*Lujan*, 504 U.S. at 573 n.8).  "[A] plaintiff in such a case need not allege any additional

harm beyond the one Congress has identified."  *Spokeo*, 578 U.S. at 342.  "A violation of the

APA's notice-and-comment requirements is one example of a deprivation of a procedural

right."  *EEOC*, 933 F.3d at 447.  And, by corollary, a procedural injury would also attach to

a violation of Section 1395hh, the Medicare-specific notice-and-comment provisions.  42

U.S.C. § 1395hh.

      Here, Texas has concrete sovereign interests in the creation and enforcement of its

abortion laws.  *Supra* Section 2.A.i.  And Texas has at least one additional concrete interest

in the avoidance of direct injury to Texas state medical providers through the loss of

Medicare or Medicaid funds or direct civil penalties. Dkt. No. 23 at 11–12; *see TransUnion*,

141 S. Ct. at 2204 ("The most obvious [concrete injuries] are traditional tangible harms,

such as physical harms and monetary harms.").  Texas hospitals and physicians receive

approximately $15.98 billion in Medicaid reimbursements annually.  Dkt. No. 23-1 at 14.

And, as of 2017, Medicare was the largest payor source for Texas hospitals, constituting

40% of gross patient revenue charges.  *Id.*  In the same year, government-payor sources,

including Medicare and Medicaid, were responsible for 57% of Texas's gross patient

revenue charges.  *Id.*  Many of the hospitals that receive these funds are state institutions like

Texas Tech University Health Sciences Center, which—between its two locations for Fiscal

Year 2022 (September 1, 2021 through August 2, 2022)—received over $148 million in

Medicare and Medicaid funding.  *Id.* at 40.  And over $7 million of that funding was

specifically used for emergency room medical services.  *Id.*

AAPLOG and CMDA also have concrete interests in the furtherance of their mission and in the representation of their members' beliefs as it related to HHS's decisions on abortion.  AAPLOG, CMDA, and their members oppose elective abortions.  Dkt. No. 23-1 at 18, 20, 25–27, 31, 34, 37.  And by circumventing the notice-and-comment procedures, they were deprived of opportunity to voice their medical, ethical, and religious objections to the abortions required under the Guidance's interpretation of EMTALA.  Dkt. No. 18 at 2, 16–20.

Assuming, as the Court must for purposes of the standing determination, that HHS was required to provide notice and comment in promulgating the Guidance, the Court finds that the plaintiffs suffered injury by exclusion from the notice-and-comment process.

### iii.   AAPLOG and CMDA's Injury by Association

The Court also finds that AAPLOG and CMDA have associational standing to represent the interests of their members.  "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).  The Court begins with the latter two requirements.

AAPLOG is an organization of OB/GYNs that are opposed to elective abortions, which it defines as "the purposeful killing of the unborn in the termination of a pregnancy for no medical reason."  Dkt. No. 23-1 at 20.  In AAPLOG's view, an abortion is not medically necessary except when a separation of the unborn child is necessary to save the life of the mother.  *Id.* at 20–21.  In accord with EMTALA's text (*see infra* Section 3.A.i),

– 23 –

AAPLOG believes that, in the case of a pregnant woman, doctors are "treating two patients, the mother and the baby," and that "every reasonable attempt to save the baby's life" would be a necessary part of treating such patients. *Id.* at 20.

CMDA is an organization of healthcare professionals that oppose abortion based on their religious beliefs. *Id.* at 25. In CMDA's view, an abortion is "elective" and, thus not necessary, "where the woman's life is not at stake." *Id.* at 26. Like AAPLOG, CMDA also believes in "protecting the life of the mother *and* her unborn child." *Id.* at 27 (emphasis added).

So both organizations and their members do not object to abortions where it is necessary to save the mother's life. *Id.* at 20, 26–27. But they oppose the Guidance because it requires their members to perform abortions even when the mother's life is not at stake, causing the members to violate their religious or moral beliefs and medical judgments. *Id.* at 20–21, 26–27. Based on these pleadings, the Court finds that the member interests AAPLOG and CMDA seek to protect are germane to their respective purposes. And because AAPLOG and CMDA request injunctive relief, "individualized proof" and their members' participation are not necessary. *Hunt*, 432 U.S. at 344; *see Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 588 (5th Cir. 2006).

The organizational plaintiffs allege that the Guidance threatens crippling punishments against their members for failure to perform abortions that violate their religious or moral beliefs or medical judgment. Dkt. No. 18 at 17–18. And certainly, the Guidance threatens enforcement of its interpretation of EMTALA by substantial civil monetary penalties and exclusion from participation in Medicare and other healthcare programs. Guidance at 5. These are concrete, financial harms. *TransUnion*, 141 S. Ct. at

2204.  And they are particularized also because they impact individual members directly. *See Spokeo*, 578 U.S. at 339.

But because they are not actual—they have not materialized yet—AAPLOG and CMDA must show that the injuries are imminent.  *See id.*  The Court finds that they have. In the pre-enforcement context, a plaintiff may establish imminent "injury in fact if he (1) has an 'intention to engage in a course of conduct arguably affected with a constitutional interest,' (2) his intended future conduct is 'arguably . . . proscribed by [the policy in question],' and (3) 'the threat of future enforcement of the [challenged policies] is substantial.'"  *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162–64 (2014)); *see also Barilla v. City of Houston*, 13 F.4th 427, 431–32 (5th Cir. 2021).

While a plaintiff need not await enforcement to challenge a policy, he must adequately allege an intention to engage in proscribed conduct.  *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).  This requirement is typically satisfied by alleging past actions and an intent to continue to engage in such actions proscribed by the policy.  *See, e.g.*, *id.* at 301–03 (finding that UFW members actively engaged in boycott activities in the past and have adequately alleged an intention to continue to do so); *Singleton v. Wulff*, 428 U.S. 106, 113 (1976) (finding sufficient physician allegations that they have performed and will continue to perform abortions that would not be reimbursed by a newly created state Medicaid statute); *Neese v. Becerra*, No. 2:21-CV-163-Z, 2022 WL 1265925, at *6 (N.D. Tex. Apr. 26, 2022) (noting that the plaintiffs alleged that they had previously refused hormone therapy and sex-change operations and were likely to encounter patients requesting such treatments).

Here, the organizational plaintiffs adequately plead that their members refuse to perform abortions that are elective—that is, not necessary to save the life of the mother. Dkt. No. 23-1 at 20–21, 26.  And they claim that the Guidance unlawfully requires members to perform abortions in "circumstances not posing a risk to the life of the mother."  Dkt. No. 18 at 16; *see* 23-1 at 21, 26–27.  In short, AAPLOG and CMDA plead that the Guidance imposes conditions "broader" than EMTALA to "include elective abortions where the woman's life is not at stake but which may constitute 'stabilizing care' under the" Guidance. Dkt. No. 18 at 16.  And they object to being forced to perform abortions "to end the life of a human being in the womb for no medical reason," which, in their view, is in situations other than when the life of the mother is at risk.  *Id.* at 17.  Both organizations' member doctors affirm these views.  Dkt. No. 23-1 at 31, 34, 37.[7]

AAPLOG and CMDA also provide affidavits confirming that their members regularly treat pregnant women in emergency situations.  *Id.* at 18, 25, 31, 34, 37.  And the doctor affidavits provided by the defendants and the brief of amici medical associations confirm that there are many situations in which a pregnant woman's health, but not her life, is in danger.  Dkt. No. 41 at 7–12 (describing pregnancy complications where abortion is necessary "to preserve the life or health of the mother"), 17–19 (describing conditions that "could be expected to increase the risk of serious impairment of maternal bodily functions

---

[7] Two AAPLOG doctors noted they were members of the Catholic Church and also shared the views of the Church regarding abortion.  Dkt. No. 23-1 at 31, 34.  They both object to the abortions required by the Guidance on religious grounds.  *Id.*  The Catholic amici's brief clarified the impact of the Guidance on Catholic medical practitioners.  Dkt. No. 70 at 6 (Catholic Health Care Leadership Alliance "believes that the position taken by Defendants' will significantly impact . . . the ability of CHCLA members to practice medicine without being forced or required to perform intentional abortions as a treatment option under EMTALA, which is a violation of CHCLA members' conscience rights as practitioners of the Catholic faith."), 7–8, 12–15.

or serious dysfunction of a bodily organ or part"), 25–28 ("EMTALA requires providing

such care in cases where it is necessary to stabilize the patient whether or not a patient is at

imminent risk of death."); 54 at 19 ("The fact is that a pregnant patient's health and life exist

on a continuum.").

These pleadings, taken together, show that AAPLOG and CMDA's member

physicians regularly treat pregnancy complications that are health-threatening but not life-

threatening to the mother.  The Guidance requires these doctors to perform such abortions.

*Supra* Section 2.A.i.a.  And because the organizations' representatives and members refuse

to perform abortions except in life-threatening circumstances, the Court finds that they

adequately plead a "serious" intent to engage in conduct proscribed by the Guidance.  *Nat'l

Fed'n of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011) (quoting *Miss. State

Democratic Party v. Barbour*, 529 F.3d 538, 545 (5th Cir. 2008)).  Furthermore, because many

AAPLOG and CMDA members object to the abortions that the Guidance requires based

on religious beliefs, this conduct is arguably affected with a constitutional interest.  Dkt. No.

18 at 17–20; *see Hoyt v. City of El Paso*, 878 F. Supp. 2d 721, 733 (W.D. Tex. 2012) (collecting

cases) (finding that the credible-threat doctrine applies to free exercise violations); *303

Creative LLC v. Elenis*, 6 F.4th 1160, 1172 (10th Cir. 2021) (finding pre-enforcement standing

based on plaintiff's sincere religious belief, which allegedly prevents her from creating

websites that celebrate same-sex marriages), *cert. granted in part*, 142 S. Ct. 1106 (2022).

Finally, the threat of enforcement is substantial.  A substantial threat can be shown

by: (1) a history of past enforcement against a plaintiff or another (*Susan B. Anthony List*, 573

U.S. at 164; *Joint Heirs Fellowship Church v. Akin*, 629 F. App'x 627, 631 (5th Cir. 2015));

(2) complaints based on violations of policy (*Speech First*, 979 F.3d at 335–38); or

(3) warnings, statements, or other pre-enforcement actions indicating an intent to enforce the policy (*Ctr. for Individual Freedom v. Carmouche*, 449 F.3d 655, 660 (5th Cir. 2006); *Barilla*, 13 F.4th at 433).  While there is no record of the Guidance being administratively enforced against healthcare providers, the Court finds that there are enough pre-enforcement actions taken by HHS or the United States to find a substantial threat of enforcement.

In *Carmouche*, the Fifth Circuit held that a credible threat of enforcement existed when an agency issued an advisory letter on a statute's meaning, intended enforcement, and recently enforced the statute against another party.  449 F.3d at 660–61; *see also Joint Heirs Fellowship Church*, 629 F. App'x at 631.  Similarly, here, HHS issued the Guidance interpreting EMTALA to impose obligations on doctors to perform abortions irrespective of state abortion laws.  Guidance at 1.  And the Guidance contains a warning that HHS may impose penalties for failure to comply and provides potential complainants with instructions on how to file an EMTALA complaint.  Guidance at 5–6.  While there is no evidence that HHS has pursued administrative enforcement actions against covered healthcare providers, the United States has sued the State of Idaho to declare Idaho's abortion laws invalid and preempted by EMTALA.  *United States v. Idaho*, No. 1:22-CV-329, Dkt. No. 1 (D. Idaho, Aug. 2, 2022).  In practical effect then, the United States—and thus, HHS—has begun to enforce the Guidance's interpretation of EMTALA, namely that EMTALA controls the doctor's obligation to perform abortions in medical emergencies despite countervailing state abortion law.

AAPLOG and CMDA's doctors are regulated by EMTALA and face dire penalties under it.  Dkt. No. 55 at 14.  And as mentioned above, AAPLOG and CMDA's member physicians regularly encounter pregnancy complications that are health-threatening but not

life-threatening.  As a result, there is a substantial likelihood that these physicians will

violate the Guidance and face significant penalties.

### iv.     Traceability

The plaintiffs' procedural injury is clearly traceable to the promulgation of the

Guidance without notice and comment, so the Court will not belabor the point.

Likewise, Texas's injuries are traceable to the Guidance's interpretation of

EMTALA, rather than the statute itself—as the defendants suggest.  Dkt. No. 39 at 23.  For

purposes of the standing analysis, the Court must assume that the Guidance contains an

impermissible construction of both the substantive requirements of EMTALA with regard to

abortion and its preemptive effect.  *See Cigna Healthcare*, 781 F.3d at 191.  And the

Guidance's interpretation of EMTALA is a final agency action binding on HHS's

enforcement staff.  *See infra* Section 2.B; *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541,

545 (6th Cir. 2004) ("It is an elemental principle of administrative law that agencies are

bound to follow their own regulations."); *Vitarelli v. Seaton*, 359 U.S. 535, 540 (1959); *Bureau*

*of Alcohol, Tobacco & Firearms v. Fed. Lab. Rels. Auth.*, 464 U.S. 89, 96 (1983) (finding an ALJ

bound by ATF guidance).

As a result, HHS enforcement staff are bound by the Guidance—not EMTALA—to

address a failure to provide an abortion in situations required by EMTALA but prohibited

by state law.  Guidance at 1, 5.  And under the Guidance, adherence to state abortion laws

governing emergency abortions will not be considered a valid defense or a proper basis for a

patient's transfer in administrative-enforcement proceedings brought under EMTALA.  *Id.*

at 4–5; *see infra* Section 2.B.ii.b.  So the threat of punishing doctors and hospitals by civil

monetary penalties and excluding them from Medicare and state healthcare programs is

traceable to the Guidance.  And, as demonstrated above, this enforcement threat is enough to constitute a sovereign injury to Texas as well as injury by association to AAPLOG and CMDA.  *See supra* Sections 2.A.i, iii.  So traceability is satisfied for these two injuries.

### v.   Redressability

The plaintiffs' injuries will be redressed by a ruling in their favor.  Specifically, the plaintiffs request that the Court not only set aside the Guidance, but also enjoin its enforcement.  Dkt. No. 23 at 31.

As to the procedural injury, "[t]he redressability requirement is lighter when the plaintiff asserts deprivation of a procedural right."  *EEOC*, 933 F.3d 433, 447 (5th Cir. 2019). "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."  *Massachusetts*, 549 U.S. at 518.  A reasonable possibility of "minimal impact" is enough.  *United States v. Johnson*, 632 F.3d 912, 921 n.45 (5th Cir. 2011) (quoting *Save Our Heritage, Inc. v. Fed. Aviation Admin.*, 269 F.3d 49, 56 (1st Cir. 2001)).  The Court finds that some possibility exists that the defendants would reconsider issuing the Guidance as written if notice-and-comment procedures were followed.  Therefore, an injunction setting aside the Guidance for failure to conduct notice and comment would redress the plaintiffs' procedural injuries.

Separately, a preliminary injunction forbidding HHS from enforcing the Guidance's interpretation of EMTALA "would safeguard Texas's sovereign interests."  *EEOC*, 933 F.3d at 449.  Such an injunction would restore the status quo.  It would remove the threat of EMTALA liability based on the Guidance's impermissible interpretation.  And Texas hospitals and doctors would defer to Texas law to supply the standard of care concerning

abortion in medical emergencies.  For the same reasons, the same injunction forbidding enforcement against AAPLOG's and CMDA's members would also remedy the associational injury.  The members would no longer face EMTALA liability for failure to perform certain abortions required under the Guidance's interpretation of EMTALA.

### B.      Final Agency Action

Before the Court may reach the merits, it must also address whether the Guidance is a final agency action subject to the Court's review.   "[W]hether an agency action is final is a jurisdictional issue, not a merits question."  *EEOC*, 933 F.3d at 440 n.8.  The Administrative Procedure Act provides for judicial review of a "final agency action."  5 U.S.C. § 704.  And an agency action is "final" for purposes of the APA where the action (1) "mark[s] the consummation of the agency's decisionmaking process" and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (cleaned up).  The Guidance satisfies both conditions, so it is reviewable.

#### i.      The Guidance is the consummation of HHS's decision-making process.

The Guidance is the consummation of HHS's decision-making process because it is not "merely tentative or interlocutory [in] nature."  *Bennett*, 520 U.S. at 178 (citation omitted).  In the Fifth Circuit and elsewhere, "guidance letters can mark the 'consummation' of an agency's decision-making process."  *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 755 (5th Cir. 2011) (citing *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1532 (D.C. Cir. 1990) (holding that the EPA's guidance letters were final agency actions because they "confirm[ed] a definitive position that ha[d] a direct and immediate impact on the parties")).  Because the Guidance is "not subject to further Agency

review," it is final. *Sackett v. EPA*, 566 U.S. 120, 127 (2012); *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, No. 20-11179, 2022 WL 3440652, at *3–4 (5th Cir. Aug. 17, 2022).

HHS resists this conclusion, arguing that the Guidance "simply restates the preexisting and long-understood requirements of the statute" and that "no administrative enforcement process has even begun" pursuant to the Guidance. Dkt. No. 39 at 35. For the reasons stated below, the Court disagrees that the Guidance is merely a restatement. *See infra* Section 3.A. The Court also disagrees that an enforcement action is a prerequisite to finality. *See EEOC*, 933 F.3d at 444–46 (finding reviewable final agency action despite the EEOC's lack of enforcement authority over Texas); *Frozen Food Exp. v. United States*, 351 U.S. 40, 44–45 (1956) (finding an agency's interpretation of a statute exempting certain commodities from regulation immediately reviewable).

In any event, when reviewing finality, the Court must take a "pragmatic" approach. *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599 (2016) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)). Nothing within the Guidance suggests "it represents only an intermediate step in a multi-stage administrative process" of deliberation or that it is subject to further agency review. *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011); *Sackett*, 566 U.S. at 127. To the contrary, the Guidance itself states that the "policy" contained in it is "[e]ffective . . . immediately" and "should be communicated to all survey and certification staff and managers immediately." Guidance at 6. Accordingly, the Court concludes the Guidance is the consummation of HHS's decision-making process.

>        ii.   **The Guidance determines obligations under EMTALA, and legal
>              consequences flow from it.**

The Guidance is also final because it purports to determine "rights or obligations," and "legal consequences will flow" from its enforcement. *Bennett*, 520 U.S. at 178 (citation

omitted).  On its face, the Guidance "issued to remind hospitals of their existing obligation

to comply with EMTALA and does not contain new policy."  Guidance at 1.  "While

mindful but suspicious of the agency's own characterization," the Court must "focus[]

primarily on whether the rule has binding effect on agency discretion or severely restricts it."

*Texas*, 809 F.3d at 171 (quoting *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592,

595 (5th Cir. 1995)).

"Courts consistently hold that an agency's guidance documents binding it and its

staff to a legal position produce legal consequences or determine rights and obligations, thus

meeting the second prong of *Bennett*."  *EEOC*, 933 F.3d at 441; *see Syncor Int'l Corp. v.

Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) ("The primary distinction between a substantive

rule—really any rule—and a general statement of policy, then, turns on whether an agency

intends to bind itself to a particular legal position.").  "[A]n agency pronouncement will be

considered binding as a practical matter if it either appears on its face to be binding, or is

applied by the agency in a way that indicates it is binding."  *Gen. Elec. Co. v. EPA*, 290 F.3d

377, 383 (D.C. Cir. 2002) (citations omitted).  In determining whether agency action binds

the agency, courts look for mandatory language, actions that restrict the agency's discretion

to adopt a different view of the law, and the creation of safe harbors from legal

consequences.  *EEOC*, 933 F.3d at 441–43.

> a.  **The Guidance speaks in mandatory terms regarding a
> doctor's obligation to perform abortions notwithstanding
> state abortion laws.**

The Court already found that the Guidance construes EMTALA to require

physicians to perform abortions in situations not permitted by state law.  *Supra* Section

2.A.i.a.  And the Court also found that the Guidance interprets EMTALA to preempt any

state law governing abortion in medical emergencies.  *Supra* Section 2.A.i.b.  These

positions are not mere recommendations; they are couched in mandatory language and

backed by the threat of enforcement action.

   The Guidance states that a physician "must" provide an abortion as stabilizing

treatment if he or she believes it is necessary to stabilize the pregnant woman.  Guidance at

1; Letter at 1.  And it makes clear that any state law that "prohibits abortion" or "draws [an]

exception more narrowly than EMTALA[]" is "preempted."  Guidance at 1; Letter at 1–2.

In fact, the Guidance states that a "hospital cannot" even "cite State law or practice as the

basis for transfer."  Guidance at 4.  In no uncertain terms, it states that "[f]ear of violating

state law through the transfer of the patient *cannot prevent* the physician from effectuating the

transfer *nor can the physician be shielded from liability* for erroneously complying with state laws

that prohibit services such as abortion or transfer of a patient for an abortion when the

original hospital does not have the capacity to provide such services."  *Id.* (emphases

added).  And, if there were lingering uncertainty, the Guidance details the various means by

which HHS may enforce its stated positions—that is, by penalizing hospitals and physicians

that fail to provide abortion when EMTALA allegedly requires it.  Guidance at 5; Letter at

2.  In sum, the Guidance leaves no doubt that physicians and hospitals must either comply

with HHS's interpretation of EMTALA or face serious financial consequences.

   **b.    The Guidance binds HHS enforcement staff to its
           interpretation of EMTALA.**

   The Guidance is also binding on HHS as to how EMTALA will be enforced in light

of newly effective state abortion laws and, in doing so, it withdraws the agency's discretion

"to adopt a different view of the law."  *EEOC*, 933 F.3d at 442.  This withdrawal

distinguishes it from unreviewable agency opinions.  *See id.*  Agencies, of course, are bound

to follow their own interpretations of statutes. *See Wilson*, 378 F.3d at 545 ("It is an elemental principle of administrative law that agencies are bound to follow their own regulations."); *Vitarelli*, 359 U.S. at 540. And, here, the binding nature of the Guidance is demonstrated by its sender, audience, language, and adoption by the HHS Secretary in his Letter.

The Guidance was promulgated by the Directors of the "Quality, Safety & Oversight Group (QSOG) and Survey & Operations Group (SOG)," the subgroup of CMS responsible for overseeing Medicare providers' compliance with HHS standards. Guidance at 1.[8] And it is addressed to the "State Survey Agency Directors," who are responsible for evaluating alleged EMTALA violations. Guidance at 1; Dkt. No. 39 at 19.[9] In the "Enforcement" section, the Guidance states that the Office of the Inspector General[10]—the enforcement arm of HHS—may impose civil monetary penalties and exclude providers from federal healthcare programs for EMTALA violations. Guidance at 5. So, on its face, the Guidance's interpretation of EMTALA is binding upon the OIG in its enforcement activities.

Furthermore, Secretary Becerra, in his Letter, refers to the Guidance and cites its contents regarding HHS's "enforcement" of EMTALA in the wake of *Dobbs*. Letter at 1. And the Guidance itself also states that the "policy" contained in it is "[e]ffective . . .

---

[8] Quality, Safety & Oversight – General Information, Centers for Medicare and Medicaid Services, https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/ SurveyCertificationGenInfo (last visited Aug. 23, 2022).

[9] State Operations Manual, Appendix V - Interpretive Guidelines - Responsibilities of Medicare Participating Hospitals in Emergency Cases at 5, 21 (July 19, 2019), https://www.cms.gov/Regulations-andDirective/Directive/Manuals/downloads/ som107ap_v_emerg.pdf.

[10] The HHS OIG is authorized to impose civil monetary penalties and exclude providers from federal healthcare programs for EMTALA violations. 42 C.F.R. § 1003.500(a).

immediately" and "should be communicated to all survey and certification staff and managers immediately."  Guidance at 6.  This makes clear that state survey agencies and HHS certification staff should review EMTALA compliance according to the Guidance's interpretation.  There can be little doubt, then, that the Guidance represents HHS's official view of EMTALA liability and enforcement with regards to abortion and state laws restricting abortion.

In practice, the Guidance removes adherence to state abortion laws as a valid defense in administrative EMTALA-enforcement proceedings.  For example, if a hospital fails to provide an abortion when required under the Guidance's interpretation of EMTALA, the hospital would be subject to an administrative enforcement action by the OIG.  42 § 1395dd(1)(A), (B) (incorporating administrative enforcement and hearing procedures contained in Section 1320a-7a).  In determining whether to bring the action, the OIG would not consider adherence to state abortion laws as a defense or basis for transfer satisfying EMTALA obligations.  *See* Guidance at 4–5; *Sameena Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9th Cir. 1998) (collecting cases) ("The Supreme Court has long recognized that a federal agency is obliged to abide by the regulations it promulgates.").  And in a hearing before an administrative law judge, the ALJ would also not consider a defense based on adherence to state abortion laws because the ALJ is likewise bound by HHS's interpretation of EMTALA.  *See* 42 C.F.R. § 1005.4(c)(1) ("The ALJ does not have the authority to . . . [f]ind invalid or refuse to follow Federal statutes or regulations or secretarial delegations of authority."); *ATF*, 464 U.S. at 96 (noting an ALJ was bound by ATF guidance).  And although the hospital may seek review from the court of appeals—which would not be

bound by the Guidance, 42 U.S.C. § 1320a-7a(e)—the legal ramifications until that review

are directly traceable to the Guidance.

> **c.** **The Guidance's interpretation is at the heart of the Idaho suit.**

The Guidance's interpretation of EMTALA has also been "applied by the agency in

a way that indicates it is binding" in the federal government's ongoing suit against the State

of Idaho. *Gen. Elec.*, 290 F.3d at 383 (citation omitted); *see United States v. Idaho*, No. 1:22-

CV-329, Dkt. No. 1 ¶ 24 (D. Idaho, Aug. 2, 2022).  There, the United States cites the

Guidance in support of its argument that "there are some pregnancy-related emergency

medical conditions—including, but not limited to, ectopic pregnancy, severe preeclampsia,

or a pregnancy complication threatening septic infections or hemorrhage—for which a

physician could determine that the necessary stabilizing treatment is care that could be

deemed an 'abortion' under Idaho law," and "[i]n that scenario, EMTALA requires the

hospital to provide that stabilizing treatment." *Id.* (footnote omitted) (citing the Guidance).

Though the suit is based on EMTALA itself rather than the Guidance, it demonstrates that

the Guidance contains HHS's official interpretation of EMTALA.

> **d.** **The Guidance provides hospitals and physicians with a "safe harbor" from state law.**

Finally, the Guidance outlines a norm or "safe harbor" by which private parties may

"shape their actions" to avoid EMTALA liability. *EEOC*, 933 F.3d at 442 (citation

omitted).  The Guidance interprets EMTALA to require physicians to perform abortions in

situations not permitted by state law and to preempt any state law governing abortion in

medical emergencies. *Supra* Sections 2.A.i.a, b.  Thus, the Guidance purports to provide

hospitals and physicians with a complete defense against countervailing state abortion laws.

When physicians have doubts about whether an abortion is required under EMTALA but prohibited under state law, the Guidance is clear: "EMTALA must be followed."  Guidance at 4.

*                    *                    *

In many ways, the agency action here parallels that in *Texas v. EEOC*.  933 F.3d 433. In that case, the Fifth Circuit dealt with the Equal Employment Opportunity Commission's enforcement guidance that claimed blanket bans on hiring individuals with criminal records were violations of Title VII.  *EEOC*, 933 F.3d at 437–38.  Even where the Commission did not have the ability to directly enforce this guidance against state employers by imposing penalties on them, the court found that the guidance was a final agency action because: (1) it expressed a legal position binding on the Commission's staff that blanket bans were unlawful; (2) it limited the Commission's staff to an analytical method in conducting Title VII investigations; and (3) it outlined safe harbors on which parties may rely to shape their actions to avoid Title VII disparate-impact liability.  *Id.* at 441–44.

As in *EEOC*, the Guidance (1) binds HHS staff to a legal position that EMTALA requires doctors to perform abortions even when state law prohibits; (2) subjects HHS staff to an obligation to investigate and enforce EMTALA under the Guidance's interpretation; and (3) purports to provide hospitals and physicians a complete defense by preemption of countervailing state abortion laws.  And unlike the Commission in *EEOC*, HHS has the power to enforce EMTALA against both state and private parties according to its interpretations.  *See* § 1395dd(d)(1); 42 U.S.C. § 1320a-7a(c); *see also* 42 C.F.R. § 1003.500–20.

– 38 –

The case for reviewability here, then, is even more compelling than in *EEOC*:  The Guidance determines the "rights or obligations" of medical providers and HHS staff under EMTALA, and it produces "legal consequences" for failure to conform to them.  *Bennett*, 520 U.S. at 178 (cleaned up).  It is reviewable final agency action.

**3.      Likelihood of Success**

The Court need not reach all of the plaintiffs' arguments to resolve their motion. The Court concludes that the plaintiffs have demonstrated a substantial likelihood of success on the merits of two of their claims.

> **A.      The HHS Guidance likely exceeds its statutory authority and is not a permissible construction of EMTALA.**

A federal agency cannot act absent congressional authorization.  *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  It cannot confer power upon itself.  *Id.*  "To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress."  *Id.* at 374–75. Furthermore, under the APA, courts must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).  And here, as discussed above, final agency action occurred.

When reviewing an agency's construction of a statute under the two-step *Chevron* framework,[11] a court must first determine whether "Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001) (citing and explaining *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). If such delegation of authority exists, a court must use the "traditional tools of statutory construction" to ascertain "whether Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 837, 842, 843 & n.9. If Congress has directly spoken to the precise issue, a court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. But "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Here, the HHS Secretary has expressly delegated authority to "prescribe such regulations as may be necessary to carry out the administration of the insurance programs" under Medicare. § 1395hh(a)(1). So the Court proceeds to *Chevron* steps one and two.

Applying *Chevron*'s first step, the Court finds that Congress has not spoken to the "precise question at issue"—EMTALA's requirements as they pertain to abortion. *See*

---

[11] The Court recognizes that the *Chevron* framework may have fallen out of favor. The Supreme Court recently decided two cases where *Chevron* could have applied, but it received no reference, let alone deference. *See Becerra v. Empire Health Found., for Valley Hosp. Med. Ctr.*, 142 S. Ct. 2354, 2362 (2022); *Am. Hosp. Ass'n v. Becerra*, 142 S. Ct. 1896, 1904 (2022). By contrast, in another recent case, the Supreme Court crystalized the long-developing major-questions doctrine. *See West Virginia. v. EPA*, 142 S. Ct. 2587, 2607–14 (2022). There, the majority again made no mention of *Chevron*. Here, the Court refrains from evaluating *Chevron*'s vitality and applies its framework out of an abundance of caution and in light of fairly recent Fifth Circuit precedent applying *Chevron*. *See W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 233–34 (5th Cir. 2019). If *Chevron*'s framework did not apply, however, the Court's conclusions here would stand on even firmer ground. In any event, HHS's interpretation of EMTALA is likely impermissible.

*Chevron*, 467 U.S. at 843.  Specifically, the question at issue here is whether Congress has directly addressed whether physicians must perform abortions when they believe that it would resolve a pregnant woman's emergency medical condition, *irrespective* of the unborn child's health and state law.  Congress has not.  EMTALA, by its terms, does not require any particular stabilization procedure except one: delivery of the unborn child and the placenta.  § 1395dd(e)(3) (defining "to stabilize" and "stabilized" to mean delivery, including the placenta, with respect to a pregnant woman who is having contractions).  Outside of requiring delivery of the child when a mother experiences contractions, EMTALA provides no roadmap for doctors when their duty to a pregnant woman and her unborn child may conflict.  That Congress spoke clearly in the context of contractions reinforces that it did not specifically address pregnancy complications through its general requirements regarding emergency medical conditions and their stabilization.  It could have addressed abortion.  But it did not.  And since it did not, the first step cannot be the only step in the Court's analysis.

At step two of *Chevron*, the Court asks whether HHS's interpretation of EMTALA— which eliminates the duty of emergency care to an unborn child when it conflicts with the health of the mother—is a "permissible construction of the statute."  *Chevron*, 467 U.S. at 843.  For the reasons stated below, it is not.

       **i.**      **EMTALA creates obligations to stabilize both a pregnant woman and her unborn child, and it fails to resolve the tension when those duties conflict**.

The statute explicitly gives hospitals the discretion to "determine[] that the individual has an emergency medical condition."  § 1395dd(b)(1).  When a physician finds that an emergency medical condition is present, the hospital must either stabilize or transfer the

patient.  *Id.*  EMTALA defines "stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility."  § 1395dd(e)(3)(A).  These provisions provide doctors and hospitals with discretion to discern an emergency medical condition and to stabilize it accordingly.

In the case of a pregnant woman, however, EMTALA imposes obligations with respect to both the pregnant woman and her unborn child.  The statute defines "emergency medical condition" to include conditions that "plac[e] the health of the individual (or, with respect to a pregnant woman, the health of the woman *or her unborn child*) in serious jeopardy."  § 1395dd(e)(1)(A)(i) (emphasis added).  So in the case of a pregnant woman, a physician's duty to screen and to stabilize or transfer appropriately applies equally to the pregnant woman and her unborn child.  *See* § 1395dd(a), (b)(1), (e)(1)(A).  And the Court must consider both duties when interpreting the statute.  *Asadi v. G.E. Energy (USA), LLC*, 720 F.3d 620, 622 (5th Cir. 2013) ("In construing a statute, a court should give effect, if possible, to every word and every provision Congress used.").

EMTALA's equal obligations to the pregnant woman and her unborn child create a potential conflict in duties that the statute does not resolve.  Imagine a mother has a pregnancy-related emergency medical condition where, if she carries the child to term, the child will live but a serious impairment of a bodily function will result, which is, by definition, an emergency medical condition.  *See* § 1395dd(e)(1)(A)(ii), (iii) ("serious impairment to bodily functions" or "serious dysfunction of any bodily organ or part").  If the doctor aborts the child, the mother will retain the bodily function.  What is the

physician's EMTALA obligation then?  The physician could (1) abort the child—
prioritizing the health of the mother over the life of the child—despite independent
EMTALA obligations to the child; or (2) keep the child in gestation and fail to stabilize the
mother's emergency medical condition, causing her to lose the function.  EMTALA
provides no answers to this  dilemma.  *See Dobbs*, 142 S. Ct. at 2265 (recognizing that
abortion presents "a question of profound moral and social importance").

  In other words, where emergency medical conditions threaten the health of both the
pregnant woman and the unborn child, EMTALA leaves that conflict unresolved.[12]
Naturally, the question arises then: who must resolve that conflict?  As explained below,
doctors must—in accordance with state law.

   ii. **EMTALA makes clear that—absent direct conflicts with state
law—it does not preempt state law.**

  The text of EMTALA recognizes a presumption of non-preemption.  It claims
preemption only where a state law requirement "directly conflicts" with EMTALA
requirements.  § 1395dd(f); *see Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992)
("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that
matters beyond that reach are not pre-empted.").  Otherwise, state law controls.  As stated

---

[12] In a less-contested provision, EMTALA appears to even prioritize the life of the unborn child in
cases of pregnancy complications accompanying contractions.  For example, where a pregnant
woman is having contractions and "there is inadequate time to effect a safe transfer to another
hospital before delivery," or a "transfer may pose a threat to the health or safety of the woman or
the unborn child," EMTALA requires the delivery of the child.  § 1395dd(e)(1)(B), (e)(3); *see also*
§ 1395dd(c)(2)(A) ("transfer . . . in which the transferring hospital provides the medical treatment
within its capacity which minimizes the risks to the individual's health and, in the case of a woman
in labor, the health of the unborn child").  In contrast with delivery, EMTALA does not mention
abortion, nor does it purport to resolve conflicts between the health of the unborn child or the
woman.  These were gaps in the statute that were left for the states, rather than HHS, to fill.  *See
generally* §§ 1395 (Medicare prohibition on supervising or controlling the practice of medicine),
1395dd(f) (the EMTALA anti-preemption provision).

by the Second Circuit, "[t]his demonstrates that one of Congress's objectives was that

EMTALA would peacefully coexist with applicable state requirements." *Hardy v. N.Y.C*

*Health & Hosp. Corp.*, 164 F.3d 789, 795 (2d Cir. 1999).  Moreover, the general "presumption

against the pre-emption of state police power regulations . . . reinforces the appropriateness

of a narrow reading" of the statutory language.  *Cipollone*, 505 U.S. at 518.  Indeed, "[i]n all

pre-emption cases, and particularly in those in which Congress has legislated . . . in a field

which the States have traditionally occupied," courts must "start with the assumption that

the historic police powers of the States were not to be superseded by the Federal Act unless

that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470,

485 (1996) (cleaned up) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

This "approach is consistent with both federalism concerns and the historic primacy of state

regulation of matters of health and safety." *Id.*[13]  This deference to state law crystalizes in

the context of abortion.

### iii.    Because EMTALA does not resolve situations where both a pregnant woman and her unborn child face emergencies, it does not preempt state laws addressing that circumstance.

As discussed, EMTALA is unclear about the obligations of doctors in cases of

conflict between the health of a pregnant woman and her unborn child.  Accordingly, there

is no direct conflict between EMTALA and state laws that attempt to address that

circumstance.  Thus, in this case, EMTALA does not preempt Texas's abortion law.

---

[13] Relevant here, courts have also found that "EMTALA's deference to state law" is apparent in
other parts of the statute such as its "express adoption of state law as to the damages recoverable."
*Hardy*, 164 F.3d at 793 (citing § 1395dd(d)(2)(A)).  The statute also accommodates practical local
limitations with regards to stabilization.  § 1395dd(b)(1)(A) (limiting the stabilization to that
possible "within the staff and facilities available at the hospital").

In every preemption analysis, Congress's purpose "is the ultimate touchstone." *Cipollone*, 505 U.S. at 516 (quoting *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978)). To discern congressional purpose, the Court looks to the words Congress wrote in the statute. Here, EMTALA's savings clause states that "[t]he provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." § 1395dd(f). The Second Circuit and other district courts have uniformly construed this savings clause as an ordinary conflicts-preemption provision. *See Hardy*, 164 F.3d at 795; *see, e.g.*, *Rodriguez v. Laredo Reg'l Med. Ctr., L.P.*, No. 5:21-CV-43, 2021 WL 7906834, at *2 (S.D. Tex. July 12, 2021). This Court does the same. Under the conflict-preemption test, a state statute "directly conflicts" with federal law where (1) it is impossible for a person to comply with both the state law and EMTALA; or (2) where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)) (citations omitted); *Hardy*, 164 F.3d at 795.

Here, it is not impossible for hospitals and physicians to comply with both Texas law and EMTALA. Congress imposed the obligations to screen, stabilize, and transfer equally to the pregnant woman and her unborn child. *See* § 1395dd(e)(1)(A). But EMTALA provides no instructions on what a physician is to do when there is a conflict between the health of the mother and the unborn child. State law fills this void. *See* § 1395dd(f). And nothing about the way Texas has filled that void—permitting abortions to protect the mother's life or to avoid a serious risk of substantial impairment of a major bodily

function—makes the provision of stabilizing care impossible.  Thus, impossibility
preemption presents no problem here.

      For similar reasons, Texas law does not stand as an "obstacle to the accomplishment
and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373
(quoting *Hines*, 312 U.S. at 67).  The primary purpose of EMTALA is to "to prevent 'patient
dumping,' which is the practice of refusing to treat patients who are unable to pay."
*Marshall ex rel. Marshall v. E. Carroll Par. Hosp. Serv. Dist.*, 134 F.3d 319, 322 (5th Cir. 1998)
(collecting cases); *see Hardy*, 164 F.3d at 795 (recognizing that EMTALA's core purpose is
"to prevent hospitals from failing to examine and stabilize uninsured patients who seek
emergency treatment").  Here, Texas law, which seeks to balance the health of the mother
and the unborn child in the context of abortion—however successful or unsuccessful—does
not undermine the provision of care to the indigent or uninsured.  It does not compel the
"rejection of patients."  *See Harry v. Marchant*, 291 F.3d 767, 774 (11th Cir. 2002).

      To be sure, EMTALA has more than one purpose.  HHS correctly asserts EMTALA
was also designed to require stabilizing emergency care for all patients, regardless of their
financial capacities.  Dkt. No. 39 at 39.  But, critically, in the case of a pregnant woman,
physicians must provide emergency care to both the pregnant mother and her unborn child
when necessary.  Protecting the health of both appears to be the particular congressional
objective at issue here, and Congress provides no specific instructions on how to accomplish
it.  In fact, Congress amended EMTALA in 1989 specifically to provide care for the
"unborn child," by inserting that phrase into the statutory definition of "emergency medical
condition" and its discussion of when transfer is "appropriate."  *Compare* 42 U.S.C.
§ 1395dd(c), (e), Pub. L. 99-272, 100 Stat. 164, 165–67 (1986), *with* 42 U.S.C. § 1395dd(c),

(e), Pub. L. 101-239, 103 Stat. 2245, 2246–49 (1989).[14]  In so doing, Congress called

particular attention to the health of the "unborn child."  Those provisions remain

unchanged today.  Accordingly, where a state seeks to balance the health interests of a

pregnant woman and her unborn child in emergency care, it carries out—rather than poses

an obstacle to—the purposes of Congress.  Again, state law fills the gap left by EMTALA.

The presumption against preemption—a particularly strong presumption when, as here,

Congress legislates in an area traditionally left to the states—bolsters this conclusion.  *See*

*Medtronic*, 518 U.S. at 485 (recognizing the "historic primacy of state regulation of matters

of health and safety").

Texas's Human Life Protection Act, for example, defines what an abortion is and

when it is appropriate.  It permits an abortion when the pregnant female "has a life-

threatening physical condition aggravated by, caused by, or arising from a pregnancy that

places the female at risk of death or poses a serious risk of substantial impairment of a major

bodily function unless the abortion is performed or induced."  H.B. 1280 § 2 (to be codified

at Tex. Health & Safety Code 170A.002(b)(2)).  And, where this exception applies, the

physician is required to perform "the abortion in a manner that, in the exercise of

reasonable medical judgment, provides the best opportunity for the unborn child to survive

unless" that manner would create "a greater risk of the pregnant female's death" or "a

serious risk of substantial impairment of a major bodily function of the pregnant female."

---

[14] That is not to say that the original version expressed no concern for the unborn child.  To the
contrary, the original version defined "active labor" separate from "emergency medical condition"
to include a situation in which the labor was such that "a transfer may pose a threat of the health
and safety of the patient or the unborn child."  § 1395dd(e)(2)(C), 100 Stat. at 166.

*Id.* (to be codified at Tex. Health & Safety Code 170A.002(b)(3)).[15]  Further, Texas law removes from its definition of abortion any act done "with the intent to (A) save the life or preserve the health of an unborn child; (B) remove a dead, unborn child whose death was caused by spontaneous abortion; or (C) remove an ectopic pregnancy."  *Id.*  In absence of EMTALA directives governing a physician's course of conduct where there is conflict between the health of the mother and the unborn child, this law controls in the State of Texas.

  *Matter of Baby K*, perhaps HHS's strongest case, does not compel a contrary conclusion.  There, the Fourth Circuit held that EMTALA preempted a seemingly contradictory state law.  16 F.3d 590, 597 (4th Cir. 1994).  Specifically, it found that a physician's duty to stabilize a baby under EMTALA preempted a Virginia statute allowing physicians to withhold medical treatment that they deem to be "medically or ethically inappropriate."  *Id.* (quoting Va. Code Ann. § 54.1-2990 (1993)).  Unlike in the context of abortion, however, Baby K had already been delivered.  The baby—and the baby alone— had an emergency medical condition that required stabilization under EMTALA.  *Id.* at 592–93.  Thus, stabilizing treatment entailed no balancing between the duty to the mother and the duty to the baby.  The mother was fine.  And, as discussed above, it is the conflict in treatment duties, which only arises in the case of a pregnant woman, that takes abortion outside the realm of conflict preemption.  Thus, the question before the Court today—one

---

[15] Texas law defines abortion as "the act of using or prescribing an instrument, a drug, a medicine, or any other substance, device, or means with the intent to cause the death of an unborn child of a woman known to be pregnant."  Tex. Health & Safety Code § 245.002.

that is particular to abortion—is unaddressed by *Matter of Baby K*.[16]  As if it needed

repeating, the abortion context is unique.

In sum, the Court agrees with HHS that EMTALA creates no express exceptions of

possible stabilizing treatments.  Dkt. No. 39 at 24, 39.  The statute, however, does not

resolve how stabilizing treatments must be provided when a doctor's duties to a pregnant

woman and her unborn child possibly conflict.  That question is left unanswered.

Accordingly, there is no direct conflict, and EMTALA leaves it to the states.  *See*

§ 1395dd(f).

### iv.   The HHS Guidance goes beyond the statute because it purports to require abortions when physicians believe an abortion will stabilize a pregnant woman's emergency medical condition *irrespective* of the unborn child's health and state law.

Having concluded that EMTALA leaves unresolved the conflict between emergency

medical conditions that threaten the health of both the pregnant woman and the unborn

child—and therefore that it does not preempt state law filling that void—it becomes clear

the Guidance goes beyond the language of the statute.  The Guidance requires physicians to

perform abortions when they believe that an abortion would resolve a pregnant woman's

emergency medical condition irrespective of the unborn child's health and contrary state

law.  It states that "if a physician believes that a pregnant patient presenting at an emergency

department is experiencing an emergency medical condition as defined by EMTALA, and

---

[16] A handful of courts have referred to—primarily in dicta—EMTALA's requirements as they relate to abortion.  All of these cases predate *Dobbs* and thus do not control.  142 S. Ct. 2228; *See, e.g.*, *Planned Parenthood of Wis., Inc. v. Schimel*, 806 F.3d 908, 909 (7th Cir. 2015) (discussing the duties of hospital emergency departments to provide emergency care generally in the context of evaluating constitutionality of admitting privileges for abortion clinics); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 951 F. Supp. 2d 891, 899–900 (W.D. Tex. 2013) (same), *rev'd in part*, 748 F.3d 583 (5th Cir. 2014).  Even in these cases, however, it is far from clear that courts have interpreted EMTALA to require stabilization through abortion in contravention of state laws that restrict abortion.

that abortion is the stabilizing treatment necessary to resolve that condition, the physician must provide that treatment."  Guidance at 1.  If that treatment, abortion, is banned by state law or only allowed in narrower circumstances than the Guidance would allow, "that state law is preempted."  *Id.*  The Guidance conspicuously eliminates the physician's statutory duty to stabilize the health of the "unborn child" when in serious jeopardy.  *Compare id.*, *with* § 1395dd(e)(1)(A)(i).  Accordingly, it purports to resolve the conflict between the health of the pregnant woman and the unborn child where EMTALA does not.  And by claiming that state abortion laws are preempted—despite resolving conflicts that EMTALA plainly did not address—the Guidance stands contrary to the statute.[17]

When confronted with the conspicuous omission of the reference to the health of the "unborn child" in the Guidance's explanation of "emergency medical conditions," HHS expressed little concern.  Tr. at 87.  In its view, the Guidance addresses a non-exhaustive definition of "emergency medical condition" as defined by the statute.  *Id.*  So then, the Guidance merely provides examples of what an emergency medical condition may include. *Id.*  This ostensibly modest reading of the Guidance goes too far for two reasons.

---

[17] Contrary to HHS's argument, prior guidance letters do not require otherwise.  Dkt. No. 39 at 20, 27.  They did not purport to require abortion in contradiction of state law and were issued before the *Dobbs* decision explained that there is no constitutional right to abortion.  *See* U.S. Dep't of Health and Human Servs. Off. for Civil Rights, "Guidance on Nondiscrimination Protections under the Church Amendments for Health Care Personnel," (Sept. 17, 2021); U.S. Dep't of Health and Human Servs. Ctrs. for Medicare and Medicaid Servs, "Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy Loss," (Sept. 17, 2021).

First, the Guidance's definition of "emergency medical condition" tracks all other elements of the statute's definition of an emergency medical condition in subsection (A).[18] *See* § 1395dd(e)(1).  The *only* component that is omitted, is the concern for the "unborn child."  *See* § 1395dd(e)(1)(A)(i).  A comparison illustrates this point.

The Guidance provides that an emergency medical condition:

> includes medical conditions with acute symptoms of sufficient severity that, in the absence of immediate medical attention, could place the health of a person (including pregnant patients) in serious jeopardy, or result in a serious impairment or dysfunction of bodily functions or any bodily organ.

Guidance at 3.  While the statute states that an emergency medical condition is:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman *or her unborn child*) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part.

§ 1395dd(e)(1)(A) (emphasis added).

Second, even if the Court accepted HHS's assertion that it does not purport to provide a full definition of an emergency medical condition in its Guidance, the omission is not trivial in this context.  HHS issued the Guidance on the heels of *Dobbs* to explicitly address pregnant women and the subject of abortion.  *See* Guidance at 1 (titled "Reinforcement of EMTALA Obligations specific to Patients who are Pregnant or are

---

[18] The Guidance also excludes Subsection B, which further expresses concern for the unborn child when complications during contractions arise.  *See* § 1395dd(e)(1)(B) (defining an emergency medical condition with respect to a pregnant woman experiencing contractions as when (i) "there is inadequate time to effect a safe transfer to another hospital before delivery, or (ii) that transfer may pose a threat to the health or safety of the woman *or the unborn child*") (emphasis added).  It contains only one reference to "unborn child" in the entire document.  Guidance at 3.

Experiencing Pregnancy Loss").  A completely understandable response.  State governments, nonprofit organizations, physicians, hospitals, and the federal government are all seeking to understand how existing laws—like EMTALA—and future laws—like Texas's Human Life Protection Act—apply in a post-*Dobbs* world.  This endeavor entails difficult questions that must be carefully addressed.  But under the plain language of EMTALA, physicians must provide care for pregnant women when their health is put in jeopardy *and* must do the same when the health of the unborn child is put in jeopardy. § 1395dd(e)(1)(A).  The statute expresses explicit concern for the unborn child.  This concern is critical to understanding how the statute approaches abortion—if at all.

In such a case, the Court finds it difficult to square a statute that instructs physicians to provide care for both the pregnant woman and the unborn child with purportedly explanatory guidance excluding the health of the unborn child as a consideration when providing care for a mother.  If there ever were a time to include the full definition of an emergency medical condition, the abortion context would be it.

### v.   The Medicare Act's prohibition of federal interference with the practice of medicine also undercuts the Guidance.

When interpreting a statute, courts must not read specific provisions in isolation.  *See United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) (explaining that "[s]tatutory construction . . . is a holistic endeavor").  Here, the surrounding statutory context undermines HHS's reading of EMTALA.  EMTALA is subject to the Medicare Act's prohibition that "[n]othing in this subchapter," which includes EMTALA, "shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided."  42 U.S.C. § 1395.  Courts across the country uniformly hold that this section

prohibits Medicare regulations that "direct or prohibit any kind of treatment or diagnosis"; "favor one procedure over another"; or "influence the judgment of medical professionals." *Goodman v. Sullivan*, 891 F.2d 449, 451 (2d Cir. 1989).[19]   The Guidance attempts to do just that.

Contrary to its disclaimer, the Guidance is not mere a "remind[er]" of existing EMTALA obligations.  *See* Guidance at 1.  Rather, it states that a physician "must" provide an abortion if he or she believes that it is the stabilizing treatment for a pregnant woman's emergency medical condition.  *Id.*  As explained above, this removes the health of the unborn child from the physician's stabilization determination, thereby "influenc[ing] the judgment of medical professionals."  *See Sullivan*, 891 F.2d at 451.[20]   By changing the statutory calculus, the Guidance impermissibly "favor[s] one procedure"—abortion—"over another."  *See id.*  The plain language of this provision, and case law interpreting it, prohibits this type of interference.

---

[19] *See also Mount Sinai Hosp.*, 517 F.2d at 345 (upholding post-treatment recoupment review for Medicare reimbursement because it does not interfere with "the provider's decision" of "[w]hether certain treatment reasonably appears to be medically necessary at the time of" treatment); *United States v. Univ. Hosp., State Univ. of N.Y. at Stony Brook*, 729 F.2d 144, 160 (2d Cir. 1984) (reading Section 1395 as a "congressional policy against the involvement of federal personnel in medical treatment decisions"); *Coll. of Am. Pathologists v. Heckler*, 734 F.2d 859, 868 (D.C. Cir. 1984) (reading Section 1395 to prohibit interference with the doctor-patient relationship); *Am. Med. Ass'n v. Weinberger*, 522 F.2d 921, 925 (7th Cir. 1975) (reading Section 1395 to forbid regulations that "may have the effect of directly influencing a doctor's decision on what type of medical treatment will be provided").

[20] The Guidance also threatens to enforce its interpretation by penalizing hospitals and physicians that fail to stabilize by providing an abortion.  Guidance at 5 (describing potential exclusion from Medicare and other state healthcare programs as well as civil monetary penalties "on a hospital ($119, 942 for hospitals with over 100 beds, $59,973 for hospitals under 100 beds/per violation) or physician ($119,942/violation)"); *see also* Letter at 2.  This likely will "have the effect of directly influencing a doctor's decision on what type of medical treatment will be provided."  *Am. Med. Ass'n*, 522 F.2d at 925.

### vi.    HHS's remaining counterarguments fall short.

Contrary to the defendants' suggestion, EMTALA's consent provision does not resolve the potential conflict between the health of the mother and the health of the unborn child.  While the defendants correctly recognize that EMTALA does not "require a provider to prioritize the fetus's health over the life or health of its mother," they also assert that "EMTALA's text leaves that balancing to the pregnant patient—who may decide, after weighing the risks and benefits, whether to accept or refuse" an abortion.  Dkt. No. 39 at 41 (citing § 1395dd(b)(2)); Tr. at 103.  As shown above, however, EMTALA leaves that balancing to doctors, who must comply with state law.  The provision the defendants cite in support—Section 1395dd(b)(2)—only provides that a hospital is deemed to have satisfied its duty to stabilize if the individual refuses to consent to stabilizing treatment.  It says nothing about abortion and does not confer upon the mother the unqualified right to abort her child—especially so, when EMTALA imposes equal stabilization obligations with respect to the unborn child and the particular abortion would violate state law.

HHS attempts to sidestep the statute's concern for the unborn child in another way.  In its view, when presented with a pregnant woman, doctors first must determine whether the mother and unborn child have emergency medical conditions.  Tr. at 102–03.  If the doctor determines that the mother has an emergency medical condition—and, in this example, that the unborn child does not—step one is complete.  *Id.*  Then the doctor proceeds to step two: determining the stabilizing treatment for the mother.  *Id.*  If that stabilizing treatment is abortion, so be it.  Because the unborn child did not have an emergency medical condition at step one, the doctor does not proceed to step two and has no stabilizing obligation to the unborn child.

This interpretation strains the statutory text.  No one disputes that attempting an abortion puts the health of the unborn child "in serious jeopardy," thereby creating an EMC that must be stabilized.  *See* § 1395dd(b), (e).  Under HHS's reading, if the doctor initially determines that the unborn child does not have an emergency medical condition, the doctor must then close his or her eyes to the unborn child's health for the remainder of the treatment.  This directly conflicts with the doctor's ongoing duty to provide care for both the mother and the unborn child when stabilizing a pregnant woman.  *See* § 1395dd(e)(1)(A)(i).  Because the doctor has a duty to both, EMTALA does not require the doctor to introduce an emergency medical condition to one in order to stabilize the other.  Again, EMTALA does not say how to balance both interests.  It leaves that determination to the doctor, who is bound by state law.[21]

For all of the foregoing reasons, the Court concludes that the HHS Guidance is an impermissible construction of EMTALA.

### B.  HHS did not follow the Medicare Act's mandatory procedures before imposing a statement of policy establishing a substantive legal standard.

In addition to concluding that the Guidance is unauthorized, the Court concludes that the plaintiffs have demonstrated a substantial likelihood of success on their claim that

---

[21] Two additional observations warrant brief mention.  First, there seems to be no limit to the defendant's interpretation; in their view, EMTALA's requirement to stabilize a patient always prevails over a state law governing medical care.  Tr. at 104–08.  That broad view of EMTALA's preemptive effect is at odds with the text's narrower understanding of when state laws are preempted.  *See* Section 1395dd(f).  Moreover, it would be strange to read EMTALA to occupy the entire field of emergency care—leaving no room for states to supplement with their own regulations—when it neither prescribes nor proscribes individual treatments.  Second, the defendants' reading may conflict with the federal law barring the importation or delivery of any device or medicine designed to produce an abortion.  Tr. at 107–11; *see* 18 U.S.C. § 1461.  How the defendants' view of EMTALA and that criminal statute would interact is not before the Court, but their fraught coexistence further counsels against the defendants' interpretation, especially in light of the strong presumption against implied repeal of another statute.

– 55 –

HHS failed to conduct notice and comment as required under Medicare-specific notice-and-comment procedures.

> ### i.   As a statement of policy that establishes or changes a substantive legal standard, the Guidance was subject to notice and comment.

Under the APA, courts must set aside agency action undertaken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). And the APA requires that an agency must first publish notice of a proposed rule and give the public an opportunity to comment before adopting a final rule. 5 U.S.C. § 553(b), (c). The agency also must publish such rules at least 30 days before its effective date. § 553(d). But, "[e]xcept when notice or hearing is required by statute," such notice-and-comment procedures are not required for "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice" or "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." § 553(b)(3), (d).

But Congress set more stringent requirements for regulations promulgated under the Medicare Act—such as the Guidance. The Medicare Act provides that "[n]o rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation." § 1395hh(a)(2). So, unlike the APA, statements of policy that establish or change a substantive legal standard are subject to notice and comment. *Compare* § 553(b)(3), *with* § 1395hh(a)(2); *see Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1806, 1811

(2019) ("[T]he Medicare Act contemplates that 'statements of policy' *can* establish or change a 'substantive legal standard,' § 1395hh(a)(2), while APA statements of policy are *not* substantive by definition but are grouped with and treated as interpretive rules, 5 U.S.C. § 553(b)(A)."). Indeed, "substantive" as used in the Medicare Act differs from the term as used in the APA because "interpretive rules and statements of policy—and any changes to them—are not substantive under the APA by definition." *Allina Health Servs.*, 139 S. Ct. at 1812. So, in the Medicare context, "when the government establishes or changes an avowedly 'gap'-filling policy, it can't evade its notice-and-comment obligations under § 1395hh(a)(2)." *Id.* at 1817.[22]

As explained above, the Guidance is "at least a 'statement of policy' because it 'le[t] the public know [HHS's] current . . . adjudicatory approach' to . . . critical question[s]" concerning the application of EMTALA with respect to abortion and state abortion laws. *See Allina Health Servs.*, 139 S. Ct. at 1810 (quoting *Syncor Int'l Corp.*, 127 F. 3d at 94); *supra* Section 2.B. Nor is the Guidance a mere recommendation. *See supra* Section 2.B.ii. The threat of exclusion from Medicare and state healthcare programs, as well as civil monetary penalties, ensure compliance with the interpretation of EMTALA set forth in the Guidance. Guidance at 5; Letter at 2. Plainly, then, the Guidance "govern[s] . . . the eligibility of individuals, entities, or organizations to furnish or receive services or benefits" under the Medicare Act. *See* § 1395hh(a)(2).

---

[22] In clarifying these terms, the Supreme Court did not adopt the D.C. Circuit's construction of the term as "law that 'creates, defines, and regulates the rights, duties, and powers of parties.'" *Allina Health Servs.*, 139 S. Ct. at 1811, 1814; *Allina Health Servs. v. Price*, 863 F.3d 937, 943 (D.C. Cir. 2017) (quoting Substantive Law, Black's Law Dictionary (10th ed. 2014)), *aff'd Allina Health Servs.*, 139 S. Ct. 1804 ("We need not, however, go so far as to say that the hospitals' interpretation, adopted by the court of appeals, is correct in every particular.").

With that context, it becomes clear that the Guidance "established or changed a 'substantive legal standard.'" *Allina Health Servs.*, 139 S. Ct. at 1810.  EMTALA does not address abortion or how doctors should respond when both the mother and the unborn child have emergency medicals conditions.  *Supra* Section 3.A.i.  But the Guidance goes beyond the statute to require abortions when physicians believe an abortion will resolve a pregnant woman's emergency medical condition, irrespective of the unborn child's health and state law.  *Supra* Section 3.A.iv.  It construes EMTALA to preempt state abortion laws in such circumstances, even though the statute is silent on the issue.  *Supra* Section 3.A.iii.  And, in so doing, the Guidance offers EMTALA as a potential defense to state abortion bans.

If that were not enough, recall that EMTALA has never been construed to preempt state abortion laws.  The pre-*Dobbs* landscape may explain that reality, but whatever the reason, that "lack of historical precedent" is another marker that the Guidance establishes a new substantive legal standard.  *See Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661, 666 (2022) (quoting *Free Enterprise Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010) (internal quotation marks omitted)); *Consumer Fin. Prot. Bureau v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 235 (5th Cir. 2022) (Jones, J., concurring) (noting the lack of historical precedent supporting the CFPB's structure).

### ii.    None of the exceptions to notice and comment apply.

The Medicare Act provides three exceptions to its requirement that substantive changes to the law be subject to notice and comment: (1) where "a statute specifically permits a regulation to be issued in interim final form or otherwise with a shorter period for public comment"; (2) where "a statute establishes a specific deadline for the implementation

of a provision and the deadline is less than 150 days after the date of the enactment of the statute in which the deadline is contained"; or (3) where an agency establishes good cause under Section 553(b)(3)(B) of the APA.  § 1395hh(b).  The first two exceptions do not apply based on EMTALA's text.  The third is irrelevant, too, because HHS did not invoke the good-cause exception, and there is no evidence that it relied on the exception when deciding to bypass notice and comment.  *See N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 768 (4th Cir. 2012) (citing *Nat'l Customs Brokers & Forwarders Ass'n of Am., Inc. v. United States*, 59 F.3d 1219, 1224 (Fed. Cir. 1995)) ("Although we do not impose a rigid requirement that an agency must explicitly invoke the good cause exception, the contemporaneous agency record must manifest plainly the agency's reliance on the exception in its decision to depart from the required notice and comment procedures.").

In sum, the Court concludes that the Guidance was likely subject to notice-and-comment procedures under Section 1395hh—procedures not followed here.

## 4.    The Remaining Factors

### A.    Irreparable Harm

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable*." Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986).  Instead, plaintiffs need only show that they are "likely to suffer irreparable harm in the absence of preliminary relief." *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018).  They have.  Above, the Court found the plaintiffs to have standing based on injury to Texas's sovereign interests, AAPLOG and CMDA's injury by association, and the plaintiffs' procedural injury by exclusion from notice and comment.  *Supra* Section 2.A.

– 59 –

A procedural injury, by definition, is irreparable injury—harm that "cannot be undone through monetary remedies." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981). HHS has already dealt the procedural injury by promulgating the Guidance without notice and comment, depriving the plaintiffs of a statutorily mandated opportunity to voice their concerns. *See EEOC*, 933 F.3d at 447. Only setting aside the Guidance until proper notice-and-comment procedures are followed or an injunction against its enforcement will protect the plaintiffs' procedural rights. *See Texas v. Becerra*, 577 F. Supp. 3d 527, 561 (N.D. Tex. 2021).

As to Texas's sovereign injury, irreparable harm exists when a federal agency action prevents a state's enforcement of its duly enacted laws. *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018) (citation omitted) ("[T]he inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State."); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). Based on a misinterpretation of EMTALA and its preemptive effect, the Guidance requires Texas hospitals and doctors to disregard Texas abortion laws in medical emergencies. *Supra* Section 2.A.i.c. And, so long as the Guidance remains standing, Texas will not be able to enforce its abortion laws in medical emergencies. This interference with the enforcement of Texas law can only be remedied by enjoining the Guidance's interpretation of EMTALA until a final ruling on the merits.

And finally, as demonstrated above, AAPLOG and CMDA's members face a substantial threat of enforcement and severe penalties for their inevitable violation of the

Guidance's requirements with regards to abortion.  *Supra* Section 2.A.ii.  This injury, too, will not be remedied unless the Guidance is enjoined.

> **B.**   **Balance of Harms and the Public Interest**

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will serve the public interest— "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Texas*, 809 F.3d at 187.  Therefore, the Court considers them together.  The Court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)).

The defendants allege that an injunction would increase the risk that pregnant women would be denied abortions to preserve their health and lives.  Dkt. No. 39 at 55.  But Texas law already contains exceptions for abortions in life-threatening circumstances presenting a risk of death or a serious risk of substantial impairment of a major bodily function.  H.B. 1280 § 2; *see also* Tex. Rev. Civ. Stat. art. 4512.6 (2010).  Moreover, Texas law expressly excludes the removal of a dead unborn child and ectopic pregnancies from the definition of abortion.  Tex. Health & Safety Code § 245.002.  These exceptions to Texas's prohibition accommodate the primary examples the defendants and their amici raise repeatedly—ectopic pregnancy, miscarriage, and the life of the mother.  To the extent that the Guidance would require abortion where Texas would not, Texas law does so to "provide[] the best opportunity for the unborn child to survive."  *See* H.B. 1280 § 2; *see also* Tex. Health & Safety Code § 245.002 (an act is not an abortion if done with the intent to "save the life or preserve the health of an unborn child").  And the Supreme Court—on

numerous occasions and most recently in *Dobbs*—has affirmed that states have a genuine

interest in protecting the life of the unborn child.[23]   Texas asserts this very interest.  Dkt. No.

23 at 31 ("Unborn children will be protected by Texas's abortion laws.").  The Court will

not interject itself in balancing the health of an unborn child and the health of his mother

when that balancing is left to the people and their elected representatives.  *Dobbs*, 142 S. Ct.

at 2284.

The defendants also assert that an injunction would interfere with HHS's ability to

advise the public of its construction of EMTALA and "sow confusion" regarding healthcare

providers' EMTALA obligations to provide emergency abortions.  Dkt. No. 39 at 55.  But

there is "no public interest in the perpetuation of unlawful agency action."  *League of Women*

*Voters of the U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citations omitted).  And the

"public interest is in having governmental agencies abide by the federal laws that govern

their existence and operations."  *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1143

(5th Cir. 2021) (quoting *Texas v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021)).  Here, the Court

finds that there is a substantial likelihood that HHS issued the Guidance unlawfully.  So

---

[23] *See, e.g.*, *Roe*, 410 U.S. at 163 ("With respect to the State's important and legitimate interest in
potential life, the 'compelling' point is at viability."); *City of Akron v. Akron Ctr. for Reprod. Health,
Inc.*, 462 U.S. 416, 428 (1983) ("At viability this interest in protecting the potential life of the
unborn child is so important that the State may proscribe abortions altogether, 'except when it is
necessary to preserve the life or health of the mother.'") (quoting *Roe*, 410 U.S. at 164); *Webster v.
Reprod. Health Servs.*, 492 U.S. 490, 516 (1989) ("In *Roe v. Wade*, the Court recognized that the State
has 'important and legitimate' interests in protecting maternal health and in the potentiality of
human life.") (quoting *Roe*, 410 U.S. at 163); *Casey*, 505 U.S. at 846 ("[T]he State has legitimate
interests from the outset of the pregnancy in protecting the health of the woman and the life of the
fetus that may become a child."); *Stenberg v. Carhart*, 530 U.S. 914, 921 (2000) ("[T]he State in
promoting its interest in the potentiality of human life, may, if it chooses, regulate, and even
proscribe, abortion.") (quoting *Casey*, 505 U.S. at 879); *Gonzales v. Carhart*, 550 U.S. 124, 158
(2007) ("[T]he State may use its regulatory power to bar certain procedures and substitute others,
all in furtherance of its legitimate interests in regulating the medical profession in order to promote
respect for life, including life of the unborn."); *Dobbs*, 142 S. Ct. at 2284 ("These legitimate interests
include respect for and preservation of prenatal life at all stages of development.").

Texas's sovereign interest in the continued enforcement of its abortion laws weighs heavily. *See Taylor*, 477 U.S. at 137.  And what lack of clarity healthcare providers have about their EMTALA obligations will be clarified by the Court's preliminary ruling that Texas abortion law governs in medical emergencies.

The Guidance is also broad and undifferentiating.  It provides no exceptions for healthcare providers with genuinely held religious objections to abortions, which may be required under federal appropriations laws or the Religious Freedom Restoration Act.[24]  As a result, AAPLOG and CMDA members who object to abortions on medical, ethical, and religious grounds face the threat of monetary penalties and exclusion from federal healthcare programs unless they perform abortions that violate their beliefs.  Dkt. No. 23 at 30.  This, too, is an interest in the plaintiffs' favor.

In sum, the Court finds that the balance of equities and the public interest weigh in favor of granting plaintiffs' motion for preliminary injunction.

## 5. Scope of Relief

Having found the preliminary-injunction standard is met, the Court turns to the scope of relief.  Texas seeks a nationwide injunction.[25]  Tr. at 35.  During the hearing, counsel for Texas argued that nationwide relief was necessary because the APA instructs courts to "set aside" unlawful agency action.  Tr. at 137; *see generally* 5 U.S.C. § 706(2)(A), (C).  AAPLOG and CMDA only request an injunction limited to their organizations and

---

[24] *See* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, §§ 506, 507, 136 Stat. 496, 496 (2022) (Hyde and Weldon Amendments); 42 U.S.C. § 238n (Coats-Snowe Amendment); 42 U.S.C. § 300a-7(c), (d) (Church Amendment); 42 U.S.C. §§ 2000bb–2000bb-4 (RFRA).

[25] At the hearing, the government stated that Texas's motion seems to request an as-applied injunction.  Tr. at 128–29.  The motion is unclear with regard to scope.  *See* Dkt. No. 22.  In any event, the Court will fashion the scope of remedy it believes the law and equity require.

members.  Tr. at 68.  In light of Fifth Circuit precedent and the record, the Court will limit the scope of the relief to the parties before it and to the issues resolved.

The Fifth Circuit recently addressed the proper scope of injunctions when reviewing a nationwide injunction. *Louisiana*, 20 F.4th at 263–64.  A district court enjoined nationwide the enforcement of Secretary Becerra's vaccination mandate for Medicare- and Medicaid-certified providers.  *Id.*  The Fifth Circuit narrowed the injunction to the 14 plaintiff states, reiterating that an injunction's scope must be justified by the circumstances. *Id.* (citing *Texas*, 809 F.3d at 188, *aff'd by an equally divided court sub nom. United States v. Texas*, 136 S. Ct. 2271, 2272 (2016)).  The panel explained that "[p]rinciples of judicial restraint control here," and noted that "[o]ther courts are considering these same issues, with several courts already and inconsistently ruling."  *Id.* at 263; *see also Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring).  And while nationwide injunctions are permissible in the immigration context, given the constitutional command for uniform immigration laws and the concern that narrower injunctions would be ineffective, that does not mean that "nationwide injunctions are required or even the norm."  *Louisiana*, 20 F.4th at 263; *see also Texas*, 809 F.3d at 187–88 (affirming a nationwide injunction of DAPA in the immigration context because the Constitution requires a uniform rule of naturalization).

Here, similar circumstances counsel in favor of a tailored, specific injunction.  The majority of the briefing and evidence presented focuses on the Guidance's injury to Texas, and much of the analysis focuses on how the Guidance's requirements are broader than Texas's exceptions for authorized abortion.  Additionally, although AAPLOG and CMDA have members nationwide, they seek only an injunction that protects their specific members. Tr. at 68.  Moreover, similar issues are being considered in the District of Idaho.  *United*

*States v. Idaho*, No. 1:22-CV-329 (D. Idaho, Aug. 2, 2022).  Thus, the Court concludes that

the circumstances do not justify or require a nationwide injunction; rather, it will follow

Fifth Circuit precedent and limit the injunction based on the parties, issues, and evidence

before it.  *Louisiana*, 20 F.4th at 263–64; *see also Dep't of Homeland Sec. v. New York*, 140 S. Ct.

599, 600 (2020) (Gorsuch, J., concurring) ("Equitable remedies, like remedies in general, are

meant to redress the injuries sustained by a particular plaintiff in a particular lawsuit.").

Thus, the defendants are preliminarily enjoined from enforcing the Guidance and

Letter's interpretation that Texas abortion laws are preempted by EMTALA.  And the

defendants are preliminarily enjoined from enforcing the Guidance and Letter's

interpretation of EMTALA—both as to when an abortion is required and EMTALA's effect

on state laws governing abortion—within the State of Texas or against AAPLOG's

members and CMDA's members.  This injunction removes Texas's sovereign injury and

AAPLOG and CMDA's injury by association through its members.  It likewise cures the

plaintiffs' procedural injury because any harm stemming from the lack of notice and

comment is neutralized by the injunction against the interpretation of EMTALA stated in

the Guidance and Letter.

Fifth Circuit precedent supports this result.  In *Texas v. EEOC*, for example, the

district court enjoined the EEOC "from enforcing the EEOC's interpretation of the

Guidance against the State of Texas until the EEOC has complied with the notice and

comment requirements under the APA."  933 F.3d at 450.  But because the Fifth Circuit

held that the EEOC lacked authority to promulgate the rule in the first place, it broadened

the injunction:  "Because the Guidance is a substantive rule, and the text of Title VII and

precedent confirm that EEOC lacks authority to promulgate substantive rules implementing

Title VII, we modify the injunction by striking the clause 'until the EEOC has complied

with the notice and comment requirements.'" *Id.* at 451.  Similarly here, because the

plaintiffs have established that HHS lacked statutory authority to issue the Guidance, the

defendants are enjoined from enforcement in Texas and against AAPLOG and CMDA.

Moreover, as in *EEOC*, the injunction need go no further to cure the notice-and-comment

violation.

## 6.    Conclusion

For all the reasons stated above, the Court denies the defendants' motion to dismiss

(Dkt. No. 38) and grants the plaintiffs' motion for a preliminary injunction (Dkt. No. 22).

The Court orders the following preliminary relief with regards to the Centers for

Medicare & Medicaid Services's July 11, 2022 Guidance, entitled "Reinforcement of

EMTALA Obligations specific to Patients who are Pregnant or are Experiencing Pregnancy

Loss (QSO-21-22-Hospitals-UPDATED JULY 2022)," and Secretary Becerra's

accompanying July 11, 2022, Letter:

(1)  The defendants may not enforce the Guidance and Letter's interpretation

that Texas abortion laws are preempted by EMTALA; and

(2)  The defendants may not enforce the Guidance and Letter's interpretation

of EMTALA—both as to when an abortion is required and EMTALA's

effect on state laws governing abortion—within the State of Texas or

against AAPLOG's members and CMDA's members.

No bond is required.  *See* Fed. R. Civ. P. 65(c).

So ordered on August 23, 2022.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE