# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>THE STATE OF IDAHO,<br><br>    Defendant. | Case No. 1:22-cv-00329-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

Pregnant women in Idaho routinely arrive at emergency rooms experiencing severe complications. The patient might be spiking a fever, experiencing uterine cramping and chills, contractions, shortness of breath, or significant vaginal bleeding. The ER physician may diagnose her with, among other possibilities, traumatic placental abruption, preeclampsia, or a preterm premature rupture of the membranes. In those situations, the physician may be called upon to make complex, difficult decisions in a fast-moving, chaotic environment. She may conclude that the only way to prevent serious harm to the patient or save her life is to terminate the pregnancy—a devastating result for the doctor and the patient.

So the job is difficult enough as it is. But once Idaho Code § 18-622 goes into effect, the physician may well find herself facing the impossible task of

attempting to simultaneously comply with both federal and state law. A decades-old federal law known as the Emergency Medical Treatment and Labor Act (EMTALA) requires that ER physicians at hospitals receiving Medicare funds offer stabilizing treatment to patients who arrive with emergency medical conditions. But when the stabilizing treatment is an abortion, offering that care is a crime under Idaho Code § 18-622—which bans *all* abortions. If the physician provides the abortion, she faces indictment, arrest, pretrial detention, loss of her medical license, a trial on felony charges, and at least two years in prison. Yet if the physician does not perform the abortion, the pregnant patient faces grave risks to her health—such as severe sepsis requiring limb amputation, uncontrollable uterine hemorrhage requiring hysterectomy, kidney failure requiring lifelong dialysis, hypoxic brain injury, or even death. And this woman, if she lives, potentially may have to live the remainder of her life with significant disabilities and chronic medical conditions as a result of her pregnancy complication. All because Idaho law prohibited the physician from performing the abortion.

Granted, the Idaho statute offers the physician the cold comfort of a narrow affirmative defense to avoid conviction. But only if she convinces a jury that, in her good faith medical judgment, performing the abortion was "necessary to prevent the death of the pregnant woman" can she possibly avoid conviction. Even then, there is no certainty a jury will acquit. And the physician cannot enjoy the

benefit of this affirmative defense if she performed the abortion merely to prevent serious harm to the patient, rather than to save her life.

Back to the pregnant patient in the emergency department. The doctor believes her EMTALA obligations require her to offer that abortion right now. But she also knows that all abortions are banned in Idaho. She thus finds herself on the horns of a dilemma. Which law should she violate?

Fortunately, the drafters of our Constitution had the wisdom to provide a clear answer in Article VI, Paragraph 2 of the Constitution—the Supremacy Clause. At its core, the Supremacy Clause says state law must yield to federal law when it's impossible to comply with both. And that's all this case is about. It's not about the bygone constitutional right to an abortion. This Court is not grappling with that larger, more profound question. Rather, the Court is called upon to address a far more modest issue—whether Idaho's criminal abortion statute conflicts with a small but important corner of federal legislation. It does.

As such, the United States has shown it will likely succeed on the merits. Given that—and for the reasons discussed in more detail below—the Court has determined it should preserve the status quo while the parties litigate this matter. The Court will therefore grant the United States' motion. During the pendency of this lawsuit, the State of Idaho will be enjoined from enforcing Idaho Code § 18-622 to the extent that statute conflicts with EMTALA-mandated care.

# BACKGROUND

## A.    The Emergency Medical Treatment and Labor Act

Congress enacted EMTALA in 1986 with the overarching purpose of ensuring that all patients receive adequate emergency medical care—regardless of the patient's ability to pay and regardless of whether the patient qualifies for Medicare. *See Arrington v. Wong,* 237 F.3d 1066, 1073-74 (9th Cir. 2001) (citation omitted). Under that Act, when a patient arrives at an emergency department and requests treatment, the hospital must provide an appropriate screening examination "to determine whether or not an emergency condition" exists. 42 U.S.C. § 1395dd(a). An "emergency medical condition" is defined to include:

> (A)  a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
>
> > (i)    placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
> >
> > (ii)   serious impairment to bodily functions, or
> >
> > (iii)  serious dysfunction of any bodily organ or part; . . .

42 U.S.C. § 1395dd(e)(1).[1]  If a hospital determines that a patient has an

---

[1] Sub-part (B) defines an emergency medical condition as it relates to "a pregnant woman having contractions," but that subsection is not relevant to the issues before the Court.

emergency medical condition, it must examine the patient and provide stabilizing treatment at the hospital, although a transfer is permitted under certain circumstances. 42 U.S.C. § 1395dd(b)(1). Under EMTALA, stabilizing an emergency medical condition generally means providing medical treatment "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during" a discharge or transfer to another facility. 42 U.S.C. § 1395dd(e).

EMTALA applies to every hospital that has an emergency department and participates in Medicare. *See* 42 U.S.C. § 1395cc(a)(1)(I). And a participating hospital that fails to comply with EMTALA's screening requirement, stabilizing treatment, or transfer provisions may be subject to civil monetary penalties up to $119,942 per violation. 42 U.S.C. § 1395dd(d)(1)-(2); 42 C.F.R. §1003.500 (2017). Likewise, treating physicians who violate EMTALA face civil monetary penalties of up to $119,942 per violation and exclusion from Medicare and state health care programs. 42 U.S.C. § 1395dd(d)(1); 42 C.F.R. §1003.500.

**B.     Idaho's Criminal Abortion Law[2]**

Idaho Code § 18-622 is set to take effect on August 25, 2022. It provides

---

[2] Idaho has enacted a series of statutes criminalizing abortion. The statute at issue here—and referred to at times as the "criminal abortion law" or the "Total Abortion Ban"—is codified (Continued)

that "[e]very person who performs or attempts to perform an abortion . . . commits the crime of criminal abortion." Idaho Code § 18-622(2). Abortion is defined as "the use of any means to intentionally terminate the clinically diagnosable pregnancy of a woman with knowledge that the termination by those means will, with reasonable likelihood, cause the death of the unborn child." § 18-604(1). Pregnancy, in turn, is defined as "the reproductive condition of having a developing fetus in the body and commences at fertilization." § 18-604(11).

Criminal abortion is a felony punishable by at least two, and up to five, years' imprisonment. § 18-622(2). In addition, "any health care professional who performs or attempts to perform or who assists in performing or attempting to perform an abortion" faces professional licensure suspension for a minimum of six months upon a first offense and permanent revocation for subsequent offenses. *Id.*

The statute provides two affirmative defenses. As relevant here, an accused physician may avoid conviction by proving, by a preponderance of the evidence, that:

> (1)  The physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman; and

---

at Idaho Code § 18-622. Not at issue is the later-enacted *Fetal Heartbeat Preborn Child Protection Act,* codified at Idaho Code § 18-8801 to 18-8808. According to Idaho Code § 18-8805, if Idaho Code § 18-622 becomes enforceable, the penalties specified in the Heartbeat Act will be superseded by §18-622. *See* Idaho Code § 18-8805(4).

(2)   The physician performed or attempted to perform the abortion in the manner that, in his good faith medical judgment and based on the facts known to the physician at the time, provided the best opportunity for the unborn child to survive, unless, in his good faith medical judgment, termination of the pregnancy in that manner would have posed a greater risk of the death of the pregnant woman.

Idaho Code § 18-622(3)(a)(ii) and (iii).

## C.    Facts

Idaho has roughly 22,000 births per year. Not surprisingly then, some patients will experience serious, pregnancy-related complications that qualify as an "emergency medical condition" under EMTALA. *See generally Fleisher Dec.* ¶ 12, Dkt. 17-3; *Corrigan Dec.* ¶¶ 9-30, Dkt. 17-6; *Cooper Dec.* ¶¶ 6-12, Dkt. 17-7; *Seyb Dec.* ¶¶ 4-13, Dkt. 17-8.

One relatively straightforward example is a patient who presents at an emergency department with an ectopic pregnancy. *Id.* ¶ 13. Accounting for about 2% of all reported pregnancies, ectopic pregnancies occur when an embryo or fetus grows outside of the uterus, most frequently in a fallopian tube. *Ex. B. to Fleisher Dec.*, Dkt. 17-4, at 91. It is undisputed that an ectopic pregnancy in a fallopian tube is an emergency medical condition that places the patient's life in jeopardy. Left untreated it will cause the fallopian tube to rupture and, in the majority of cases, cause significant and potentially fatal internal bleeding. *See, e.g.*, *White Dec.* ¶ 3, Dkt. 66-1. Likewise, the parties do not dispute that the appropriate treatment for an

ectopic pregnancy is either "emergency surgery and removal of the involved fallopian tube, including the embryo or fetus, or administration of a drug to cause embryonic or fetal demise." *Fleisher Dec.* ¶ 13, Dkt. 17-3. Still, though, during oral argument, the State conceded that the procedure necessary to terminate an ectopic pregnancy is a criminal act, given the broad definitions used in Idaho's criminal abortion statute.

In addition to ectopic pregnancies, there are many other complications that may arise during pregnancy—all of which may place the patient's health in serious jeopardy or threaten bodily functions. Despite the risks such conditions present, it is not always possible for a physician to know whether treatment for any particular condition, at any particular moment in time, is "necessary to prevent the death" of the pregnant patient, which is the prerequisite to their relying on the affirmative defense offered by the criminal abortion statute. *See Fleisher Dec.* ¶¶ 13-21, Dkt. 17-3. Some examples include the following scenarios:

- A patient arrives at an emergency room with nausea and shortness of breath, leading to a diagnosis of preeclampsia. Preeclampsia can quickly progress to eclampsia, with the onset of seizures.

- A woman arrives at an emergency room with an infection after the amniotic sac surrounding the fetus has ruptured. That condition can progress into sepsis, at which point the patient's organs may fail.

- A patient arrives at the hospital with chest pain or shortness of breath, which leads the physician to discover elevated blood

pressure or a blood clot.

- A patient arrives at the emergency room with vaginal bleeding caused by a placental abruption. Placental abruption is when the placenta partly or completely separates from the inner wall of the uterus. It can lead to catastrophic or uncontrollable bleeding. If the bleeding is uncontrollable, the patient may go into shock, which could result in organ disfunction such as kidney failure, and even cardiac arrest.

*Id.* ¶¶ 15-22.

Idaho physicians have submitted declarations describing specific patients who have presented with these types of complications and have required abortions.[3] Each of these conditions unquestionably qualifies as an "emergency medical condition" under EMTALA. Accordingly, if future patients with similar conditions presented at Medicare-funded hospitals, they would be entitled to the emergency care required by EMTALA—which will often include an emergency abortion.

The impact of Idaho's criminal abortion statute on the emergency care

---

[3] *See Corrigan Dec.* ¶¶ 9-30, Dkt. 17-6 (describing three patients who required abortions after experiencing, respectively, (1) severe infection due to premature rupture of the membranes; (2) placental abruption which other medications and blood products failed to mitigate; and (3) preeclampsia with pleural effusions and high blood pressure); *Cooper Dec.* ¶¶ 6-11, Dkt. 17-7 (describing three patients who required abortions after experiencing, respectively, (1) preeclampsia with severe features, (2) HELLP syndrome, and (3) lab abnormalities consistent with a diagnosis of HELLP syndrome); *Seyb Dec.* ¶¶ 7-13, Dkt. 17-8 (describing three patients who required abortions after experiencing, respectively, (1) a septic abortion, (2) preeclampsia with severe features, and (3) heavy vaginal bleeding).

dictated by EMTALA is substantial. The United States has submitted declarations

from four physicians practicing in Idaho who say that if Idaho Code § 18-622 goes

into effect, they believe "there will be serious and negative consequences for

patients and healthcare workers alike." *Corrigan Supp. Dec.* ¶ 13, Dkt. 86-3. Dr.

Emily Corrigan, a board-certified Obstetrician-Gynecologist practicing at a Boise

hospital, explains why this is so. First, she speaks specifically as to three recent

patients—all of whom presented with emergency medical conditions and required

an abortion. She says that for each of these patients, it was "medically impossible

to say that death was the guaranteed outcome." *Id.* ¶ 8. Regarding Jane Doe 1, for

example, she says that this patient "could have developed severe sepsis potentially

resulting in catastrophic injuries such as septic emboli necessitating limb

amputations or uncontrollable uterine hemorrhage ultimately requiring

hysterectomy but [she] could still be alive." *Id.* Jane Does 2 and 3 were in similar

situations—they could have survived, but each "potentially would have had to live

the remainder of their lives with significant disabilities and chronic medical

conditions as a result of their pregnancy complication." *Id.*.

More broadly, Dr. Corrigan says that "while the State's physician

declarations speak in terms of absolutes," in her view, "medicine does not work

that way in most cases. Death may be a possible or even probable outcome, but

different outcomes or conditions may also be probable. That is why doctors

frequently refuse to answer the question, 'What are my chances?'" *Id.* ¶ 9.

Dr. Corrigan also points out that if Idaho Code § 18-622 goes into effect, patient care will be delayed. *Id.* ¶ 11. She says that, under Idaho's law, physicians must "wait until death is near-certain and in the meantime, the patient will experience pain and complications that may have lifelong disabling consequences." *Id.* Ultimately then, from her perspective, "[a] physician administering an emergency abortion in Idaho would be risking their professional license, livelihood, personal security, and freedom." *Id.*

Compliance with the EMTALA standards is significant to this state's health care system. In Idaho, there are thirty-nine hospitals that receive Medicare funding and provide emergency services. *Wright Dec.* ¶ 8, Dkt. 17-9. Between 2018 and 2020, these hospitals' emergency departments received approximately $74 million in federal Medicare funding, which was conditioned on compliance with EMTALA. *Shadle Dec.* ¶ 6, Dkt. 17-10.

## LEGAL STANDARD

The United States asks for a preliminary injunction to enjoin Idaho from enforcing its criminal abortion law to the extent it conflicts with EMTALA-mandated care. "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Fraihat v. United States Immigration & Customs Enf't*, 16

F.4th 613, 635 (9th Cir. 2021) (citation omitted).

To obtain relief, the United States must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. NRDC*, 555 U.S. 7, 24 (2008). As to the last two factors, "[w]here the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and public interest factors merge." *Padilla v. Immigration & Customs Enf't*, 953 F.3d 1134, 1141 (9th Cir. 2020).

"A district court has considerable discretion in granting injunctive relief and in tailoring its injunctive relief." *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 768 (9th Cir. 2008). Generally, a court must ensure that the relief is "tailored to eliminate only the specific harm alleged" and not "overbroad." *E.&J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992). "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And in the context of enjoining a state statute subjected to an as-applied challenge, the Supreme Court has said, "Generally speaking, when confronting a constitutional flaw in a statute, we try to limit the solution to the problem. We . . . enjoin only the unconstitutional applications of a statute while leaving other applications in force." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S.

320, 328-29 (2006).

## ANALYSIS

The key substantive question this Court must address is whether Idaho Code § 18-622 conflicts with certain requirements of the federal Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd. But before turning to that question, the Court will resolve three threshold issues: (1) whether the United States has a cause of action; (2) whether the United States has standing; and (3) whether the United States has mounted a facial or an as-applied attack to the challenged statute.

## A.    Cause of Action

The United States has the unquestioned authority to sue. It has asked this Court, sitting in equity, to partially enjoin the enforcement of Idaho Code § 18-622 because of its direct conflict with a federal statute. Such a Supremacy Clause claim fits squarely within causes of action the Supreme Court has recognized. As the Supreme Court explained in *Shaw v. Delta Air Lines*, 463 U.S. 85 (1983), "[a] plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question." *Id.* at 96 n.14; *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) ("[W]e have long recognized, if an individual claims federal law immunizes him

from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted."). Here, the United States has a cause of action because it seeks to halt Idaho's allegedly unconstitutional encroachment on EMTALA; it is not seeking to enforce federal law against would-be violators. This case is therefore distinct from the line of cases where plaintiffs challenge state administrative action taken under a particular statute, as opposed to challenging the validity of the state statute itself. *See*, *e.g.*, *Armstrong*, 575 U.S. at 324.

In a somewhat related argument, the State, in its briefing, attempted to raise[] serious concerns that EMTALA's required stabilizing treatment, as interpreted by the United States and expressed in this litigation, is invalid as coercive spending clause legislation." *State Br.*, Dkt. 66, at 19 n.10 (citing *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 575-87 (2012)). To the extent this "concern" is an argument, it is not sufficiently developed here. *Cf. Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 930 (9th Cir. 2003) ("We require contentions to be accompanied by reasons."). The State cannot challenge the constitutionality of a 35-year-old federal statute in a passing footnote. More importantly, deciding that question would "run contrary to the fundamental principle of judicial restraint that courts should neither 'anticipate a question of constitutional law in advance of the necessity of deciding it' nor 'formulate a rule of constitutional law broader than is required by the precise

facts to which it is to be applied.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (quoting *Ashwander v. TVA*, 297 U.S. 288, 346-47 (1936) (Brandeis, J., concurring)).

## B.     Standing

To establish standing, the United States must demonstrate that it has suffered an injury in fact that is fairly traceable to Idaho's actions and that will likely be redressed by a favorable decision from the Court. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992).

Here, United States alleges at least three types of harm. First, the United States' sovereign interests are harmed when its laws are violated. *See Vt. Agency of Nat. Res. v. United States ex rel Stevens,* 529 U.S. 765, 771 (2000); *United States v. Arizona,* 641 F.3d 339, 366 (9th Cir. 2011), *rev'd in part on other grounds,* 567 U.S. 387 (2012). Second, if Idaho Code § 18-622 goes fully into effect, pregnant patients throughout Idaho will be denied EMTALA-mandated care. As a general principle, the United States may sue to redress widespread injuries to the general welfare. *In re Debs*, 158 U.S. 564, 584 (1895). Third, the United States has alleged that Idaho's law deprives it of the benefits of its bargain in that it has provided Medicare funding to hospitals within Idaho, and that funding was conditioned on those hospitals' compliance with EMTALA.

From there, the standing analysis is simple. The harms the United States

alleges are traceable to Idaho's actions in enacting and, soon, enforcing Idaho Code § 18-622. And the remedies sought here would redress the injury. The United States thus has established standing.

## C.    Facial versus As-Applied

"As a general matter, a facial challenge is a challenge to an entire legislative enactment or provision," *Hoye v. City of Oakland*, 653 F.3d 835, 857 (9th Cir. 2011), and a successful facial challenge "invalidates the law itself." *Italian Colors Restaurant v. Becerra*, 878 F.3d 1165, 1175 (9th Cir. 2018). An as-applied challenge, on the other hand, "challenges only one of the rules in a statute, a subset of the statute's applications, or the application of the statute to a specific circumstance." *Hoye*, 653 F.3d at 857. Thus, "a successful as-applied challenge invalidates only the particular application of the law." *Italian Colors*, 878 F.3d at 1175 (internal quotation and citation omitted).

Ultimately, though, "[t]he label is not what matters." *Doe v. Reed*, 561 U.S. 186, 194 (2010) (acknowledging that plaintiffs' claim had characteristics of both an as-applied and facial challenge). Rather, the "important" inquiry is whether the "claim and the relief that would follow . . . reach beyond the particular circumstances of the[ ] plaintiffs." *Id.* In other words, the distinction between the two types of challenges mainly goes to the breadth of the remedy.

Here, a quick skim of the United States' complaint reveals an as-applied

challenge. In its prayer for relief, the United States asks the Court to issue a declaratory judgment stating that "Idaho Code § 18-622 violates the Supremacy Clause and is preempted and therefore invalid *to the extent that it conflicts with EMTALA." Compl.* ¶ 16, Dkt. 1 (emphasis added). The complaint repeats that limiting language in the prayer for injunctive relief. *Id.* And in moving for a preliminary junction, the United States once again—and repeatedly—clarified that it is seeking a limited form or relief. *See, e.g.*, *Mtn.*, Dkt. 17-1, at 8.

The State acknowledges this limiting language but nevertheless argues that the United States is bringing a facial challenge, based on the United States' argument that there is a conflict in *all* instances in which both EMTALA and Idaho Code § 18-622 apply. The State says this isn't so because, at times, the two statutes can operate harmoniously.

The Court does not find the State's argument persuasive because it has failed to properly account for the staggeringly broad scope of its law, which has been accurately characterized by this Court and the Idaho Supreme Court as a "Total Abortion Ban." *See Planned Parenthood Great Nw. v. Idaho*, --- P.3d ---, 2022 WL 3335696, at *1 (Idaho Aug. 12, 2022). As will be discussed more fully below, Idaho Code § 18-622 doesn't just criminalize EMTALA-mandated abortions; it criminalizes all abortions. So, in that sense, the United States has mounted a textbook, as-applied challenge focusing only on a particular application of the

statute in a particular context. After all, Idaho Code § 18-622 will take effect on August 25, 2022, regardless. The United States is not trying to stop that. The only question this Court is addressing is whether the statute must include a carve-out for EMTALA-mandated care. The United States has mounted an as-applied challenge.

Moreover, even if the Court were to construe the challenge as a facial one—focusing only on the subset of abortions EMTALA requires—the United States is still likely to succeed on the merits of its claim. As explained below, even within that subset there will always be a conflict between EMTALA and Idaho Code § 18-622.

## D.     Likelihood of Success on the Merits

With these threshold questions resolved, the Court turns to whether the United States is entitled to a preliminary injunction. The first question—whether the United States is likely to succeed on the merits—is the most important. *California v. Azar*, 950 F.3d 1067, 1083 (9th Cir. 2020). To resolve that question, the Court is guided by the Supremacy Clause and basic preemption principles.

### 1.  The Supremacy Clause & Preemption

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. "Congress may consequently pre-empt, *i.e.*, invalidate, a state law through federal legislation." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015).

In EMTALA, Congress indicated its intent to displace state law through an express preemption provision, which says EMTALA preempts state law only "to the extent that the [state law] requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). The Ninth Circuit has construed EMTALA's "directly conflicts" language as referring to two types of preemption—impossibility preemption and obstacle preemption. *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993). Impossibility preemption occurs, straightforwardly, "where it is impossible for a private party to comply with both state and federal law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). And obstacle preemption exists where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 373.

### 2. Impossibility Preemption

Here, it is impossible to comply with both statutes. As already discussed, when pregnant women come to a Medicare-funded hospital with an emergency medical condition, EMTALA obligates the treating physician to provide stabilizing treatment, including abortion care. But regardless of the pregnant patient's condition, Idaho statutory law makes that treatment a crime. Idaho Code § 18-622(2). And where federal law requires the provision of care and state law criminalizes that very care, it is impossible to comply with both laws. Full stop.

The statute's affirmative defense does not cure the impossibility. An affirmative defense is an excuse, not an exception. The difference is not academic. The affirmative defense admits that the physician committed a crime but asserts that the crime was justified and is therefore legally blameless. And it can only be raised after the physician has already faced indictment, arrest, pretrial detention, and trial for every abortion they perform. *See generally United States v. Sisson*, 399 U.S. 267, 288 (1970) (indictments need not anticipate affirmative defenses). So even though accused healthcare workers might avoid a conviction, the statute still makes it impossible to provide an abortion without also committing a crime.

Moreover, even taking the affirmative defense into account, the plain language of the statutes demonstrates that EMTALA requires abortions that the affirmative defense would not cover. When an abortion is the necessary stabilizing treatment, EMTALA directs physicians to provide that care if they reasonably expect the patient's condition will result in serious impairment to bodily functions, serious dysfunction of any bodily organ or part, or serious jeopardy to the patient's health. 42 U.S.C. § 1395dd(3)(1). In contrast, the criminal abortion statute admits to no such exception. It only justifies abortions that the treating physician determines are *necessary* to prevent the patient's death. Idaho Code § 18-622(a)(ii) (emphasis added). According to the dictionary, the word "necessary" means something is "needed" or "essential." *See Necessary*, Black's Law Dictionary

(11th ed. 2019). And the Idaho Supreme Court has said that "[w]hen engaging in statutory interpretation," it "begins with the dictionary definitions of disputed words or phrases contained in the statute." *Idaho v. Clark*, 484 P.3d 187, 192 (Idaho 2021).  Thus, an abortion is only justified under the statute if the treating physician can persuade the jury that she made a good faith determination that the patient would have died if the abortion had not been performed.

EMTALA is thus broader than the affirmative defense on two levels. First, it demands abortion care to prevent injuries that are more wide-ranging than death. Second, and more significantly, it calls for stabilizing treatment, which of course may include abortion care—when harm is probable, when the patient could "reasonably be expected" to suffer injury. In contrast, to qualify for the affirmative defense, the patient's death must be imminent or certain absent an abortion. It is not enough, as the Legislature has argued, for a condition to be life-threatening, which suggests only the *possibility* of death. *See Life-Threatening*, Black's Law Dictionary (11th ed. 2019) ("illness, injury, or danger that *could* cause a person to die") (emphasis added).

Finally, as the Court discusses further below, when the defense is put up against the realities of medical judgments, its scope is tremendously ambiguous. Although this makes it difficult to determine whether some abortions would qualify for both the affirmative defense and be mandated by EMTALA, that

question is ultimately immaterial to the Court's determination that it is impossible for physicians to comply with both statutes.

Seeking to skirt the conflict between federal and state law, the Legislature advances three main points. First, the Legislature submits declarations from two physicians who offer up opinions as to what Idaho Code § 18-622 means. They say that terminating a pregnancy to save the life of the pregnant woman is *never* considered an abortion under Idaho law. *French Dec.* ¶¶ 14, 17, Dkt. 71-5; *Reynolds Dec.* ¶ 12, Dkt. 71-1. But as already discussed, on its face, the Idaho law criminalizes *all* procedures *intended* to terminate a pregnancy, even if necessary to save the patient's life or to preserve her health. *See* Idaho Code § 18-604(1). And it should go without saying that Idaho law controls the inquiry on this point—not the medical community. Indeed, if anything, this argument crystallizes the conflict between Idaho law and EMTALA: Idaho law criminalizes as an "abortion" what physicians in emergency medicine have long understood as both life- and health-preserving care.

The Legislature's primary example of ectopic pregnancies as falling outside the statutory prohibition further reveals the fallacy of their argument: Idaho law expressly defines "pregnancy" as "having a developing fetus in the body" and commencing at fertilization. Idaho Code § 18-604(11). This plain language, which refers to "the body," rather than the uterus, and "fertilization" rather than

implantation, evinces the Legislature's intent to include ectopic pregnancies within the statutory definition of "pregnancy." *See Worley Highway Dist. v. Kootenai Cnty.*, 576 P.2d 206, 209 (Idaho 1978). As such, termination of an ectopic pregnancy falls within the definition of an "abortion." The Legislature cannot avoid the effect of its chosen statutory language by relying on the medical community's definition of what is (and what is not) an abortion.

The Legislature next says that terminations of ectopic pregnancies—or any other, similar lifesaving procedures—do not fall within the scope of the statute because such terminations are "covered" by the exemption of Idaho Code § 18-622(4). *See French Dec.* ¶ 15, Dkt. 71-5. This sub-section exempts from the statute's prohibitions medical treatment provided to pregnant women that results in the "*accidental* death" or "*unintentional* injury" to the fetus. Idaho Code § 18-622(4). But certain pregnancy-related conditions, such as ectopic pregnancy, require pregnancy termination to preserve a patient's health or save her life—and the "death" or "injury" to the "unborn child" in that situation will be neither accidental nor unintentional. *See Cooper Dec.* ¶ 3, Dkt. 17-6; *Fleisher Dec.* ¶ 13, Dkt. 17-3; *Seyb Dec.* ¶ 6, Dkt. 17-8. It is therefore nonsensical to classify it as such, simply because the pregnancy was terminated to save the life or health of the mother.

Second, during oral argument, the Legislature acknowledged the

"conceptual textual conflicts" between § 18-622 and EMTALA but entreated the Court to ignore the Idaho statute's text and focus instead on "what happens in the real world." Even if the Court accepted this invitation to ignore what the law says, the Legislature's speculations about how the law will work in practice are belied by the actual, "real-life" experience of medical professionals in Idaho who regularly treat women in these situations. They conclude that emergency care normally provided to pregnant patients will be made criminal by the plain language of § 18-622, which will, in turn, hinder their ability to provide that care if the law goes into effect. *See Corrigan Dec.* ¶¶ 31-35, Dkt. 17-6; *Cooper Dec.* ¶ 12, Dkt. 17-7; *Seyb Dec.* ¶ 13, Dkt. 17-8. As one Idaho physician testified, OB/GYN physicians in Idaho have been "bracing for the impact of this law, as if it is a large meteor headed towards Idaho." *Supp. Cooper Dec.* ¶ 13, Dkt. 86-3. More fundamentally, if the law does not mean what it says, why have it at all?

In short, given the extraordinarily broad scope of Idaho Code § 18-622, neither the State nor the Legislature have convinced the Court that it is possible for healthcare workers to simultaneously comply with their obligations under EMTALA and Idaho statutory law. The state law must therefore yield to federal law to the extent of that conflict.

### 3. Obstacle Preemption

Moreover, even if it were theoretically possible to simultaneously comply

with both laws, Idaho law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373. To be sure, the Supreme Court has cautioned that "a high threshold must be met if a state law is to be pre-empted for conflicting with the purposes of a federal Act." *Chamber of Commerce of the United States v. Whiting*, 563 U.S. 582, 607 (2011) (citation and quotation omitted). Nevertheless, that threshold is met when it is plain that "Congress made 'a considered judgment' or 'a deliberate choice' to preclude state regulation" because "a federal enactment clearly struck a particular balance of interests that would be disturbed or impeded by state regulation." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020) (*quoting Arizona*, 567 U.S. at 405).

"The first step in the obstacle preemption analysis is to establish what precisely were the purposes and objectives of Congress in enacting" the statute at issue. *Chamber of Commerce v. Bonta*, 13 F.4th 766, 778 (9th Cir. 2021). For nearly four decades, EMTALA has served as the bedrock for the emergency-care safety net. Congress enacted EMTALA primarily because it was "concerned that medically unstable patients are not being treated appropriately" including in "situations where treatment was simply not provided." H.R. Rep. No. 99-241, Pt. I, at 27 (1985). Congress's clear purpose was to establish a bare minimum of emergency care that would be available to all people in Medicare-funded hospitals.

*See Arrington v. Wong*, 237 F.3d 1066, 1073-74 (9th Cir. 2001).

Congress chose to use "federal sanctions" to ensure that emergency screening and treatment was available for "all individuals for whom care is sought." H.R. Rep. No. 99-241, Pt. III, at 4-5 (1985). But Congress was mindful that overly severe sanctions might lead "some hospitals, particularly those located in rural or poor areas, [to] decide to close their emergency rooms entirely rather than risk the . . . penalties that might ensue." *Id.* at 6. Notably, Congress took care to avoid sanctions that would "result in a decrease in available emergency care, rather than an increase in such care, which appears to have been the major goal of [EMTALA]." *Id.*

Here, Idaho's criminal abortion statute, as currently drafted, stands as a clear obstacle to what Congress was attempting to accomplish with EMTALA. As discussed below, Idaho's criminal abortion law will undoubtedly deter physicians from providing abortions in some emergency situations. That, in turn, would obviously frustrate Congress's intent to ensure adequate emergency care for all patients who turn up in Medicare-funded hospitals.

### a. Idaho Code § 18-622 Deters Abortions

It goes without saying that all criminal laws have some deterrent effect. But the structure of Idaho's criminal abortion law—specifically that it provides for an affirmative defense rather than an exception—compounds the deterrent effect and

increases the obstacle it poses to achieving the goals of EMTALA.

For one, the process of enduring criminal prosecution and licensing authority sanctions has a deterrent effect, regardless of the outcome. As Dr. Corrigan aptly explained, "[h]aving to defend against such a case would be incredibly burdensome, stressful, costly." *Corrigan Dec.* ¶ 10, Dkt. 17-6. By criminalizing all abortions, Idaho guarantees that physicians will have to accept this hardship every time they perform an abortion. The result is reluctance to perform abortions in any circumstances.

The uncertain scope of the affirmative defense intensifies that result. Providers who might be willing to depend on the affirmative defense do not have the clarity to do so because of the statute's ambiguous language and the complex realities of medical judgments.

Consider what a defendant-physician needs to prove to avail herself of the affirmative defense. The core of the affirmative defense at issue requires the defendant-physician to show she determined "the abortion was necessary to prevent the death of the pregnant woman." Idaho Code § 18-622(2). In that sense, the defense is objective—either the defendant-physician made the determination, or she did not. Yet the nature of that determination—how imminent a patient's death must before an abortion is necessary—is inscrutable.

Applying the standard to another medical context shows its ambiguity. Say a

sovereign adopted a law that allowed oncologists to provide cancer treatment "only when necessary to prevent death." Under that standard, oncologists would likely feel comfortable providing care to a patient with a stage four terminal cancer diagnosis. But what about a patient with stage one cancer? On the one hand, treatment may be lawful because the patient has a condition that, left untreated, will eventually, almost certainly cause death. On the other hand, the patient is not in danger of dying soon, so perhaps the oncologist needs to withhold treatment until the cancer progresses to the point where treatment is more obviously necessary to prevent death.

Idaho physicians treating pregnant women face this precise dilemma. As Dr. Cooper puts it, "For those patients who are clearly suffering from a severe pregnancy related illness and for which there is a clear indicated treatment, but death is not imminent, it is unclear whether I should provide the appropriate treatment because the circumstances may not justify the affirmative defense." *See Cooper Supp. Dec.* ¶ 2, Dkt. 86-5. In other words, when, precisely, does the "necessary-to-prevent-death" language apply? Healthcare providers can seldom know the imminency of death because medicine rarely works in absolutes. *Corrigan Supp. Dec.* ¶ 9, Dkt. 86-3. Instead, physicians treat patients whose medical risks "exist along a continuum" without bright lines to specify "when exactly a condition becomes 'life-threatening' or 'necessary to prevent the death'

of the pregnant patient." *Fleisher Supp. Dec.* ¶ 7, Dkt. 86-2; *see also Seyb Dec.* ¶ 13, Dkt. 17-8 (explaining that "'prevent the death of the pregnant woman'" standard is not useful because "this is not a dichotomous variable"). Faced with these limitations, physicians provide care by making "educated guess[es] . . . . [b]ut we can only rarely predict with certainty a particular outcome." *Corrigan Supp. Dec.* ¶ 9, Dkt. 86-3. Because medical needs present on a spectrum, in a given moment of decision, "[d]eath may be a possible or even probable outcome, but different outcomes may also be possible or probable." *Id.*

But the affirmative defense is only available to physicians once they make that often "medically impossible" determination that "death [i]s the guaranteed outcome." *Corrigan Supp. Dec.* ¶ 8; *see also ACEP et al Amicus Br.*, Dkt. 62 at 6 (describing the affirmative defense as "a legislatively imagined but medically nonexistent line"); *Fleisher Dec.* ¶ 12, Dkt. 17-3 ("[I]n some cases where the patient's health is unambiguously threatened, it may be less clear whether there is also a certainty of death without stabilizing treatment—and a physician may not ever be able to confirm whether death would result absent immediate treatment.").

In short, against the backdrop of these uncertain, medically complex situations, the affirmative defense is an empty promise—it does not provide any clarity. The upshot of this uncertainty is that even those providers willing to risk prosecution if they were confident in the availability of the affirmative defense will

be deterred from providing emergency abortion care under EMTALA, where the availability of the defense is so uncertain.

And the Legislature cannot step in and say there is no obstacle to providing EMTALA-mandated care—that these Idaho healthcare workers may comfortably forge ahead and provided emergency abortions—based on its assertion that Idaho prosecutors would not enforce the law as written.[4] The Legislature supports this argument with a single declaration from a single county prosecutor, who said he "would not prosecute any health care professional based on facts like those set forth in [the United States'] declarations, and that he "believe[s] no Idaho prosecuting attorney would do so." *Loebs Dec.* ¶ 7, Dkt. 71-6. But Idaho prosecutors have a statutory duty "to prosecute *all* felony criminal actions." Idaho Code § 31-2604(2) (emphasis added). And this one prosecutor lacks the authority to bind the other forty-three elected county prosecutors, let alone grand juries or citizens who might independently seek to initiate criminal proceedings, or any of the disciplinary boards that might pursue license revocation proceedings. *Cf.* Idaho

---

[4] The Legislature also submitted a declaration from a Nevada doctor who opines that the standard laid out in Idaho Code § 18-622 "provides a clear and workable standard" and that "physicians may proceed without the kinds of subjective 'fears' and 'chillings' suggested in the declarations of the three Idaho doctors.'" *Reynolds Dec.* ¶¶ 9-10, Dkt. 71-1. The Court does not find this assertion persuasive. At best, it's a difference of opinion—some doctors will be chilled; some won't. On balance, and based on the factual record before it, the Court finds that if Idaho Code § 18-622 goes into effect, physicians practicing in Idaho are likely to be deterred from providing EMTALA-mandated care, including emergency abortions.

Code § 19-1108 (grand juries); *Idaho v. Murphy*, 584 P.2d 1236, 1241 (Idaho 1978) (citizen complaints); § 18-622(2).

One prosecutor's promise to refrain from enforcing the law as written, therefore, offers little solace to physicians attempting to navigate their way around both EMTALA and Idaho's criminal abortion laws—and whose "professional license, livelihood, personal security, and freedom" are on the line. *Corrigan Supp. Dec.* ¶ 11, Dkt. 86-3 ("Our malpractice insurance may not cover us for performing an act that some may view as a crime."). Indeed, the Ninth Circuit has expressly rejected the argument that courts may uphold a law merely because the enacting authority promises to enforce it only to the extent it is consistent with federal law. *United States v. City of Arcata*, 629 F.3d 986, 992 (9th Cir. 2010) (holding officials' "promise of self-restraint does not affect our consideration of the ordinances' validity" under preemption doctrine). Physicians performing health- or life-saving abortions should not be left to "the mercy of *noblesse oblige*." *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1215 (9th Cir. 2010) (citation omitted) ("We may not uphold the statutes merely because the state promises to treat them as properly limited.").

### *b.* **Deterring Abortions is an Obstacle to EMTALA**

The clear and intended effect of Idaho's criminal abortion law is to curb abortion as a form of medical care. This extends to emergency situations,

obstructing EMTALA's purpose. Idaho's choice to impose severe and sweeping sanctions that decrease the overall availability of emergency abortion care flies in the face of Congress's deliberate decision to do the opposite.

The primary obstacle is delayed care. Under the status quo, physicians "rely upon their medical judgement or best practices for handling pregnancy complications." *Seyb Dec.* ¶ 13, Dkt. 17-8. But because of the criminal abortion statute, "providers will likely delay care for fear of criminal prosecution and loss of licensure." *Id.; see also Cooper Supp. Dec.* ¶ 7, Dkt. 86-5 ("provider fear and unease is real and widespread"). The incentive to do so is obvious—delaying care so that the patient gets nearer to death and thus closer to the blurry line of the affirmative defense. Providers may also delay care to allow extra time to consult with legal experts. *See, e.g.*, *Corrigan Dec.* ¶¶ 25, Dkt. 17-6.

Delayed care is worse care. "The goal in medicine is to effectively identify problems and treat them promptly so patients are stabilized *before* they develop a life-threatening emergency. The Idaho law requires doctors to do the opposite—to wait until abortion is necessary to prevent the patient's death. *See Huntsberger Dec.* ¶ 12, Dkt. 86-4. Rather than providing the stabilizing treatment that EMTALA calls for, Idaho subjects women in medical crisis to periods of "serious physical and emotional trauma" as they wait to get nearer and nearer to death. *Corrigan Supp. Dec.* ¶ 13, Dkt. 86-3.

The wait for care is troubling enough on its own. Even worse, delayed care worsens patient outcomes. As a result of delay, "[p]atients may experience serious complications, have negative impacts on future fertility, require additional hospital resources including blood products, and some patients may die." *Huntsberger Dec.* ¶ 15, Dkt. 86-4. A recent study of maternal morbidity in Texas confirms this. When a pregnant woman with specific pregnancy complications was treated with "the standard protocol of terminating the pregnancy to preserve the pregnant patient's life or health," the rate of serious maternal morbidity was 33 percent. *California et al Amicus Br.*, Dkt. 59 at 21.[5] That rate reached 57 percent, nearly doubling, when providers used "an expectant-management approach," meaning the physician provided "observation-only care until serious infection develops or the fetus no longer has cardiac activity." *Id*.

These delays in providing care frustrate EMTALA in two ways. First, delays frustrate Congress's intent to eliminate situations where treatment was simply not provided by providing for basic emergency treatment. Second, the worsened patient outcomes offend EMTALA's core purpose of ensuring that the most vulnerable people were not left to suffer catastrophic outcomes because of

---

[5] Citing Anjali Nambiar et al., *Maternal Morbidity and Fetal Outcomes Among Pregnant Women at 22 Weeks' Gestation or Less with Complications in 2 Texas Hospitals After Legislation on Abortion*, Am. J. Obstetrics & Gynecology (forthcoming 2022) (internet).

indifference from physicians—or, in this case, obstacles created by the State.

Another effect of Idaho's criminal abortion law is that it will likely make it more difficult to recruit OB/GYNs, who are on the front lines of providing abortion care in emergency situations. Because Idaho does not have in-state training for the specialty, all OB/GYNs must be recruited to come here. *Seyb Dec.* ¶ 14, Dkt. 17-8. But if these newly trained physicians "can practice in a state without these conflicts and risks, it is only natural that they would be deterred from practicing here." *Id.* By extension, OB/GYNs who are already practicing here may choose to leave or to change the nature of their practice. *See, e.g.*, *Corrigan Dec.* ¶ 32, Dkt. 17-6. In both cases, the end result is fewer providers performing health and life-saving abortions. This, again, is an obstacle to EMTALA because it disrupts Congress's careful balance to avoid overly severe sanctions that could lead to providers deciding not to provide emergency care.

In sum, cutting back on emergency abortion care quantitatively and qualitatively is a plain obstacle to EMTALA, which Congress enacted to ensure that all individuals—including pregnant women—have access to a minimum level of emergency care.

### E. Likelihood of Irreparable Harm

Having concluded that that the United State is likely to succeed on the merits of its claims, the Court turns to whether the United States has shown it is likely to

suffer irreparable harm in the absence of an injunction.

The United States has met that burden, as Supremacy Clause violations trigger a presumption of irreparable harm when the United States is a plaintiff. *See generally United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *rev'd in part on other grounds*, 567 U.S. 387 (2012) ("[A]n alleged constitutional infringement will often alone constitute irreparable harm.") (citation omitted). As one court has explained, "The United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012).

And so it is here. If Idaho's criminal abortion statute is allowed to go fully into effect, federal law will be significantly frustrated—as discussed in detail above. Most significantly, allowing the criminal abortion ban to take effect, without a cutout for EMTALA-required care, would inject tremendous uncertainty into precisely what care is required (and permitted) for pregnant patients who present in Medicare-funded emergency rooms with emergency medical conditions. *See generally United States v. South Carolina*, 840 F. Supp. 2d 898, 925 (D.S.C. 2011) (finding irreparable harm where state immigration law "could create a chaotic situation in immigration enforcement"). The net result—discussed further in the next section—is that these patients could suffer irreparable injury in the absence of an injunction.

**F.    The Balance of Equities and the Public Interest**

The next question is whether the balance of equities tips in the United States' favor and whether an injunction is in the public interest. As noted above, because the United States is a party, these two factors merge. The key consideration here is what impact an injunction would have on non-parties and the public at large. *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003).

Looking first to the public at large, in the most general sense, "preventing a violation of the Supremacy Clause serves the public interest." *United States v. California*, 921 F.3d 865, 893-94 (9th Cir. 2019) (citing *Arizona*, 641 F.3d at 366). As the Ninth Circuit has explained, "it is clear that it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available. In such circumstances, the interest of preserving the Supremacy Clause is paramount." *Arizona*, 641 F.3d at 366 (cleaned up, citations omitted).

Next, based on the various declarations submitted by the parties, the Court finds that allowing the Idaho law to go into effect would threaten severe, irreparable harm to pregnant patients in Idaho. Speaking of patients, although the parties and the Court have often focused mainly on the actions and competing interests of doctors, prosecutors, legislators, and governors, we should not forget the one person with the greatest stake in the outcome of this case—the pregnant

patient, laying on a gurney in an emergency room facing the terrifying prospect of

a pregnancy complication that may claim her life. One cannot imagine the anxiety

and fear she will experience if her doctors feel hobbled by an Idaho law that does

not allow them to provide the medical care necessary to preserve her health and

life. From that vantage point, the public interest clearly favors the issuance of a

preliminary injunction.

In that regard—and as discussed at some length above—the United States

has submitted declarations from physicians explaining that there are any number of

pregnancy-related complications that require emergency care mandated by

EMTALA but that are forbidden by Idaho's criminal abortion law. Idaho

physicians have treated such complications in the past, and it is inevitable that they

will be called upon to do so in the future. Not only would Idaho Code § 18-622

prevent emergency care mandated by EMTALA, it would also discourage

healthcare professionals from providing *any* abortions—even those that might

ultimately be deemed to have been necessary to save the patient's life—given the

affirmative-defense structure already discussed. Finally, if the abortion ban laid out

in the Idaho statute goes into effect, the capacity of hospitals in neighboring states

that do not prohibit physicians from providing EMTALA-mandated care

(Washington and Oregon, for example)—would be pressured as patients may

choose to cross state lines to get the emergency care they are entitled to receive

under federal law. *See* Dkt. 45-1, at 16-17.

Turning to the other side of the equitable balance sheet, the State of Idaho will not suffer any real harm if the Court issues the modest preliminary injunction the United States is requesting. In fact, as a practical matter, the State (and, to a much greater extent, the Legislature) argue that physicians who perform the types of emergency abortions at issue here won't violate Idaho law anyway; therefore, by their own reasoning, they will suffer no harm if enforcement of § 18-622 is enjoined on this limited basis. And although the State has argued that in the wake of *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), the public interest lies in allowing states to regulate abortions, *Dobbs* did not overrule the Supremacy Clause. Thus, even when it comes to regulating abortion, state law must yield to conflicting federal law. As such, the public interest lies in favor of enjoining the challenged Idaho law to the extent it conflicts with EMTALA.

## ORDER

**IT IS ORDERED that:**

1. Plaintiff's motion for a preliminary injunction (Dkt. 17) is **GRANTED**.

2. The Court hereby restrains and enjoins the State of Idaho, including all of its officers, employees, and agents, from enforcing Idaho Code § 18-622(2)-(3) as applied to medical care required by the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd. Specifically, the State of

Idaho, including all of its officers, employees, and agents, are prohibited from initiating any criminal prosecution against, attempting to suspend or revoke the professional license of, or seeking to impose any other form of liability on, any medical provider or hospital based on their performance of conduct that (1) is defined as an "abortion" under Idaho Code § 18-604(1), but that is necessary to avoid (i) "placing the health of" a pregnant patient "in serious jeopardy"; (ii) a "serious impairment to bodily functions" of the pregnant patient; or (iii) a "serious dysfunction of any bodily organ or part" of the pregnant patient, pursuant to 42 U.S.C. § 1395dd(e)(1)(A)(i)-(iii).

3. This preliminary injunction is effective immediately and shall remain in full force and effect through the date on which judgment is entered in this case.

DATED: August 24, 2022

B. Lynn Winmill
United States District Judge