LAWRENCE G. WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN, ISB #3586
Chief, Civil Litigation Division

| | |
|---|---|
| MEGAN A. LARRONDO, ISB #10597 | JOAN E. CALLAHAN, ISB #9241 |
| BRIAN V. CHURCH, ISB #9391 | NAYLOR & HALES, P.C. |
| ALAN W. FOUTZ, ISB #11533 | Special Deputy Attorney General |
| INGRID C. BATEY, ISB #10022 | 950 W. Bannock Street, Ste. 610 |
| Deputy Attorneys General | Boise, ID 83702 |
| CLAY R. SMITH, ISB #6385 | Telephone: (208) 383-9511 |
| Special Deputy Attorney General | Facsimile: (208) 383-9516 |
| 954 W. Jefferson Street, 2nd Floor | joan@naylorhales.com |
| P.O. Box 83720 | |
| Boise, ID  83720-0010 | |
| Telephone: (208) 334-2400 | |
| Facsimile: (208) 854-8073 | |
| megan.larrondo@ag.idaho.gov | |
| brian.church@ag.idaho.gov | |

*Attorneys for Defendant State of Idaho*

## UNITED STATES DISTRICT COURT

## DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:22-cv-329 |
| Plaintiff, | **MEMORANDUM IN SUPPORT OF STATE OF IDAHO'S MOTION TO RECONSIDER PRELIMINARY INJUNCTION (Dkt. 95)** |
| v. | |
| THE STATE OF IDAHO, | |
| Defendant. | |

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

LEGAL STANDARD...............................................................................................1

ARGUMENT FOR RECONSIDERATION.............................................................2

I.    The Court erred in its interpretation of EMTALA, resulting in an injunction that is internally contradictory and an interpretation of EMTALA that is at odds with the Medicare Act ......................................2

    A.    The Court's interpretation of stabilizing treatment does not align with the statutory definition and results in a contradictory injunction ...............2

    B.    The Court misunderstands EMTALA to force a state to allow a particular "treatment"—here the taking of an unborn child's life—which is inconsistent with EMTALA and the Medicare Act......................3

II.    The Court erred in its interpretation of Idaho Code § 18-622 .......................6

    A.    The plain language of Idaho Code § 18-622(3) does not contain an imminency requirement ...............................................................................7

    B.    Idaho Code § 18-622's affirmative defense related to the life of the mother is clear .....................................................................................7

    C.    Even if the Court found the language ambiguous, the Court failed to follow Idaho law on how to determine the meaning of a statute ................8

    D.    The Court also erred in its understanding of the purpose of the Idaho law, which weighs the balance of human life ...............................................8

III.    The Court erred in concluding that the United States met its heavy burden of showing that it is physically impossible to comply with both statutes and in showing that Idaho's law effectively nullified EMTALA ....................................9

    A.    The Court erred in finding that it was physically impossible to comply with both statutes ......................................................................................9

    B.    There cannot be a direct conflict because EMTALA's obligations are triggered by the voluntary choice of hospitals...........................................11

    C.    Idaho's regulation of abortion does not nullify the anti-patient-dumping purpose of EMTALA ...............................................................................11

IV.    When the Court grants reconsideration, it should find that the United States does not have a likelihood of success on the merits ...........................................13

V.      When the Court grants reconsideration, it should find that the other factors
        support denying the preliminary injunction ........................................................14

VI.     The district court erred in concluding that the United States had a cause
        of action ............................................................................................................14

VII.    The district court erred in concluding that the United States had standing ..........15

VIII.   The district court erred in concluding that the United States' understanding of
        EMTALA did not invade the State's Tenth Amendment reserved powers and
        that the interpretation of EMTALA amounted to coercive spending ...................17

IX.     The Court erred in concluding that this is an as-applied challenge .....................19

CONCLUSION.................................................................................................................19

## TABLE OF CASES AND AUTHORITIES

**CASES**

*Arizona v. United States*,
   567 US 387 (2012) ............................................................................15

*Armstrong v. Exceptional Child Center, Inc.*,
   575 U.S. 320 (2015)............................................................................14

*Arrington v. Wong*,
   237 F.3d 1066, 1073 (9th Cir. 2001) ...........................................9, 12

*Bryan v. Rectors & Visitors of Univ. of Va.*,
   95 F.3d 349 (4th Cir. 1996) .............................................................12

*Crossen v. Att'y Gen. of Ky.*,
   344 F. Supp. 587 (E.D. Ky. 1972) .....................................................8

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022)................................................................ *passim*

*Earth Island Institute v. Carlton*,
   626 F.3d 462 (9th Cir. 2010) ...........................................................10

*Eberhardt v. City of Los Angeles*,
   62 F.3d 1253 (9th Cir. 1995) ................................................6, 11, 12

*FW/PBS, Inc. v. City of Dallas*,
   493 U.S. 215 (1990) .........................................................................14

*Goodman v. Sullivan*,
   891 F.2d 449 (2d Cir. 1989) ...............................................................4

*Hardy v. N.Y.C. Health & Hosp. Corp.*,
   (2d Cir. 1999) ...................................................................................11

*Hawker v. New York*,
   170 U.S. 189 (1898) ............................................................................4

*In re Debs*,
    158 U.S. 564 (1895).................................................................................16, 17

*In re Volkswagen "Clean Diesel" Marketing, Sales, Practices, & Products Liability Litigation*,
    959 F.3d 1201 (9th Cir. 2020) ..............................................................11

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010) ..............................................................................19

*Lujan v. Defenders of Wildlife*,
    504 US 555 (1992) ................................................................................15

*Marshall v. East Carroll Parish Hosp.*,
    134 F.3d 319 (5th Cir. 1998) ................................................................12

*Maryland v. King*,
    567 U.S. 1301 (2012) ............................................................................14

*Matter of Baby "K"*,
    16 F.3d 590 (4th Cir. 1994) ................................................................5, 6

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018) ............................................................................5

*Nelson v. City of Albuquerque*,
    921 F.3d 925 (10th Cir. 2019) ................................................................1

*Nelson v. Evans*,
    166 Idaho 815, 464 P.3d 301 (2020) ......................................................8

*New York v. United States*,
    505 U.S. 144, (1992) ............................................................................18

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) .........................................................................17, 18

*Roe v. Wade*,
    410 U.S. 113 (1973)........................................................................1, 8, 17

*Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*,
    5 F.3d 1255 (9th Cir. 1993) ....................................................................1

*Skydive Ariz., Inc. v. Quattrocchi*,
    673 F.3d 1105 (9th Cir. 2012) ................................................................3

*State v. Clark*,
　　168 Idaho 503, 484 P.3d 187 (2021) ...............................................................7

*State v. Gomez-Alas*,
　　167 Idaho 857, 477 P.3d 911 (2020) ..............................................................7

*Texas v. Becerra*,
　　--- F. Supp. 3d ---, ---, 2022 WL 3639525, at *25 (N.D. Tex. 2022) ...........4, 8

*U.S. v. Mattson*,
　　600 F.2d 1295 (9th Cir. 1979) .................................................................15, 16

*United States v. Arizona,*
　　641 F. 3d 339, 351 (9th Cir. 2011), rev'd in part on other grounds,
　　567 U.S. 387 (2012)................................................................................15, 16

*United States v. Freter*,
　　31 F.3d 783 (9th Cir. 1994) ..........................................................................10

*United States v. Morrison*,
　　529 U.S. 598 (2000) .......................................................................................4

*United States v. Pearson*,
　　274 F.3d 1225 (9th Cir. 2001) ......................................................................10

*Vargas v. Del Puerto Hospital*,
　　98 F.3d 1202 (9th Cir. 1996) ........................................................................12

*Vermont Agency of Natural Resources v. United States ex rel. Stevens*,
　　529 U.S. 765 (2000) .....................................................................................15

*West Virginia v. EPA*,
　　142 S. Ct. 2587 (2022) ...................................................................................5

*Whole Women's Health v. Jackson*,
　　142 S. Ct. 522 (2021) .....................................................................................7

*Wyeth v. Levine*,
　　555 U.S. 555 (2009) .......................................................................................4

## U.S. CONSTITUTION

U.S. Const., amend. X.......................................................................................4

**U.S.C.**

31 U.S.C. § 3730 ..........................................................................................15

42 U.S.C. § 1395 .........................................................................................4, 6

42 U.S.C. § 1395cc(b)(2) ............................................................................14

42 U.S.C. § 1395dd(a)-(b), dd(e)(5) ............................................................2

42 U.S.C. § 1395dd(b)(1)(A) .......................................................................2

42 U.S.C. § 1395dd(d) ................................................................................14

42 U.S.C. § 1395dd(d)(1)(B) ........................................................................3

42 U.S.C § 1395dd(e)(3)(A) .........................................................................2

42 U.S.C. § 1395dd(f) .................................................................................11

**IDAHO CODE**

Idaho Code § 18-622 ............................................................................ *passim*

Idaho Code § 18-622(2)-(3) ......................................................................2, 3

Idaho Code § 18-622(3) ........................................................................ *passim*

Idaho Code § 18-8805(4) ...............................................................................3

**RULES**

Fed. R. Civ. P. 65(d) ......................................................................................3

42 C.F.R. § 489.24(d)(1)(i) .................................................................2, 5, 10

**OTHER AUTHORITIES**

Consolidated Appropriations Act,
    2022, Pub. L. No. 117-103, title V, sec. 507(d)(1), 136 Stat. 496 (2022) ...........................5

H.R. Rep. No. 99-241, pt. 3, at 6 (1985), reprinted in 1986 U.S.C.C.A.N. 726, 728 ...................13

John Yoo, *Schumer and Graham are both wrong on abortion: Congress can't legislate it*,
    The Wash. Post, (Sept. 15, 2022, 2:54 PM EDT),
    https://www.washingtonpost.com/opinions/2022/09/15/schumer-graham-abortion-laws-unconstitutional/ ...........................................................................................4

## INTRODUCTION

This case is not about denying necessary medical care to save the lives of women. This case is about preserving for the State its sovereign power to regulate abortions within its boundaries. The Court erred when it found that Idaho Code § 18-622 directly conflicted with and was preempted by the Emergency Medical Treatment and Labor Act (EMTALA). The Court's order misinterpreted both the relevant state and federal statutes and, in so doing, created a nonexistent conflict that has significant federalism and state sovereignty concerns. After *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), states have the power to regulate, and even prohibit, abortions—EMTALA, a statute that was intended to ensure that all people receive emergency medical care regardless of ability to pay, did not suddenly take on new form to federalize abortion when *Roe v. Wade* was reversed. *Roe v. Wade*, 410 U.S. 113 (1973). The Court's interpretation of EMTALA unconstitutionally hijacks Idaho's power to regulate abortion and is the product of clear error. Moreover, the Court's injunction is internally inconsistent and failed to hold the United States to its heavy burden on a motion for preliminary injunction. Idaho asks that this Court reconsider its decision, vacate the preliminary injunction, and deny upon reconsideration the United States' request for a preliminary injunction.

## LEGAL STANDARD

A motion to reconsider is appropriate where "the court has misapprehended the facts, a party's position, or the controlling law." *Nelson v. City of Albuquerque*, 921 F.3d 925, 929 (10th Cir. 2019) (citation omitted). A motion to reconsider should be granted "if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993) (citation omitted).

## ARGUMENT FOR RECONSIDERATION

I.    **The Court erred in its interpretation of EMTALA, resulting in an injunction that is internally contradictory and an interpretation of EMTALA that is at odds with the Medicare Act.**

    A.    **The Court's interpretation of stabilizing treatment does not align with the statutory definition and results in a contradictory injunction.**

The Court's preliminary injunction has a clear error. The preliminary injunction begins by stating it will enjoin Idaho from enforcing Idaho Code § 18-622(2)-(3) "as applied to medical care required by [EMTALA]." Mem. Decision and Order, Dkt. 95 (Order) at 38. But in the very next sentence, the Court enjoins Idaho from certain acts when an abortion "is necessary to avoid . . ." certain emergency medical conditions. *Id.* at 39. That is not the standard specified by EMTALA, even if one were to assume that EMTALA requires certain medical treatment (it does not).

Under EMTALA*, if* an applicable hospital determines that the person has an emergency medical condition, *then* it must either provide for transfer to another medical facility or provide "within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to *stabilize* the medical condition." 42 U.S.C. § 1395dd(b)(1)(A) (emphasis added). This means that a hospital must, within its capabilities, provide "such medical treatment of the condition **as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely** to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(A) (emphasis added); *see also* 42 C.F.R. § 489.24(d)(1)(i). This is not a "necessary to avoid" standard, which expands EMTALA requirements to a prevention, as opposed to stabilization, standard. The injunction also broadens EMTALA's reach by applying it to "any medical provider or hospital," not just those subject to EMTALA. *See* 42 U.S.C. §§ 1395dd(a)-(b), dd(e)(5)

The injunction also goes beyond the scope of the challenge to Idaho Code § 18-622. It purports to enjoin Idaho from "seeking to impose any other form of liability on" hospitals or medical providers that conduct an abortion under the novel "necessary to avoid" standard. Order 39. However, the United States only sought to enjoin enforcement of Idaho Code § 18-622. Dkt.

MEMORANDUM IN SUPPORT OF STATE OF IDAHO'S MOTION TO RECONSIDER
PRELIMINARY INJUNCTION (Dkt. 95) - 2

17-1 at 20 (asking the Court to enjoin Idaho "from enforcing Idaho Code § 18-622(2)-(3) as applied to EMTALA-mandated care."). That code section specifies the forms of liability that may be imposed. Thus, the injunction extends to other, unidentified "form[s] of liability" that are not contained in the challenged Section 18-622(2)-(3). *See* Fed. R. Civ. P. 65(d); *Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1116 (9th Cir. 2012) ("Courts should not enjoin conduct that has not been found to violate any law."). In addition, the second sentence of the injunction does not limit itself to Idaho Code § 18-622. As currently written, the injunction appears to bar the State from enforcing its Fetal Heartbeat Act that has not been contested by the United States (as discussed during oral argument). That law remains effective where Idaho Code § 18-622 is unenforceable and contains its own sanctions for unlawful abortions. Idaho Code § 18-8805(4). Thus, the injunction's second sentence, as it is currently written, appears to impermissibly enjoin the Fetal Heartbeat Act, which is not at issue in this litigation.

**B.     The Court misunderstands EMTALA to force a state to allow a particular "treatment"—here the taking of an unborn child's life—which is inconsistent with EMTALA and the Medicare Act.**

The Court's Order understands EMTALA to require a particular method of "care," even if the State does not permit the procedure in the circumstance identified.[1] Order 17 ("EMTALA-mandated abortions"); 19 (EMTALA obligates "abortion care"); 20 ("EMTALA requires abortions that the affirmative defense would not cover."); 21 (EMTALA "demands abortion care to prevent injuries that are more wide-ranging than death."); 31, 32 (faulting Idaho for "curb[ing] abortion as a form of medical care," which it believes frustrates "EMTALA's purpose.") In short, the Court understands EMTALA to mandate the medical procedures offered across the nation: If

---

[1] This interpretation of EMTALA flows from the interpretation advanced by the United States, which was promulgated by the July 11, 2022 CMS guidance and corresponding letter sent by HHS Secretary Becerra. To the extent this lawsuit arises from this agency action—an issue that is currently unclear—the Court's interpretation of EMTALA and the associated Order violates the major questions doctrine and the State incorporates the Legislature's argument contained at Section III(B)(1) of the Legislature's Motion for Reconsideration as to why the major questions doctrine has been violated. *See* Dkt. 97-1 at 10-11.

a physician believes an abortion would be a stabilizing treatment, the United States through EMTALA can force the State to allow the abortion, even if the State does not allow the abortion in that circumstance. The Court's conclusions regarding EMTALA reflects clear error.

Understanding EMTALA as mandating abortions as medical care is an afront to the State's sovereignty and police power. *Dobbs* returned regulation of abortion to the states, subjecting such regulation to rational basis review, and beginning with "a strong presumption of validity." 142 S. Ct. at 2284 (citation omitted). In preemption cases, there is an assumption that must be made that "historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (cleaned up). Here, regulation of the medical profession has long been recognized as a power of states. *E.g., Hawker v. New York*, 170 U.S. 189, 192-93 (1898). Indeed, constitutionally, Congress lacks the authority to regulate the practice of medical care or to intrude upon the states' prerogatives regarding criminal law. *Cf. United States v. Morrison*, 529 U.S. 598, 613, 618 (2000); John Yoo, *Schumer and Graham are both wrong on abortion: Congress can't legislate it*, The Wash. Post (Sept. 15, 2022, 2:54 PM EDT), https://www.washingtonpost.com/opinions/2022/09/15/schumer-graham-abortion-laws-unconstitutional/. Consistent with this constitutional limit, Congress has expressly disclaimed any power to regulate the practice of medical care in the Medicare Act. 42 U.S.C. § 1395. Instead, this is a power exercised by the States. *See* U.S. Const. amend. X.

The Court's understanding of EMTALA is also contrary to Congress's intent in enacting the Medicare and EMTALA statutes. As noted by the Idaho Legislature, Dkt. 97-1 at 8-9, Medicare prevents the federal government from interfering in the supervision or control of the practice of medicine or the manner in which medical services are provided. 42 U.S.C. § 1395. "Courts across the country uniformly hold that this section prohibits Medicare regulations that 'direct or prohibit any kind of treatment or diagnosis'; 'favor one procedure over another'; or 'influence the judgment of medical professionals.'" *Texas v. Becerra*, --- F. Supp. 3d ---, ---, 2022 WL 3639525, at *25 (N.D. Tex. 2022) (quoting *Goodman v. Sullivan*, 891 F.2d 449, 451 (2d Cir. 1989)). EMTALA

also recognizes that the "capabilities of the staff and facilities" at the hospital limit stabilizing treatment that a hospital is obligated to provide. 42 C.F.R. § 489.24(d)(1)(i). A long-extant statute such as EMTALA cannot now be given a transformative expansion of its regulatory reach by an allegedly just-discovered unheralded power to regulate abortions at the federal level. *Cf. West Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022).

This understanding of EMTALA is confirmed by other Congressional enactments. Congress has made clear through the Weldon Amendment that the United States cannot through Medicare discriminate against hospitals or providers that do not provide abortions. *See* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, title V, § 507(d)(1), 136 Stat. 496 (2022). Any thought that EMTALA mandates the performance of abortions through the threat of the loss of federal funds for non-performance runs afoul of the Weldon Amendment.

Finally, the anti-commandeering doctrine prohibits Congress from issuing "direct orders to the governments of the States." *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018). To be sure, the federal Congress can regulate private actors within its power, and when it does, preemption can occur. *Id.* at 1479-81. But Congress cannot directly compel state governments to enact and enforce a federal regulatory program, nor compel state officers (or officers of their political subdivisions) to administer or enforce a federal program. *Id.* at 1477 (citations omitted).

With these legal principles in mind, the Court's assertion that EMTALA mandates abortion is plainly incorrect. EMTALA requires hospitals to provide stabilizing treatment (or transfer), but EMTALA does not specify that an abortion must be a form of treatment available when the State has otherwise disallowed it.[2] Nor could it, because Congress cannot compel (or commandeer)

---

[2] This point is not inconsistent with *Matter of Baby "K"*, 16 F.3d 590 (4th Cir. 1994). There, a hospital *could* provide *and had* provided a treatment—meaning the treatment was not regulated by the state. However, the state allowed physicians to *elect* not to provide treatment he or she viewed as medically or ethically inappropriate. The Fourth Circuit found that the statute *allowing the physician election not to provide treatment* directly conflicted with the EMTALA requirement to provide stabilizing treatment. The *Baby "K"* issue is thus focused not on the manner of treatment

States to allow abortions. Medicare and EMTALA respect historic state regulation of the practice of medicine through the states' police powers. What EMTALA regulates are persons (hospitals accepting Medicare and their physicians) through a requirement to provide screening and, if necessary, treatment or transfer. This has long been understood to be the objective of EMTALA: It is a "Patient Anti-Dumping Act" enacted in response to a concern that "hospitals were 'dumping' patients who were unable to pay, by either refusing to provide emergency medical treatment or transferring patients before their conditions were stabilized." *Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1255 (9th Cir. 1995). The Court erred in interpreting EMTALA to mandate that a State allow a particular "treatment."

## II.   The Court erred in its interpretation of Idaho Code § 18-622.

Having first misunderstood EMTALA to require the performance of abortions, the Court then misunderstood Idaho Code § 18-622 to prevent the performance of abortions in those circumstances when it understood EMTALA to require them. The Court did this by erroneously viewing the affirmative defense in Idaho Code § 18-622(3) as unclear and ambiguous. It said the statute lacked "clarity" "because of the statute's ambiguous language and the complex realities of medical judgments." Order 27. It interpreted Section 622(3) to require "the patient's death must be imminent or certain absent an abortion." *Id.* at 21, 27. The Court saw the quandary as being "when, precisely, does the 'necessary-to-prevent-death' language apply?" *Id.* at 28. The Court then characterized the affirmative defense as being an "empty promise" only "available to physicians once they make that often 'medically impossible' determination that death [i]s the guaranteed outcome." *Id.* at 29. Multiple problems exist with the Court's interpretation. Read properly, the

---

(although in that as-applied case, one form of treatment was sought), but instead on whether a physician *can be allowed to choose* not to provide stabilizing treatment. This case stands opposite of the *Baby "K"* case. Idaho has disallowed abortion—removing this "treatment" option in all circumstances except where the exceptions (the affirmative defenses) identified in Section 18-622, apply. The fact that Idaho has disallowed an abortion in all other instances is something that this Court must respect under 42 U.S.C. § 1395—not a direct conflict with the stabilizing treatment requirement.

affirmative defense in Idaho Code § 18-622 allows the performance of an abortion when the woman's treating physician determines in good faith that the abortion is necessary to prevent her death—regardless of imminence.

### A.  The plain language of Idaho Code § 18-622(3) does not contain an imminency requirement.

The Court erred in reading an imminency requirement into Idaho Code § 18-622. *Id.* at 20; *see also id.* at 27. The plain language of Idaho Code § 18-622(3) does not contain an imminence or temporal requirement. *See State v. Clark*, 168 Idaho 503, 508, 484 P.3d 187, 192 (2021) (requiring a court to begin with the literal words, which are given their plain meaning). Even the United States did not add an imminence-of-death requirement. *E.g.,* Dkt. 17-1 at 8, 15. The Court was clearly incorrect to turn to statements from physicians in interpreting Idaho Code § 18-622(3). *See* Order 28 (citing Cooper Suppl. Decl., Dkt. 86-5; Corrigan Suppl. Decl., Dkt. 86-3). Furthermore, in Idaho, statutes should be construed to avoid a conflict with the state or federal constitution. *See State v. Gomez-Alas*, 167 Idaho 857, 866, 477 P.3d 911, 920 (2020). The Court turned toward, not away from, a constitutional issue.

### B.  Idaho Code § 18-622's affirmative defense related to the life of the mother is clear.

The Court expressed significant concern about a perceived lack of clarity in the affirmative defenses. Order 26-31. The Court's analysis hinted at whether the statute was vague as part of its ambiguity analysis, even though this issue was not raised by the United States. The Idaho Supreme Court is currently considering whether Idaho Code § 18-622 is vague.[3] But similar laws restricting abortion have likewise used phrases such as "necessary to prevent the death" or "necessary to

---

[3] As part of that analysis, the Idaho Supreme Court will interpret Idaho Code § 18-622. The Idaho Supreme Court is the "final arbiter[] of the meaning of state statutory directions." *Whole Women's Health v. Jackson*, 142 S. Ct. 522, 536 (2021) (plurality opinion of Gorsuch, J., in part II-C) (citation omitted). As such this Court should defer its interpretation of Idaho Code § 18-622 and adopt the Idaho Supreme Court's interpretation of Idaho Code § 18-622. Oral argument on the pending Idaho Supreme Court petitions is currently set for September 29, 2022, and an opinion will issue in due course—potentially before this motion is fully ripe for the Court's consideration.

preserve her life," and state and federal courts have upheld their constitutionality.[4] Even Idaho's pre-*Roe* statutes contained such a requirement. Contrary to the Court's hinted analysis, the plain language of Idaho Code § 18-622(3) and "necessary to prevent the death of the pregnant woman" are well understood, and use language with meanings that withstood the test of time. The Court's concerns do not support the conclusion that the statute is ambiguous.

      C.     **Even if the Court found the language ambiguous, the Court failed to follow Idaho law on how to determine the meaning of a statute.**

Given that the Court found the plain language unclear, the Court committed clear error by not engaging in the construction necessary to give effect to legislative intent. *Nelson v. Evans*, 166 Idaho 815, 820, 464 P.3d 301, 306 (2020). It took none of the steps to engage in statutory construction, such as looking at the context, public policy, and legislative history. (Nor was any of this argued or provided by the United States.) Instead, the Court relied on declarations from physicians. *See* Order 28-29. Its failure to follow what it was required to do was clear error.

      D.     **The Court also erred in its understanding of the purpose of the Idaho law that weighs the balance of human life.**

As expressed by the Idaho Legislature, Dkt. 97-1 at 4-6, an alternative way of looking at Idaho Code § 18-622 is as an exercise of the state's police power that values the life of an unborn child, but recognizes when an unborn child's life may be taken when both it and its mother are suffering an emergency medical condition. As the *Texas v. Becerra* court pointed out, EMTALA imposes on a physician the duty to screen and to treat or transfer "equally to the pregnant woman and her unborn child." *Texas*, 2022 WL 3639525, at *20. As such, "EMTALA's equal obligations to the pregnant woman and her unborn child create a potential conflict in duties that the statute does not resolve." *Id.* State law fills this void. *Id.* As such, it does not create a direct conflict (or make compliance with both physically impossible). *Id.* at *21. This alternative view of the statute

---

[4] *E.g., Crossen v. Att'y Gen. of Ky.*, 344 F. Supp. 587, 590 (E.D. Ky. 1972) (three-judge court) (rejecting challenge that statute "does not describe what the probability of a woman's death must be in order to legalize the performance of an abortion" as "nothing more than a guise for the plaintiff's belief that the statute too rigidly regulates.")

MEMORANDUM IN SUPPORT OF STATE OF IDAHO'S MOTION TO RECONSIDER PRELIMINARY INJUNCTION (Dkt. 95) - 8

is not an obstacle to "the full purposes and objectives of Congress": Idaho's policy weighing "however successful or unsuccessful—does not undermine the provision of care to the indigent or uninsured. It does not compel the 'rejection of patients.'" *Id.* at \*22 (citations omitted). In fact, it carries out Congress's purpose. *Id.*

**III.  The Court erred in concluding that the United States met its heavy burden of showing that it is physically impossible to comply with both statutes and in showing that Idaho's law effectively nullified EMTALA.**

**A.  The Court erred in finding that it was physically impossible to comply with both statutes.**

The Court found it was physically impossible to comply with both statutes because: (1) EMTALA requires a physician to provide an abortion, regardless of what state law allows; (2) "Idaho statutory law makes that treatment a crime"; and (3) "[W]here federal law requires the provision of care and state law criminalizes that very care, it is impossible to comply with both laws." Order 19. The Court cited no authority for this proposition. The United States cited *Arrington v. Wong*, 237 F.3d 1066, 1073-74 (9th Cir. 2001), Dkt. 86 at 17, but that case offered no support for this proposition. The United States did not meet its heavy burden of showing it was a "physical impossibility" to comply with both statutes.

The first error in the Court's analysis is that it understands EMTALA to force a state to allow a particular "treatment," even if the State has decided not to allow the "treatment." This is incorrect, as discussed above. The second error is that it concludes it is physically impossible to comply with (1) a law that requires the provision of stabilizing treatment (within the bounds of treatment a physician and hospital can provide) and (2) a state law generally disallowing abortion, subject to two exceptions. But there is no direct conflict between the state law defining the bounds of care that can be provided and a requirement of EMTALA to provide stabilizing treatment within those bounds. Nor is it physically impossible for a physician to comply with both laws. In fact, EMTALA (and Medicare) expects that hospitals and physicians will work within the bounds of what they can do to provide treatment. The requirement in EMTALA, that stabilizing treatment be

provided "within the staff and facilities available at the hospital," embodies this point. *See also* 42 C.F.R. § 489.24(d)(1)(i) ("Within the capabilities of the staff and facilities available").

With respect to the abortions that Idaho allows through exceptions in Section 18-622, the affirmative defenses are not in direct conflict with any EMTALA requirement.[5] The key point is the medical professional can be "legally blameless" for providing an abortion that is within the bounds of Idaho law and that is stabilizing treatment. *See* Order 20. Idaho can choose to criminalize abortions except under three circumstances. *See Dobbs*, 142 S. Ct. at 2284. Its use of an affirmative defense ultimately allowing the medical professional to be "legally blameless," means that it is not impossible to comply with both statutes.

Though the Court faults Idaho's policy of only allowing two exceptions, comparing it to other situations where the Court understands an abortion could be stabilizing treatment, Order 20, this again misunderstands what the State can do (control types of "treatment") as compared to what EMTALA requires: treat or transfer within the bounds of the treatments the State authorizes. And although the Court ultimately asserts that EMTALA is "broader than the affirmative defense on two levels," Order 21, those two "levels" flow from the misunderstanding discussed above—the Court's misunderstanding that EMTALA can require abortions in circumstances that a State law does not allow.

Finally, the Court observes that "neither the State nor the Legislature have convinced the Court that it is possible for healthcare workers to simultaneously comply with their obligations under EMTALA and Idaho statutory law." Order 24. The clear error in this statement, which the State assumes is a summation of the Court's reasoning, is that the Court says it placed the burden on the Defendant to prove the likelihood of success element with respect to impossibility. That is contrary to well-established law requiring that the movant, by a clear showing, carry the heavy

---

[5] Although the Court, Order 20, and United States, Dkt. 86 at 7, see a difference between an exception and an affirmative defense, affirmative defenses deriving from statutes are generally understood to be exceptions to statutory liability. *See, e.g., United States v. Pearson*, 274 F.3d 1225, 1232-33 (9th Cir. 2001); *United States v. Freter*, 31 F.3d 783, 788 (9th Cir. 1994).

burden of establishing they are entitled to the preliminary injunction. *Earth Island Institute v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010).

     **B.     There cannot be a direct conflict because EMTALA's obligations are triggered by the voluntary choice of hospitals.**

There was also error in finding that the United States met its burden to demonstrate physical impossibility for dual compliance and a direct conflict between EMTALA and Idaho Code § 18-622. There can be no impossibility sufficient to enjoin a validly enacted state statute that applies uniformly where EMTALA is not mandatory and not a law of general applicability. Hospitals and providers are not required to serve Medicare patients or to bill Medicare for their services. Those are voluntary choices. The fact that conditions to Medicare funding are codified does not change the fundamental nature that those provisions only apply when voluntarily agreed to by the participant. There is simply no impossibility to comply with two generally applicable laws. In fact, it is impossible to violate EMTALA, even in circumstances identified by the Court, unless a hospital or provider has voluntarily entered into an agreement. To hold otherwise, and find a direct conflict between EMTALA and Idaho law, is to leverage federal policy interpretations to usurp and allow private entities to contract away the sovereign's constitutional interest.

     **C.     Idaho's regulation of abortion does not nullify the anti-patient-dumping purpose of EMTALA.**

EMTALA's express savings clause, 42 U.S.C. § 1395dd(f), begins by saving "any State or local law requirement, *except* to the extent that the requirement directly conflicts with a requirement of [EMTALA]." (emphasis added). This Court must give "great weight to Congress's inclusion" of the savings provision. *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1213 (9th Cir. 2020). Under obstacle preemption, the Court would have to find that the state law essentially nullifies or defeats the federal law's purpose. *Id.* at 1214. The United States did not meet its burden.

The Ninth Circuit concluded that Congress' purpose with EMTALA was to "respond" to a concern "that hospitals were 'dumping' patients who were unable to pay, by either refusing to

provide emergency medical treatment or transferring patients before their conditions were stabilized." *Eberhardt*, 62 F.3d at 1255; *accord Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789 (2d Cir. 1999); *Marshall v. East Carroll Parish Hosp.*, 134 F.3d 319, 322 (5th Cir. 1998) (collecting cases). In contrast, this Court found that "Congress's clear purpose was to establish **a bare minimum of** emergency care that would be available to all people in Medicare-funded hospitals." Order 25 (emphasis added). But the *Arrington* case the Court cites does not use that language, and it's clear that the phrase "adequate emergency medical care" as used in the case is directed at ensuring that persons arriving at an emergency medical department are not dumped— not requiring particular care or its quality.[6] *See Marshall*, 134 F.3d at 322 (noting that required screening "is not judged by its proficiency in accurately diagnosing the patient's illness, but rather by whether it was performed equitably in comparison to other patients with similar symptoms"); *see also Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 351 (4th Cir. 1996) ("Its core purpose is to get patients into the system who might otherwise go untreated . . ."). The Court therefore erred by recharacterizing the purpose of EMTALA.

The Court also erred in finding that Idaho's law stands as an obstacle to EMTALA's purposes. Idaho's policy choice of not allowing the taking of an unborn child's life except as identified by two affirmative defenses does not nullify Congress' purpose of ensuring that all individuals who arrive at an emergency medical department receive care, regardless of their insurance status. Furthermore, the fact that Congress chose not to impose certain sanctions as part of EMTALA, *see* Order 32, is irrelevant given that States can criminalize abortion and thus impose

---

[6] The *Arrington* case cited *Vargas v. Del Puerto Hospital*, 98 F.3d 1202, 1205 (9th Cir. 1996), which in turn cited *Eberhardt*, 62 F.3d at 1255. As discussed above, *Eberhardt* understood EMTALA's purpose was to respond to patient dumping.

MEMORANDUM IN SUPPORT OF STATE OF IDAHO'S MOTION TO RECONSIDER PRELIMINARY INJUNCTION (Dkt. 95) - 12

consequences on those persons who take an unborn child's life outside of the exceptions Idaho recognizes.[7]

Nor do the United States' doctors' speculative statements establish that Idaho Code § 18-622 nullifies EMTALA's anti-patient dumping purpose. The doctors' concern about delaying care is unfounded, given their misinterpretation of Idaho Code § 18-622. *See* Order 32. Likewise, the speculative concerns about recruiting OB/GYNs, *id.* at 34, and whether this will result in "fewer providers performing health and life-saving abortions," *id.*, shows no obstacle to EMTALA, as EMTALA does not regulate hospital staffing. EMTALA specifically recognizes that stabilizing treatment must consider the capabilities of the hospital and its staff. Simply because Idaho's policy choice does not align with the federal government's or individual doctors' policy preferences, does not establish a direct conflict with EMTALA.

The Court is simply wrong to assert that EMTALA had a purpose of establishing that all individuals "have access to a minimum level of emergency care"; i.e., that EMTALA mandates abortions. *Id.* Idaho has chosen a uniform policy of disallowing abortions subject to two exceptions applicable to insured and uninsured persons alike. Idaho's policy choice does not directly conflict with EMTALA; it does not nullify EMTALA's anti-patient dumping purpose.

## IV.    When the Court grants reconsideration, it should find that the United States does not have a likelihood of success on the merits.

Because the federal government cannot force the state to adopt a particular "treatment," this Court should conclude that the United States has no likelihood of success with respect to abortions that Idaho does not allow. With respect to the abortions that Idaho allows—where the

---

[7] As an aside, the Court thought Congress was careful in avoiding sanctions that could result in a decrease in available emergency care. Order 34. Yet, the exact opposite is true; the very same House Judiciary Committee report, *see id.* at 26, recommended "a strong incentive" of "extend[ing] the civil fines provision to the responsible physician, so that the physician, like the hospital, could be fined." H.R. Rep. No. 99-241, pt. 3, at 6 (1985), *reprinted in* 1986 U.S.C.C.A.N. 726, 728. And indeed, physicians are subject to civil penalties of $50,000 per violation. 42 U.S.C. § 1395dd(d)(1)(B).

physician determines in his or her good faith medical judgment that the abortion is necessary to prevent the death of the mother, and in the cases of rape or incest—the Court should conclude there is no direct conflict with EMTALA. Thus, the Court should find the United States has not carried its burden of demonstrating a likelihood of success with respect to these abortions.

## V.   When the Court grants reconsideration, it should find that the other factors support denying the preliminary injunction.

Additionally, when the Court grants reconsideration, the Court should find that there is no irreparable harm to the United States, given that the State has acted within its bounds. *See also* Dkt. 66 at 17-18. The Court should, instead, find that Idaho will suffer irreparable harm if an injunction is issued because the injunction would invade Idaho's sovereign interest in regulating abortion. Likewise, the Court should find that the public interest favors Idaho continuing to regulate within the realm stated by the United States Supreme Court. As noted, Idaho will be harmed by disallowing the effectuation of its policy, even in this limited area. *See id.* at 18-20 (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers)).

## VI.   The district court erred in concluding that the United States had a cause of action.

In response to the State's contention that the United States did not have a cause of action on which to proceed under the Supremacy Clause, the Court concluded that the suit was appropriate because the United States was bringing this action in equity. Order 13. However, the Court erred in failing to address whether Congress' chosen remedial scheme foreclosed such an action. *See* Order 13-14; Dkt. 66 at 7; *see also* Dkt. 80 at 8-9. Any suit in equity is barred here because Congress provided an extensive remedial scheme in which the United States could redress any violation of EMTALA, whether through EMTALA's penalties or through the Medicare Act provider agreement enforcement provisions. 42 U.S.C. § 1395dd(d), 42 U.S.C. § 1395cc(b)(2). The State, like the Legislature, recognizes that *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015) bars this Court from hearing the claim brought by the United States. *See* Dkt. 97-1 at 11-12.

MEMORANDUM IN SUPPORT OF STATE OF IDAHO'S MOTION TO RECONSIDER PRELIMINARY INJUNCTION (Dkt. 95) - 14

## VII.  The district court erred in concluding that the United States had standing.

The Order also erred in finding the United States had standing when the United States lacks the legal authorization to do so and failed to demonstrate an actual injury-in-fact. A federal court has an "independent obligation" to thoroughly examine a plaintiff's standing. *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (citation omitted). This is particularly critical where, as here, standing is "substantially more difficult to establish" because the United States is not the object of the hypothetical government action. *Lujan v. Defenders of Wildlife*, 504 US 555, 562 (1992) (citation omitted). The importance is heightened when the matter pertains to maintaining the foundations and separations of our dual form of government. *United States v. Mattson*, 600 F.2d 1295, 1297 (9th Cir. 1979). However, the Order only gave cursory review to this foundational issue. And a closer examination of the three harms found in the Order show the United States lacks this threshold requirement. The United States conceded it does not assert third-party standing. Dkt. 86 at 3. Thus, it must assert an actual injury traceable to Idaho Code § 18-622.

The Order cited two cases concerning statutes very different from EMTALA to conclude the United States' sovereign interests were harmed. The first case, *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765 (2000), involved the False Claims Act, and addressed a relator's standing. Although not at issue in *Vermont*, the False Claims Act has an express statutory authorization for the United States to bring suit. 31 U.S.C. § 3730. EMTALA does not have that, and so it was error to rely on that case's legally distinct injury.

The second concerned the Immigration and Nationality Act, which preempted the field, and which concerned the United States' significant authority over immigration policy. *Arizona v. United States,* 567 US 387, 394-95, 401, 406, 416 (2012). The Supreme Court did not address standing as part of its analysis. Another vital distinguishing factor is that the INA contains express provisions for the United States to direct and closely supervise the state actors assisting in the enforcement of federal immigration law. *United States v. Arizona*, 641 F. 3d 339, 348-349, 351 (9th Cir. 2011), *rev'd in part on other grounds*, 567 U.S. 387 (2012). None of these elements are present within EMTALA. The Medicare Act expressly disclaimed regulating the practice of

MEMORANDUM IN SUPPORT OF STATE OF IDAHO'S MOTION TO RECONSIDER PRELIMINARY INJUNCTION (Dkt. 95) - 15

medicine and EMTALA disclaimed preempting state regulation except when there is direct conflict. The State does not have a role in assisting in the enforcement of EMTALA; therefore, the United States does not direct or closely supervise the State's activities in this area. And, EMTALA is solely based on Congress's spending authority rather than any constitutional or inherent power. Thus, it is clear error to rely on *United States v. Arizona* to establish an injury to the United States sufficient to create standing in this matter.

It was also clear error to rely on *In re Debs,* 158 U.S. 564 (1895) to find standing in this case based on the "general welfare." Order 15. *Debs* contains the nebulous statement that an "injury to the general welfare, is *often* of itself sufficient to give [every government] a standing in court" even when the government does not have a direct pecuniary harm. 158 U.S. at 584 (emphasis added). Taking this statement in isolation, it appears to give standing in any action to a governmental entity acting in the "general welfare." But even setting aside the problem that this would virtually eliminate boundaries on governmental standing, what is the "general welfare"? This dispute exemplifies this dilemma where Idaho disagrees that the United States' policy preferences with regard to whether and to what extent abortion advances the "general welfare." *Dobbs* established that, in the abortion arena, States are responsible for acting for the general welfare.

Moreover, other courts grappling with this vague statement in *Debs* have not interpreted it in the same generalized manner as it was used in the Order. *See Mattson*, 600 F.2d at 1298-1299 (discussing cases). Specifically, the Ninth Circuit in *Mattson* considered whether the United States had standing to sue based upon several federal acts and programs. *Id.* at 1299, 1299 n.4. It also analyzed a line of cases including *Debs* and found that the United States lacked standing to assert claims where there was no property interest, interference with national security, or burden on interstate commerce. *Id.* at 1298-99. Hence, it found the United States lacked standing to redress a violation of a federal law requiring care and treatment for individuals with developmental disabilities because the United States' interest "ha[d] not extended beyond providing funds for the

various programs and acting in a supervisory role." *Id*. at 1299. Thus, Ninth Circuit precedent prohibits finding that the United States has standing here, where its interest is limited to providing and supervising Medicare funds.

Finally, the third harm used to justify standing is the United States' claimed benefit of its bargain in providing Medicare funds in exchange for emergency medical care treatment, or here, abortion. Order 15. However, EMTALA was enacted after *Roe*. Thus, it is a fallacy that the United States bargained for abortion when abortion was a constitutional right. The United States could not bargain for something that could not be withheld, even if private entities could bargain away the State's Tenth Amendment right.

Ultimately, EMTALA bargained for emergency medical care for patients who were unable to pay for emergency medical care. Although the United States is concerned that a provider will not provide an abortion when, in its opinion, it is the most desirable form of treatment, the record does not suggest that physicians would cease treatment or only observe a patient. Thus, there is no concrete, actual or imminent harm to the United States that a hospital will violate EMTALA by failing to provide treatment, or that such violation cannot be redressed through the authorized remedies.

**VIII.   The district court erred in concluding that the United States' understanding of EMTALA did not invade the State's Tenth Amendment reserved powers and that the interpretation of EMTALA amounted to coercive spending.**

As noted by the Idaho Legislature, too, Dkt. 97-1 at 13-15, the Order erred in disregarding whether United States' interpretation of EMTALA and position in this litigation amounted to unconstitutionally coercing the State into surrendering its sovereign authority to regulate abortion. The Order erred in its conclusion that, because EMTALA was enacted 35 years ago, there could be no issue. Yet, EMTALA was enacted in the *Roe* era, and it is just now that the United States has asserted in this litigation that EMTALA requires, regardless of state law, that Idaho offer abortions.

MEMORANDUM IN SUPPORT OF STATE OF IDAHO'S MOTION TO RECONSIDER
PRELIMINARY INJUNCTION (Dkt. 95) - 17

As the U.S. Supreme Court described, Congress impermissibly puts a gun to the head of states when it threatens a substantial amount of the state's funds unless the state agrees to what the United States wants, calling this "economic dragooning." *NFIB v. Sebelius*, 567 U.S. 519, 581-82 (2012). The Spending Clause and the Tenth Amendment do not allow that action. *Id*. at 582. The *NFIB* Court primarily focused on two elements of the Medicaid expansion at issue. First, if a state did not comply with the new requirements that arose after acceptance and implementation of the Medicaid program, it risked the existing Medicaid funding upon which it relied. *Id*. at 580, 584. The second element was the significance of the financial inducement that was at stake. *Id*. at 582-84. In short, the two principals of an impermissible coercive scheme are (1) imposing new conditions for old money and (2) the significance of the threatened funds.

Here, the power to regulate abortion was returned to the states just months ago. However, it is Medicare funding for Idaho's hospitals that are put at risk unless the State chooses to surrender some of its sovereign power over abortion. The United States' position, fresh within the last two months, is that there is a new requirement under EMTALA: that states authorize abortions any time stabilizing treatment is needed. In other words, when Idaho hospitals accepted the EMTALA conditions, there was no legal tension between what the State could prohibit and what EMTALA required. Now, it is a new condition that the federal government seeks to require—that providers in Idaho be allowed to terminate the lives of unborn children in more circumstances than what the State would otherwise allow. Hence, the federal government has imposed a new post-acceptance condition on the existing Medicare funding for Idaho hospitals that provide emergency care.

Beyond the approximately $1 billion per year in Medicare funding at risk to Idaho's hospitals, *see* Dkt. 17-10 ¶ 6, any hospitals that are excluded from Medicare would not be able to bill for Medicare patients—putting a substantial number of Idahoans at risk of losing access to (or even be able to afford) medical care. Thus, the consequence to Idaho is to either surrender its policy choice regulating abortion, or hospitals and citizenry to lose Medicare benefits on which they rely. These potentially devasting consequences leave Idaho without a legitimate choice.

This is not a situation where Congress uses its taxing and spending authority to merely encourage or incentivize state regulatory and policy choices. *See New York v. United States*, 505 U.S. 144, 166 (1992). Rather, the federal government is using a pre-*Dobbs* legislative scheme to abolish the State's policy choices post-*Dobbs* in the emergency medical care setting. Its position is that hospitals that accept millions in Medicare funds are exempt from State law. The coercive nature of this is unmistakable, not just to the providers and hospitals, but to the State, which is coerced with threats directly to its budget or indirectly to the ability of its citizens to obtain healthcare.

IX.    **The Court erred in concluding that this is an as-applied challenge.**

The Court said the United States "has mounted a textbook, as-applied challenge." Order 17. Yet, the United States sought to have the Court issue injunctive relief regarding all instances where there is EMTALA treatment, not a particular circumstance involving one mother and one set of facts, and that would allow such relief to follow through to non-party hospitals, physicians, and pregnant women in Idaho. What the Court has before it is a facial challenge that must be decided on the facial standard.

Imagine a plaintiff concerned about a referendum petition and the state's public records act (PRA). Imagine the complaint asserts the PRA violates the first amendment as applied to referendum petitions—obviously the PRA's application to other documents is unchallenged. According to this Court's analysis, this is a "textbook, as-applied challenge." But the Court would be wrong. *John Doe No. 1 v. Reed*, 561 U.S. 186 (2010), explains that this type of challenge is indeed a facial challenge, despite having characteristics of an as-applied challenge.

## CONCLUSION

The Court should grant the motion for reconsideration, vacate the preliminary injunction, and on reconsideration deny the United States' motion for a preliminary injunction.

DATED this 21st day of September, 2022.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL


By:   */s/ Brian V. Church*
STEVEN L. OLSEN
MEGAN A. LARRONDO
BRIAN V. CHURCH
Deputy Attorneys General

CLAY R. SMITH
JOAN E. CALLAHAN
Special Deputy Attorneys General

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of September, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

BRIAN DAVID NETTER
DOJ-Civ
Civil Division
brian.netter@usdoj.gov

DANIEL SCHWEI
DOJ-Civ
Federal Programs Branch
daniel.s.schwei@usdoj.gov

JULIE STRAUS HARRIS
DOJ-Civ
Civil Division, Federal Programs Branch
julie.strausharris@usdoj.gov

LISA NEWMAN
DOJ-Civ
Civil Division, Federal Programs Branch
lisa.n.newman@usdoj.gov

ANNA LYNN DEFFEBACH
DOJ-Civ
Civil Division, Federal Programs Branch
anna.l.deffebach@usdoj.gov

CHRISTOPHER A. EISWERTH
DOJ-Civ
Federal Programs Branch
christopher.a.eiswerth@usdoj.gov

EMILY NESTLER
DOJ-Civ
emily.b.nestler@usdoj.gov

*Attorneys for Plaintiff United States of America*

LAURA ETLINGER
New York State Office
of the Attorney General
laura.Etlinger@ag.ny.gov

*Attorney for Amici States*
*California, New York, Colorado, Connecticut,*
*Delaware, Hawaii, Illinois, Maine, Maryland,*

DANIEL W. BOWER
Morris Bower & Haws PLLC
dbower@morrisbowerhaws.com

MONTE NEIL STEWART
Attorney at Law
monteneilstewart@gmail.com

*Attorneys for Intervenors-Defendants*

JAY ALAN SEKULOW
sekulow@aclj.org

JORDAN A. SEKULOW
jordansekulow@aclj.org

STUART J. ROTH
Stuartroth1@gmail.com

OLIVIA F. SUMMERS
osummers@aclj.org

LAURA B. HERNANDEZ
lhernandez@aclj.org

*Attorneys for Amicus Curiae*
*American Center for Law & Justice*

WENDY OLSON
Stoel Rives LLP
wendy.olson@stoel.com

JACOB M. ROTH
Jones Day
jroth@jonesday.com

AMANDA K. RICE
Jones Day
arice@jonesday.com

CHARLOTTE H. TAYLOR

MEMORANDUM IN SUPPORT OF STATE OF IDAHO'S MOTION TO RECONSIDER
PRELIMINARY INJUNCTION (Dkt. 95) - 21

*Massachusetts, Michigan, Minnesota,*
*Nevada, New Jersey, New Mexico, North*
*Carolina, Oregon, Pennsylvania, Rhode*
*Island, Washington, and Washington, D.C.*

Jones Day
ctaylor@jonesday.com

*Attorneys for Amici Curiae*
*The American Hospital Association and the*
*Association of American Medical Colleges*

SHANNON ROSE SELDEN
Debevoise & Plimpton LLP
srselden@debevoise.com

ADAM B. AUKLAND-PECK
Debevoise & Plimpton LLP
Aaukland-peck@debevoise.com

LEAH S. MARTIN
Debevoise & Plimpton LLP
lmartin@debevoise.com

*Attorneys for Amici Curiae American College*
*of Emergency Physicians, Idaho Chapter of*
*the American College of Emergency*
*Physicians, American college of Obstetricians*
*and Gynecologists, Society for Maternal-*
*Fetal Medicine, National Medical*
*Association, National Hispanic Medical*
*Association, American Academy of*
*Pediatrics, American Academy of Family*
*Physicians, American Public Health*
*Association, and American Medical*
*Association*

 *Brian V. Church*
BRIAN V. CHURCH
Deputy Attorney General

MEMORANDUM IN SUPPORT OF STATE OF IDAHO'S MOTION TO RECONSIDER
PRELIMINARY INJUNCTION (Dkt. 95) - 22