BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
BRIAN D. NETTER
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
DANIEL SCHWEI
Special Counsel
LISA NEWMAN
ANNA DEFFEBACH
EMILY NESTLER
**CHRISTOPHER A. EISWERTH (DC Bar No. 1029490)**
Trial Attorneys
JULIE STRAUS HARRIS
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 305-0568
christopher.a.eiswerth@usdoj.gov

*Counsel for Plaintiff*
United States of America

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO
### SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> THE STATE OF IDAHO, <br><br> Defendant, <br><br> SCOTT BEDKE; CHUCK WINDER; the SIXTY-SIXTH LEGISLATURE, <br><br> Intervenors-Defendants. | Case No. 1:22-cv-329-BLW <br><br> **THE UNITED STATES' CONSOLIDATED OPPOSITION TO THE STATE OF IDAHO'S AND THE LEGISLATURE'S MOTIONS FOR RECONSIDERATION [Dkts. 97, 101]** |

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

ARGUMENT ............................................................................................................................ 3

    I.      The Motions For Reconsideration Are Procedurally Improper ...................................... 3

          A.     The State and the Legislature wrongly seek a second bite at the apple. ........... 3

          B.     The Legislature has exceeded the scope of its permitted intervention. ............ 5

    II.     The Motions For Reconsideration Are Meritless. ......................................................... 6

          A.     The Court correctly rejected the threshold arguments. ..................................... 6

                 1.     The United States has standing. ............................................................... 7

                 2.     The United States has a cause of action. .................................................. 9

                 3.     The United States has appropriately challenged § 18-622 as applied to circumstances in which it is preempted. ......................... 11

          B.     The Court correctly concluded that EMTALA preempts § 18-622 to the extent there is a conflict. ................................................................... 11

                 1.     The Court did not err in its interpretation of EMTALA. ................. 12

                 2.     The Court did not err in its interpretation of § 18-622. ..................... 16

                 3.     The Court did not err in its preemption analysis. ................................ 18

           C.     The Court correctly rejected the State's and the Legislature's constitutional arguments. ................................................................................. 19

          D.     The Court appropriately tailored the preliminary injunction. .......................... 23

CONCLUSION ...................................................................................................................... 24

# TABLE OF AUTHORITIES

**CASES**

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
548 U.S. 291 (2006) ................................................................................................................20

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ..................................................................................................................9

*Backlund v. Barnhart*,
778 F.2d 1386 (9th Cir. 1985) ............................................................................................ 3, 15

*Bank of New York Mellon Trust Co. v. Morgan Stanley Mortgage Capital, Inc.*,
No. 11 Civ. 505 (CM) (GWG), 2017 WL 737344 (S.D.N.Y. Feb. 10, 2017) ....................24

*Carroll v. Nakatani*,
342 F.3d 934 (9th Cir. 2003) ............................................................................................... 1, 3

*Carmen v. Breville USA, Inc.*,
No. 1:15-cv-00117, 2017 WL 9882664 (D. Idaho June 22, 2017) ................................. 3, 11

*Christianson v. Colt Indus. Operating Corp.*,
486 U.S. 800 (1988) ..................................................................................................................3

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000) ................................................................................................................11

*Dickinson Frozen Foods, Inc. v. FPS Food Process Sols. Corp.*,
No. 1:17-cv-519-DCN, 2020 WL 2841517 (D. Idaho June 1, 2020)......................................3

*Dobbs v. Jackson Women's Health Organization*,
142 S. Ct. 2228 (2022)....................................................................................................... 19, 20

*Draper v. Chiapuzio*,
9 F.3d 1391 (9th Cir. 1993) ....................................................................................................12

*Edmo v. Corizon, Inc.*,
935 F.3d 757 (9th Cir. 2019) ..................................................................................................24

*Fisher v. Tucson Unified Sch. Dist.*,
652 F.3d 1131 (9th Cir. 2011)..................................................................................................4

*Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*,
959 F.3d 178 (5th Cir.)............................................................................................................21

*Hardy v. N.Y.C. Health & Hosp. Corp.*,
   164 F.3d 789 (2d Cir. 1999) ................................................................................12

*Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*,
   452 U.S. 264 (1981) ............................................................................................22

*In re Debs*,
   158 U.S. 564 (1895) ..............................................................................................7

*Island Airlines, Inc. v. CAB*,
   352 F.2d 735 (9th Cir. 1965) ...............................................................................9

*King v. Smith*,
   392 U.S. 309 ........................................................................................................21

*Kona Enters., Inc. v. Est. of Bishop*,
   229 F.3d 877 (9th Cir. 2000) .........................................................................*passim*

*Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1*,
   469 U.S. 256 (1985) ............................................................................................21

*Minnesota ex rel. Hatch v. United States*,
   102 F. Supp. 2d 1115 (D. Minn. 2000)...............................................................22

*National Federation of Independent Business v. Sebelius*,
   567 U.S. 519 (2012) ......................................................................................20, 21

*New York v. United States*,
   505 U.S. 144 (1992) ............................................................................................20

*Northport Health Servs. of Arkansas, LLC v. HHS*,
   438 F. Supp. 3d 956 (W.D. Ark. 2020)...............................................................21

*Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*,
   960 F.3d 603 (9th Cir. 2020) ...............................................................................6

*Pennhurst State School & Hospital v. Halderman*,
   451 U.S. 1 (1981) ...............................................................................................20

*PhRMA v. Walsh*,
   538 U.S. 644 (2003) ...........................................................................................21

*Quinn v. City of Vancouver*,
   No. C17-5969, 2021 WL 4592381 (W.D. Wash. Oct. 6, 2021) .........................14

*Sabri v. United States*,
   541 U.S. 600 ........................................................................................................15

*Se. Ark. Hospice, Inc. v. Burwell,*
   815 F.3d 448 (8th Cir. 2016) ...........................................................................21

*Sch. Dist. No. 1J, Multnomah Cnty. v. AC & S, Inc.*
   5 F.3d 1255 (9th Cir. 1993) ............................................................................15

*Sequa Corp. v. GBJ Corp.,*
   156 F.3d 136 (2d Cir. 1998) .............................................................................4

*Shaw v. Delta Air Lines,*
   463 U.S. 85 (1983) ...........................................................................................9

*Sherman v. Yahoo! Inc.,*
   997 F. Supp. 2d 1129 (S.D. Cal. 2014) ............................................................4

*Texas v. Becerra,*
   --- F. Supp. 3d ---, No. 5:22-cv-185-H, 2022 WL 3639525 (N.D. Tex. Aug. 23, 2022) ............ 4, 14

*Turner v. Burlington N. Santa Fe R.R. Co.,*
   338 F.3d 1058 (9th Cir. 2003) ..........................................................................3

*United States v. Arizona,*
   641 F.3d 339 (9th Cir. 2011) ............................................................................7

*United States v. Jones,*
   231 F.3d 508 (9th Cir. 2000) ..........................................................................22

*United States v. Mattson,*
   600 F.2d 1295 (9th Cir. 1979) ..........................................................................8

*United States v. Mussari,*
   95 F.3d 787 (9th Cir. 1996) ............................................................................22

*United States v. Tovar,*
   No. 1:13-cr-00115-BLW,2021 WL 5166156 (D. Idaho Nov. 4, 2021) ........................... 1, 3

*Vt. Agency of Nat. Res. v. United States ex rel. Stevens,*
   529 U.S. 765 (2000) ......................................................................................7, 8

*Weeks v. Bayer,*
   246 F.3d 1231 (9th Cir. 2001) ..........................................................................1

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) ...................................................................................19

*Wilder v. Va. Hosp. Ass'n,*
   496 U.S. 498 (1990) ......................................................................................20

iv

**STATUTES**

42 U.S.C. § 1395 ................................................................................................................15

42 U.S.C. § 1395dd .................................................................................................passim

42 U.S.C. § 18023 ..............................................................................................................14

Idaho Code § 18-622 ...............................................................................................passim

Idaho Code § 18-8805 ......................................................................................................23

**REGULATIONS**

42 C.F.R. § 489.24 .............................................................................................................15

**OTHER AUTHORITIES**

151 Cong. Rec. H177 (Jan. 25, 2005) ..........................................................................14

Idaho Supreme Court Hearing on Abortion Laws (Oct. 6, 2022),
   https://www.youtube.com/watch?v=En6SXskpIuo ...........................................17

## INTRODUCTION

The State of Idaho and the Idaho Legislature have filed motions for reconsideration of the Court's order granting a preliminary injunction. *See* Dkt. 97-1 ("Leg. Mot."), 101-1 ("State Mot."). Both motions are procedurally and substantively defective and should be denied.

First, the State and the Legislature have failed to make any argument or present any evidence of the kind necessary to carry their heavy burden on a motion for reconsideration. Such motions seek "an extraordinary remedy" that "should not be granted, absent highly unusual circumstances, unless the district court is presented with newly discovered evidence, committed clear error, or if there is an intervening change in the controlling law." *Carroll v. Nakatani*, 342 F.3d 934, 945 (9th Cir. 2003). Nothing in the State's or the Legislature's motions suggests any of these conditions is present. The Court received extensive briefing, heard argument, and issued a well-reasoned decision. The State and the Legislature merely seek "a second bite at the apple" by rehashing arguments that they previously presented or by offering arguments without any excuse for having failed to raise them before. *United States v. Tovar*, No. 1:13-cr-00115-BLW, 2021 WL 5166156, at *1 (D. Idaho Nov. 4, 2021) (quoting *Weeks v. Bayer*, 246 F.3d 1231, 1236 (9th Cir. 2001)). That is not a proper use of Rule 59. The motions should accordingly be denied.

Second, the Legislature has once again exceeded the scope of its permitted intervention. *See, e.g.*, Dkt. 75 (denying leave to file legal arguments, Dkt. 69).[1] The Court allowed the Legislature to intervene only to present evidence and argument regarding one factual issue, Dkt. 27 at 17-18; the Legislature's motion does not mention that issue but instead repeats arguments that it attempted to raise previously. The Legislature's motion should be denied for this independent reason.

Third, even if the motions were procedurally proper and even if the Court had not already

---

[1] On October 4, 2022, weeks after filing its motion for reconsideration, the Legislature filed a renewed motion to intervene. Dkt. 105. The United States intends to oppose that motion.

rejected their arguments, the motions should still be denied because the Court's order granting the preliminary injunction was correct. The motions' arguments are meritless.

## BACKGROUND

On August 24, 2022, the Court granted the United States' motion for a preliminary injunction, enjoining the State "from enforcing Idaho Code § 18-622(2)-(3) as applied to medical care required by the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd." Dkt. 95 at 38 ("Order"). In doing so, the Court correctly recognized that Idaho Code § 18-622 places physicians treating pregnant patients in certain dire situations "on the horns of a dilemma": when abortion is the medical treatment necessary to save a pregnant patient's life or health, physicians must either violate EMTALA or subject themselves to "indictment, arrest, pretrial detention, loss of … medical license, a trial on felony charges, and at least two years in prison" for violating Idaho's abortion ban. *Id.* at 2. The Court acknowledged that this conflict implicates the sovereign interests of the United States and Idaho, *see id.* at 3, and that leaving the conflict unresolved could cause severe and devastating consequences for pregnant patients in Idaho and the physicians who treat them. The Court rightly determined that this conflict is intolerable and that Idaho law must give way to federal law. *Id.* at 3.

Rather than appealing this order, the Legislature and the State have filed motions for reconsideration. The Legislature—despite being granted permission to intervene only to address a single factual issue—contends that the Court clearly erred, among other reasons, by not adopting the Legislature's "thrice-iterated 'most important point'" from the August 22 oral argument. Leg. Mot. at 3 (Sept. 7, 2022). The State, for its part, raises nine separate grounds for reconsideration. *See* State Mot. (Sept. 21, 2022).

**ARGUMENT**

**I.      The Motions For Reconsideration Are Procedurally Improper**

**A.      The State and the Legislature wrongly seek a second bite at the apple.**

The State and the Legislature have not demonstrated that extraordinary circumstances exist that would justify reconsideration of the Court's order preliminarily enjoining the State from enforcing Idaho Code § 18-622 to the extent it conflicts with EMTALA. They simply reargue their prior positions or use their motions to insert new arguments that they failed to make previously. Neither is proper in this procedural posture.

Motions for reconsideration are "generally disfavored," *Carmen v. Breville USA, Inc.*, No. 1:15-cv-00117, 2017 WL 9882664, at *1 (D. Idaho June 22, 2017), and the moving party must clear a high bar due to "concerns for preserving dwindling resources and promoting judicial efficiency," *Tovar*, 2021 WL 5166156, at *1; *accord Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988); *Carroll*, 342 F.3d at 945. There are thus only four grounds on which a motion for reconsideration can be granted: "(1) to correct manifest errors of law or fact; (2) to consider newly discovered or previously unavailable evidence; (3) to prevent manifest injustice; or (4) to consider an intervening change in the law." *Tovar*, 2021 WL 5166156, at *1 (citing *Turner v. Burlington N. Santa Fe R.R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003)); *accord Dickinson Frozen Foods, Inc. v. FPS Food Process Sols. Corp.*, No. 1:17-cv-519-DCN, 2020 WL 2841517, at *11 (D. Idaho June 1, 2020); *Carmen*, 2017 WL 9882664, at *1. Motions for reconsideration may not "be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona Enters., Inc. v. Est. of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000). "Ultimately, a party seeking reconsideration must show 'more than a disagreement with the Court's decision, and recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden.'" *Carmen*, 2017 WL 9882664 at *1; *accord Backlund v. Barnhart*, 778 F.2d 1386, 1388 (9th Cir. 1985) (motion for

reconsideration properly denied where it relies on arguments already raised in underlying briefing); *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998) ("It is well-settled that Rule 59 is not a vehicle for relitigating old issues ... or otherwise taking a 'second bite at the apple.'").

The State's and the Legislature's motions fail to meet this demanding standard. First, neither identifies any newly discovered evidence or intervening change in the controlling law that would justify reconsideration. The District Court for the Northern District of Texas's decision in *Texas v. Becerra*, --- F. Supp. 3d ---, No. 5:22-cv-185-H, 2022 WL 3639525 (N.D. Tex. Aug. 23, 2022), "as [a] district court opinion, does not qualify as an 'intervening change in the controlling law' sufficient to justify reconsideration." *Sherman v. Yahoo! Inc.*, 997 F. Supp. 2d 1129, 1141 (S.D. Cal. 2014) (citing *Kona*, 229 F.3d at 890)). Moreover, that decision predates the Court's order granting the preliminary injunction. *See* Leg. Mot. at 4 (noting the Court "had the Texas Decision in hand on August 24" (citing Dkt. 94-1 (Aug. 24, 2022) (Exhibit 1 to State of Idaho's Notice of Supplemental Authority)).

Second, while both the State and the Legislature invoke the rhetoric of "manifest injustice" or "clear error," *see, e.g.*, State Mot. at 2, Leg. Mot. at 2, their arguments establish only that they disagree with the Court's decision—not that the Court made an obvious error requiring immediate correction. *See Fisher v. Tucson Unified Sch. Dist.*, 652 F.3d 1131, 1136 (9th Cir. 2011) ("The clear error standard is significantly deferential and is not met unless the reviewing court is left with a 'definite and firm conviction that a mistake has been committed.'"). Indeed, as explained further below, the Court has already considered and rejected many of the State's and the Legislature's arguments. *See* Part II, *infra*. The movants merely restate their same contentions. *See, e.g.*, Leg. Mot. at 3 (referencing "the Legislature's thrice-repeated 'most important point'"). And their efforts to marshal wholly new arguments in a Rule 59(e) motion are likewise inappropriate. *See Kona*, 229 F.3d at 890.

In short, the State's and the Legislature's motions for reconsideration are efforts to re-litigate, on the same terms, what the Court has already decided. These motions conflict with the standards for

and purposes of granting reconsideration. They should be rejected in the interest of conserving resources and promoting efficiency, lest every adverse decision in this case be subject to re-litigation by the losing party.

> **B.    The Legislature has exceeded the scope of its permitted intervention.**

On August 13, 2022, the Court permitted the Legislature to intervene in this case's preliminary-injunction proceedings only for the "limited" purpose of presenting "evidence and argument" on the "sole issue" of "whether 'Relevant Abortions' are 'occurring in Idaho's Medicare-funded emergency rooms.'" Dkt. 27 at 17-18; *see id.* at 17 (permitting intervention (footnote omitted)). In doing so, the Court specifically stated that it would "not allow the State and the Legislature to pursue duplicative strategies during the preliminary-injunction proceedings." *Id.* at 19. The Legislature's motion for reconsideration, however, ignores entirely the issue that it was granted intervention to address, and focuses instead on raising numerous legal arguments that the State advanced—or could have advanced—in its opposition to the United States' motion for a preliminary injunction, *see* Dkt. 66. The Legislature has not been granted permission to expand its role in this case.[2] The Court should accordingly disregard the Legislature's legal arguments as improper.

The scope of the Legislature's permissive intervention in this case is narrow. Dkt. 27 at 17-18. Notably, on August 17, the Legislature tried to expand its role by filing a brief including legal arguments. But the Court "decline[d] … to modify the conditions it imposed in its earlier Order" because "[a]llowing the Legislature to file an additional brief past the deadline of the expedited briefing schedule would unduly prejudice the United States." Dkt. 75. The Legislature's motion for

---

[2] To be sure, nearly a month after filing its motion for reconsideration, the Legislature has now filed a renewed motion to intervene, seeking to expand its role in this case. Dkt. 105. But that motion has not been granted, and as the United States will explain in its opposition to that motion, it should not be granted. And even if that motion were granted going forward, that has no bearing on the issues pertaining to this reconsideration motion—*i.e.*, whether the Court committed a "manifest injustice" or "clear error" in deciding the preliminary injunction motion based on the arguments then before it.

reconsideration is essentially asking the Court to revisit that decision as well—because their reconsideration motion makes many of the same legal arguments the Legislature sought to present in the previously rejected August 17 filing. But a motion for reconsideration is not a vehicle for excusing a party's prior procedural error, *see Kona*, 229 F.3d at 890-91, and certainly there was no "manifest injustice" in the Court issuing a preliminary injunction decision based on the arguments timely raised by the parties authorized to raise them.

The Legislature's motion for reconsideration should thus be rejected as an unapproved expansion of the Legislature's limited role in this case. Its motion does not include the term "Relevant Abortions," let alone purport to offer new evidence or arguments regarding them. The motion instead repeats legal arguments from in its Opposition, *compare, e.g.*, Dkt. 97-1 at 13-15 (Spending Clause), *with* Dkt. 65 at 13, the already-rejected Motion for Leave to File Legal Arguments, *compare, e.g.*, Dkt. 97-1 at 10-11 (major questions doctrine), *with* Dkt. 69-1 at 6-8, and the State's Opposition, *compare, e.g.*, Dkt. 97-1 at 11-12 (cause of action), *with* Dkt. 66 at 7, and raises new contentions without any justification for not having presented them before. The Court acted within the "wide latitude" granted it under Rule 24(b) in limiting the Legislature's role previously, and the Legislature's motion should be denied as "outside [its] permitted scope of intervention." *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603, 619-20 (9th Cir. 2020).

## II.     The Motions For Reconsideration Are Meritless.

The motions—while leveling various accusations against the Court and the United States— do not demonstrate that the Court clearly erred, nor could they. The Court's decision was correct.

### A.     The Court correctly rejected the threshold arguments.

In the Order, the Court properly concluded that three threshold arguments—that the United States lacked standing, that it lacked a cause of action, and that it was bringing an improper facial challenge to § 18-622—were without merit. *See* Order at 13-18. The State and the Legislature

nevertheless re-raise these same points on the same terms. State Mot. at 14-17, 19; Leg. Mot. at 11-12. The Court should summarily reject them.

### 1.    The United States has standing.

The Court rightly found that the United States has standing. Specifically, the Court recognized that the United States has suffered three types of harm: (1) the "United States' sovereign interests are harmed when its laws are violated," Order at 15 (citing *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000); *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *rev'd in part on other grounds*, 567 U.S. 387 (2012)); (2) "the United States may sue to redress widespread injuries to the general welfare," *id.* (citing *In re Debs*, 158 U.S. 564, 584 (1895)); and (3) Idaho's law "deprives [the United States] of the benefits of its bargain" under Medicare, *id.* Further, the Court correctly decided that those harms are traceable to Idaho's actions and would be remedied by the relief sought in this case. *Id.* at 16. The State now faults the Court for giving "only … cursory review to this foundational issue" and contests the United States' standing. State Mot. at 15-17.[3] Its arguments fail.

The Court did not err in its standing determination. *See* State Mot. at 15-16. For starters, the Court correctly recognized that the United States has standing based on harms to its sovereign interests, and efforts to attack that determination by challenging the Court's reliance on *Vermont Agency* and *Arizona* are meritless. The State's focus on the False Claims Act's "express statutory authorization for the United States to bring suit" (which it claims is not present in EMTALA) does not distinguish *Vermont Agency*. *Id.* at 15. In *Vermont Agency*, the Supreme Court did not ground its recognition that the

---

[3] Despite raising numerous "questions" regarding the United States' standing to bring this suit in its original opposition brief, Dkt. 66 at 7-8, the arguments now included in the State's motion for reconsideration were not among them, and in any event, the State affirmatively disclaimed seeking a standing ruling, *id.* at 8. Its reconsideration arguments are based entirely on cases the United States cited in its reply brief. *Compare* State Mot. at 15-17, *with* Dkt. 86 at 2-3. The State never raised its objections at oral argument, nor filed a sur-reply challenging reliance upon these cases. If it were manifest error for the Court to find standing based on the United States' contentions, surely the State would have made that point weeks ago.

United States is injured by violation of its laws in any specific provision of the FCA. 529 U.S. at 771 ("It is beyond doubt that the complaint asserts an injury to the United States—both the injury to its sovereignty arising from violation of its laws (which suffices to support a criminal lawsuit by the Government) and the proprietary injury resulting from the alleged fraud."). And the State's attempt to distinguish *Arizona* on the basis that the Immigration and Nationality Act (INA) gives the United States authority and a role in supervising enforcement of federal immigration law (*see* State Mot. at 15) ignores that EMTALA, too, expressly delegates to the Secretary of HHS the authority to investigate and punish violations of EMTALA. *See* 42 U.S.C. § 1395dd(d)(3). Because the Court correctly concluded that § 18-622 harms the United States' sovereign interests, and given that no party has challenged causality or redressability, the Court need not proceed further to satisfy itself of subject-matter jurisdiction.

In any event, the State's attacks on the United States' second and third bases for standing fare no better. The State's claim that *United States v. Mattson*, 600 F.2d 1295 (9th Cir. 1979), precludes any assertion of standing here based on *In re Debs*, is misguided. *Mattson* itself explains that *In re* Debs and numerous other decisions recognize the United States' standing to "protect the public at large" where "a violation of some congressional enactment" interferes with a property interest, national security, interstate commerce, or other important federal interest. 600 F.2d at 1298-99. The Court in *Mattson* concluded that the statutes relied upon by the United States in that case were insufficient because the government had made "no assertion" of such interests, the relevant statutes specifically contemplated state (as opposed to federal) enforcement systems, and Congress had expressly refused to authorize the Attorney General to bring suits involving civil rights violations of the sort alleged. *Id.* at 1299-1300. Here, § 18-622 itself creates the conflict with federal law (in addition to burdening interstate commerce and affecting the United States' agreement to provide federal Medicare funds); Congress included an express preemption clause in EMTALA; and the State points to no similar history of

Congress rejecting an express authorization. This Court was correct to recognize that *In re Debs* and its progeny support the United States' standing. *See Island Airlines, Inc. v. CAB*, 352 F.2d 735, 744 (9th Cir. 1965) ("The United States may lawfully maintain suits in its own courts to prevent interference with the means it adopts to exercise its powers of government and to carry into effect its policies.").

The State's claim concerning the United States' third injury (Idaho depriving the United States of the benefit of its bargain with respect to Medicare funding) is also meritless. The State argues that the United States could not have bargained for the inclusion of abortion among EMTALA's necessary stabilizing treatments when EMTALA was enacted, because "abortion was a constitutional right" at the time and thus "could not be withheld" under *Roe*. State Mot. at 17. But the State misunderstands the nature of the United States' bargain under EMTALA. Even though abortion was recognized as a constitutional right at the time EMTALA was enacted, it did not follow that Medicare-funded hospital emergency departments would be obligated to provide abortion as a stabilizing treatment when an emergency medical condition is identified. It was EMTALA that required, in certain circumstances, physicians at Medicare-funded hospitals to offer all treatment necessary to stabilize the patient, regardless of the patient's ability to pay, including abortion care. *See* Order at 19-20. Section 18-622 now undermines that bargain. Accordingly, the State has provided no basis for reconsidering the Court's finding that the United States has demonstrated standing.

### 2. The United States has a cause of action.

The Court also correctly concluded that "the United States has a cause of action because it seeks to halt Idaho's allegedly unconstitutional encroachment on" a federal statute, EMTALA, and "is not seeking to enforce federal law against would-be violators." Order at 13-14 (relying on *Shaw v. Delta Air Lines*, 463 U.S. 85 (1983), and *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015)). The State and the Legislature now claim that this determination was clear error. State Mot. at 14; Leg.

Mot. at 11-12. Their arguments fail.

The Legislature's arguments, to start, are outside the scope of its permitted intervention, as they are not related to the "sole" factual issue on which it was allowed to participate, *see* Part I.B, *supra*, and even then, the Legislature did not advance any argument regarding a cause of action as part of its "unique legal arguments" brief, *see* Dkt. 69-1, or at oral argument, *see generally* Hr'g Tr., Dkt. 96. A motion for reconsideration is not a proper vehicle for advancing new arguments. *Kona*, 229 F.3d at 890. Regardless, this claim that "the Court d[id] not grapple with how *Armstrong* precludes this case," Leg. Mot. at 12; *accord* State Mot. at 14, ignores that the Court distinguished the instant action from one in which a private party seeks "'to enforce federal laws against the States,'" *see* Order at 14 (the United States "is not seeking to enforce federal law against would-be violators"). The Legislature also mischaracterizes the United States as asserting a cause of action directly under the Supremacy Clause, when the United States has previously explained that it is advancing an equitable cause of action— exactly of the type recognized in *Armstrong*. *See* Dkt. 86 at 4. And neither the State nor the Legislature has any meaningful response to the ample authority recognizing the United States' ability to sue in equity to challenge state laws that violate the Supremacy Clause. *See id.* at 4 n.1 (collecting cases).

In its motion, the State repeats its argument that EMTALA's remedial scheme precludes a suit in equity. State Mot. at 14. The State—as it did with standing—hinted at this contention in its opposition to the motion for a preliminary injunction, *see* Dkt. 66 at 7, but expressly disclaimed seeking a ruling upon it, *id.* In any event, the Court correctly rejected this argument when it recognized that the United States is "not seeking to enforce federal law against would-be violators." Order at 14. Indeed, the State continues to overlook the fundamental differences between this action and the types of enforcement contemplated by EMTALA, which highlights why remedial preclusion—against the United States, no less—would be inappropriate. *See* Dkt. 86 at 4.

**3.    The United States has appropriately challenged § 18-622 as applied to circumstances in which it is preempted.**

The Court correctly concluded that the United States had brought an as-applied challenge to § 18-622 because it seeks to enjoin the law only to the extent it conflicts with EMTALA. Order at 16-18. The State reasserts its prior view that the United States' challenge is facial, State Mot. at 19, but it offers no explanation beyond its original argument as to how the Court's decision was clear error. That is insufficient on a motion for reconsideration, *Carmen*, 2017 WL 9882664 at *1, and in any event, the Court concluded that the United States was still likely to succeed on the merits even if it reviewed the claims under the facial standard, Order at 18—a finding the State's motion does not address. The State has failed to carry its burden of demonstrating anything manifestly incorrect in this analysis.

**B.    The Court correctly concluded that EMTALA preempts § 18-622 to the extent there is a conflict.**

The Court determined that the United States is likely to succeed on the merits because § 18-622 is preempted by federal law to the extent it directly conflicts with EMTALA. Applying basic Supremacy Clause and preemption principles, the Court correctly analyzed the requirements of both statutes and then determined that they conflict. First, the Court recognized that "[i]mpossibility preemption occurs, straightforwardly, 'where it is impossible for a private party to comply with both state and federal law,'" Order at 19 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000)), and determined that because EMTALA "requires the provision of care and [§ 18-622] criminalizes that very care, it is impossible to comply with both laws." *Id.* Second, the Court recognized that "obstacle preemption exists where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *id.* at 24-25 (quoting *Crosby*, 530 U.S. at 373), and determined that "even if it were theoretically possible to simultaneously comply with both laws," § 18-622 would frustrate EMTALA's "clear purpose [which is] to establish a bare minimum of

emergency care that would be available to all people in Medicare-funded hospitals." *Id.* at 25.[4]

Nothing in the State's or the Legislature's motions calls the Court's analysis into question, let alone establishes that it committed manifest error in granting the injunction. The Court did not "misunderstand" the terms of EMTALA or § 18-622. Rather, the Court's interpretation of both EMTALA and § 18-622—and, correspondingly, the Court's determination that the statutes conflict— is consistent with the statutes' plain language, history, and common sense.

### 1.    The Court did not err in its interpretation of EMTALA.

The Court correctly recognized that EMTALA requires covered hospitals to offer stabilizing treatment for patients with emergency medical conditions who present to a hospital's emergency department, Order at 5, and that, in some cases, the stabilizing treatment necessary for a pregnant patient with an emergency medical condition is a procedure that would be considered an abortion under Idaho law, *id.* at 19. The State and the Legislature have failed to demonstrate that conclusion is clearly erroneous.

First, contrary to the motions' claims, Congress's inclusion of "unborn child" in EMTALA's definition of "emergency medical condition" does not undermine the Court's conclusion that an abortion could be the stabilizing treatment physicians must offer under EMTALA. *See* State Mot. at 8; Leg. Mot. at 2-7. As an initial matter, while the Legislature now calls it the "most important point," Leg. Mot. at 3, neither the State nor the Legislature actually presented this argument in their

---

[4] The Court also correctly recognized that, "[i]n EMTALA, Congress indicated its intent to displace state law through an express preemption provision." Order at 19. As explained in the preliminary injunction briefing, EMTALA's preemption provision only preserves state laws to the extent that they do not directly conflict with EMTALA's requirements. Dkt. 17-1 at 5 (quoting § 1395dd(f)). Consistent with the Court's Order, case law makes clear that, for purposes of EMTALA, "[a] state statute 'directly conflicts' with federal law in either of two cases: first, if 'compliance with both federal and state regulations is a physical impossibility,' or second, if the state law is 'an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Draper v. Chiapuzio,* 9 F.3d 1391, 1393 (9th Cir. 1993) (citations omitted) (per curiam); *accord Hardy v. N.Y.C. Health & Hosp. Corp.,* 164 F.3d 789, 795 (2d Cir. 1999).

preliminary injunction briefing, and the Legislature raised it only for the first time at oral argument even though the relevant information—*i.e.*, the statutory language—was available all along. *See* Hr'g Tr. at 59-60; *see also* Dkt. 17-1 at 10-14 (addressing this issue and the "unborn child" statutory language). In addition, this argument contradicts the positions of the State and the Legislature (and their declarants) in their prior oppositions, in which they acknowledged that, under EMTALA, an abortion could sometimes constitute stabilizing treatment. *See, e.g.*, Dkt. 66 at 12-13 ("the United States merely identifies circumstances when stabilizing treatment necessitated by EMTALA includes an abortion"); Dkt. 65 at 10 (""[I]n the emergency situations ... anticipated by EMTALA, the subordination of the mother's life and health in favor of the unborn child by a physician has not and will not occur."" (quoting French Decl., Dkt. 71-5 ¶ 9)). Motions for reconsideration are not the appropriate vehicle for raising new arguments, *see, e.g.*, *Kona*, 229 F.3d at 890, especially arguments that contradict prior positions.

Regardless, the State's and the Legislature's new interpretation of EMTALA is wrong. EMTALA's definition of "emergency medical condition"—which includes conditions that "plac[e] the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy"—does not give States the option to disregard the health of pregnant patients and deny them life- or health-saving care. 42 U.S.C. § 1395dd(e)(1)(A). Rather, that provision ensures that a hospital's EMTALA obligations extend to the situation where stabilizing treatment is needed to safeguard the health of the "unborn child" but not the pregnant patient. *See* Dkt. 17-1 at 13. The State and the Legislature point to nothing in EMTALA's language that suggests a pregnant patient's health may be treated as secondary, and thus allowed to deteriorate, under circumstances in which abortion is the necessary stabilizing treatment. On the contrary, EMTALA requires—without any such qualification—stabilizing a patient's emergency medical condition with "treatment 'necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely

to result from or occur during' a discharge or transfer to another facility," Order at 5 (quoting 42 U.S.C. § 1395dd(e)). To the extent a form of stabilizing treatment may place both a patient's life or health and her pregnancy at risk, EMTALA's text leaves any balancing of that consideration to the pregnant patient—who may decide, after weighing the risks and benefits, whether to accept or refuse the treatment. *See id.* § 1395dd(b)(2) (acknowledging that "the individual" with an emergency medical condition, after being informed "of the risks and benefits" of treatment, may "refuse[] to consent to the . . . treatment").[5]

Second, the Court did not "misunderstand[] EMTALA to force a state to allow 'a particular 'treatment.'" State Mot. at 3, 9. Rather, the Court correctly interpreted EMTALA—consistent with its express preemption provision—to preclude a State from imposing penalties on *any* form of stabilizing treatment offered by a covered hospital's emergency department in circumstances covered by EMTALA, including, but not limited to, abortion when medically necessary. Order at 19. Under EMTALA, once a physician identifies that a pregnant individual presenting to the hospital emergency department suffers from an emergency medical condition, that individual must be offered "such treatment as may be required to stabilize the medical condition." 42 U.S.C. § 1395dd(b)(1)(A); *see also*

---

[5] The State and the Legislature invoke *Texas v. Becerra* in support of their argument that an "unborn child's" health can be prioritized over the health of a pregnant patient under EMTALA. State Mot. at 4; Leg. Mot. at 4-7. That case involves different claims, challenging different governmental actions and concerning different state laws. To be sure, the *Texas* Court held that "EMTALA leaves unresolved the conflict between emergency medical conditions that threaten the health of both the pregnant woman and the unborn child." 2022 WL 3639525, at * 23. But that determination is not binding on this Court and thus cannot render this Court's different view manifest error. *See Quinn v. City of Vancouver*, No. C17-5969, 2021 WL 4592381, at *1 (W.D. Wash. Oct. 6, 2021) ("It is not manifest error to decline to follow non-binding precedent."). Moreover, the *Texas* decision is incorrect for several reasons. For example: (1) it improperly discounts the role Congress intended patient choice to play in deciding which stabilizing treatments to accept, as discussed above; (2) it wholly ignored several statutory indications, including in the Affordable Care Act and the history of the Weldon Amendment, that Congress intended EMTALA to require physicians to offer abortion when it is the stabilizing treatment, *see* Dkt. 17-1 at 11-12 (citing 42 U.S.C. § 18023; 151 Cong. Rec. H177 (Jan. 25, 2005) (statement of Rep. Weldon)); and (3) its statutory analysis—that state law, rather than EMTALA, governs when abortion is available, *Texas*, 2022 WL 3639525, at *22—is contrary to the structure and purpose of EMTALA, *see* Order at 26-27.

42 C.F.R. § 489.24(a)(1)(ii) ("If an emergency medical condition is determined to exist," the hospital must "provide any necessary stabilizing treatment[.]"). Because a physician may determine that, in some cases, abortion is the necessary stabilizing treatment for an emergency medical condition—as both the State and Legislature previously acknowledged—EMTALA's plain text requires that treatment be offered under those circumstances. Dkt. 17-1 at 10-11. The Court, thus, aptly interpreted the text of EMTALA to require physicians to offer all forms of treatment—including, but not limited to, abortion—when it is determined to be the necessary stabilizing care. Order at 19. Nothing in EMTALA creates a different rule for any particular type of treatment (abortion or otherwise).[6]

Finally, the State's and the Legislature's remaining points merely rehash the same arguments that were presented in their preliminary injunction briefing, which the Court has already rejected, and which are therefore improper for a motion for reconsideration. *See, e.g.*, *Backlund*, 778 F.2d at 1388. For example, the State argues that "mandating abortions as medical care is an affront to the State's sovereignty and police power." State Mot. at 4; *compare* Dkt. 66 at 15-16 (making the same argument). But the Court already considered that argument and correctly determined that this case is about "a far more modest issue—whether Idaho's criminal abortion statute conflicts with a small but important corner of federal legislation." Order at 3; *see also Sabri v. United States*, 541 U.S. 600, 608 n* (2004) (federal spending power applies with equal force when Congress legislates "in an area historically of state concern"). The State also argues again that EMTALA's purpose is limited solely to preventing

---

[6] Because the Court's interpretation of EMTALA is one of general application, it does not run afoul of 42 U.S.C. § 1395. *See* State Mot. at 4; Leg. Mot. at 8-9. Section 1395 provides that nothing in the relevant section of the Social Security Act (which includes EMTALA) shall be construed to direct, prohibit, or favor a particular treatment or diagnosis or influence the judgment of medical professionals. 42 U.S.C. § 1395. EMTALA, as interpreted by the Court, does just the opposite—it respects and preserves medical professionals' judgment about what stabilizing treatment is necessary to treat emergency medical conditions. In any event, because the State and Legislature failed to raise Section 1395 in their preliminary injunction briefing, their new argument is not properly before the Court at the reconsideration phase. *See Sch. Dist. No. 1J, Multnomah Cnty. v. AC & S, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993).

the dumping of patients who are unable to pay. State Mot. at 11-13; *compare* Dkt. 66 at 15 (making the same argument). But the Court already rejected that argument too, concluding that "Congress's clear purpose was to establish a bare minimum of emergency care that would be available to all people in Medicare-funded hospitals." Order at 25-27. Defendants point to no flaw in the Court's reasoning, and their continuing disagreement with the Court's rejection of their legal arguments cannot be recast as "clear error."

### 2.      The Court did not err in its interpretation of § 18-622.

The State also argues that the Court "misunderstood" Idaho's abortion ban by "erroneously viewing the affirmative defense in Idaho Code § 18-622(3) as unclear and ambiguous." State Mot. at 6-9. However, Idaho's law criminalizes all abortions (no matter how medically necessary or life-saving and no matter whether the pregnancy is viable) and allows medical professionals to avoid criminal liability only by proving an affirmative defense that is narrower than what EMTALA requires. The State's arguments about the scope of the affirmative defense are both wrong and beside the point.

As a threshold matter, any arguments about the terms of § 18-622's affirmative defense are a red herring. It is undisputed that § 18-622 contains no textual exception to the so-called "crime of criminal abortion." As the Court recognized, an affirmative defense is not an exception and, by definition, cannot meet the requirements of EMTALA. Order at 20. The Court explained:

> An affirmative defense is an excuse, not an exception. The difference is not academic. The affirmative defense admits that the physician committed a crime but asserts that the crime was justified and is therefore legally blameless. And it can only be raised after the physician has already faced indictment, arrest, pretrial detention, and trial for every abortion they perform. So even though accused healthcare workers might avoid a conviction, the statute still makes it impossible to provide an abortion without also committing a crime.

Order at 20 (citation omitted). The Court's determination that § 18-622 makes it impossible for physicians to provide *any* medically necessary abortion care without facing "indictment, arrest, pretrial detention, and trial for every abortion they perform" was grounded in statutory text, settled legal

principles, and common sense. *Id.* By contrast, the State cites nothing that even remotely calls these legal and practical realities into question. *See* State Mot. at 10 (asserting without citing any authority that "[t]he key point is the medical professional can be 'legally blameless'").

In any event, the State is also wrong to argue that the Court misunderstood the scope of the Idaho law's affirmative defense. The Court correctly found that § 18-622(3)(a)(ii) is narrower than EMTALA because it applies only when "necessary to prevent the death of the pregnant woman." Order at 20-21. First, the Court recognized that § 18-622 does not provide any defense when "the patient's condition will result in serious impairment to bodily functions, serious dysfunction of any bodily organ or part, or serious jeopardy to the patient's health," which is a form of "emergency medical condition" encompassed by EMTALA. Order at 19-20 (citing 42 U.S.C. § 1395dd(e)(1)). The State does not dispute this fact,[7] which alone is sufficient to show that § 18-622's affirmative defense conflicts with EMTALA and is thus preempted.

Second, the Court recognized that the language of § 18-622(3)(a)(ii) is narrower than EMTALA even in situations where the pregnant patient's life is threatened. While Idaho's affirmative defense is limited to abortions that are "*necessary* to prevent [] death," (emphasis added), EMTALA requires stabilizing care (including abortion) when the patient's condition "*could reasonably be expected*" to place a person's health or life "in serious jeopardy" absent treatment. 42 U.S.C. § 1395dd(a) (emphasis added); *see also* Dkt. 86 at 10-13 (explaining that the difference in language between Idaho's affirmative defense and EMTALA is material because a condition that threatens a patient's life or places it in jeopardy may not *necessarily* result in death absent an abortion). Based on differences in the statutory text, the Court reasonably found that EMTALA's language calls for stabilizing treatment

---

[7] On October 6, 2022, during oral argument before the Supreme Court of Idaho in *Planned Parenthood Great Northwest v. Idaho*, No. 49615, 49817, 49899, the State confirmed that § 18-622's affirmative defense does not cover abortions provided to protect a pregnant person's health. *See* Idaho Supreme Court Hearing on Abortion Laws (Oct. 6, 2022), *available at* https://www.youtube.com/watch?v=En6SXskpIuo (1:18:00 to 1:19:36).

"when harm is probable" (*i.e.*, "reasonably expected"), whereas the Idaho affirmative defense is much narrower in scope and requires that the patient's death "be imminent or certain absent an abortion" (*i.e.*, "necessary to prevent … death"). Order at 20-21. In other words, contrary to the State's assertions, the Court did not "err[] in reading an imminency requirement into Idaho Code § 18-622," nor did it "hint[] at whether the statute was vague." State Mot. at 7-8. Rather, the Court's interpretation was based on the plain language of § 18-622, and the obvious difference when compared to the broader language of EMTALA. There was nothing erroneous about the Court's approach.

### 3. The Court did not err in its preemption analysis.

Given that EMTALA requires physicians at Medicare-funded hospitals to offer stabilizing care to patients presenting to a hospital's emergency department with an identified emergency medical condition, including in some circumstances abortion, and that § 18-622 criminalizes providing any abortions (as broadly defined by Idaho law), the Court rightly concluded that it is impossible for a physician to comply with both federal law (and their oaths) and § 18-622. Order at 19. Likewise, the Court was correct to find that even if it were theoretically possible to comply with federal and state law, § 18-622 would present a "plain obstacle to EMTALA" and is thus preempted. Order at 34. The State's argument to the contrary is meritless.

The State claims that the Court flipped the burden of proof by requiring the State and the Legislature to demonstrate that it is "'possible for healthcare workers to simultaneously comply with their obligations under EMTALA and Idaho statutory law.'" State Mot. at 10 (quoting Order at 24). The State misstates the Court's opinion. In reality, the United States demonstrated that EMTALA requires physicians to offer abortion (as Idaho has defined that term) as a stabilizing treatment in certain situations, such as when discovering an ectopic pregnancy, and that Idaho law—by its plain terms—criminalizes that treatment. *See* Order at 19. The State and the Legislature conceded at oral argument that there are "'conceptual textual conflicts' between § 18-622 and EMTALA." Order at 23-

24. But the Legislature nevertheless asked the Court to look to atextual considerations that would show there were no real conflicts, and the Court found those atextual considerations unpersuasive. *Id.* Far from flipping the burden, the Court simply refused to ignore the plain language of the statute. That is not clear error.

    **C.**    **The Court correctly rejected the State's and the Legislature's constitutional arguments.**

In their motions, both the State and the Legislature present several pages of argument that the Court's interpretation of EMTALA violates the major questions doctrine and various constitutional limits, including Article III, the Tenth Amendment, and limitations on Congress's authority under the Spending Clause. State Mot. at 17-19; Leg. Mot. at 13-16. The Court expressly found that the State failed to properly raise these arguments. Order at 14 ("The State cannot challenge the constitutionality of a 35-year-old federal statute in a passing footnote."). And as discussed above, the Court did not permit the Legislature to make legal arguments. *See* Dkt. 27 at 17-18; Dkt. 75. But even if these arguments had been adequately asserted, they lack merit and provide no basis to upset the Court's decision.

First, the Legislature (and, in a footnote, the State) contend that the United States' claims under EMTALA violate the major questions doctrine. *See* Leg. Mot. at 10-11; State Mot. at 3 n.1. That doctrine, as the Legislature's cited authorities make clear, applies "in certain extraordinary cases" where there is affirmative *agency* regulatory action involving "major policy decisions." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022). As the United States noted in its reply brief in support of the motion for a preliminary injunction, this case does not involve agency action. Dkt. 86 at 6. The doctrine is therefore irrelevant and provides no basis for revisiting the Court's decision.

Second, the Legislature claims that the Court's Order somehow violates Article III of the Constitution because it purportedly conflicts with the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). Leg. Mot. at 12-13. But the issue in *Dobbs* was

whether Mississippi's ban on abortions after the fetus reached a gestational age of 15 weeks (excepting medical emergencies and cases of a severe fetal abnormality) violated the 14th Amendment's Due Process Clause, 142 S. Ct. at 2243, and the Court held that it did not because abortion was "not a fundamental constitutional right," *id.* at 2283. Neither EMTALA nor § 18-622 was at issue in that case, and the Court made no ruling on any federal statute. As this Court appropriately recognized, "*Dobbs* did not overrule the Supremacy Clause," and thus, "even when it comes to regulating abortion, state law must yield to conflicting federal law." Order at 38.

Third, the Legislature and the State, relying on *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012) (*NFIB*), and *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981), argue that EMTALA constitutes a condition on federal funding that is both coercive and retroactive. But under the referenced cases, EMTALA is both permissible and unexceptional.

"'[U]nder Congress['s] spending power, [it] may attach conditions on the receipt of federal funds,' as long as '[s]uch conditions ... bear some relationship to the purpose of the federal spending.'" *New York v. United States*, 505 U.S. 144, 167 (1992) (citation omitted). "Congress has broad power to set the terms on which it disburses federal money to the States." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst*, 451 U.S. at 17.

Medicare is a massive federal program that imposes many conditions with which participants must comply in order to receive funds. Even where, unlike here, the Medicaid program has conditioned federal funding on the States' agreement to certain conditions, courts have upheld those conditions absent the extraordinary (indeed, to date, the single) circumstance where the offer of federal funding is coercive. *See, e.g.*, *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990) ("Although participation in the [Medicaid] program is voluntary, participating [s]tates must comply with certain requirements

imposed by the Act and regulations promulgated by the Secretary."). Congress stands on no less solid ground when it offers federal funding to private entities (rather than States) in exchange for those private entities' agreement to abide by certain conditions on that funding, such as an agreement to provide necessary stabilizing treatment to patients presenting to hospital emergency departments with emergency medical conditions. *See, e.g., Se. Ark. Hospice, Inc. v. Burwell,* 815 F.3d 448, 450 (8th Cir. 2016) (holding that hospice provider's voluntary participation in Medicare "forecloses the possibility that the statute could result in an imposed taking of private property which would give rise to the constitutional right of just compensation"); *Northport Health Servs. of Arkansas, LLC v. HHS*, 438 F. Supp. 3d 956, 970–71 (W.D. Ark. 2020).[8]

The State and Legislature nevertheless argue on the basis of *NFIB* that putting "Medicare funding for Idaho's hospitals ... at risk unless the State chooses to surrender some of its sovereign power over abortion," State Mot. at 18, *see also* Leg. Mot. at 14-15, is "a gun to the head," State Mot. at 18, Leg. Mot. at 15 (quoting *NFIB*), to compel compliance. But in *NFIB*, the plurality reasoned that Congress had coerced the States by conditioning all funding for one program, the traditional Medicaid program, on the States' agreement to participate in a new, second program, the expansion of the program to new populations. Here, neither Congress nor anyone else has "enlist[ed] the States in a

---

[8] The State's concession that participation in Medicare is wholly voluntary, State Mot. at 11, lays bare the fallacy of their argument that Medicare conditions are coercive. Nor is the voluntary nature of Medicare relevant to the preemption analysis: should an entity voluntarily participate in the Medicare program, it does so subject to the federal laws governing that program which, like all federal laws, preempt any state law *to the extent of any conflict*. EMTALA's status as Spending Clause legislation likewise does not preclude a preemption claim against a conflicting state law. *Cf. generally* Amicus Br. of Ind., Dkt. 87-2. "There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and that any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid." *King v. Smith,* 392 U.S. 309, 333 n. 34 (1968); *see also PhRMA v. Walsh,* 538 U.S. 644 (2003) (implicitly rejecting contention that plaintiff could not bring preemption claim under federal Spending Clause legislation); *Lawrence Cnty. v. Lead-Deadwood Sch. Dist. No. 40-1,* 469 U.S. 256 (1985) (holding that state law is preempted to the extent it interferes with third parties' compliance with conditions attached to federal funds).

new health care program," *NFIB*, 567 U.S. at 584. *See Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 184 (5th Cir.), *cert. denied*, 141 S. Ct. 901 (2020). Rather, the United States is simply seeking to affirm that the existing provisions of the Medicare statute persist in the face of a new conflicting state law. The State's and the Legislature's suggestions that the United States advances a "new requirement under EMTALA," State Mot. at 18, *see* Leg. Mot. at 15, again misunderstands what EMTALA has always required. *See supra* II.B.1

For similar reasons, the State's and the Legislature's assertion that "the federal government has imposed a new post-acceptance condition on the existing Medicare funding for Idaho hospitals that provide emergency care," State Mot. at 18; *see also* Leg. Mot. at 15, cannot be seriously countenanced. Congress passed EMTALA, in its current form, 36 years ago. Each Idaho hospital and provider that participates in Medicare today has repeatedly recommitted to abiding by the conditions of Medicare, including EMTALA, each time it has renewed it certification since then. Wright Decl., Dkt. 17-9 ¶¶ 4-6. And EMTALA has long been understood to require stabilizing treatment, which sometimes might include abortion, as both the State and the Legislature (and their declarants) previously acknowledged.

Finally, the State's and the Legislature's arguments based on the Tenth Amendment, State Mot. at 18, Leg. Mot. at 15-16, fare no better in identifying error in the Court's decision. The Supreme Court "long ago rejected the suggestion that Congress invades areas reserved to the States by the Tenth Amendment simply because it exercises its authority under the Commerce Clause [or, as here, the Spending Clause] in a manner that displaces the States' exercise of their police powers." *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 291 (1981). In fact, "if Congress acts under one of its enumerated powers, there can be no violation of the Tenth Amendment." *United States v. Jones*, 231 F.3d 508, 515 (9th Cir. 2000) (citing *United States v. Mussari*, 95 F.3d 787, 791 (9th Cir. 1996)). And "Congress' authority under the Spending Clause to choose how to fund the Medicare program

is not in doubt." *Minnesota ex rel. Hatch v. United States*, 102 F. Supp. 2d 1115, 1123 (D. Minn. 2000), *aff'd sub nom. Minnesota Senior Fed'n, Metro. Region v. United States*, 273 F.3d 805 (8th Cir. 2001). Accordingly, any challenge to EMTALA grounded in the Tenth Amendment must fail.

### D.   The Court appropriately tailored the preliminary injunction.

The Court enjoined § 18-622 only to the extent it conflicts with EMTALA—and nothing more. The State is wrong to argue that the preliminary injunction "goes beyond the scope of the challenge to Idaho Code § 18-622." State Mot. at 2. While the State cherry picks certain language from the Court's order, the most straightforward reading of the injunction makes clear that it is limited to the claims at hand.[9]

First, the Court repeatedly made clear that the only issue addressed by its Order is whether § 18-622 "must include a carve-out for EMTALA-mandated care." Order at 18; *see also, e.g.*, *id.* at 3 ("[T]he Court is called upon to address a far more modest issue—whether Idaho's criminal abortion statute conflicts with a small but important corner of federal legislation."); *id.* ("During the pendency of this lawsuit, the State of Idaho will be enjoined from enforcing Idaho Code § 18-622 to the extent that statute conflicts with EMTALA-mandated care."); *see also* Hr'g Tr. at 40 ("I certainly won't enjoin anything more than what the United States has asked, which is enjoin enforcement in the context where EMTALA would require medical treatment.").

Second, the terms of the Court's injunction reflect the limited nature of the injunctive relief granted. The Order states:

> The Court hereby restrains and enjoins the State of Idaho . . . **from enforcing Idaho Code § 18-622(2)-(3) as applied to medical care required by ... (EMTALA), 42 U.S.C. § 1395dd. Specifically**, the State of Idaho . . . [is] prohibited from initiating

---

[9] The State offers four specific theories about how the injunction is overbroad, including that it: (1) extends abortion access beyond emergency medical care; (2) applies beyond medical providers or hospitals subject to EMTALA; (3) covers forms of liability not contemplated by EMTALA; or (4) bars the State from enforcing any other statutes, including its Fetal Heartbeat Act, Idaho Code § 18-8805. *Id.* at 2-3. All of these concerns are grounded in the same overarching misapprehension that the injunction reaches beyond § 18-622 and beyond EMTALA, which it does not.

any criminal prosecution against, attempting to suspend or revoke the professional license of, or seeking to impose any other form of liability on, any medical provider or hospital based on their performance of conduct that (1) is defined as an "abortion" under [the Idaho Code] but that is necessary to avoid (i) "placing the health of" a pregnant "in serious jeopardy"; (ii) a "serious impairment to bodily functions" of the pregnant patient; or (iii) a "serious dysfunction of any bodily organ or part" of the pregnant patient, **pursuant to 42 U.S.C. § 1395dd(e)(1)(A)(i)-(iii)**.

Order at 38-39 (emphasis added). The first sentence sets forth the parameters of the injunction—that it is limited to enjoining enforcement of § 18-622 and only to the extent it conflicts with EMTALA. And the second sentence merely defines the scope of that order subject to its limiting principles. Indeed, the second sentence begins with the connector "specifically," which denotes that it is intended to be read consistent with the principle announced in the first sentence. *See generally Bank of New York Mellon Trust Co. v. Morgan Stanley Mortgage Capital, Inc.*, No. 11 Civ. 505 (CM) (GWG), 2017 WL 737344, at *6-7 (S.D.N.Y. Feb. 10, 2017) (providing survey of the use and meaning of the word "specifically" as interpreted by courts and other authorities). And, lest there still were any doubt, the second sentence also closes by reiterating that the injunction's parameters are set "pursuant to [EMTALA]."

In sum, the State's arguments about the scope of the injunction misconstrue the Court's Order by reading out the first sentence and other key language. State Mot. at 2-3. The Court's language must be read in context. *See, e.g.*, *Edmo v. Corizon, Inc.*, 935 F.3d 757, 800 (9th Cir. 2019) (affirming injunction over appellant's arguments that relief was overbroad because its argument ignored limiting language that was apparent when read in context). And, when read in context as it must be, the injunction is plainly limited to the claims in this case—*i.e.*, prohibiting only enforcement of Idaho Code § 18-622(2)-(3) as applied to medical care required by EMTALA.

## CONCLUSION

For the foregoing reasons, the State's motion for reconsideration and the Legislature's motion for reconsideration should be denied.

Dated: October 12, 2022

Respectfully submitted,

SAMUEL R. BAGENSTOS
General Counsel

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PAUL R. RODRÍGUEZ
Deputy General Counsel

BRIAN D. NETTER
Deputy Assistant Attorney General

DAVID HOSKINS
Supervisory Litigation Attorney

ALEXANDER K. HAAS
Director, Federal Programs Branch

JESSICA BOWMAN
MELISSA HART
Attorneys

DANIEL SCHWEI
Special Counsel

U.S. Department of Health & Human Servs.
200 Independence Ave., SW
Washington, DC 20201

*/s/ Christopher A. Eisworth*
LISA NEWMAN
ANNA DEFFEBACH
EMILY NESTLER
CHRISTOPHER A. EISWERTH
  (DC Bar No. 1029490)
Trial Attorneys

JULIE STRAUS HARRIS
Senior Trial Counsel

U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 305-0568
christopher.a.eiswerth@usdoj.gov

*Counsel for the United States*