BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
BRIAN D. NETTER
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
DANIEL SCHWEI
Special Counsel
JULIE STRAUS HARRIS
Assistant Branch Director
**ANNA DEFFEBACH (DC Bar # 241346)**
LISA NEWMAN
EMILY NESTLER
CHRISTOPHER A. EISWERTH
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 993-5182
anna.l.deffebach@usdoj.gov

*Counsel for Plaintiff*
United States of America

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>v.<br><br>THE STATE OF IDAHO,<br><br>                    Defendant. | Case No. 1:22-cv-329-BLW<br><br>**UNITED STATES' OPPOSITION TO THE LEGISLATURE'S MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL**<br>**[Dkt. 140]** |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

I.     The Emergency Medical Treatment And Labor Act (EMTALA) ...............................2

II.    Idaho's Abortion Law And Procedural History ..........................................................3

ARGUMENT ..........................................................................................................................6

I.     The Idaho Legislature Has Not Shown Any Likelihood Of Success On Appeal. ....7

        A.     Idaho Code § 18-622 Is Preempted Because It Prohibits Medical Care That Federal Law Requires To Be Offered.......................................................7

        B.     The Legislature's Constitutional Objections Are Meritless. ..........................14

II.    The Legislature Has Not Even Attempted To Demonstrate Concrete Irreparable Harm From The Preliminary Injunction. ..................................................................16

III.   The Balance Of The Equities And The Public Interest Weigh Decidedly Against Staying The Preliminary Injunction. ........................................................................19

CONCLUSION ....................................................................................................................20

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Al Otro Lado v. Wolf,*
  952 F.3d 999 (9th Cir. 2020) ................................................................................................17

*Allee v. Medrano,*
  416 U.S. 802 (1974) .............................................................................................................16

*Armstrong v. Exceptional Child Ctr., Inc.,*
  575 U.S. 320 (2015) .............................................................................................................14

*Baker v. Adventist Health, Inc.,*
  260 F.3d 987 (9th Cir. 2001) ..................................................................................................8

*Beame v. Friends of Earth,*
  434 U.S. 1310 (1977) ...........................................................................................................18

*Bernhardt v. L.A. Cnty.,*
  339 F.3d 920 (9th Cir. 2003) ................................................................................................19

*Biden v. Missouri,*
  142 S. Ct. 647 (2022) ..................................................................................................... 9, 15

*Bostock v. Clayton Cnty.,*
  140 S. Ct. 1731 (2020) .........................................................................................................10

*Cal. Pharmacists Ass'n v. Maxwell-Jolly,*
  563 F.3d 847 (9th Cir. 2009) ................................................................................................19

*California v. United States,*
  No. 05-cv-00328, 2008 WL 744840 (N.D. Cal. Mar. 18, 2008) ..........................................11

*Chamber of Com. of the U.S. v. Bonta,*
  62 F.4th 473 (9th Cir. 2023) ................................................................................................18

*Cummings v. Premier Rehab Keller, PLLC,*
  142 S. Ct. 1562 (2022) ...........................................................................................................9

*Dobbs v. Jackson Women's Health Organization,*
  142 S. Ct. 2228 (2022) .........................................................................................................16

*Draper v. Chiapuzio,*
  9 F.3d 1391 (9th Cir. 1993) ........................................................................................ 8, 9, 14

*Garcia v. Google, Inc.,*
  786 F.3d 733 (9th Cir. 2015) ................................................................................................19

*Harris v. McRae,*
   448 U.S. 297 (1980) ............................................................................................13

*In the Matter of Baby K,*
   16 F.3d 590 (4th Cir. 1994) ...............................................................................10

*Leiva-Perez v. Holder,*
   640 F.3d 962 (9th Cir. 2011) .............................................................................16

*Mayes v. Biden,*
   67 F.4th 921 (9th Cir. 2023) ..............................................................................15

*Minnesota ex rel. Hatch v. United States,*
   102 F. Supp. 2d 1115 (D. Minn. 2000), *aff'd sub nom.*
   *Minnesota Senior Fed'n, Metro. Region v. United States,* 273 F.3d 805 (8th Cir. 2001) ............................16

*Morin v. E. Maine Med. Ctr.,*
   780 F. Supp. 2d 84 (D. Me. 2010) .....................................................................10

*Nat'l Fed'n of Indep. Bus. (NFIB) v. Sebelius,*
   567 U.S. 519 (2012) ..........................................................................................15

*New York v. Dep't of Health & Hum. Servs.,*
   414 F. Supp. 3d 475 (S.D.N.Y. 2019) ...............................................................10

*Nken v. Holder,*
   556 U.S. 418 (2009) ....................................................................................... 6, 16

*Northport Health Servs. of Arkansas, LLC v. Dep't of Health & Hum. Servs.,*
   438 F. Supp. 3d 956 (W.D. Ark. 2020), *aff'd,* 14 F.4th 856 (8th Cir. 2021) ......................15

*Planned Parenthood Great Nw. v. State,*
   522 P.3d 1132 (Idaho 2023) ........................................................................... 5, 6

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank,*
   566 U.S. 639, (2012) ...........................................................................................9

*Shaw v. Delta Air Lines,*
   463 U.S. 85 (1983) .............................................................................................14

*Sierra Club v. Trump,*
   929 F.3d 670 (9th Cir. 2019) ...............................................................................6

*United States v. Arizona,*
   641 F.3d 339 (9th Cir. 2011), *rev'd in part on other grounds,* 567 U.S. 387 (2012) ............ 18, 19

*United States v. California,*
   921 F.3d 865 (9th Cir. 2019) .............................................................................19

*Util. Air. Reg. Grp. v. EPA*, ("UARG"),
   573 U.S. 302 (2014) ...............................................................................................15

*Valle Sol Inc. v. Whiting*,
   732 F.3d 1006 (9th Cir. 2013) ..............................................................................18

*Virginian Ry. Co. v. United States*,
   272 U.S. 658 (1926) ................................................................................................6

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ..............................................................................18

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ...........................................................................................15

**CONSTITUTIONS**

Idaho Const. art. II, § 1 .............................................................................................17

Idaho Const. art. IV, § 5 ............................................................................................17

U.S. Const. art. VI, cl. 2 ............................................................................................19

**STATUTES**

10 U.S.C. § 1093 ........................................................................................................13

20 U.S.C. § 1688 ........................................................................................................13

22 U.S.C. § 5453(b) ....................................................................................................13

22 U.S.C. § 7704(e)(4) ...............................................................................................13

25 U.S.C. § 1676 ........................................................................................................13

42 U.S.C. § 238n .........................................................................................................13

42 U.S.C. § 280h-5(a)(3)(C) .......................................................................................13

42 U.S.C. § 300a-6 .....................................................................................................13

42 U.S.C. § 300a-7 .....................................................................................................13

42 U.S.C. § 300a-8 .....................................................................................................13

42 U.S.C. § 300z-10 ....................................................................................................13

42 U.S.C. § 1395 .....................................................................................................8, 9

42 U.S.C. § 1395cc(a)(1)(I)(i) ........................................................................................... 2

42 U.S.C. § 1395dd ................................................................................................. *passim*

42 U.S.C. § 1397ee(c)(7) ................................................................................................ 13

42 U.S.C. § 2996f(b)(8) ................................................................................................. 13

42 U.S.C. § 12584a(a)(9) ............................................................................................... 13

42 U.S.C. § 18023 ......................................................................................................... 12

Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49 ........................ 13

Consolidated Omnibus Reconciliation Act of 1985, H.R. 3128, 99th Cong., § 124 (1985) ................. 13

Idaho Code § 18-604(1) .................................................................................................. 6

Idaho Code § 18-622 ............................................................................................... *passim*

Idaho House Bill 374 ................................................................................................. 5, 6

**RULES**

Fed. R. App. P. 4(a)(1)(B) ............................................................................................... 5

**REGULATIONS**

42 C.F.R. § 489.24 ..................................................................................................... 2, 3

**LEGISLATIVE HISTORY**

151 Cong. Rec. H.143, H177 (daily ed. Jan. 25, 2005) .......................................................... 13

# INTRODUCTION

The Idaho Legislature has appealed the preliminary injunction entered in this case, and now asks this Court to stay the injunction—which has been in effect for nearly eleven months—while that appeal remains pending. This Court should deny this extraordinary and belated stay request, which raises arguments that exceed the scope of the Legislature's limited intervention in this case. The Court allowed the Legislature to intervene on the "sole issue" of challenging the "factual foundation" of the United States' preliminary-injunction motion, Dkt. 27 at 17-18, but the Legislature's stay motion raises arguments beyond this narrow issue, in addition to entirely new statutory arguments. Their motion for a stay of an injunction pending an appeal is not a proper vehicle for raising such arguments.

Even if considered on its own terms, the Legislature's stay motion should still be denied. First and most fundamentally, the Legislature has failed to show that it has any likelihood of success on the merits, or to cast any doubts on this Court's two prior opinions correctly finding that Idaho's abortion law, Idaho Code § 18-622, is preempted by the Emergency Medical Treatment and Labor Act (EMTALA), 42 U.S.C. § 1395dd. The Legislature instead repeats arguments the Court has already rejected and distorts the governing statutory framework.

Second, the Legislature has also failed to demonstrate irreparable harm. The Legislature makes no attempt to argue that it has suffered any concrete irreparable harm over the past eleven months while the injunction has been in effect. To the contrary, the Legislature asked this Court to delay resolving the Legislature's motion to reconsider that injunction, Dkt. 121, and then delayed in filing a notice of appeal, Dkt. 138. Nor does the Legislature point to any real-world harms that it will suffer during the pendency of the appeal. These failures alone provide an independent basis to deny the Legislature's request for a stay. A stay, moreover, would result in far more compelling and concrete harms: pregnant Idahoans would be deprived of their right under federal law to emergency stabilizing medical treatment in the event they develop a complication during pregnancy that places their health

in serious jeopardy. The balance of equities and the public interest weigh sharply in favor of denying the motion to stay the injunction, and thereby guaranteeing those patients access to health-preserving medical care while the Legislature's appeal remains pending.

## BACKGROUND

## I.     The Emergency Medical Treatment And Labor Act (EMTALA)

As this Court previously recognized, "Congress enacted EMTALA in 1986 with the overarching purpose of ensuring that all patients receive adequate emergency medical care—regardless of the patient's ability to pay and regardless of whether the patient qualifies for Medicare." Order Granting Prelim. Inj. ("PI Order"), Dkt. 95, at 4. EMTALA applies to every hospital that participates in Medicare, *see* 42 U.S.C. § 1395dd(e)(2), and Congress has statutorily required that hospitals participating in Medicare agree to comply with EMTALA as a condition of receiving federal funding. *See id.* § 1395cc(a)(1)(I)(i).

Under EMTALA, when an individual arrives at the emergency department of a Medicare-participating hospital and requests treatment, the hospital must provide an appropriate medical screening examination "to determine whether or not an emergency medical condition" exists. *Id.* § 1395dd(a); *see* 42 C.F.R. § 489.24(a)(1)(i). Congress defined an "emergency medical condition" as:

(A) a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-
    (i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy,
    (ii) serious impairment to bodily functions, or
    (iii) serious dysfunction of any bodily organ or part …

(B) with respect to a pregnant woman who is having contractions-
    (i) that there is inadequate time to effect a safe transfer to another hospital before delivery, or
    (ii) that transfer may pose a threat to the health or safety of the woman or the unborn child.

42 U.S.C. § 1395dd(e)(1). If a hospital determines that an individual has an emergency medical condition, "the hospital must provide either (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another medical facility in accordance with" certain requirements. *Id.* § 1395dd(b)(1). The hospital may also "admit[] th[e] individual as an inpatient in good faith in order to stabilize the emergency medical condition." 42 C.F.R. § 489.24(d)(2)(i).

Under EMTALA, "to stabilize" means "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). "[T]ransfer" is defined to include discharge of a patient. *Id.* § 1395dd(e)(4). A hospital satisfies its obligations under EMTALA if, after being informed of the risks and benefits of treatment, the individual (or their representative) does not consent to the treatment. *Id.* § 1395dd(b)(2).

In short, EMTALA requires that covered hospitals offer stabilizing treatment where "the health" of the individual is "in serious jeopardy," or where a condition could result in a "serious impairment to bodily functions" or a "serious dysfunction of any bodily organ or part." *Id.* § 1395dd(e)(1)(A). The hospital may also "transfer" such an individual, but only if the transfer meets certain requirements, *e.g.*, that the medical benefits outweigh the risks. *Id.* § 1395dd(c)(1)(A)(ii). EMTALA also contains an express preemption provision, preserving state laws "except to the extent that the requirement directly conflicts with a requirement of this section." *Id.* § 1395dd(f).

## II.    Idaho's Abortion Law And Procedural History

The United States filed this suit against the State of Idaho on August 2, 2022, challenging Idaho's abortion law, Idaho Code § 18-622, as preempted to the extent it prohibited medical care required by EMTALA. *See* Compl., Dkt 1. On August 9, 2022, the United States moved for a

preliminary injunction seeking to obtain relief before Idaho Code § 18-622 went into effect on August 25, 2022. *See* Dkt. 17.

The Idaho Legislature sought to intervene as a separate Defendant in the case, *see* Dkt. 15, and the Court allowed the Legislature "to participate in the preliminary-injunction proceedings only . . . in [a] limited fashion." Intervention Order, Dkt. 27, at 1-2. Specifically, the Legislature was "limited to presenting evidence and arguments the Legislature has said will show 'the holes in the factual foundation' of the United States' motion." *Id.* at 1; *see also id.* at 17-18. The Legislature later sought reconsideration of that decision, Dkt. 105, which the Court denied. Dkt. 125.

At the time of the preliminary-injunction proceedings, Idaho Code § 18-622 made the performance of any abortion a felony punishable by two to five years imprisonment, and also required the suspension or revocation of the professional license of "any health care professional who performs . . . or who assists in performing" an abortion. Idaho Code § 18-622(2) (as originally enacted). A provider could avoid conviction and license suspension only if they could prove an affirmative defense—as relevant here, that "[t]he physician determined, in his good faith medical judgment and based on the facts known to the physician at the time, that the abortion was necessary to prevent the death of the pregnant woman." *Id.* § 18-622(3)(a)(ii).

The United States' preliminary-injunction motion argued that § 18-622 conflicted with and therefore was preempted by EMTALA, because (1) EMTALA requires offering treatment for a broader set of medical conditions beyond those allowed under § 18-622; (2) the affirmative defense structure of § 18-622 itself posed an obstacle to EMTALA; and (3) the licensing sanctions of § 18-622 will deter medical professionals from performing and assisting in the performance of abortions. *See* Dkt. 17-1 at 14-17. On August 24, 2022, this Court granted the United States' motion, agreeing that § 18-622 was preempted to the extent it conflicted with EMTALA. *See* PI Order at 19-34.

Rather than appealing the preliminary injunction or seeking to stay its effect, the State of Idaho

and the Legislature filed motions for reconsideration. Dkts. 97 & 101. Subsequently, both the State and the Legislature asked this Court to delay ruling on their motions for reconsideration and instead allow supplemental briefing on the impact of an Idaho Supreme Court decision interpreting Idaho Code § 18-622 as a matter of state law. Dkts. 120 & 121; *see Planned Parenthood Great Nw. v. State*, 522 P.3d 1132 (Idaho 2023). As relevant here, the Idaho Supreme Court held that § 18-622 does not extend to ectopic and certain other nonviable pregnancies; that the affirmative defense structure of § 18-622 did not violate the Idaho Constitution; and that the scope of § 18-622's affirmative defense likewise did not violate the Idaho Constitution, even though it was narrower than other state laws that more closely aligned with EMTALA. *See Planned Parenthood Great Nw.*, 522 P.3d at 1195-97, 1202-03, 1207. This Court granted the State's and Legislature's request to delay ruling and authorized the parties to file supplemental briefing. Dkt. 123.

On May 4, 2023, this Court denied the motions for reconsideration and reaffirmed its holding that Idaho Code § 18-622 conflicted with EMTALA and was therefore preempted. Order Denying Mots. for Reconsid. ("Reconsid. Order"), Dkt. 135. In particular, this Court noted that "the Idaho Supreme Court confirmed that . . . the affirmative defense covers a narrower set of circumstances than those in which EMTALA requires a hospital to offer stabilizing treatment[.]" *Id.* at 6-7.

On June 28, 2023—almost two months after the Court's denial of the motions for reconsideration—the State of Idaho filed a notice of appeal regarding the preliminary injunction. Dkt. 136. The Legislature did not file a notice of appeal until July 3, 2023—the last possible day permitted under Federal Rule of Appellate Procedure 4(a)(1)(B). Dkt. 138. The Legislature also filed a motion to stay the preliminary injunction pending the appeal, Dkt. 140, notwithstanding that the injunction has already been in effect for nearly eleven months.

Separately, Idaho recently enacted amendments to several provisions of law, including Idaho Code § 18-622, and those amendments became effective on July 1, 2023. *See* House Bill 374 (attached

hereto as Ex. A), § 4. Among other things, the new law codifies the Idaho Supreme Court's exclusion of ectopic pregnancies from the relevant statutory definition of "abortion." *See* H.B. 374 § 1 (amending § 18-604(1)(a)-(d)).[1] Additionally, H.B. 374 removes the affirmative defense structure from § 18-622, converting those affirmative defenses into exceptions to liability in certain circumstances. *See id.* § 2 (excluding from the definition of "criminal abortions" those abortions "necessary to prevent the death of the pregnant woman"). But H.B. 374 did not change the language of the relevant standard, and therefore Idaho law continues to allow only those abortions "necessary to prevent . . . death." *Id.*; *see* Idaho Code § 18-622(2)(a)(i).

## ARGUMENT

A request for a stay pending appeal is committed to the exercise of judicial discretion. *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926). The party requesting a stay pending appeal "bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 433-34 (2009). "A stay is not a matter of right" but is instead "an intrusion into the ordinary processes of administration and judicial review" and is "not to be issued 'reflexively,' but rather based on the circumstances of the particular case." *Sierra Club v. Trump*, 929 F.3d 670, 687-88 (9th Cir. 2019) (quoting *Nken*, 556 U.S. at 427, 433) (alterations omitted). As the party seeking to stay the injunction, the Idaho Legislature must show (1) a strong showing of likelihood of success on the merits, (2) that the Idaho Legislature will be irreparably injured absent a stay, (3) that the balance of hardships favors allowing Idaho Code § 18-622 to go into effect, and (4) that allowing Idaho Code § 18-622 to go into effect is in the public interest. *Nken*, 556 U.S. at 426. Of these, "[t]he first two factors are the most critical." *Id.* at 434. Here, the Idaho Legislature fails to meet any of these factors, and its motion should

---

[1] The law also excludes "removal of a dead unborn child," "removal of a[] . . . molar pregnancy," and "treatment of a woman who is no longer pregnant" from the statutory definition of abortion, *see* H.B. 374 § 1, but the law does not otherwise incorporate the Idaho Supreme Court's exclusion of certain "nonviable pregnancies." *See Planned Parenthood Great Nw.*, 522 P.3d at 1202-03.

accordingly be denied.

## I.      The Idaho Legislature Has Not Shown Any Likelihood Of Success On Appeal.

This Court previously concluded that Idaho's abortion law is preempted as applied to medical care that federal law requires be offered. *See* PI Order at 19-34; Reconsid. Order at 5-11. That legal conclusion continues to be correct. The Legislature, whose arguments have already been rejected by this Court on multiple occasions, does not have a strong likelihood of success on appeal.

As an initial matter, the Legislature's stay motion exceeds the scope of its authorized intervention, which was limited to the "sole issue" of "'showing the holes' in the factual foundation" of the United States' preliminary-injunction motion. Intervention Order, Dkt. 27 at 17-18. The Legislature's stay motion does not dispute the factual support for the preliminary injunction; it raises only legal arguments. *See* Dkt. 140-1 ("Stay Mot.") at 4-17. And the Legislature's motion makes no attempt to justify how the arguments it presents are consistent with the narrow scope of its intervention.[2] Thus, the stay motion exceeds the Legislature's limited role in this case. In any event, all of the Legislature's arguments are substantively meritless on their own terms.

### A.      Idaho Code § 18-622 Is Preempted Because It Prohibits Medical Care That Federal Law Requires To Be Offered.

This Court's prior preemption analysis was straightforward. "[W]hen pregnant women come to a Medicare-funded hospital with an emergency medical condition, EMTALA obligates the treating physician to provide stabilizing treatment, including abortion care." PI Order at 19. Idaho law, however, allows only those "abortions that the treating physician determines are *necessary* to prevent the patient's death." *Id.* at 20 (citing Idaho Code § 18-622). That standard is narrower than EMTALA's

---

[2] The Court "fully consider[ed]" the Legislature's motion for reconsideration, Dkt. 125 at 10, but briefing on that motion occurred while the Legislature's renewed motion for intervention was pending, which the Legislature itself relied on as a basis for presenting broad legal arguments challenging the injunction. *See* Dkt. 111 at 3. That justification no longer applies with respect to the Legislature's stay motion, however, given that the Court has now twice confirmed the narrow scope of the Legislature's permitted intervention. *See* Dkts. 27, 125.

requirements, because "EMTALA . . . demands abortion care to prevent injuries that are more wide-ranging than death." *Id.* at 21; *see also* Reconsid. Order at 9 ("EMTALA requires providing stabilizing care not just when the patient faces death, but also when a patient faces serious health risks that may stop short of death, including permanent and irreversible health risks and impairment of bodily functions."). It is therefore "impossible to comply with both laws" because "federal law requires the provision of care and state law criminalizes that very care." PI Order at 19. Moreover, the threat of "licensing authority sanctions has a deterrent effect," *id.* at 27, contrary to EMTALA's purpose of "ensur[ing] that all individuals—including pregnant women—have access to a minimum level of emergency care." *Id.* at 34. Thus, "Idaho's criminal abortion statute . . . stands as a clear obstacle to what Congress was attempting to accomplish with EMTALA." *Id.* at 26. The Legislature does not offer any serious reason to doubt the correctness of this analysis.

**1.** The Legislature first argues that the Court failed to recognize that EMTALA's preemption provision is actually "a non-preemption provision." Stay Mot. at 5 (quoting *Baker v. Adventist Health, Inc.*, 260 F.3d 987, 993 (9th Cir. 2001)). As *Baker* itself confirmed, however, the statutory provision is only "a non-preemption provision" for *additional* "state remedies," such as "a state law claim for medical malpractice." 260 F.3d at 993. EMTALA's preemption provision preserves state laws requiring emergency care *beyond* what EMTALA mandates, but still preempts state law when it conflicts with the federal minimum guaranteed by EMTALA. *See* Dkt. 17-1 at 5. Indeed, the Ninth Circuit has already confirmed that EMTALA's preemption provision incorporates principles of both impossibility and obstacle preemption, as this Court previously recognized. *See* PI Order at 19 (citing *Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993) (per curiam)).

In an effort to support its "non-preemption" argument, the Legislature invokes a different Medicare provision, 42 U.S.C. § 1395, which states generally that federal employees are not authorized to "exercise any supervision or control over the practice of medicine or the manner in which medical

services are provided[.]" 42 U.S.C. § 1395; Stay Mot. at 5. But that provision does not prevent the Federal Government from establishing and enforcing conditions of participation in Medicare, *see Biden v. Missouri*, 142 S. Ct. 647, 654 (2022), nor does it eliminate Congress's "broad power under the Spending Clause of the Constitution to set the terms on which it disburses federal funds." *Cummings v. Premier Rehab Keller, PLLC*, 142 S. Ct. 1562, 1568 (2022). Moreover, the United States' interpretation of EMTALA *preserves* medical professionals' ability to determine what stabilizing treatment is necessary—the very opposite of supervising or controlling the practice of medicine—and is thus fully consistent with § 1395. Nothing about § 1395 overrides EMTALA's express preemption provision or the Ninth Circuit's interpretation of that provision set forth in *Draper*, 9 F.3d at 1393. And even if there were any tension between EMTALA's stabilization requirement and the general provision in § 1395, EMTALA—the subsequent and more specific statute—would control. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645, (2012) ("[I]t is a commonplace of statutory construction that the specific governs the general.").

**2.** The Legislature next contends that EMTALA does not require participating hospitals to offer abortions as necessary stabilizing treatment. *See* Stay Mot. at 6-10. As an initial matter, that position is contrary to the Legislature's arguments during the preliminary-injunction proceedings. The Legislature now argues that EMTALA prohibits providing care to a pregnant patient if doing so would harm the pregnancy, *id.* at 8-11, but during the preliminary-injunction proceedings the Legislature endorsed its declarant's view that, under EMTALA, the pregnant patient's life and health cannot be treated as secondary:

> [I]n the [pregnancy-related] emergency situations . . . anticipated by EMTALA, the subordination of the mother's life and health in favor of the unborn child by a physician has not and will not occur. Further, these same physicians would never interpret Idaho Code 18-622 to mean that the mother's health and welfare are secondary to the baby.

Dkt. 65 at 7-8 (quoting French Decl., Dkt. 71-5 ¶ 9); *see also id.* at 9 (acknowledging the possibility of

a "serious medical condition . . . that requires an emergency medical procedure under EMTALA, with that procedure ending the life of the pre-born child"); Reynolds Decl., Dkt. 71-1, ¶ 13 (listing various emergency medical conditions that may "necessitate an emergency abortion to save the life of the mother").

In any event, the Legislature's new statutory argument is also wrong. It is irrelevant that "EMTALA says nothing about abortion." Stay Mot. at 7. EMTALA does not list specific stabilizing treatments like defibrillation or CPR, and for good reason: the definition of "stabilize" is intentionally broad. 42 U.S.C. § 1395dd(e)(3)(A); *see id.* § 1395dd(b)(1)(A). The Legislature's proposed interpretive method, requiring EMTALA to specifically enumerate the emergency medical treatments it requires, would render EMTALA and its preemption provision meaningless.

Moreover, the Legislature does not dispute that, as this Court previously held, "there are many . . . complications that may arise during pregnancy" that *do* meet the statutory definition of an emergency medical condition, and for which the necessary stabilizing treatment may "include an emergency abortion." PI Order at 8-9. Congress explicitly contemplated that pregnant individuals would be among those arriving at an emergency department experiencing an "emergency medical condition," *see* 42 U.S.C. § 1395dd(e)(1)(A)(i), (B), yet Congress chose not to exclude abortion care (or any other specific care) from the definition of stabilizing treatment that covered hospitals are required to offer when medically indicated. There is thus no basis for interpreting EMTALA's text as excluding such treatment. *See Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1747 (2020) ("[W]hen Congress chooses not to include any exceptions to a broad rule, courts apply the broad rule."); *In the Matter of Baby K*, 16 F.3d 590, 596 (4th Cir. 1994) (finding no "statutory language or legislative history [in EMTALA] evincing a Congressional intent to create an exception to the duty to provide stabilizing treatment"). Indeed, several courts have understood EMTALA to encompass abortion-related services. *See New York v. Dep't of Health & Hum. Servs.*, 414 F. Supp. 3d 475, 538 (S.D.N.Y. 2019); *Morin v. E. Maine Med.*

*Ctr.*, 780 F. Supp. 2d 84, 96 (D. Me. 2010); *California v. United States*, No. 05-cv-00328, 2008 WL 744840, at *4 (N.D. Cal. Mar. 18, 2008).

The Legislature contends that, by interpreting EMTALA to include abortion care as a stabilizing treatment that must be offered when medically indicated, the Court has "erased" EMTALA's references to protecting the health of an unborn child. Stay Mot. at 10. But those provisions simply expand the definition of an "emergency medical condition" to situations in which the individual's emergency condition would place the pregnancy—and thus the health of the "unborn child"—in serious jeopardy if left untreated, regardless of whether any other aspect of the pregnant individual's own health is also at risk. 42 U.S.C. § 1395dd(e)(1).  That language does not suggest that a pregnant individual's health may be treated as secondary, and thus allowed to deteriorate, under circumstances in which abortion is the necessary stabilizing treatment. On the contrary, EMTALA requires—without any such qualification—stabilizing an individual's emergency medical condition with treatment "necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during" transfer or discharge. *Id.* § 1395dd(e)(3)(A). To the extent a form of stabilizing treatment may place both an individual's life or health and her pregnancy at risk, EMTALA's text leaves any balancing of that consideration to the pregnant individual—who may decide, after weighing the risks and benefits, whether to accept or refuse the treatment. *See id.* § 1395dd(b)(2) (acknowledging that, after being informed "of the risks and benefits" of treatment, an individual may "refuse[] to consent to the . . . treatment").

The Legislature also presents a new statutory theory, invoking EMTALA's reference to a pregnant woman being "stabilized" once "the woman has delivered (including the placenta)." 42 U.S.C. § 1395dd(e)(3)(B); *see* Stay Mot. at 9-11. But that provision does not imply that the *only* stabilizing treatment available to pregnant individuals under EMTALA is delivery. The Legislature ignores that this statutory definition of "stabilized" applies only "with respect to a pregnant woman

*who is having contractions.*" 42 U.S.C. § 1395dd(e)(1)(B) (emphasis added); *see* 42 U.S.C. § 1395dd(e)(3)(A) (this definition of "stabilized" applies only "with respect to an emergency medical condition described in paragraph (1)(B)"). By singling out "contractions" in subparagraph (e)(1)(B), EMTALA ensures that labor *always* constitutes an emergency medical condition," regardless of whether it satisfies any of the standards in (e)(1)(A). This provision has no bearing on the appropriate stabilizing treatment for pregnant individuals presenting with *other* emergency medical conditions—defined under § 1395dd(e)(1)(A), rather than (e)(1)(B)—that can occur without contractions, including the emergency medical conditions on which the United States and this Court relied during the preliminary-injunction proceedings. *See* PI Order at 8-9; Reconsid. Order at 10-11. For those conditions, as the Court previously held, "when pregnant women come to a Medicare-funded hospital . . . EMTALA obligates the treating physician to provide stabilizing treatment, including abortion care." PI Order at 19.

Other provisions of federal law likewise confirm that EMTALA encompasses abortion care. For example, the Affordable Care Act's provision addressing abortion allows States to prohibit abortion coverage in certain health plans, but also makes explicit that "[n]othing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including section 1867 of the Social Security Act (popularly known as 'EMTALA.')." 42 U.S.C. § 18023. Similarly, when Congress was debating the Weldon Amendment—a frequently enacted appropriations provision that prohibits discrimination against certain entities that do not perform abortions—the Amendment's sponsor, when confronted with a concern that "women will die because they will not have access to an abortion needed to save the life of the mother," expressly referenced EMTALA as addressing that concern:

> [The Weldon Amendment] does nothing of the sort. It ensures that in situations where a mother's life is in danger a health provider must act to save the mother's life. In fact, Congress passed [EMTALA] forbidding critical-care health facilities to abandon patients in medical emergencies, and requires them to provide treatment to stabilize

the medical condition of such patients—particularly pregnant women.

151 Cong. Rec. H143, H177 (daily ed. Jan. 25, 2005) (statement of Rep. Weldon). And more generally, when Congress creates special rules for abortion—or excludes abortion care from otherwise-applicable rules—it does so expressly.[3] Indeed, the very same legislation through which Congress considered EMTALA included a separate program that *did* expressly carve out abortion. *Compare* Consolidated Omnibus Reconciliation Act of 1985, H.R. 3128, 99th Cong., § 124 (1985) (language that became EMTALA), *with id.* § 302(b)(2)(B) (expressly excluding abortion from a different program's authorized activities). The Legislature's argument—that Congress *sub silentio* excluded abortion care from the scope of stabilizing treatment even when an abortion is necessary to protect a pregnant individual's health—is contrary to EMTALA's plain text, history, and surrounding statutory structure.

**3.** Finally, the Legislature points to "[r]ecent amendments clarify[ing] that section 622 contains straightforward exceptions rather than affirmative defenses," which in the Legislature's view means "Section 622 should no longer 'deter physicians from providing abortions in some emergency situations.'" Stay Mot. at 11. But the recent amendments, although they remove the affirmative defense structure, still allow only those abortions "necessary to prevent . . . death." Idaho Code § 18-622(2)(a)(i). Thus, § 18-622 continues to conflict with EMTALA based on all the other aspects of the law that independently supported this Court's preliminary injunction.

In particular, EMTALA "demands abortion care to prevent injuries that are more wide-ranging than death," PI Order at 21, but § 18-622 continues to criminalize such care. *See also* Reconsid.

---

[3] Examples of these abortion-specific provisions include 10 U.S.C. § 1093; 20 U.S.C. § 1688; 22 U.S.C. §§ 5453(b), 7704(e)(4); 25 U.S.C. § 1676; 42 U.S.C. §§ 238n, 280h-5(a)(3)(C), 300a-6, 300a-7, 300a-8, 300z-10, 1397ee(c)(7), 2996f(b)(8), and 12584a(a)(9). Congress has also routinely enacted a similar provision in appropriations laws, commonly referred to as the "Hyde Amendment." *See, e.g.,* Consolidated Appropriations Act, 2022, Div. H, Tit. V, §§ 506, 507, Pub. L. No. 117-103, 136 Stat. 49, 496; *cf. Harris v. McRae*, 448 U.S. 297, 302 (1980).

Order at 9 ("EMTALA requires providing stabilizing care not just when the patient faces death, but also when a patient faces serious health risks that may stop short of death, including permanent and irreversible health risks and impairment of bodily functions."). Moreover, § 18-622 still stands as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Draper*, 9 F.3d at 1394, because § 18-622 deters medical professionals from providing EMTALA-covered care for all the other reasons this Court and the United States previously identified. *See* PI Order at 25-34; Reconsid. Order at 6-10; Dkt. 17-1 at 16-17. Thus, the recent amendments to § 18-622 do not change the analysis, and this Court's prior conclusions continue to be correct—EMTALA requires abortion care in certain circumstances, Idaho's law prohibits and deters the provisions of such care, and Idaho's law is therefore preempted.

### B.   The Legislature's Constitutional Objections Are Meritless.

Apart from the Legislature's statutory arguments about the meaning of EMTALA, the Legislature also raises a variety of constitutional arguments, all of which this Court can quickly reject.

**1.** The Legislature first argues that the United States lacks a cause of action under the Supremacy Clause to bring this suit. Stay Mot. at 12. But the Legislature merely repeats arguments that this Court has already rejected. *See* PI Order at 13-14 (concluding that "the United States has a cause of action because it seeks to halt Idaho's allegedly unconstitutional encroachment on" a federal statute, EMTALA, and "is not seeking to enforce federal law against would-be violators") (relying on *Shaw v. Delta Air Lines*, 463 U.S. 85 (1983), and *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015)). As the United States has previously explained, the Legislature's attempt to characterize the cause of action as arising directly under the Supremacy Clause is incorrect—the United States is advancing an equitable cause of action, precisely the type approved in *Armstrong*, 575 U.S. at 326-27. And the Legislature cannot meaningfully dispute the ample authority recognizing the United States' ability to sue in equity to challenge state laws that violate the Supremacy Clause. *See* Dkt. 86 at 4 n.1.

**2.** The Legislature next argues that the Court's interpretation of EMTALA violates the major questions doctrine. *See* Stay Mot. at 12-13. But that doctrine applies only "in certain extraordinary cases" where there is affirmative *agency* regulatory action involving "major policy decisions." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022); *see also Mayes v. Biden*, 67 F.4th 921, 933 (9th Cir. 2023) (doctrine does not apply where there is "no relevant agency action"). The major questions doctrine only applies to "*agency* decisions of vast 'economic and political significance.'" *Mayes*, 67 F.4th at 933. (quoting *Util. Air. Reg. Grp. v. EPA* ("*UARG*"), 573 U.S. 302, 324 (2014)). Here, as the United States has previously explained, this case involves no agency action and no exercise of agency regulatory authority; instead, the United States is enforcing a "policy decision[]" made by "Congress . . . itself[.]" *West Virginia*, 142 S. Ct. at 2609; *see* Dkt. 86 at 6, Dkt. 106 at 19. Nor would any agency action, even if it existed here, constitute a "transformative expansion" of regulatory authority, *Mayes*, 67 F.4th at 934-36 (quoting *UARG*, 573 U.S. at 324), given that "healthcare facilities that wish to participate in Medicare and Medicaid have always been obligated to satisfy a host of conditions that address the safe and effective provision of healthcare." *Missouri*, 142 S. Ct. at 652.

**3.** The Legislature also argues that EMTALA violates the Spending Clause because it is unconstitutionally coercive. *See* Stay Mot. at 17-19. But the only time the Supreme Court has found coercion in a spending program was in connection with Medicaid—which involves providing funding directly to states—and that finding was based on the Court's view that the states were effectively being required to adopt a whole new spending program or lose federal funding for their pre-existing Medicaid programs. *See Nat'l Fed'n of Indep. Bus. (NFIB) v. Sebelius*, 567 U.S. 519, 580-85 (2012) (plurality opinion of Roberts, C.J.). Here, in contrast, the decision to participate in Medicare is made by individual hospitals, which even the Legislature concedes is a wholly voluntary choice by each hospital. *See* Legisl.'s Answer, Dkt. 15-2, ¶ 15 (admitting that "[m]edical providers' participation in Medicare is voluntary"); *see also Northport Health Servs. of Arkansas, LLC v. Dep't of Health & Hum. Servs.*, 438 F.

Supp. 3d 956, 970-71 (W.D. Ark. 2020) ("No part of the Court's decision in *NFIB* touched on the government's power to place conditions on private entities. In fact, Courts of Appeals have held time and time again that the participation of private entities in Medicare and Medicaid is always voluntary[.]"), *aff'd*, 14 F.4th 856 (8th Cir. 2021). The Legislature has not demonstrated that it has standing to raise a Spending Clause argument when it is the hospitals, not the Legislature, that would be injured by any alleged coercion. *See Allee v. Medrano*, 416 U.S. 802, 828-29 (1974) ("[A] person cannot predicate standing on injury which he does not share."). Moreover, the United States is simply seeking to enforce a longstanding condition on federal Medicare funding—no different than numerous other conditions of participation in Medicare, which Congress plainly has the authority to enact. *See Minnesota ex rel. Hatch v. United States*, 102 F. Supp. 2d 1115, 1123 (D. Minn. 2000) ("Congress' authority under the Spending Clause to choose how to fund the Medicare program is not in doubt."), *aff'd sub nom. Minnesota Senior Fed'n, Metro. Region v. United States*, 273 F.3d 805 (8th Cir. 2001). Thus, this Court's recognition of EMTALA as a spending condition is not objectionable.

**4.** Finally, the Legislature argues that the preliminary injunction violates the Tenth Amendment and the Supreme Court's decision in *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022). *See* Stay Mot. at 16-17. But as this Court previously recognized, "*Dobbs* did not overrule the Supremacy Clause" and "[t]hus, even when it comes to regulating abortion, state law must yield to conflicting federal law." PI Order at 38. In short, the Legislature's arguments do not demonstrate a likelihood of success on appeal, and that failure alone warrants denial of the Legislature's stay motion.

## II.   The Legislature Has Not Even Attempted To Demonstrate Concrete Irreparable Harm From The Preliminary Injunction.

Under Ninth Circuit precedent, a party cannot obtain a stay of an injunction unless they demonstrate irreparable harm. *See Leiva-Perez v. Holder*, 640 F.3d 962, 965 (9th Cir. 2011) (per curiam) ("[I]f the petition has not made a certain threshold showing regarding irreparable harm . . . then a stay

may not issue, regardless of the petitioner's proof regarding the other stay factors.") (citing *Nken*, 556 U.S. at 433-34)). Here, the Legislature has failed to meet its burden of showing that it will be irreparably harmed if the Court's injunction is not stayed, and the Legislature's stay motion thus independently fails for this reason as well.

Most notably, the preliminary injunction has already been in effect for almost eleven months, and the Legislature makes no attempt to establish that it has suffered any real-world harms during that time period. As the Ninth Circuit has held, a party's failure to "submit[] evidence of actual burdens . . . it has experienced since the injunction issued" undermines any claim of irreparable harm. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020). Nor does the Legislature plausibly claim it has suffered any real-world harms from the continuation of the status quo preserved by the injunction, given that Idaho Code § 18-622 has never been in effect with respect to EMTALA-covered care, and during the time the preliminary injunction has been in effect the Legislature has only taken steps to narrow the reach of § 18-622.

The Legislature attempts to claim irreparable harm by invoking the principle that it suffers harm because the injunction prevents it from enforcing a duly enacted law. *See* Stay Mot. at 2. But that principle, even if applicable, is highly abstract and would pale in comparison to the concrete, real-world harms demonstrating the continued need for the injunction. *See* Part III, *infra*. More fundamentally, that principle has no application to a stay request from the Idaho Legislature, which has no responsibility for the enforcement of state law—that duty falls to Idaho's executive branch. *See* Idaho Const., art. II, § 1 (dividing power across three distinct branches), art. IV, § 5 ("The supreme executive power of the state is vested in the governor, who shall see that the laws are faithfully executed."). Notably, neither the State nor the executive branch officials representing the State as a party in this litigation have sought a stay of the preliminary injunction. The Legislature suffers no cognizable harm from being unable to enforce Idaho Code § 18-622 because it never had the authority

to enforce Idaho Code § 18-622, injunction or not.

The Legislature also argues that the preliminary injunction blocks Idaho's exercise of its sovereign authority to pass legislation. *See* Dkt. 140-1 at 2-3. But that argument is just a repackaged version of the Legislature's view of the merits, *i.e.*, that Idaho Code § 18-622 is not preempted by EMTALA and is a legitimate exercise of state authority. That perceived institutional injury is not "irreparable," however, because Idaho "may yet pursue and vindicate its interests in the full course of this litigation." *Washington v. Trump*, 847 F.3d 1151, 1168 (9th Cir. 2017) (per curiam). Indeed, under the Legislature's theory, a state would suffer irreparable harm warranting a stay anytime a state law is held to be preempted, and no state law could ever be the subject of a preliminary injunction on preemption grounds. That is not correct. *See, e.g.*, *Chamber of Com. of the U.S. v. Bonta*, 62 F.4th 473 (9th Cir. 2023) (affirming preliminary injunction holding state law preempted by federal law); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) (same). On the other hand, this Court has already found that the United States would suffer irreparable harm if Idaho Code § 18-622 is *not* enjoined, because violations of the Supremacy Clause trigger a presumption of irreparable harm when the United States is the Plaintiff. PI Order at 35 (citing *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *rev'd in part on other grounds*, 567 U.S. 387 (2012)).

Finally, even apart from the Legislature's failure to provide even a scintilla of evidence of any actual harms it has suffered during the eleven months the injunction has been in effect, the Legislature's significant delay in seeking a stay of the injunction undermines any claim that they will be irreparably harmed. *See Beame v. Friends of Earth*, 434 U.S. 1310, 1313 (1977) ("The applicants' delay in filing their petition and seeking a stay vitiates much of the force of their allegations of irreparable harm."). The injunction has been in effect for eleven months, and the Legislature never previously sought a stay. At one point the Legislature affirmatively requested that the Court *delay* ruling on the reconsideration motions until after the parties could submit additional briefing. Dkt. 121. Even

discounting the entire time period between the injunction's issuance and the Court's denial of the reconsideration motions, the Legislature still waited the full sixty days—nearly two months—to notice an appeal of this Court's injunction and seek a stay. A stay of the injunction is particularly unwarranted where, as here, the Legislature has provided no explanation or justification for such delay. *Cf. Garcia v. Google, Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc) ("The district court did not abuse its discretion by finding this delay undercut Garcia's claim of irreparable harm."). The Legislature's lack of demonstrated irreparable harm independently forecloses a stay here.

### III.   The Balance Of The Equities And The Public Interest Weigh Decidedly Against Staying The Preliminary Injunction.

Where, as here, the United States is a party, the balance of the equities and the public interest merge. *Bernhardt v. L.A. Cnty.*, 339 F.3d 920, 931 (9th Cir. 2003). The key consideration is what impact an injunction would have on non-parties and the public at large. *Id.* As this Court has already observed, "preventing a violation of the Supremacy Clause serves the public interest." PI Order at 36 (quoting *United States v. California*, 921 F.3d 865, 893-94 (9th Cir. 2019)).

The Legislature argues that staying the injunction and allowing Idaho Code § 18-622 to go into effect serves the public interest by maintaining the constitutional structure of the division of power between the state and federal government. *See* Stay Mot. at 17. But again, this argument is just a repackaged merits argument, and thus cuts in favor of keeping the injunction in place. For the reasons explained above, the injunction is necessary to respect the supremacy of federal law over state law. *See* U.S. Const. art. VI, cl. 2*; see also, e.g., Arizona*, 641 F.3d at 366 ("We have found that 'it is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available . . . . In such circumstances, the interest of preserving the Supremacy Clause is paramount.'") (alterations in original) (quoting *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852-53 (9th Cir. 2009)).

Perhaps most crucially in considering the public interest, moreover, is the fact that if the

injunction were stayed, pregnant Idahoans would lose the protections afforded to them under federal law, and immediately face a risk of severe irreparable harm if they suffer a medical emergency that requires pregnancy termination to prevent serious risk of bodily injury or serious deterioration of major bodily functions. *See* PI Order at 36 ("[T]he Court finds that allowing the Idaho law to go into effect would threaten severe, irreparable harm to pregnant patients in Idaho."). The Legislature dismisses this harm to third parties, *see* Stay Mot. at 18, notwithstanding that the factual record here is one-sided in demonstrating that these types of medical emergencies will invariably arise. *See* PI Order at 37 ("Idaho physicians have treated such complications in the past, and it is inevitable that they will be called upon to do so in the future."). The balance of the equities and the public interest thus strongly favor keeping the injunction in place and ensuring that pregnant individuals have access to crucial health-preserving medical care while this case remains pending.

## CONCLUSION

Because the Legislature is unlikely to succeed on the merits and has not suffered any irreparable harm, and because the balance of equities and public interest strongly favor preserving Idahoans' access to necessary emergency medical care, the Court should deny the Legislature's motion to stay the preliminary injunction pending appeal.

Dated: July 24, 2023

SAMUEL BAGENSTOS
General Counsel

PAUL R. RODRÍGUEZ
Deputy General Counsel

DAVID HOSKINS
Supervisory Litigation Attorney

JESSICA BOWMAN
MELISSA HART
Attorneys

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIAN D. NETTER
Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

DANIEL SCHWEI
Special Counsel

200 Independence Ave., SW
U.S. Department of Health & Human Servs.
Washington, DC  20201

JULIE STRAUS HARRIS
Assistant Branch Director

*/s/ Anna Deffebach*
ANNA DEFFEBACH (DC Bar # 241346)
LISA NEWMAN
EMILY NESTLER
CHRISTOPHER A. EISWERTH
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 993-5182
anna.l.deffebach@usdoj.gov

*Counsel for Plaintiff*