Daniel W. Bower, ISB #7204
MORRIS BOWER & HAWS PLLC
1305 12th Ave. Rd.
Nampa, Idaho 83686
Telephone: (208) 345-3333
dbower@morrisbowerhaws.com

Monte Neil Stewart, ISB #8129
11000 Cherwell Court
Las Vegas, Nevada 89144
monteneilstewart@gmail.com

*Attorneys for Defendant-Intervenor Idaho Legislature*


# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO
## SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:22-cv-00329-BLW |
| Plaintiff, | |
| | **REPLY MEMORANDUM IN** |
| v. | **SUPPORT OF MOTION TO STAY** |
| | **PRELIMINARY INJUNCTION** |
| THE STATE OF IDAHO, | **PENDING APPEAL** |
| Defendant. | |

The Speaker of the Idaho House of Representatives Mike Moyle, Idaho Senate
President Pro Tempore Chuck Winder, and the Sixty-Seventh Idaho Legislature
respectfully submit this Reply Memorandum in response to the United States' Opposition
to the Legislature's Motion to Stay Preliminary Injunction Pending Appeal ("Gov't Opp.

1

Br.") (Dkt. 144) and in support of the Legislature's Motion to Stay Preliminary Injunction Pending Appeal (Dkt. 140).

## <u>INTRODUCTION</u>

The Idaho Legislature appealed the preliminary injunction entered in this case and now seeks, contemporaneously with that appeal to the Ninth Circuit, a stay of the injunction during the appeal process. *See* Legislature Notice of Appeal [re Preliminary Injunction] (Dkt. 138.  In response to the Legislature's request, the Government makes three primary arguments in opposition—all without merit.

*First*, the Government argues without any meaningful authority that the request for stay should be denied because the request for a stay exceeds the scope of the Legislature's "limited intervention." *See* Gov't Opp. Br., p.1.  There is no controlling authority for the Government's position that the Legislature's role as an intervenor somehow limits its ability to seek a stay pending appeal, particularly where the Legislature has also appealed the District Court's ruling that resulted in that limited intervention role. *See* Legislature Notice of Appeal [re Intervention] (Dkt. 131).

*Second*, the Government asserts the Legislature has "failed to show that it has any likelihood of success on the merits." *See* Gov't Opp. Br., p.1.  As set forth in the opening brief and as highlighted below, there is substantial statutory basis and legal authority supporting the Legislature's argument that it will prevail on the merits of its appeal.

*Third*, the Government claims the Legislature cannot demonstrate irreparable harm essentially because of its nature—a law-making representative body. *See* Gov't Opp. Br., pp.1-2.  This argument is directly refuted by United States Supreme Court precedent. Additionally, faced with that authority and unable to directly refute the Legislature's obvious and unique harm as a representative entity, the Government also makes the outrageous assertion that the timeliness of the Legislature's motion supports the Government's claim that there is no irreparable harm.  This assertion is not supported by either legal authority or by the actual timeline of events.  Simply put, there has been no delay.  Indeed, it is the Legislature that has consistently tried to expedite this case precisely because of the obvious and plain irreparable harm that is impacting the individuals it represents, the citizenry of Idaho.

Accordingly, the Legislature respectfully contends that this Court stay its orders dated August 24, 2022 (Dkt. 95) (August Order) and May 4, 2023 (Dkt. 135) (May Order), pending disposition of an appeal by the United States Court of Appeals for the Ninth Circuit and proceedings, if any, before the Supreme Court of the United States.

## **LEGAL STANDARD**

There is no dispute as to the applicable standard.  Issuing a stay is appropriate to the extent the Legislature meets four elements: (1) a strong showing of success on the merits; (2) irreparable injury absent a stay; (3) lack of substantial injury to other parties; and (4) issuing the stay is in the public interest. *See Nken v. Holder*, 556 U.S. 418, 426 (2009). Moreover, there is no dispute that *Nken* holds that the final two factors—harm to the

opposing party and the public interest—"merge when the Government is the opposing party." *Id.* at 435.   And, as highlighted in the opening brief and acknowledged by the Government, the first two elements—likelihood of prevailing on the merits and irreparable injury—"are the most critical." *Id.* at 434; *see also* Gov't Opp. Br., p.6.

The Government's opposition has primarily focused its arguments on the Legislature's assertion that these two critical elements have been met.   This reply brief addresses that opposition.

## ARGUMENT

I. **The Idaho Legislature's Status As An Intervenor Has No Impact On Its Timely Request For Stay Pending Appeal.**

The Government begins its opposition with the general assertion that the Legislature should not be permitted to request a stay pending appeal because the Legislature's "stay motion exceeds the scope of its authorized intervention." *See* Gov't Opp. Br., p.7.   Here, in an apparent attempt to avoid addressing the Legislature's legal arguments, the Government simply refuses to acknowledge the fact that the Idaho Legislature has appealed its status as a "limited intervenor." *See* Legislature Notice of Appeal [re Intervention] (Dkt. 131).   Moreover, as implicitly acknowledged by the Government, the legal arguments that the Government seeks to avoid have already been raised to the District Court in various contexts including a renewed motion to intervene.   And, thus, will be a basis for asserted error to the Ninth Circuit. *See* Legislature's Renewed Motion to Intervene (Dkt. 105).

Regardless, because the legal issues as well as the Legislature's limited status are being appealed, the Government's attempt to exclude the Legislature's legal arguments is groundless.  All the issues related to claimed error by the Legislature are a basis for the requested stay. *See* Legislature's Motion to Stay Preliminary Injunction Pending Appeal (Dkt. 140).

## II.   The Idaho Legislature Has Established A Strong Likelihood Of Success On Appeal.

The Legislature appreciates that *Nken* requires "a strong showing" that the party requesting a stay is likely to prevail on the merits. 556 U.S. at 434.  And, as set forth in the opening brief, the Legislature asserts this standard has been met.  The following addresses this first *Nken* element in light of the arguments proffered by the Government.

### A.   Idaho's Regulation Of Medicine Is Not Preempted By EMTALA As Supported By EMTALA's Anti-Preemption Language And Other Provisions Of Federal Law.

The primary basis for the District Court's preliminary injunction is that "there will always be a conflict between EMTALA and Idaho Code § 18-622" because "EMTALA [42 U.S.C. § 1395dd] obligates the treating physician to provide stabilizing treatment, including abortion care." Aug. Order at 18-19.  The District Court made this determination despite the incontrovertible fact that there is no statutory language in EMTALA explicitly creating a duty to provide an abortion.  Thus, the Government's claimed prohibition, adopted by the District Court, can only be an extension of EMTALA's generic requirement

for a physician to "provide stabilizing treatment" for a patient with an emergency medical condition." *See id.* at 19.

In the initial brief, the Legislature points out that a fundamental flaw in the Court's injunctive ruling is its failure to "construe [EMTALA's] preemptive effect as narrowly as possible" and refusal to give meaning to other controlling statutory language. *See* Memorandum in Support of Idaho Legislature's Motion to Stay Preliminary Injunction Pending Appeal (Dkt. 140-1), p.5 ("Legislature Memo ISO Stay") (*quoting Draper v. Chiapuzio*, 9 F.3d 1391, 1393 (9th Cir. 1993)). In essence, by not construing EMTALA's preemptive effect as narrowly as possible and ignoring relevant statutory language, the District Court created conflict where none exists.

To highlight this misunderstanding, the Legislature first identified the controlling non-preemption provision governing EMTALA: "The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). Second, the Legislature identified other applicable provisions of the Medicare Act wherein Congress made clear that: "[n]othing in this subchapter [the Medicare Act] shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. § 1395.[1]   In light of these two provisions and *Draper*'s clear directive to "construe

---

[1] As explained in the opening brief, EMTALA is bound by this provision as part of the Medicare Act.  EMTALA does not authorize the federal government "to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided." 42 U.S.C. §

[EMTALA's] preemptive effect as narrowly as possible," there is a "strong showing" that the Legislature will prevail on appeal and that the requested stay be issued. *Draper*, 9 F.3d at 1393; *Nken*, 556 U.S. at 434.

In response, the Government refuses to acknowledge the directive of *Draper* to construe the "preemptive effect as narrowly as possible" and asserts that the statutory language cited by the Legislature is simply inapplicable. *Draper*, 9 F.3d at 1393. This failure is fatal to the Government's opposition.

Instead of acknowledging the limits on EMTALA's preemptive reach, the Government merely argues that its interpretation of EMTALA avoids any effect of the non-preemption provision of the Medicare Act, 42 U.S.C. § 1395, by "preserv[ing] medical professionals' ability to determine what stabilizing treatment is necessary—the very opposite of supervising or controlling the practice of medicine." *See* Gov't Opp. Br., p.9 (emphasis omitted). But that answer simply evades what the statute plainly says.

The Government violates the Medicare Act when it purports to supervise or control the practice of medicine—regardless of whether the federal government's preferred rule gives physicians more or less power than they have under state law. The point is not the range of autonomy for *medical professionals*; it's the range of autonomy for *states*. Congress plainly intended for states to supervise and control the practice of medicine.

---

1395; *accord Eberhardt v. City of Los Angeles*, 62 F.3d 1253, 1258 (9th Cir. 1995) ("Congress enacted the EMTALA not to improve the overall standard of medical care, but to ensure that hospitals do not refuse essential emergency care because of a patient's inability to pay."). Enjoining Idaho law violates this prohibition.

Thus, because the Government's interpretation of EMTALA imposes a standard of medical care—abortion must be available for any pregnancy complication as the physician deems necessary—that interpretation necessarily violates the non-preemption provision of the Medicare Act.

The Government also attacks the Medicare Act language by arguing that EMTALA's specific non-preemption provision should somehow control the Medicare Act's more general non-preemption provision.  This argument also lacks merit.  Ordinary rules of statutory interpretation require courts to harmonize all portions of a statute wherever possible, not to ignore provisions the court dislikes. *See Ysleta del Sur Pueblo v. Texas*, 142 S. Ct. 1929, 1939 (2022).  And, even if a court were to follow the Government's misguided direction, it still does not save the Government's flawed interpretation of EMTALA.  The Government nowhere explains how an implied duty to perform abortions can ever "directly conflict" with a particular state's abortion law.  As fully explained in the Legislature's opening brief, interpreting EMTALA as a *de facto* federal abortion mandate violates non-preemption clauses in both EMTALA and the Medicare Act. *See* Legislature Memo ISO Stay, pp. 3-12.

In addition, the Government attacks the Legislature's EMTALA interpretation as inconsistent.  In support of this assertion the Government includes a quotation from one of the Legislature's physicians, *see* Legislature's Brief in Opp. to the Government's Mot. for Prelim. Inj. (Dkt. 65), pp. 7-8, as support for its assertion that the Legislature has conceded that EMTALA and the federal government can dictate the practice of medicine. Gov't Opp. Br., p.9. This quotation is

used to argue that the Legislature previously assured the District Court that "the mother's health and welfare are secondary to the baby*." Id.* Nothing in the Legislature's motion for a stay pending appeal questions that proposition. Instead, the Legislature simply argues that EMTALA requires medical care for a pregnant woman and her unborn child—*not* medical care that pits their health care treatment against each other. What's more, the quotation from the Legislature's earlier pleading refers to how Idaho doctors will "interpret" Idaho Code § 18-622 ("section 622"), not how they will interpret EMTALA. The point still stands. The Government has read EMTALA as an abortion mandate when the statutory language plainly requires hospitals to provide emergency care to both a pregnant woman *and* her unborn child. How a physician should respond when a pregnant woman has complications requiring an abortion for her health and welfare is governed by Idaho law, not by EMTALA.

The Government also asserts that the Legislature's "interpretive method, requiring EMTALA to specifically enumerate the emergency medical treatments it requires, would render EMTALA and its preemption provision meaningless." *See* Gov't Opp. Br., p.10. This argument fails to appreciate the uniqueness of an abortion. First, abortion is unlike "defibrillation or CPR." *Id.* It is an issue of momentous political and moral controversy with the potential of exploitation—as evidenced by the federal executive's directives referenced in prior briefing. *See* State of Idaho's Response to the United States' Motion for a Preliminary Injunction (Dkt. 66), p.5-6.

EMTALA's requirement of stabilizing care cannot be a "blank page" for the federal government to fill in with its preferred policy on abortion. EMTALA simply requires a hospital to offer stabilizing care for a particular medical condition on the same terms as

any similarly situated patient.  EMTALA does not require *all* hospitals to provide CPR or tonsillectomies for the same condition, and it certainly does not mandate abortions.  Third, as highlighted above, EMTALA's non-preemption provision is extremely narrow, just as the Ninth Circuit held in *Draper*. *Draper*, 9 F.3d at 1393.  That provision is satisfied if a hospital provides the screening, stabilization, and conditions upon transfer expressly dictated by EMTALA's language.

In essence, the Government is arguing that EMTALA requires abortions unless the statute specifically excludes abortions.[2]  However, that interpretive method turns ordinary statutory construction upside-down by reading every broad word or phrase as if it included all kinds of things that Congress never intended.  Indeed, that method of interpretation would obliterate the presumption against preemption, as every federal statute with broad language can preempt state law at will.  And, perhaps most importantly in the present context, it ignores the actual language of EMTALA's non-preemption clause, under which the "baseline" is that EMTALA does not preempt state law. *See* Legislature Memo ISO Stay, p.5.

Simply put, EMTALA cannot preempt Idaho law on the basis of a judicially implied duty to perform abortions that would preempt Idaho standards of medical care—including

---

[2] It should be noted that there is no federal circuit court support for the Government's interpretation of EMTALA as an abortion mandate.  The Government references three federal district court cases that have the same controlling authority as *Texas v. Becerra*, 623 F.Supp.3d 696 (N.D. Texas 2022), cited by the Legislature, and that case was effectively ignored.  Simply put, there is no federal circuit court authority for the Government's argument.

the conditions when an abortion is lawful.  Failing to appreciate the limits of EMTALA's preemptive reach is an error that renders the preliminary injunction void.

**B. The Government Continues To Ignore Other EMTALA Language That Supports The Legislature's Statutory Interpretation That Precludes EMTALA From Becoming A Federal Abortion Mandate.**

As set forth in its initial memorandum, the Legislature asserts it was error for the District Court to disregard subsection (B) of EMTALA's definition of *emergency medical condition*, 42 U.S.C. § 1395dd(e)(1).  *See* Aug. Order, p. 4 n.1.  The Legislature has consistently maintained that EMTALA's directions regarding the proper treatment of "a pregnant woman who is having contractions" are plainly relevant to the Government's claim challenging Idaho's restrictions on the availability of abortion. 42 U.S.C. § 1395dd(e)(1).  Moreover, it is fundamental error to effectively recast EMTALA's definition of "emergency medical condition" by removing reference to the medical treatment of an unborn child. *Id.*

On this issue, the Government denies that its misguided statutory interpretation erases EMTALA's references to protecting the health of the unborn child: "That language [in EMTALA] does not suggest that a pregnant individual's health may be treated as secondary, and thus allowed to deteriorate, under circumstances in which abortion is the necessary stabilizing treatment." *See* Gov't Opp. Br., p.11.  This responsive argument simply restates the Government's invented federal abortion mandate and fails to address the salient issue.  The Government makes no attempt to explain how a statute requiring hospitals to treat both a pregnant woman and her unborn child can be fairly read as a

*requirement* to provide an abortion.  Nor does the Legislature ever argue, as claimed in the Government's opposition, that a pregnant woman's health can be "treated as secondary." *Id*.  The Legislature's contention is simply this—Idaho law, not EMTALA, determines what medical treatment a pregnant woman suffering an emergency medical condition should receive.  EMTALA requires that some such treatment be given, regardless of the patient's ability to pay.  But it does not authorize the United States to seize control of medical decisions made in Idaho hospitals.[3]

The Government attacks this argument as "a new statutory theory" and argues that the Legislature's common-sense point in support of this argument, that EMTALA endorses delivery of a baby as stabilizing care, is somehow novel. *See* Gov't Opp. Br., p.11-12.  It's not new at all.  Rather, it is a fair reading of a condition that falls in subsection (B) of the statutory definition of "emergency medical treatment," which, the District Court dismissed as irrelevant and is a basis for the asserted error. *See* 42 U.S.C. 1395dd(e)(1).  Respectfully, subsection (B) is not irrelevant.  The Legislature certainly does not suggest that "the only stabilizing treatment available to individuals under EMTALA is delivery." *See* Gov't Opp. Br., p.11.  Rather, a pregnant woman (with or without contractions) should receive other forms of medical care for an emergency medical condition.  The Legislature's point here is that the Government's interpretation of EMTALA wars against a text that Congress

---

[3] The Government oddly contends that EMTALA's informed consent provision, *see* 42 U.S.C. § 1395dd(b)(2), supports its position.  That provision adds nothing relevant.  Whether or not a patient consents to a particular medical treatment says nothing about the medical treatment EMTALA requires.

adopted with multiple references to the medical care of an unborn child and to delivery of a live birth as the only expressly endorsed form of stabilizing care for a pregnant woman with contractions.

In a similar vein, the Government argues that the EMTALA provision endorsing delivery as a form of stabilizing care "has no bearing on the appropriate stabilizing treatment for pregnant individuals presenting with other emergency medical conditions … that can occur without contractions, including the emergency medical conditions on which the United States and this Court relied during the preliminary injunction proceedings." *Id*. at p.12 (emphasis omitted).

Again, this argument is not supportable.  In the early stages of this case, both the Government and the District Court placed great emphasis on the notion of "ectopic pregnancies."  However, this issue has been rendered moot.  The Idaho Supreme Court has held that such is excluded from Idaho Code § 18-622 as removing an ectopic pregnancy is not an "abortion" as the Idaho statute defines it.  *Planned Parenthood Great Nw. v. State*, __ P.3d__, 2022 WL 3335696, at *6 (Idaho Aug. 12, 2022).

Similarly, pre-eclampsia was also frequently mentioned as an asserted conclusory circumstance supporting the Government's position.  However, pre-eclampsia is a potentially fatal condition, for which section 622's authorization for an abortion to save the woman's life seems to obviously apply. *See* Idaho Code § 18-622(2).  Other pregnancy complications can amount to individual medical judgment, which section 622 defers to

largely whenever the doctor acting in good faith decides that an abortion is necessary to save a woman's life (or to terminate a pregnancy caused by rape or incest). *See id.*

In sum, because EMTALA does not dictate any particular forms of medical treatment—including abortion—an Idaho doctor complies with EMTALA by simply giving a pregnant woman with an emergency medical condition the same medical treatment provided to any similarly situated patient, regardless of ability to pay. And what the Government still does not appreciate is that this may include medical treatments other than abortion to resolve a pregnant woman's emergency medical condition.

### C. The Affordable Care Act Does Not Support The Government's Interpretation Of EMTALA

The Government next opposes the Legislature's assertion that it will prevail on appeal and is entitled to a stay on the basis that its interpretation is inconsistent with the Affordable Care Act ("ACA"), specifically 42 U.S.C. § 18023. In particular, the Government argues that the ACA supports the conclusion that "EMTALA encompasses abortion care." Gov't Opp. Br., p.12. Section 18023(d) does nothing of the kind. It simply clarifies that the ACA does not "relieve any health care provider from providing emergency services as required by State or Federal law, including [EMTALA]." 42 U.S.C. § 18023(d). Because this provision says nothing about EMTALA requiring abortion, it adds nothing to the argument. Moreover, statutory context demolishes any inference that the ACA's broad reference to EMTALA preserves an abortion mandate in it. In the same statutory framework, section 18023, the ACA specifically denies that it preempts state laws "on

14

abortions" or affects federal laws concerning "conscience protection," "willingness or refusal to provide abortion," and "discrimination on the basis of willingness or refusal to provide … abortion." 42 U.S.C. § 18023(c)(1)-(2).

In essence, the Government asks this Court to accept without support or authority the assertion that the ACA expressly requires states to provide abortions when statutory context implies the opposite, or that the ACA affects federal laws protecting the conscience rights of medical professionals while still—in oblique language that never mentions abortion—preserving a federal abortion mandate under EMTALA.  That interpretation is tortured at best.

The Government asserts the Legislature is trying to read EMTALA in a way that "exclude[s] abortion care from the scope of stabilizing treatment even when an abortion is necessary to protect a pregnant individual's health." Gov't Opp. Br., p.13.  Not so.  Moreover, the Government wants to argue that section 622 (even as amended) stands as an "obstacle" to the "accomplishment and execution of the full purposes and objectives of Congress." *See* Gov't Opp. Br., p.14.  The Government is getting the telescope backwards.  Courts read statutes for what they say—not for what they don't say.  And it would be a once-in-a-lifetime discovery to find that in EMTALA the Congress of the United States adopted a national abortion mandate without saying so expressly.

In summation, the preliminary injunction rests on the District Court's conclusion that "EMTALA obligates the treating physician to provide stabilizing treatment, including abortion care." Aug. Order at 19.  As explained above, that conclusion is simply wrong

and, as explained above and in the initial brief, is based on a flawed interpretation of federal statute.

**D. The Government's Objections To The Legislature's Constitutional Arguments Lack Merit.**

In addition to the assertions regarding the misreading of EMTALA, the Legislature also identifies significant constitutional issues with the District Court's preliminary injunction.  The Government objects to four of the arguments to which the Legislature responds as follows:

1.     *Supremacy Clause.*  The Legislature asserts that the Supremacy Clause does not support the implied right of action upon which the Government's case rests and cites *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324–25 (2015).  In response, the Government valiantly attempts to distinguish *Armstrong*, but unpersuasively.  As explained by the Supreme Court, the Supremacy Clause "creates a rule of decision" but not a "cause of action." *Id*.  The Government attempts to recharacterize the action to assert that it is not seeking to "enforce" federal law in the manner proscribed in *Armstrong*. Gov't Opp. Br., p. 14.  This argument falls to the ground.  In reality, the Government's acts are even more troubling—here, the Government is clearly pursuing the creation and enforcement of a federal abortion mandate.

2     *Major Questions Doctrine.*  The Legislature also argues that the District Court's injunction offends the major questions doctrine, which requires "Congress to speak clearly if it wishes to assign to an agency decisions of vast economic and political

significance." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (internal quotation omitted).  Specifically, the Legislature asserts that the District Court's May Order violates the major questions doctrine by accepting a reading of EMTALA that grants the federal government unprecedented authority over abortion without express Congressional approval.  Thus, because federal control over Idaho abortion law is a matter of "vast … political significance," *id.*, "more than a merely plausible textual basis" must justify it. *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022).  And, under the circumstances, that federal action is not justified.  Consequently, the major questions doctrine condemns what can only be described as an undelegated exercise of executive power.

In response to this argument, the Government argues that (1) the doctrine only applies to agency action and that in this case, the Government is not an agency; (2) related to the first, the Government is not "enforcing" a "policy decision" but rather legislation by Congress itself; and (3) there is no "transformative expansion" of authority. *See* Gov't Opp. Br., p.15.

The Legislature's response the Government's arguments is straightforward.

*First*, the fundamental basis for the major questions doctrine.  The doctrine is a corollary of the separation of powers principles, and applies to the Executive Branch as a whole, no less than to a particular agency. *See, e.g., West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022); *NFIB v. OSHA*, 142 S. Ct. 661 (2022); *Ala. Assoc. of Realtors v. Dep't of Health and Hum. Servs.*, 141 S. Ct. 2485 (2021).

*Second*, the idea that the Government is not "enforcing" a policy decision is without support where, as explained above, the federal executive's publicly acknowledged "reproductive" policy that is being carried out is *not* supported by EMTALA language. Indeed, if the Government's argument were persuasive, the major questions doctrine would not apply to any contested issues of statutory interpretation. Clearly, this is not the case.

*Third*, the assertion that this is not a transformative expansion is simply unsupportable. As highlighted above, the Government is attempting to use EMTALA as a tool for creating a federal abortion mandate to further publicly adopted executive policy related to abortion. That is the very definition of transformative expansion. Moreover, the Legislature has cited Supreme Court precedent that supports the Legislature's assertions that the Government cannot leverage compliance with its non-textual mandate, *i.e.* transformative expansion, under the relatively small federal aid granted under EMTALA or risk the loss of the devastatingly large amount of aid granted under the Medicare Act as a whole. *See* Legislature Memo ISO Stay, p.14. Thus, here, not only is this expansion transformative, it is also unprecedented.

3.     *Spending Clause*. The Legislature argues that construing EMTALA as an abortion mandate also violates the Spending Clause. *See* U.S. CONST. art. I, § 8. In response, the Government argues for the first time that the Legislature has no standing to raise a Spending Clause argument because it is the hospitals not the Legislature, that would be injured by the coercion. *See* Gov't Opp. Br., p.16. This argument has no merit. If the Government carries out its threat to deprive the State of Idaho of Medicare funding unless

18

it complies with the federal government's newly imposed abortion mandate, the Idaho Legislature will suffer a concrete injury by having to divert state tax money to cover the difference; that injury is traceable to the Government's mandate-plus-threat. *See* USA Mem. in Supp. of Mot. for a Prelim. Inj. (Dkt. 17 (attachment #1)), p.19.  Thus, a court order rejecting the government's interpretation of EMTALA and its attack on section 622 would provide obvious and complete relief.  In short, the idea that the Legislature does not have standing because it is not injured is false.

4.    *Tenth Amendment*.    Here, the Legislature asserts that the preliminary injunction violates the State of Idaho's reserved powers over abortion.  The basis for this argument is obviously *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022).  Dobbs clearly provided that the authority to regulate abortion belongs "to the people and their elected representatives." *Id*. at 2284.  As set forth in the initial memorandum, the preliminary injunction thwarts the exercise of that authority because Idaho cannot carry out Idaho Code §§ 18-622(2) and (3) insofar as the District Court concludes that it collides with the Government's EMTALA-based federal abortion mandate.  In response, the Government only identifies language from the August Order that "state law must yield to conflicting federal law." Gov't Opp. Brief, p.16.  However, where that interpretation of federal law lacks clear statutory authority as explained above, there is an obvious Tenth Amendment conflict.  The Government may not like it, but, for now, *Dobbs* continues to be the dispositive answer to the constitutional question of which

level of government—federal or state—holds the authority to regulate abortions performed in emergency rooms.

Directly stated, Congress has not passed a law superseding state abortion law. Blocking Idaho law based on a misinterpretation of EMTALA is a violation of the Tenth Amendment and a basis for concluding that the Legislature will prevail on appeal and is entitled to the requested stay pending that appeal.

III.    **Granting a Stay Serves Significant Public Interests.**

There is no dispute that *Nken* holds that the remaining factors—harm to the opposing party and the public interest—"merge when the Government is the opposing party." *See* Gov't Opp., Br., p.19 (citing *Nken*, 556 U.S. at 435).  The Legislature has asserted that these remaining factors also support a stay.  The Government disagrees.  Here, the Government parrots the language from the August Order and asserts that if the injunction were stayed "pregnant Idahoans would lose the protections afforded to them under federal law." *See* Gov't Opp. Br., p.20.  However, this ignores the Legislature's primary argument that public interest is best served by confining the Government within its lawful bounds and "maintaining our constitutional structure" of powers divided among the three branches of the national government and between the federal government and the states. *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021); *see also Sierra Club v. Trump*, 929 F.3d 670, 677 (9th Cir. 2019) (concluding that the public interest would be served by "respecting the Constitution's assignment of the power of the purse to

Congress, and by deferring to Congress's understanding of the public interest"). In this case, that significant public interest can only be served by issuing a stay pending the appeal.

## CONCLUSION

For these reasons, the Legislature respectfully requests this Court to stay its orders dated August 24, 2022 (Dkt. 95) and May 4, 2023 (Dkt. 135), pending disposition of an appeal by the United States Court of Appeals for the Ninth Circuit and proceedings, if any, before the Supreme Court of the United States.

Dated this 7th day of August 2023.

MORRIS BOWER & HAWS PLLC

By: */s/ Daniel W. Bower*
Daniel W. Bower

*/s/ Monte Neil Stewart*
Monte Neil Stewart

*Attorneys for Proposed Intervenors-Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th Day of August, 2023, I electronically filed the foregoing with the Clerk of the Court via the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

| | | |
|---|---|---|
| Brian David Netter | ☐ | U.S. Mail |
| DOJ-Civ | ☐ | Hand Delivered |
| Civil Division | ☐ | Facsimile: |
| 950 Pennsylvania Avenue NW | ☒ | ECF Email: brian.netter@usdoj.gov |
| Washington, D.C. 20530 | | |

*Attorneys for Plaintiff*

| | | |
|---|---|---|
| Daniel Schwei | ☐ | U.S. Mail |
| DOJ-Civ | ☐ | Hand Delivered |
| Federal Programs Branch | ☐ | Facsimile: |
| 1100 L Street, N.W., Ste. 11532 | ☒ | ECF Email: daniel.s.schwei@usdoj.gov |
| Washington, D.C. 20530 | | |

*Attorneys for Plaintiff*

| | | |
|---|---|---|
| Julie Straus Harris | ☐ | U.S. Mail |
| DOJ-Civ | ☐ | Hand Delivered |
| Civil Division, Federal Programs | ☐ | Facsimile: |
| Branch | ☒ | ECF Email: |
| 1100 L Street, N.W. | | julie.strausharris@usdoj.gov |
| Washington, D.C. 20530 | | |

*Attorneys for Plaintiff*

| | | |
|---|---|---|
| Lisa Newman | ☐ | U.S. Mail |
| U.S. Department of Justice | ☐ | Hand Delivered |
| Civil Division, Federal Programs | ☐ | Facsimile: |
| Branch | ☒ | ECF Email: lisa.n.newman@usdoj.gov |
| 1100 L Street, N.W. | | |
| Washington, D.C. 20005 | | |

*Attorneys for Plaintiff*

| | | |
|---|---|---|
| Anna Lynn Deffebach | ☐ | U.S. Mail |

DOJ-Civ                                   ☐   Hand Delivered
Civil Division, Federal Programs          ☐   Facsimile:
Branch                                    ☒   ECF Email:
1100 L Street, N.W., Ste. 12104           anna.l.deffebach@usdoj.gov
Washington, D.C. 20005

*Attorneys for Plaintiff*


Christopher A. Eiswerth                    ☐   U.S. Mail
DOJ-Civ                                    ☐   Hand Delivered
Federal Programs Branch                    ☐   Facsimile:
1100 L Street, N.W., Ste. 12310            ☒   ECF Email:
Washington, D.C. 20005                        christopher.a.eiswerth@usdoj.gov

*Attorneys for Plaintiff*

Emily Nestler                              ☐   U.S. Mail
DOJ-Civ                                    ☐   Hand Delivered
1100 L Street                              ☐   Facsimile:
Washington, D.C. 20005                     ☒   ECF Email: emily.b.nestler@usdoj.gov

*Attorneys for Plaintiff*

Raúl Labrador                              ☐   U.S. Mail
Attorney General                           ☐   Hand Delivered
                                           ☐   Facsimile: (208) 334-2400
Lincoln Davis Wilson                       ☒   ECF Email:
Chief of Civil Litigation and                 lincoln.wilson@ag.idaho.gov
Constitutional Defense
Brian v. Church                               brian.church@ag.idaho.gov
Deputy Attorney General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, ID 83720-0010

*Attorneys for Defendant*

*/s/ Daniel W. Bower*

Daniel W. Bower