(Slip Opinion)                  Cite as:  603 U. S. ____ (2024)                  1

Per Curiam

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 23–726 and 23–727

———————

MIKE MOYLE, SPEAKER OF THE IDAHO HOUSE OF
REPRESENTATIVES, ET AL., PETITIONERS
23–726                           *v.*
UNITED STATES


IDAHO, PETITIONER
23–727                           *v.*
UNITED STATES

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 27, 2024]

PER CURIAM.

The writs of certiorari before judgment are dismissed as
improvidently granted, and the stays entered by the Court
on January 5, 2024, are vacated.

*It is so ordered.*

Cite as: 603 U. S. ____ (2024)          1

KAGAN, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 23–726 and 23–727

_____

MIKE MOYLE, SPEAKER OF THE IDAHO HOUSE OF
REPRESENTATIVES, ET AL., PETITIONERS

23–726          *v.*

UNITED STATES


IDAHO, PETITIONER

23–727          *v.*

UNITED STATES

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 27, 2024]

JUSTICE KAGAN, with whom JUSTICE SOTOMAYOR joins, and with whom JUSTICE JACKSON joins as to Part II, concurring.

An Idaho law prohibits abortions unless necessary to prevent a pregnant woman's death; the law makes no exception for abortions necessary to prevent grave harms to the woman's health, like the loss of her fertility. Before the law could take effect, the Federal Government sued the State under the Emergency Medical Treatment and Labor Act (EMTALA). That law requires a Medicare-funded hospital to provide essential care to patients experiencing medical emergencies. The Government's suit contended that EMTALA preempts the Idaho abortion law in a narrow class of cases: when the state law bars a hospital from performing an abortion needed to prevent serious health harms.

The District Court, believing the Government was likely

to prevail in its suit, entered a preliminary injunction. During the year that the injunction was in place, women in Idaho were able to obtain abortions in medical emergencies. Idaho meanwhile sought to get the injunction lifted. When the en banc Court of Appeals for the Ninth Circuit declined to stay the injunction, Idaho filed an emergency application here. This Court stayed the injunction and granted the State's petition for certiorari before judgment. With that stay in effect, Idaho could enforce its abortion ban even when terminating a pregnancy was necessary to prevent grave harm to the woman. The on-the-ground impact was immediate. To ensure appropriate medical care, the State's largest provider of emergency services had to airlift pregnant women out of Idaho roughly every other week, compared to once in all of the prior year (when the injunction was in effect). See Tr. of Oral Arg. 66, 113.

I concur in the Court's decision today to vacate its stay and dismiss the writ of certiorari before judgment as improvidently granted. I do so because Idaho's arguments about EMTALA do not justify, and have never justified, either emergency relief or our early consideration of this dispute. With this Court's writ of certiorari dismissed, the lower courts can proceed with this litigation in the regular course. And with this Court's stay dissolved, the District Court's preliminary injunction will again take effect. That will prevent Idaho from enforcing its abortion ban when the termination of a pregnancy is needed to prevent serious harms to a woman's health.

## I

EMTALA requires hospitals to provide abortions that Idaho's law prohibits. When that is so, Idaho's law is preempted. The Court's ruling today follows from those premises.

Federal law and Idaho law are in conflict about the treatment of pregnant women facing health emergencies.

KAGAN, J., concurring

EMTALA requires a Medicare-funded hospital to offer an abortion when needed to stabilize a medical condition that seriously threatens a pregnant woman's life or health. See 42 U. S. C. §1395dd. Idaho allows abortions only when "necessary to prevent" a pregnant woman's "death." Idaho Code Ann. §18–622(2)(a)(i) (Supp. 2023). By their terms, the two laws differ. What falls in the gap between them are cases in which continuing a pregnancy does not put a woman's life in danger, but still places her at risk of grave health consequences, including loss of fertility. In that situation, federal law requires a hospital to offer an abortion, whereas Idaho law prohibits that emergency care. And the record shows that, as a matter of medical reality, such cases exist. For example, when a woman comes to an emergency room with PPROM, the serious risk she faces may not be of death but of damage to her uterus, preventing her from having children in the future. See 2 App. 594; see also *id.*, at 615–616 (similar for pre-eclampsia). Idaho has never suggested that its law would allow an abortion in those circumstances. See Tr. of Oral Arg. 23 (stating that although the threat of death need not be "imminen[t]," only that threat can justify an abortion); see also *id.*, at 25–28, 33–34. That is why hospitals in Idaho have had to airlift medically fragile women to other States to receive abortions needed to prevent serious harms to their health. See *id.*, at 66, 103–104, 113–115. Those transfers measure the difference between the life-threatening conditions Idaho will allow hospitals to treat and the health-threatening conditions it will not, despite EMTALA's command.

Given that conflict, I agree with the Court's decision today to step back from its early intervention in this dispute. In the first stage of this suit, the District Court considered both sides' medical evidence and entered a preliminary injunction against Idaho's law on the ground of preemption. See 623 F. Supp. 3d 1096, 1103–1105, 1110, 1117 (2022).

After the Idaho Supreme Court construed the law, the District Court revisited its findings, and reaffirmed its entry of the injunction. See 2023 WL 3284977, *1, *5 (May 4, 2023). In line with standard practice, that decision now can go to the Court of Appeals, and the District Court can afterward consider further evidence and arguments for the purpose of final judgment. Idaho is not entitled to anything more. It mainly argues that EMTALA never requires a hospital to "offer medical treatments that violate state law," even when they are needed to prevent substantial health harms. Tr. of Oral Arg. 4. In my view, that understanding of EMTALA is not "likely to succeed on the merits," and so cannot support a stay of the injunction. *Nken* v. *Holder*, 556 U. S. 418, 434 (2009). Neither does the State's argument provide any basis for this Court to short-circuit the proceedings below. Today's ruling thus puts the case back where it belongs, and with the preliminary injunction in place.

## II

JUSTICE ALITO's dissenting opinion requires a brief response. His primary argument is that although EMTALA generally obligates hospitals to provide emergency medical care, it never demands that they offer an abortion—no matter how much that procedure is needed to prevent grave physical harm, or even death. See *post*, at 4–15. That view has no basis in the statute.

EMTALA unambiguously requires that a Medicare-funded hospital provide whatever medical treatment is necessary to stabilize a health emergency—and an abortion, in rare situations, is such a treatment. The statutory obligation kicks in when an individual arrives at a hospital with an "emergency medical condition," which is one involving serious jeopardy to health. §1395dd(e)(1)(A). The hospital must then "stabilize" the condition. §1395dd(b)(1)(A). That means offering the medical treatment necessary to ensure that "no material deterioration of the condition" is likely to

occur. §1395dd(e)(3)(A). The statute does not list particular treatments—for example, defibrillation, blood transfusion, or mechanical ventilation. What it instead requires is the treatment that is medically appropriate to stabilize the patient. And when a pregnancy goes terribly wrong, that treatment may be an abortion. Termination of the pregnancy (which is often of a non-viable fetus) may be the only way to prevent a woman's death or serious injury, including kidney failure or loss of fertility. See 623 F. Supp. 3d, at 1101, 1103–1105. I do not understand JUSTICE ALITO to dispute that medical fact. And from that fact, a statutory obligation arises. It does not matter that EMTALA "does not mention abortion." *Post*, at 12; see *post*, at 5. Neither, as just noted, does EMTALA mention any other treatment. The statute simply requires the hospital to offer the treatment necessary to prevent the emergency condition from spiraling downward. And on rare occasions that means providing an abortion.

   The statute's references to protecting an "unborn child" do not lead to a different result. Contrary to JUSTICE ALITO's view, none alters EMTALA's command when a pregnancy threatens the woman's life or health. Three of the four provisions JUSTICE ALITO cites concern the treatment of women in labor (including all those with healthy pregnancies). Those provisions ensure that a hospital, in considering the transfer of a woman to another facility, takes account of risks to not only the woman but also her "unborn child." §1395dd(c)(1)(A)(ii), (2)(A), (e)(1)(B)(ii). The provisions have no application to women who are not in labor, but instead are experiencing a different pregnancy-related condition. The fourth provision (included within the definition of "emergency medical condition") specifies that a hospital must treat a condition that "plac[es] the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy." §1395dd(e)(1)(A)(i). The parenthetical there, added

in an amendment to EMTALA, ensures that a woman with no health risks of her own can demand emergency-room treatment if her fetus is in peril. It does not displace the hospital's duty to a woman whose life or health *is* in jeopardy, and who needs an abortion to stabilize her condition. Then, the statute requires offering that treatment to the woman.*

Because the Idaho law conflicts with that requirement— prevents hospitals from doing what EMTALA commands— the Court is right to dissolve its stay of the District Court's injunction. Doing so will again give Idaho women access to all the needed medical treatments that EMTALA guarantees.

————————

*The amendment's history confirms that understanding. As originally enacted, EMTALA did not obligate hospitals to provide medical care when a woman's fetus, but not the woman herself, was in peril. See Tr. of Oral Arg. 105 (Solicitor General describing "well-publicized cases" where women's "own health and life were not in danger, but the fetus was in grave distress and hospitals weren't treating them"). To fix that problem, very large bipartisan majorities in both the House and the Senate elected to broaden the provision, entitling a woman to demand care for her unborn child as well as herself. See 103 Stat. 2248; 135 Cong. Rec. 31431 (1989); *id.*, at 31127; *id.*, at 24605; *id.*, at 23393. The amendment would likely have sparked far more opposition if it somehow tacitly withdrew EMTALA's requirement that hospitals treat women who need an abortion to prevent death or serious harm.

Cite as: 603 U. S. ____ (2024)          1

BARRETT, J., concurring

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 23–726 and 23–727

_____

MIKE MOYLE, SPEAKER OF THE IDAHO HOUSE OF
REPRESENTATIVES, ET AL., PETITIONERS
23–726          *v.*
UNITED STATES


IDAHO, PETITIONER
23–727          *v.*
UNITED STATES

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 27, 2024]

JUSTICE BARRETT, with whom THE CHIEF JUSTICE and
JUSTICE KAVANAUGH join, concurring.

We granted certiorari before judgment in these cases to
decide whether the Emergency Medical Treatment and La-
bor Act (EMTALA) preempts a provision of Idaho law that
prohibits abortions except when necessary to save the life
of the mother. 601 U. S. ___ (2024). Because the shape of
these cases has substantially shifted since we granted cer-
tiorari, I concur in the Court's judgment dismissing the writ
as improvidently granted.

I

In 2022, the Department of Health and Human Services
issued guidance to "remind hospitals of their existing obli-
gation to comply with EMTALA." Centers for Medicare &
Medicaid Services, Reinforcement of EMTALA Obligations
Specific to Patients Who Are Pregnant or Are Experiencing
Pregnancy Loss, Note, p. 1 (July 11, 2022) (rev. Aug. 25,
2022) (italics deleted). The guidance tells physicians that if

BARRETT, J., concurring

they believe that "abortion is the stabilizing treatment necessary to resolve" a pregnant woman's emergency medical condition, they "must provide that treatment." *Id.*, at 1 (italics and emphasis deleted). Any contrary state law, the guidance continues, is "preempted." *Ibid.* (italics and emphasis deleted).

Idaho's Defense of Life Act criminalizes the performance of most abortions. Idaho Code Ann. §18–622 (Supp. 2023). As originally enacted, the Act allowed accused physicians to raise an affirmative defense that "the abortion was necessary to prevent the death of the pregnant woman." §18–622(2)(a)(i). Soon before the Act was set to take effect, the United States sued Idaho, seeking to enjoin Idaho's law "to the extent it conflicts with EMTALA." 1 App. 5. EMTALA, the United States argued, requires physicians to perform abortions under certain circumstances that Idaho's Act would forbid.

After holding an evidentiary hearing, the District Court identified a conflict and granted a preliminary injunction. 623 F. Supp. 3d 1096 (Idaho 2022). The court based its conclusion on three key assumptions: (1) The Act prohibits the termination of ectopic pregnancies; (2) the pregnant woman's death must be objectively "imminent" or "certain" before a physician can perform an abortion; and (3) the "necessary to prevent death" exception is only an affirmative defense. *Id.*, at 1109–1114. The Government's witnesses, whose testimony the court credited, made similar assumptions. *Id.*, at 1104–1105. They claimed that the Act might prohibit abortions as treatment for conditions including severe heart failure, pre-eclampsia, preterm premature rupture of the membranes (PPROM), sepsis, and placental abruption, because a physician could not know, "with certainty," that an abortion is necessary to save the mother's life in those circumstances. See, *e.g.*, 1 App. 30–38. They also assumed that the Act only permitted abortions where death was "imminent." See, *e.g.*, 2 *id.*, at 608.

BARRETT, J., concurring

After the District Court ruled, the Idaho Supreme Court construed the Act. That court explained that the Act "does not require *objective* certainty, or a particular level of immediacy, before the abortion can be 'necessary' to save the woman's life." *Planned Parenthood Great Nw.* v. *State*, 171 Idaho 374, 445, 522 P. 3d 1132, 1203 (2023). And "treating an ectopic pregnancy, by removing the fetus," the court concluded, does not count as an "'abortion'" under the Act. *Ibid.*

Without holding a new evidentiary hearing, the District Court denied Idaho's motion for reconsideration. 2023 WL 3284977 (May 4, 2023). The Idaho Legislature later amended the definition of "abortion" to exclude "[t]he removal of a dead unborn child" and "[t]he removal of an ectopic or molar pregnancy." §18–604(1)(b), (c). It also changed the "life of the mother" affirmative defense into an exception from the prohibition on criminal abortions. §18–622(2).

The Ninth Circuit initially stayed the District Court's injunction, 83 F. 4th 1130 (2023), but the en banc court vacated the panel's stay, declined to stay the injunction, and scheduled oral argument on the merits, 82 F. 4th 1296 (2023). We granted Idaho's and the Legislature's applications to stay the District Court's injunction pending appeal, treated the applications as petitions for a writ of certiorari before judgment, and granted the petitions. 601 U. S. ___ (2024).

## II

Before the Ninth Circuit had the opportunity to review the District Court's preliminary injunction, this Court stayed the injunction and granted certiorari before judgment. Both decisions were premised on the belief that Idaho would suffer irreparable harm under the injunction and that these cases were ready for the Court's immediate determination. Since then, briefing and oral argument

have "shed more light on this case than in the nature of
things was afforded at the time" the Court considered peti-
tioners' emergency applications. *Belcher* v. *Stengel*, 429
U. S. 118, 119 (1976) (*per curiam*) (dismissed as improvi-
dently granted). I am now convinced that these cases are
no longer appropriate for early resolution.

The parties dispute whether EMTALA requires hospitals
to provide abortions—or any other treatment forbidden
by state law—as necessary stabilizing care. They also disa-
gree about whether EMTALA, as a statute enacted under
Congress's spending power and that operates on private
parties, *can* preempt state law (an issue aired for the first
time in this Court). In my judgment, it would be imprudent
to answer these important questions now. Since this suit
began in the District Court, Idaho law has significantly
changed—twice. And since we granted certiorari, the par-
ties' litigating positions have rendered the scope of the dis-
pute unclear, at best.

In its stay application, Idaho argued that the Govern-
ment's interpretation of EMTALA would render Idaho's Act
virtually unenforceable. As Idaho understood it, the Gov-
ernment's theory would allow physicians to perform abor-
tions whenever necessary to avoid "'serious jeopardy'" to
the mother's *mental* health. Stay Reply Brief in No.
23A470, p. 6. On that broad reading, Idaho projected that
emergency rooms would function as "federal abortion en-
claves governed not by state law, but by physician judg-
ment, as enforced by the United States's mandate to per-
form abortions on demand." *Ibid.* (citation omitted). Idaho
also warned that the Government's interpretation would
"threate[n] religious healthcare providers" by forcing doc-
tors and hospitals to perform abortions regardless of con-
science objections. *Id.*, at 15. Both of these points were rel-
evant to the Court's assessment of the irreparable harm
that Idaho would suffer from the preliminary injunction,
*Nken* v. *Holder*, 556 U. S. 418, 434 (2009), as well as the

BARRETT, J., concurring

need for "immediate determination in this Court," Supreme Court Rule 11.

At the merits stage, however, the United States disclaimed these interpretations of EMTALA. First, it emphatically disavowed the notion that an abortion is ever required as stabilizing treatment for mental health conditions. Brief for United States 26, n. 5; Tr. of Oral Arg. 76–78. That is an important concession: If restricted to conditions posing serious jeopardy to a woman's physical health, the Government's reading of EMTALA does not gut Idaho's Act.* Second, the United States clarified that federal conscience protections, for both hospitals and individual physicians, apply in the EMTALA context. Tr. of Oral Arg. 87–89. That is another critical point: It alleviates Idaho's concern that the Government's interpretation of EMTALA would strip healthcare providers of conscience protections.

Narrowing happened from the other direction too. The United States identified PPROM, placental abruption, preeclampsia, and eclampsia as conditions for which EMTALA requires an emergency abortion to be available. (The same conditions that the Government's witnesses identified—before Idaho's law changed.) But in this Court, petitioners represent that the Act permits physicians to treat each of these conditions with emergency abortions, even if the threat to the woman's life is not imminent. Reply Brief in No. 23–726, pp. 21–22; Reply Brief in No. 23–727, pp. 8–9;

——————

*The United States also clarified that if pregnancy seriously jeopardizes the woman's health postviability, EMTALA requires delivery, not abortion. Brief for United States 10; Tr. of Oral Arg. 75. And it emphasized that EMTALA requires abortion only in an "emergency acute medical situation," where a woman's health is in jeopardy if she does not receive an abortion "then and there." Tr. of Oral Arg. 79–80. These two temporal points also narrow the scope of EMTALA's potential conflict with Idaho's Act.

BARRETT, J., concurring

Tr. of Oral Arg. 23. The same is true for the conditions identified by the Government's witnesses (severe heart failure and sepsis). Reply Brief in No. 23–727, pp. 8–9.

A grant of certiorari before judgment presumes that further proceedings below are unnecessary to the Court's resolution of the question presented. That was a miscalculation in these cases, because the parties' positions are still evolving. The United States has clarified that EMTALA's reach is far more modest than it appeared when we granted certiorari and a stay. Idaho law has materially changed since the District Court entered the preliminary injunction, and, based on the parties' arguments before us, it seems that the framing of these cases has not had sufficient opportunity to catch up. Cf. *The Monrosa* v. *Carbon Black Export, Inc.*, 359 U. S. 180, 184 (1959) ("Examination of a case on the merits, on oral argument, may bring into 'proper focus' a consideration which, though present in the record at the time of granting the writ, only later indicates that the grant was improvident").

On top of that, petitioners have raised a difficult and consequential argument, which they did not discuss in their stay applications, about whether Congress, in reliance on the Spending Clause, can obligate recipients of federal funds to violate state criminal law. Brief for Petitioners in No. 23–726, pp. 48–51; Reply Brief in No. 23–727, pp. 3–4; see also Brief for Prolife Center at the University of St. Thomas as *Amicus Curiae*. The District Court did not address this issue below—nor did the Ninth Circuit, which we bypassed. We should not jump ahead of the lower courts, particularly on an issue of such importance. *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005) ("[W]e are a court of review, not of first view"); *New York* v. *Uplinger*, 467 U. S. 246, 251 (1984) (Stevens, J., concurring) (dismissing as improvidently granted where "constitutional questions" would otherwise be considered "premature[ly]"). The lower courts should address the Spending Clause issue in the first instance.

BARRETT, J., concurring

For these reasons, a "deviation from normal appellate practice" in these cases has proved to be unwise. Supreme Court Rule 11. I therefore agree that we should dismiss the writ of certiorari as improvidently granted and permit proceedings to run their course in the courts below.

Having dismissed the writ, I also agree that we should vacate the stay. As the party seeking emergency relief from this Court, Idaho bore the burden of showing that it would be "'irreparably injured'" if the preliminary injunction remained in effect. *Nken*, 556 U. S., at 434. The Court's grant of a stay reflected, among other things, its determination that Idaho had satisfied that burden. Now, based on the parties' representations, it appears that the injunction will not stop Idaho from enforcing its law in the vast majority of circumstances.

To be sure, the text of the two laws differs: Idaho's Act allows abortion only when "necessary to prevent the death of the pregnant woman," Idaho Code Ann. §18–622(2)(a)(i), while EMTALA requires stabilizing care to prevent "serious jeopardy" to the woman's health, 42 U. S. C. §1395dd(e)(1)(A)(i). But Idaho represents that its exception is broader than the United States fears, and the United States represents that EMTALA's requirement is narrower than Idaho fears. That matters in assessing Idaho's irreparable harm for purposes of the stay. The dramatic narrowing of the dispute—especially the Government's position on abortions to address mental health and conscience exemptions for healthcare providers—has undercut the conclusion that Idaho would suffer irreparable harm under the preliminary injunction. Contrary to Idaho's concerns at the stay stage, the Government's interpretation of EMTALA does not purport to transform emergency rooms into "federal abortion enclaves governed not by state law, but by physician judgment, as enforced by the United States's mandate to perform abortions on demand." Stay Reply Brief in No. 23A470, p. 6 (citation omitted). Nor does it purport to deprive doctors and hospitals of conscience protections. Cf.

8                MOYLE *v.* UNITED STATES

*id.*, at 15. Thus, even with the preliminary injunction in place, Idaho's ability to enforce its law remains almost entirely intact.

Opinion of JACKSON, J.

# SUPREME COURT OF THE UNITED STATES

————————

Nos. 23–726 and 23–727

————————

## MIKE MOYLE, SPEAKER OF THE IDAHO HOUSE OF REPRESENTATIVES, ET AL., PETITIONERS
23–726    *v.*
### UNITED STATES

## IDAHO, PETITIONER
23–727    *v.*
### UNITED STATES

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 27, 2024]

JUSTICE JACKSON, concurring in part and dissenting in part.

In 1986, Congress passed the Emergency Medical Treatment and Labor Act (EMTALA), which requires hospitals to provide stabilizing treatment when patients present with emergency medical conditions. See 42 U. S. C. §1395dd. Sometimes, an abortion is the only way to stabilize a patient and, therefore, comply with EMTALA. But Idaho law prohibits abortions unless the treating physician believes that the abortion is "necessary to prevent the [patient's] death." Idaho Code Ann. §18–622(2)(a)(i) (Supp. 2023).

Recognizing the clear conflict between EMTALA and Idaho law, a Federal District Judge issued an injunction that had the effect of ensuring that Idaho physicians would be able to provide the abortion care EMTALA requires. Five months ago, this Court stayed that injunction. As a legal matter, this Court's stay meant that unless a doctor

Opinion of JACKSON, J.

could actually say that the abortion was necessary to pre-
vent a patient's death, that doctor could no longer provide
abortion care that she viewed as reasonably necessary to
keep a patient from losing her uterus, going into organ fail-
ure, or avoiding any number of other serious health risks.
Compare §18–622(a)(i) with 42 U. S. C. §1395dd(e)(1)(A).
As a practical matter, this Court's intervention meant that
Idaho physicians were forced to step back and watch as
their patients suffered, or arrange for their patients to be
airlifted out of Idaho.

This months-long catastrophe was completely unneces-
sary.  More to the point, it directly violated federal law,
which in our system of government is supreme.  See Art. VI,
cl. 2.  As JUSTICE KAGAN explains, EMTALA plainly re-
quires doctors to provide medically necessary stabilizing
abortions in limited situations.  See *ante,* at 4–6 (concurring
opinion).  To the extent that Idaho law conflicts with
EMTALA, the State's law must give way.  I join in JUSTICE
KAGAN's statutory analysis, see *ibid.,* and I concur in the
Court's *per curiam* decision to lift its stay, which should not
have been entered in the first place.  I dissent in part be-
cause, in my view, the Court is wrong to dismiss these cases
as improvidently granted.

I

This Court typically dismisses cases as improvidently
granted based on "circumstances . . . which 'were not . . .
fully apprehended at the time certiorari was granted.'"  *The
Monrosa* v. *Carbon Black Export, Inc.*, 359 U. S. 180, 183
(1959) (some alterations in original).  This procedural mech-
anism should be reserved for that end—not turned into a
tool for the Court to use to avoid issues that it does not wish
to decide.

The reasons that justified our grant of certiorari in these
cases still hold true today.  See this Court's Rule 11.  The
importance of recognizing Congress's judgments in

Opinion of JACKSON, J.

EMTALA remains as imperative as ever. The United States is still hamstrung in its ability to enforce federal law while States pass laws that effectively nullify EMTALA's requirements. And, on the ground, healthcare providers "have been all but paralyzed by legal uncertainties," placing pregnant patients at risk while they are waiting to be transferred out of State to receive the care they need. Brief for St. Luke's Health System as *Amicus Curiae* 14–15.

If anything, the need for a clear answer to the Supremacy Clause question has only increased in the intervening months. Other States across the country have enacted legislation that gives rise to the same sort of legal conflict that Idaho has created. This pre-emption issue is not going away anytime soon and will most certainly return to this Court. Indeed, it already has. Just three days before we granted this petition, the Fifth Circuit decided a similar case, affirming a permanent injunction that prevents the United States from enforcing EMTALA's requirements with respect to stabilizing emergency abortions prohibited by Texas law. See *Texas* v. *Becerra*, 89 F. 4th 529, 533 (2024). The United States has already petitioned for certiorari in that case. See Pet. for Cert. in *Becerra* v. *Texas*, O. T. 2023, No. 23–1076.

Nor has there been any change in today's cases that might eliminate or undermine the need for this Court's review. The Government continues to maintain (correctly, in my view) that EMTALA's plain text requires hospitals to provide certain emergency abortions when doing so is the only way to stabilize an emergency condition. Brief for United States 12–20. Idaho continues to criminalize the provision of such abortions unless doing so is necessary to prevent the patient's death. Idaho Code Ann. §18–622(2)(a)(i). And both Idaho and the United States still agree that Idaho law directly criminalizes emergency care that the Federal Government reads EMTALA to require. See Tr. of Oral Arg. 16–17, 65–66. Idaho's lawyers may

have changed their tune about the exact types of medical care that fall in the gap between state and federal law, but the fundamentals of this dispute remain the same.

## II

Most importantly, as JUSTICE KAGAN observes, the conflict between the state and federal law—as they are actually being interpreted and applied on the ground—is both substantial and significant. *Ante,* at 4–6. It is a clash that clearly exists despite the attempt by Idaho's counsel to muddy the waters concerning the scope of the State's law.

The textual conflict is plain. EMTALA requires stabilizing treatment if a patient has an acute medical condition that is so severe "that the absence of immediate medical attention could be reasonably expected to" either result in a serious health risk, or seriously threaten bodily functions or organs. 42 U. S. C. §§1395dd(b)(1), (e)(1)(A). In such cases, EMTALA requires hospitals "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to . . . occur." §1395dd(e)(3)(A). Idaho's broad criminalization of abortion—unless the treating physician believes that the abortion is "necessary to prevent the [patient's] death," Idaho Code Ann. §18–622(2)(a)(i)—conflicts with the text of EMTALA. Put simply, under federal law, a hospital *must* provide an emergency abortion that is reasonably necessary to preserve a patient's health within the meaning of EMTALA. But, under Idaho law, a doctor cannot provide this care (required by federal law) without committing a criminal act.

From the beginning of this litigation, the United States has emphasized the host of emergency medical conditions that require stabilizing abortions—even when the procedure is not necessarily life saving. That list includes preeclampsia, preterm premature rupture of the membranes

Opinion of JACKSON, J.

(PPROM), sepsis, and placental abruption, to name just a few examples. Having now been sued over its interference with EMTALA's protections for people experiencing these conditions, Idaho has shifted its position, both here and before the District Court, recharacterizing abortions in these scenarios as life-saving care permitted under Idaho law.

Some of my colleagues appear to view this convenient rhetorical maneuver as a material change that (also conveniently) reduces the conflict between state and federal law to the point that a ruling from this Court is no longer warranted. See *ante,* at 6–7 (BARRETT, J., concurring). But it is both legally and factually implausible to say that Idaho's current litigating position actually mitigates the conflict between that State's law and EMTALA.

The conflict between state and federal law still exists—in real life. Idaho cannot credibly maintain that its law *always* permits abortions in cases of PPROM or pre-eclampsia such that its mandate *never* conflicts with federal law. The same medical condition can present with different risks in different patients. See, *e.g.*, Brief for Physicians for Reproductive Health as *Amicus Curiae* 10–11; Brief for Physicians for Human Rights as *Amicus Curiae* 11–19. And, often, a doctor simply does not know what the risks are or whether a patient might face death. See Tr. of Oral Arg. 103–104; 2 App. 615–617. Such a doctor, observing the different legal thresholds for action under state and federal law—not to mention the severe criminal penalties for a miscalculation—would surely be cowed into not providing abortion care that medical standards warrant and federal law requires. Do not take my word for this; *it is already happening.** So it is strange, to say the least, that this Court

_____

*See Brief for Idaho Coalition for Safe Healthcare, Inc., as *Amicus Curiae* 7–13 (providing examples in Idaho where doctors' lack of certainty prevented them from providing medically necessary abortions); see also Brief for St. Luke's Health System as *Amicus Curiae* 14–16 (same); Brief

6                          MOYLE *v.* UNITED STATES

                             Opinion of JACKSON, J.

would shirk its duty to resolve a pressing legal issue on the
basis of representations that defy medical realities.

   In any event, the representations Idaho's counsel made
during oral argument and in the State's briefs filed in this
Court are not a definitive interpretation of Idaho law. That
authority remains with the Idaho Supreme Court, which
has never endorsed the State's position. To the contrary,
the Idaho Supreme Court has emphasized that, to avoid
criminal liability, a doctor must subjectively believe that an
abortion is necessary to prevent death. *Planned
Parenthood Great Northwest* v. *State*, 171 Idaho 374, 445–
446, 522 P. 3d 1132, 1203–1204 (2023). And that is to say
nothing of local prosecutors, who may not be aware of (or
care about) Idaho's newfound interpretation of its abortion
ban, and who are highly incentivized to enforce the law to
the hilt. See Idaho Code Ann. §63–3642 (Supp. 2023) (with-
holding funding from local governments if their officials de-
cline to enforce Idaho felony laws, which include these fel-
ony abortion laws); see also Brief for Idaho Coalition for
Safe Healthcare, Inc., as *Amicus Curiae* 14–24 (discussing
myriad ways in which state and local officials in Idaho have
targeted physicians). Still, some of my colleagues latch onto
the bald representations of Idaho's counsel, using them as
an escape hatch that justifies our dispensing with having to
issue a merits ruling in these cases.

   We cannot simply wind back the clock to how things were
before the Court injected itself into this matter. Our inter-
vention has already distorted this litigation process. We
permitted Idaho's law to go into effect by staying the Dis-
trict Court's injunction in the first place, then allowed this
matter to sit on our merits docket for five months while we
considered the question presented. It is too little, too late
for the Court to take a mulligan and just tell the lower

_____

for Amanda Zurawski et al. as *Amici Curiae* 29–30 (same); Brief for Phy-
sicians for Human Rights as *Amicus Curiae* 12–17 (same).

Opinion of JACKSON, J.

courts to carry on as if none of this has happened. As the old adage goes: The Court has made this bed so now it must lie in it—by proceeding to decide the merits of the critical pre-emption issue this case presents.

We have granted certiorari and heard argument. We have had ample opportunity to consider the issues. The parties were well represented on both sides, and dozens of *amici* have weighed in. What is more, the necessary legal reasoning is straightforward, and the answer to the question presented is—or at least should be—quite clear: Idaho law prohibits what federal law requires, so to that extent, under the Supremacy Clause, Idaho's law is pre-empted. See *Mutual Pharmaceutical Co.* v. *Bartlett*, 570 U. S. 472, 479–480 (2013) ("[I]t has long been settled that state laws that conflict with federal laws are 'without effect'" (quoting *Maryland* v. *Louisiana*, 451 U. S. 725, 746 (1981))). There is simply no good reason not to resolve this conflict now.

\*      \*      \*

Despite the clarity of the legal issue and the dire need for an answer from this Court, today six Justices refuse to recognize the rights that EMTALA protects. See *ante,* at 4–7 (BARRETT, J., concurring); *post,* at 4–11 (ALITO, J., dissenting). The majority opts, instead, to dismiss these cases. But storm clouds loom ahead. Three Justices suggest, at least in this context, that States have free rein to nullify federal law. See *post,* at 11–14 (ALITO, J., dissenting). And three more decline to disagree with those dissenters on the merits. See *ante,* at 4–7 (BARRETT, J., concurring). The latter group offers only murmurs that "petitioners have raised a difficult and consequential argument" about Congress's authority under the Spending Clause. *Ante,* at 6 (BARRETT, J., concurring). So, as of today, the Court has not adopted Idaho's farfetched theories—but it has not rejected them either.

Instead, the Court puts off the decision. But how long

must pregnant patients wait for an answer? Until we confront the pending petition that the Government filed with us after the Fifth Circuit enabled Texas's flouting of EMTALA? Until these very cases return to us in a few years? Will this Court just have a do-over, rehearing and rehashing the same arguments we are considering now, just at a comparatively more convenient point in time? Or maybe we will keep punting on this issue altogether, allowing chaos to reign wherever lower courts enable States to flagrantly undercut federal law, facilitating the suffering of people in need of urgent medical treatment.

After today, there will be a few months—maybe a few years—during which doctors may no longer need to airlift pregnant patients out of Idaho. As JUSTICE KAGAN emphasizes, portions of Idaho's law will be preliminarily enjoined (at least for now). *Ante,* at 2, 4. But having not heard from this Court on the ultimate pre-emption issue, Idaho's doctors will still have to decide whether to provide emergency medical care in the midst of highly charged legal circumstances with no guarantee that this fragile detente over the State's categorical prohibitions will be maintained. Cf. *ante,* at 8 (BARRETT, J., concurring) ("Even with the preliminary injunction in place, Idaho's ability to enforce its law remains almost entirely intact").

So, to be clear: Today's decision is not a victory for pregnant patients in Idaho. It is delay. While this Court dawdles and the country waits, pregnant people experiencing emergency medical conditions remain in a precarious position, as their doctors are kept in the dark about what the law requires. This Court had a chance to bring clarity and certainty to this tragic situation, and we have squandered it. And for as long as we refuse to declare what the law requires, pregnant patients in Idaho, Texas, and elsewhere will be paying the price. Because we owe them—and the Nation—an answer to the straightforward pre-emption question presented in these cases, I respectfully dissent.

ALITO, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 23–726 and 23–727

_____

MIKE MOYLE, SPEAKER OF THE IDAHO HOUSE OF
REPRESENTATIVES, ET AL., PETITIONERS
23–726                     *v.*
UNITED STATES


IDAHO, PETITIONER
23–727                     *v.*
UNITED STATES

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 27, 2024]

JUSTICE ALITO, with whom JUSTICE THOMAS joins, and
with whom JUSTICE GORSUCH joins as to Parts I and II, dissenting.

This case presents an important and unsettled question
of federal statutory law: whether the Emergency Medical
Treatment and Labor Act (EMTALA), 42 U. S. C. §1395dd,
sometimes demands that hospitals perform abortions and
thereby preempts Idaho's recently adopted Defense of Life
Act, Idaho Code Ann. §18–622 (Supp. 2023). Enacted
nearly 40 years ago, EMTALA requires hospitals participating in Medicare to "scree[n]" and "stabilize" "any individual" who comes to an emergency room with an "emergency medical condition" that jeopardizes the patient's
"health." §§1395dd(a), (b)(1)(A), (e)(1)(A). And if the patient is a pregnant woman, the hospital must stabilize both
"the woman" and "her unborn child." §1395dd(e)(1)(A)(i).

After this Court's decision in *Dobbs* v. *Jackson Women's
Health Organization*, 597 U. S. 215 (2022), Idaho and other

ALITO, J., dissenting

States enacted new laws restricting the performance of abortions. To protect both "maternal health and safety" and "'the life of preborn children,'" *Planned Parenthood Great Northwest* v. *State*, 171 Idaho 374, 438, 522 P. 3d 1132, 1196 (2023) (quoting Idaho Code Ann. §18–601), Idaho's law permits an abortion only when "necessary to prevent the death of the pregnant woman," §18–622(2)(a)(i).

Shortly before Idaho's law took effect, President Biden instructed members of his administration to find ways to limit *Dobbs*'s reach. Protecting Access to Reproductive Healthcare Services, Exec. Order No. 14076, 87 Fed. Reg. 42053 (2022). In response, Government lawyers hit upon the novel argument that, under EMTALA, all Medicare-funded hospitals—that is, the vast majority of hospitals[1]—*must* perform abortions on request when the "health" of a pregnant woman is in serious jeopardy. §1395dd(e)(1)(A)(i). In the Government's view, EMTALA trumps laws like Idaho's, which allow abortions only to preserve the life of the pregnant woman. See Dept. of Health & Human Servs. (HHS), Reinforcement of EMTALA Obligations Specific to Patients Who Are Pregnant or Are Experiencing Pregnancy Loss 1 (QSO–22–22–Hospitals, July 11, 2022). The Government sued Idaho on this preemption theory and obtained a preliminary injunction against enforcement of the state law "to the extent it conflicts with EMTALA." 623 F. Supp. 3d 1097, 1117 (Idaho 2022).

The Government's preemption theory is plainly unsound. Far from requiring hospitals to perform abortions, EMTALA's text unambiguously demands that Medicare-funded hospitals protect the health of both a pregnant woman *and* her "unborn child." §1395dd(e)(1)(A)(i). And

——————

[1] For instance, the American Hospital Association (AHA) calculates that 96% of hospitals have at least 50% of their inpatient days paid by Medicare and Medicaid. AHA, Fact Sheet: Majority of Hospital Payments Dependent on Medicare or Medicaid (Mar. 2024).

ALITO, J., dissenting

even if there were some ambiguity in the statutory text, we would be obligated to resolve that ambiguity in favor of the State because EMTALA was enacted under the Spending Clause, and as we have held time and again, conditions attached to the receipt of federal funds must be unambiguous. *Arlington Central School Dist. Bd. of Ed.* v. *Murphy*, 548 U. S. 291, 296 (2006); *Pennhurst State School and Hospital* v. *Halderman*, 451 U. S. 1, 17 (1981). Here, no one who has any respect for statutory language can plausibly say that the Government's interpretation is unambiguously correct. And in any event, Idaho never consented to *any* conditions imposed by EMTALA and certainly did not surrender control of the practice of medicine and the regulation of abortions within its territory.

Recognizing the flaws in the Government's theory and Idaho's "strong" likelihood of success, this Court stayed the preliminary injunction pending appeal on January 5. And, wisely or not, the Court also took the unusual step of granting certiorari before Idaho's appeal was heard by the Ninth Circuit. See this Court's Rule 11. Now the Court dismisses the writ and, what is worse, vacates the stay.

This about-face is baffling. Nothing legally relevant has occurred since January 5. And the underlying issue in this case—whether EMTALA requires hospitals to perform abortions in some circumstances—is a straightforward question of statutory interpretation. It is squarely presented by the decision below, and it has been exhaustively briefed and argued. In addition to the parties' briefs, we received 46 *amicus* briefs, including briefs submitted by 44 States and the District of Columbia; briefs expressing the views of 379 Members of Congress; and briefs from prominent medical organizations. Altogether, we have more than 1,300 pages of briefing to assist us, and we heard nearly two hours of argument. Everything there is to say about the statutory interpretation question has probably been said many times over. That question is as ripe for decision as it

ever will be. Apparently, the Court has simply lost the will to decide the easy but emotional and highly politicized question that the case presents. That is regrettable.

Having already taken the extraordinary step of granting certiorari before judgment in order to decide whether the Government's new interpretation of EMTALA is correct, we have no good reason to change course now. This is especially so because the Court's decision to reexamine the stay issued in January makes it necessary to reassess whether Idaho showed a likelihood of success on the merits, a question that is closely related to the question whether Idaho or the Government has correctly interpreted EMTALA. I will therefore proceed to analyze what EMTALA means.

### I
### A

The text of EMTALA shows clearly that it does not require hospitals to perform abortions in violation of Idaho law. To the contrary, EMTALA obligates Medicare-funded hospitals to *treat*, not abort, an "unborn child."

EMTALA imposes two main obligations on covered hospitals. First, a hospital must, within its "capabilit[ies]," "screen" "any individual" arriving at the emergency room without regard to the individual's ability to pay. §§1395dd(a), (h). The purpose of this screening is to determine whether the individual has an "emergency medical condition," which EMTALA defines as follows:

> "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—
>
> "(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman *or her unborn child)* in serious jeopardy,
>
> "(ii) serious impairment to bodily functions, or
>
> "(iii) serious dysfunction of any bodily organ or

ALITO, J., dissenting

part." §1395dd(e)(1)(A) (emphasis added).[2]

When a hospital determines that an "emergency medical condition" exists, it has two options. It may provide "treatment" within the capability of its "staff and facilities." §1395dd(b)(1)(A). Or it may "transfer . . . the individual" to another hospital that "has available space and qualified personnel for the treatment" as long as the transfer would effect a net benefit for the patient. §§1395dd(b)(1)(B), (c)(2)(B)(i).

At no point in its elaboration of the screening, stabilization, and transfer requirements does EMTALA mention abortion. Just the opposite is true: EMTALA requires the hospital at every stage to protect an "unborn child" from harm.

Begin with the screening provision, which requires a hospital "to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1)) exists." §1395dd(a). "[W]ith respect to a pregnant woman," subsection (e)(1) defines an emergency medical condition as one that is sufficiently serious to "plac[e] . . . the health of the woman *or her unborn child* . . . in serious jeopardy." §1395dd(e)(1)(A)(i) (emphasis added). Thus, if the hospital identifies an emergency medical condition threatening the child, it must "stabilize" that condition to ensure that the child's health does not remain in "jeopardy." §§1395dd(b)(1)(A), (e)(1)(A)(i). It goes without saying that aborting an "unborn child" does not protect it from jeopardy.

Similarly, if a hospital wants to transfer a pregnant woman to another facility, it may not do so unless, among other things, a physician certifies directly or through an intermediary that the medical benefits of transfer outweigh

———————

[2]At oral argument, the Solicitor General stated that, in the Government's view, an "impairment" or "dysfunction" under §1395dd (e)(1)(A)(i) and (ii) may be temporary. Tr. of Oral Arg. 80.

any "increased risks" to the woman "and, in the case of labor, to the unborn child." §§1395dd(c)(1)(A)(ii), (e)(1)(B). Thus, regardless of whether a hospital chooses to treat or transfer a pregnant woman, it must strive to protect her "unborn child" from harm.

The Government struggles mightily—but unsuccessfully—to get around this language. First, the Government argues that EMTALA's repeated use of the term "individual," coupled with the Dictionary Act's definition of that term, which does not include an "unborn child,"[3] shows that "[a]ll of EMTALA's duties—screening, stabilization, and transfer—run to the 'individual' seeking care." Brief for United States 41. That assertion falls flat in light of EMTALA's express protection of the unborn child.

Besides, there is a simple explanation for EMTALA's repeated use of the term "individual," and it provides no support for the Government's interpretation. Most of those references involve conduct in which only the pregnant woman can engage, such as going to an emergency room,[4] receiving medical information,[5] consenting to or refusing treatment,[6] or filing suit.[7] Many references concern transfer to another facility,[8] and when a pregnant woman is transferred, her "unborn child" obviously goes with her. Another reference concerns a woman's "emergency medical condition," which, as noted, includes conditions that jeopardize her "unborn

---

[3]The Dictionary Act defines an "individual" to "include every infant member of the species homo sapiens who is born alive at any stage of development." 1 U. S. C. §8(a). But it goes on to provide that this definition is not to "be construed to . . . deny . . . any legal status or legal right applicable to any member of the species homo sapiens at any point prior to being 'born alive.'" §8(c). Thus, the Act itself provides no support for the Government's position.

[4]§1395dd(a).

[5]§1395dd(c)(1)(A)(i).

[6]§1395dd(b)(2).

[7]§1395dd(d)(2)(A).

[8]§§1395dd(b)(3), (c), (e)(4).

ALITO, J., dissenting

child."[9]  And some references expressly mention both the "individual" and "the unborn child."[10]  No use of the term "individual" supports the Government's interpretation.

Second, based on a provision stating that an individual may not be treated without consent, §1395dd(b)(2), the Government infers that "it is for the pregnant woman, not state law, to decide how to proceed" when her health is at risk. Brief for United States 43.  The Government's logic is faulty.  The right to withhold consent does not necessarily carry with it the right to demand whatever cannot be done without consent.  $X$ may withhold consent to a contract with $Y$, but that does not mean that $X$ may demand to enter into such a contract.  A person may not be forced to assume the duties of the Presidency without consent, but it does not follow that this person may demand to be sworn in as President.

Or, to provide an example that is more closely related to the matter at hand, the right to refuse medical treatment without consent does not entail the right to demand treatment that is prohibited by law.  Cancer patients have the right to refuse treatment that their doctors recommend, but they do not have a right to obtain whatever treatment they want, such as the administration of a drug that cannot legally be used in this country.  Cf. 21 U. S. C. §360bbb–0a (granting terminal patients the right to try experimental drugs).  Likewise here, a woman's right to withhold consent to treatment related to her pregnancy does not mean that she can demand an abortion.

For these reasons, the text of EMTALA conclusively shows that it does not require hospitals to perform abortions.

––––––––––––

[9] §1395dd(e)(1)(A)(i).

[10] §§1395dd(c)(1)(A)(ii) and (2)(A), (e)(1)(A)(i).

B

For those who find it appropriate to look beyond the statutory text, the context in which EMTALA was enacted reinforces what the text makes clear. Congress designed EMTALA to solve a particular problem—preventing private hospitals from turning away patients who are unable to pay for medical care. H. R. Rep. No. 99–241(I), pt. 1, p. 27 (1985); K. Treiger, Preventing Patient Dumping: Sharpening the COBRA's Fangs, 61 N. Y. U. L. Rev. 1186, 1188 (1986). And none of many briefs submitted in this suit has found any suggestion in the proceedings leading up to EMTALA's passage that the Act might also use the carrot of federal funds to entice hospitals to perform abortions. To the contrary, EMTALA garnered broad support in both Houses of Congress, including the support of Members such as Representative Henry Hyde who adamantly opposed the use of federal funds to abet abortion.[11]

It is also telling that the Congress that initially enacted EMTALA in 1986 and the one that amended it in 1989 also passed appropriations riders under what is now known as the Hyde Amendment (named after Representative Hyde) to prevent federal funds from facilitating abortions, except in limited circumstances. See *Harris* v. *McRae*, 448 U. S. 297, 302 (1980). Between 1981 and 1993—the very period when EMTALA was enacted and amended—the Hyde Amendment contained only one exception: for abortions necessary to save the life of the pregnant woman. Congressional Research Service, E. Liu & W. Shen, The Hyde Amendment: An Overview 1 (2022); see §204, 99 Stat. 1119 (1986 Hyde Amendment). The Hyde Amendment thus prohibited federal funds from paying for the health-related

––––––––––––

[11] See House Vote #499 in 1986 (99th Cong.), GovTrack.US (Mar. 20, 1986), https://www.govtrack.us/congress/votes/99-1986/h499; Senate Vote #379 in 1985 (99th Cong.), GovTrack.US (Dec. 19, 1985), https://www.govtrack.us/congress/votes/99-1985/s379.

abortions that the Government says EMTALA mandates. It would have been strange indeed if a Congress that repeatedly sought to prevent federal funding of abortions simultaneously enacted a law that, as interpreted by the Government, requires hospitals and physicians to perform that very same procedure.

The Government's reading of EMTALA is doubly strange given that the President who signed that law repeatedly promised not to use federal funds to subsidize or require the provision of abortions. Less than three months before signing EMTALA, President Reagan told participants in the annual March for Life that "the resources of government are not [to be] used to promote or perform abortions." The American Presidency Project, Remarks to Participants in the March for Life Rally (Jan. 22, 1986). The next year, he touted his administration's work "to restrict the use of Federal funds to perform abortions." *Id.*, Remarks to Participants in the March for Life Rally (Jan. 22, 1987). In another 1987 speech, he promised that his administration would "oppose any legislation that would require individuals or institutions, public or private, to finance or perform abortions." *Id.*, Remarks at a White House Briefing for Right to Life Activists (July 30, 1987). And his 1986 and 1987 messages to Congress repeated that promise. See *id.*, Message to the Congress on "A Quest for Excellence" (Jan. 27, 1987); *id.*, Message to the Congress on America's Agenda for the Future (Feb. 6, 1986).

Around the same time, President Reagan's HHS Secretary testified before Congress that "the Administration steadfastly opposes [the] creation of [a] program which would encourage, promote or finance the performance of abortions." Statement of the Hon. Margaret M. Heckler, in Budget Reconciliation: Hearings before the Senate Committee on Finance, 99th Cong., 1st Sess., pt. 1, p. 273 (1985). It beggars belief that President Reagan would have happily

ALITO, J., dissenting

signed EMTALA into law if it did what he "steadfastly opposed]." *Ibid.*

## C

Desperate to find some crumb of support for its interpretation, the Government scrapes together a handful of sources that it says evidence a general understanding that EMTALA requires hospitals to perform health-related abortions prohibited by Idaho law. None of these sources stands for that proposition.

First, the Government searched a vast database of HHS enforcement decisions and located six occurring between 2010 and 2023 that it finds helpful. It is not obvious why those enforcement decisions—which postdate EMTALA by more than 20 years—shed light on its original meaning. And it is even less clear why they justify the Government's claim that EMTALA preempts Idaho law. Five of the six cases involved ectopic pregnancies, which the Idaho law does not cover. See Idaho Code Ann. §18–604(1)(c) (excluding ectopic pregnancies from the definition of "abortion"). In the remaining case, the hospital was faulted, not for failing to perform an abortion, but for discharging a sick pregnant woman without calling for an ambulance to transport her to another hospital.[12]

The Government also seizes upon a provision in the Affordable Care Act stating that "[n]othing in this Act shall be construed to relieve any health care provider from providing emergency services as required by State or Fed-

---

[12] Additionally, it is doubtful that Idaho law would have prevented an abortion in this suit. The woman was diagnosed with "[i]nevitable abortion." Centers for Medicare and Medicaid Services, Hospital Surveys With 2567 Statement of Deficiencies—2024Q1 (2010–2016 file) Row 16,961. But Idaho law does not apply to "non-viable pregnancies . . . where the unborn child is no longer developing." *Planned Parenthood Great Northwest* v. *State*, 171 Idaho 374, 445, 522 P. 3d 1132, 1203 (2023); see also Idaho Code Ann. §§18–604(1), (11).

ALITO, J., dissenting

eral law, including . . . EMTALA." 42 U. S. C. §18023(d) (internal quotation marks omitted). Because this provision was placed in a section of the Act concerning abortion, the Government infers that it reflects a congressional understanding that EMTALA sometimes requires abortions. Brief for United States 19–20. That inference is totally unwarranted. The provision in question refers to the entire massive Affordable Care Act, not just the relatively few provisions concerning abortion. Compare §18023(d), with §18023(c) (referring more narrowly to "this subsection"). It reaffirms the duty of participating hospitals to comply with EMTALA, but it does not expand what the text of EMTALA requires.[13] So this provision cannot support the Government's interpretation of EMTALA either.

## II

As the previous Part shows, EMTALA's text and context decisively refute the Government's interpretation. But there is a third strike against the Government's position: EMTALA is an exercise of Congress's spending power. And when Congress relies on its authority to attach conditions to the receipt of federal funds, special rules apply.

Spending Clause legislation operates "much in the nature of a contract: in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Pennhurst*, 451 U. S., at 17. These conditions do not bind unless and until they are accepted, and private parties "can opt out of spending programs" at will, "completely nullifying whatever force the spending conditions once had." *Health and Hospital Corporation of Marion Cty.* v. *Talevski*, 599 U. S. 166, 201 (2023) (THOMAS, J., dissenting); accord, *Townsend* v. *Swank*, 404 U. S. 282, 292 (1971) (Burger, C. J., concurring in result) ("[A]herence to [Spending

_____

[13] Section 18023(d) also demands compliance with state emergency care requirements, and laws like Idaho's impose requirements regarding permissible emergency care for pregnant women.

Clause] provisions . . . is in no way mandatory"). "[T]he 'legitimacy of Congress' power'" to enforce conditions tied to federal funds depends on whether the parties who accepted federal funds also "'voluntarily and knowingly'" accepted the conditions. *Cummings* v. *Premier Rehab Keller*, 596 U. S. 212, 219 (2022) (quoting *Barnes* v. *Gorman*, 536 U. S. 181, 186 (2002)).

Because the enforcement of conditions attached to the receipt of federal money depends on a recipient's knowing and voluntary consent, "the conditions must be set out 'unambiguously.'" *Arlington Central*, 548 U. S., at 296 (quoting *Pennhurst*, 451 U. S., at 17). And recipients must be given a "legitimate choice whether to accept the federal conditions." *National Federation of Independent Business* v. *Sebelius*, 567 U. S. 519, 578 (2012) (opinion of ROBERTS, C. J.); accord, *Steward Machine Co.* v. *Davis*, 301 U. S. 548, 590 (1937). The Government's interpretation founders at both points.

First, consider the requirement that EMTALA speak unambiguously. Even if it were possible to read EMTALA as requiring abortions prohibited by Idaho law, it is beyond dispute that such a requirement is not unambiguously clear. The statute does not mention abortion, let alone expressly bind hospitals to perform abortions contrary to state law.

The need for clear statutory language is especially important in this suit because the Government's interpretation would intrude on an area traditionally left to state control, namely, the practice of medicine. We typically expect Congress to "'make its intention "clear and manifest" if it intends to pre-empt the historic powers of the States.'" *Gregory* v. *Ashcroft*, 501 U. S. 452, 461 (1991) (quoting *Rice* v. *Santa Fe Elevator Corp.*, 331 U. S. 218, 230 (1947)); see also *Gonzales* v. *Oregon*, 546 U. S. 243, 274 (2006) ("[T]he background principles of our federal system also belie the notion that Congress would use such an obscure grant of

ALITO, J., dissenting

authority to regulate areas traditionally supervised by the States' police power").

Second, consider the requirement that parties be given a choice before being bound by Spending Clause conditions. The Government's interpretation purports to limit Idaho's choices about what conduct to criminalize. But Idaho never "agree[d]" to be bound by EMTALA,[14] *Cummings*, 596 U. S., at 219, let alone to surrender its historic power to regulate the practice of medicine or the performance of abortions within its borders.

The Idaho Legislature takes its argument against preemption even further. It contends that EMTALA cannot preempt the State's abortion regulations because Idaho is not a party to the agreement between the Federal Government and the hospitals that take Medicare funds. See Brief for Petitioners in No. 23–726, pp. 50–51. As it explains, States cannot be bound by terms that they never accepted, so it is hard to see how a third party's agreement with the Federal Government can deprive a State of the ability to enforce its criminal laws. Accord, *Talevski*, 599 U. S., at 212 (THOMAS, J., dissenting) ("[E]ven those who held the broadest conception of the spending power recognized that it was only a power to spend, not a power to impose binding requirements with the force of federal law").

The potential implications of permitting preemption here are far-reaching. Under the Government's view, Congress could apparently pay doctors to perform not only emergency abortions but also third-trimester elective abortions or eugenic abortions. It could condition Medicare funds on hospitals' offering assisted suicide even in the vast majority of States that ban the practice. It could authorize the practice of medicine by any doctor who accepts Medicare payments

———————
[14] Only one state psychiatric hospital accepts Medicare funds, and it does not have an emergency room. 2 App. 531.

even if he or she does not meet the State's licensing requirements.

While the Government is not troubled by the potential consequences of its preemption argument, Congress was sensitive to state prerogatives. The Medicare Act, in which EMTALA is situated, disclaims any construction that would "authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided" in a particular State. 42 U. S. C. §1395. This disclaimer evidences a desire to "minimize federal intrusion" into state healthcare regulation. *Massachusetts Medical Soc.* v. *Dukakis*, 815 F. 2d 790, 791 (CA1 1987) (opinion of Breyer, J.). EMTALA's narrow preemption clause also respects core state powers by providing that the Act "do[es] not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." §1395dd(f). This phrasing signals that EMTALA's default position is coexistence with state law.

In response to the Legislature's argument, the Government claims that a handful of our cases have held that Spending Clause statutes can preempt the laws of non-consenting States, but those cases do not begin to settle the question at hand. Two are entirely inapposite.[15] And the remaining cases simply upheld the Federal Government's ability to prevent the use of federal money for purposes

---

[15] *Coventry Health Care of Mo., Inc.* v. *Nevils*, 581 U. S. 87, 95–99 (2017), held that Missouri's anti-subrogation law was preempted by the Federal Employee Health Benefits Act with regard to contracts for health benefits negotiated between the Federal Government and insurance carriers. It did not present the question whether Spending Clause conditions placed on private parties could preempt States from enforcing their criminal statutes against any of their residents—including parties that did not contract with the Federal Government. And in *Townsend* v. *Swank*, 404 U. S. 282 (1971), the State itself was the recipient of the funds in question.

ALITO, J., dissenting

other than those intended by Congress.[16]  The Government
has not identified any decision holding that a federal law
enacted under the Spending Clause preempts a state crim-
inal law or public health regulation.

For present purposes, it is not necessary to decide
whether the Legislature's theory is correct.  At a minimum,
however, it provides yet another reason to be wary about
interpreting EMTALA to displace the core powers of a non-
consenting State without unmistakable clarity regarding
the meaning of the federal law.

*    *    *

In sum, the Government's new interpretation of
EMTALA is refuted by the statutory text, the context in
which the law was enacted, and the rules of interpretation
that we apply to Spending Clause legislation.  We should
reject the Government's interpretation and put that matter
to rest.[17]

_____

[16] See *Philpott* v. *Essex County Welfare Bd.*, 409 U. S. 413, 415 (1973)
(attachment of Social Security benefits); *Bennett* v. *Arkansas*, 485 U. S.
395, 398 (1988) (*per curiam*) (same); *Lawrence County* v. *Lead-Deadwood
School Dist. No. 40–1*, 469 U. S. 256, 271 (1985) (use of federal payments
in lieu of taxes made to municipalities with federal facilities).

[17] JUSTICE SOTOMAYOR, JUSTICE KAGAN, and JUSTICE JACKSON endorse
the Government's interpretation of EMTALA but barely bother to ex-
plain why they think the interpretation is correct.  JUSTICE KAGAN's opin-
ion, which JUSTICE SOTOMAYOR and JUSTICE JACKSON join, argues that
"EMTALA unambiguously requires that a Medicare-funded hospital pro-
vide whatever medical treatment is necessary to stabilize a health emer-
gency" and in some cases this may require an abortion.  *Ante,* at 4 (con-
curring opinion).  JUSTICE KAGAN conveniently fails to note that
EMTALA defines the term "emergency medical condition" and that this
definition includes any condition that is sufficiently serious to "plac[e]
. . . the health of [a pregnant] woman or her unborn child . . . in serious
jeopardy." §1395dd(e)(1)(A)(i).  Therefore, as I have already explained,
EMTALA demands that a covered hospital stabilize any sufficiently se-
rious threat to the health of an "unborn child."

Not only is JUSTICE KAGAN's analysis of the statutory language faulty,
but she fails to say anything about the special rules of interpretation that

### III

Even if the Court is unwilling to decide the statutory interpretation question, there is no excuse for vacating the stay of the preliminary injunction. In order to obtain that injunction, the Government was required to make a strong showing that it was likely to prevail on the merits. See *Munaf* v. *Geren*, 553 U. S. 674, 690 (2008). And as I have explained, its argument was almost certain to lose. That in itself is sufficient to preclude continuation of the preliminary injunction.

Why then have six Justices voted to vacate the stay? The *per curiam* itself provides no explanation. In separate opinions, three of the six agree with the Government's interpretation of EMTALA, see *supra*, at 15, n. 17, and that at least is an explanation that would make sense if the premise (the correctness of the Government's interpretation) were sound. As for the remaining three, their only explanation is that "the injunction will not stop Idaho from enforcing its law in the vast majority of circumstances" and that therefore Idaho cannot show that it will be irreparably harmed by allowing the injunction to remain in place during the pendency of the appeal. *Ante*, at 7 (BARRETT, J., joined by ROBERTS, C. J., and KAVANAUGH, J., concurring). That justification is patently unsound. "'[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland* v. *King*, 567 U. S. 1301, 1303 (2012) (ROBERTS, C. J., in chambers). And in this case, Idaho's injury is not abstract. As I will explain, it is very likely that

---

apply to Spending Clause measures or how Idaho can be bound by conditions to which it has never agreed.

JUSTICE JACKSON's opinion adds nothing to JUSTICE KAGAN's legal analysis, but she reads my opinion to suggest "that States have free rein to nullify federal law." *Ante,* at 7 (opinion concurring in part and dissenting in part). Anyone who reads my opinion can see that it makes no such suggestion but simply explains what the federal law in question means.

ALITO, J., dissenting

the preliminary injunction will lead to more abortions, including in at least some cases where the fetus is viable. The State of Idaho wants to prevent that; the preliminary injunction stands in its way. Isn't that enough to constitute irreparable harm?

The Justices who have joined JUSTICE BARRETT's concurrence claim that the parties' briefs and oral arguments seem to have narrowed the degree to which EMTALA, as interpreted by the Government, conflicts with the Idaho law, *ante*, at 7–8, but all the parties continue to insist that the laws conflict. The Solicitor General argued that EMTALA's focus on a pregnant woman's health is broader than Idaho's life-of-the-mother exception. In forceful terms, she told us: "In Idaho, doctors have to shut their eyes to everything except death," whereas under EMTALA, a physician is supposed to think about serious threats to a pregnant woman's health. Tr. of Oral Arg. 102. In light of this perceived conflict, the Solicitor General said it was "gravely mistaken" to suggest that "there really isn't in operation a difference between" EMTALA and Idaho law. *Id.*, at 101–102.

Idaho agreed that the Government's interpretation of EMTALA conflicts with state law. In particular, the State worried that "the United States' novel theory" would "authorize emergency-room doctors to perform abortions" for mental-health reasons and would thus "turn emergency rooms into federal abortion enclaves governed not by state law but by subjective physician judgment." Brief for Petitioner in No. 23–727, p. 30; see also Tr. of Oral Arg. 45–46.

Thus, whatever narrowing may have occurred during briefing and argument in this Court, both the Government and the State of Idaho fervently maintain that it matters whether the Idaho law is enforced. Do any Justices in the majority seriously disagree? Do any of them think that the parties, not to mention their armies of *amici*, are fighting about nothing?

Three of the six Justices in the majority also agree that there is a conflict—and judging from their fiery rhetoric, a big one. See *ante,* at 1 (KAGAN, J., joined by SOTOMAYOR, J., and by JACKSON, J., as to Part II, concurring); *ante,* at 7 (JACKSON, J., concurring in part and dissenting in part). And they are correct to this extent: there is a real conflict.

## A

I begin with the Government's argument that "there are numerous conditions" that may afflict a pregnant woman "where a doctor's immediate concern is not death." Tr. of Oral Arg. 103. In those cases, the Government explains, a doctor might be worried about serious risks to the woman's "health." *Ibid.* In the Government's telling, EMTALA requires hospitals to perform an abortion on demand in these circumstances.

Idaho law says otherwise. An Idaho doctor may not perform an abortion unless the doctor "determine[s], in his good faith medical judgment . . . , that the abortion [is] necessary to prevent the death of the pregnant woman." Idaho Code Ann. §18–622(2)(a)(i). And even then, the doctor must "attemp[t] to perform the abortion in the manner that . . . provide[s] the best opportunity for the unborn child to survive," unless doing so "would . . . pos[e] a greater risk of the death of the pregnant woman." §622(2)(a)(ii).

These standards do not require a doctor to be "objec-tive[ly] certai[n]" that the abortion is "'necessary' to save the woman's life." *Planned Parenthood*, 171 Idaho, at 445, 522 P. 3d, at 1203 (emphasis deleted). Nor does Idaho law require that the risk of death be particularly immediate. *Ibid.* Indeed, the Idaho Supreme Court has explained that the law "leaves wide room for the physician's 'good faith medical judgment' on whether [an] abortion was 'necessary.'" *Ibid.*; accord, *id.*, at 446, 522 P. 3d, at 1203 (noting that the Act "imposes a subjective standard based on the individual physician's good faith medical judgment"). And

ALITO, J., dissenting

any latitude, it said, "'operates for the benefit, not the dis-advantage, of the pregnant woman.'" *Id.*, at 445–446, 522 P. 3d, at 1203–1204. Even so, Idaho's law is focused on "death," and a doctor must be able to say in "good faith" that he or she was acting to preserve the woman's life, not simply her health. Idaho Code Ann. §18–622(2)(a)(i).

These different considerations—health versus life—may lead to different outcomes. For instance, consider the situation of a woman who experiences a condition that was discussed in the briefs and at argument: preterm prelabor rupture of membranes (PPROM), which occurs when a woman's amniotic sac breaks before the 37th week of pregnancy. 1 App. 295. The Members of this Court are not physicians and should therefore be wary about expressing conclusions about medical issues. But guidance provided by prominent medical institutions is sufficient to show how Idaho law and EMTALA, as interpreted by the Government, may conflict in such cases.

If a woman experiences PPROM between the 34th and 37th week of pregnancy and does not go into labor, her physician is likely to recommend that labor be induced.[18] In that situation, it does not appear that the risk of conflict is high.

On the other hand, when PPROM occurs earlier than that, the chances of conflict are greatly increased. If PPROM occurs before the 34th week and the woman's pregnancy continues, she may experience conditions such as an infection of the amniotic fluid, inflammation of the uterine lining, hemorrhage, or sepsis.[19] However, life-threatening

———————

[18] See, *e.g.*, 1 App. 306; Mount Sinai, Premature Rupture of Membranes, https://www.mountsinai.org/health-library/special-topic/premature-rupture-of-membranes#:~:text=Sometimes%20the%20membranes%20break%20before,rupture%20of%20membranes%20 (June 21, 2024).

[19] One study found that 14% of women with PPROM before the point of viability developed one or more of these complications, and approximately 1% to 5% developed life-threatening sepsis. 1 App. 298. A review

ALITO, J., dissenting

complications are not inevitable, and according to the PPROM Foundation, death is "extremely rare."[20] A physician may try to delay labor by putting the woman on bed rest and administering steroids to help the baby's lungs grow and antibiotics to prevent infection.[21]

When PPROM occurs before the 24th week of pregnancy, the potential for conflict appears to be even higher. But in that situation, it may still be possible to manage the situation until the baby can be delivered,[22] and there is a chance of a good outcome for both the mother and child, although studies have yielded different results.[23]   Thus, when

––––––––––

of studies after 1993 indicated that the most common maternal morbidity is infection of the amniotic fluid, "with approximately 37% of women developing this complication." T. Waters & B. Mercer, The Management of Preterm Premature Rupture of Membranes Near the Limit of Fetal Viability, Am. J. Obstetrics & Gynecology (AJOG), p. 231 (Sept. 2009); see also Brief for Physicians for Reproductive Health as *Amicus Curiae* 18.

[20] PPROM Foundation, PPROM Facts, https://www.aaprom. org/community/ppromfacts (June 21, 2024) (PPROM Facts).

[21] *Ibid.*; see also Children's Hospital of Philadelphia, Premature Rupture of Membranes (PROM)/Preterm Premature Rupture of Membranes (PPROM), https://www.chop.edu/conditions-diseases/premature-rupture-membranes-prompreterm-premature-rupture-membranes-pprom (June 21, 2024).

[22] See, *e.g.*, S. Dayal & P. Hong, Premature Rupture of Membranes (July 17, 2023), https://www.ncbi.nlm.nih.gov/books/NBK532888.

[23] "A recent study reports a 90% survival rate for infants exposed to prolonged PPROM occurring between 18–24 weeks who were delivered after 24 weeks." PPROM Facts (citing J. Brumbaugh et al., Neonatal Survival After Prolonged Preterm Premature Rupture of Membranes Before 24 Weeks of Gestation, 124 Obstetrics & Gynecology 992 (2014); see also A. Ozel et al., Outcomes of Pregnancies Complicated by Preterm Premature Rupture of Membranes Before and After 24 Gestational Weeks: A Retrospective Analysis, J. Clinical Obstetrics & Gynecology, p. 231 (Nov. 2023) (reporting that one-third of unborn children survived PPROM before viability at a hospital between 2018–2020); E. Lorthe et al., Preterm Premature Rupture of Membranes and 22–25 Weeks' Gestation, AJOG, p. 5 (Sept. 2018) (determining that, when PPROM occurred between weeks 22 and 25, about half of the children survived, and roughly three-quarters of the survivors did not have severe morbidities);

ALITO, J., dissenting

PPROM occurs before the 34th week of pregnancy, there is a risk to the health of both the woman and her unborn child.

In these situations, the Defense of Life Act requires doctors to consider whether performing an abortion is necessary to prevent the woman's death. Because this is a "subjective" standard, *Planned Parenthood*, 171 Idaho, at 446, 522 P. 3d, at 1204, different doctors may reach different conclusions about when PPROM endangers the woman's life. At least some may conclude in some cases of PPROM occurring before the 34th week of pregnancy that the woman's life is not endangered since she may never develop a serious infection, let alone life-threatening sepsis or any other potentially fatal condition, if she receives proper treatment. See 1 App. 306–307. Rather, those doctors may believe that Idaho law requires them to try to delay delivery long enough to save the child's life, unless PPROM becomes sufficiently "severe" to cause "infection and serious risk of sepsis." See, *e.g.*, 2 *id.*, at 547. [24]

According to the Government's experts, however, EMTALA requires a hospital to perform an abortion at the woman's request whenever PPROM is diagnosed, even if the woman has not yet developed an infection or any other health complications. That is because, they assert, it can

——————

P. Wagner et al., Outcome of Pregnancies With Spontaneous PPROM Before 24+0 Weeks' Gestation (2016) (reporting that "[a]bout half" of fetuses in PPROM pregnancies that make it to viability "will be discharged alive without major complications").

[24] It has been estimated that PPROM occurs in about 2% of all pregnancies involving a single fetus and in 7% of all pregnancies involving twins. See PPROM Facts. It is reported that in 2022, there were 22,391 live births in Idaho. March of Dimes, Fertility Rate: Idaho, 2012–2022, https://www.marchofdimes.org/peristats/data?reg=99&top=2&stop=1&lev=slev=4&obj=1&sreg=16 (Jan. 2024). These statistics suggest that PPROM may have occurred in as many as 500 cases. In some of these cases, the fetus may not have been viable, and in some, the pregnant woman may not have chosen to have an abortion even if the law allowed. Nevertheless, it would not be surprising if the Idaho law, if allowed to be enforced, would result in fewer abortions and more live births.

be "reasonably expected" that, in "the absence of immediate medical attention," PPROM would "plac[e] the health" of the pregnant woman "in serious jeopardy" or cause "serious dysfunction" to her reproductive organs. §§1395dd(c)(1)(A)(ii), (e)(1)(A)(i) and (iii); see, *e.g.*, 2 App. 594 ("Providing stabilizing treatment in the form of termination of pregnancy at the point of diagnosis would be an appropriate means to preserve the patient's reproductive organs at that time"). Thus, in PPROM cases, there may be an important conflict between what Idaho law permits and what EMTALA, as interpreted by the Government, demands. And the same may be true with respect to other conditions that a pregnant woman may experience.

This gap between the Idaho law and the Government's interpretation of EMTALA matters. Idaho has always permitted abortions that are necessary to preserve the life of a pregnant woman, but it has not allowed abortions for other non-life-threatening medical conditions. *Planned Parenthood*, 171 Idaho, at 391–394, 522 P. 3d, at 1149–1152 (summarizing Idaho's historical restrictions); see also *Dobbs*, 597 U. S., at 302–330 (compiling other state statutes with identical exceptions). This balance reflects Idaho's judgment about a difficult and important moral question. See *Planned Parenthood*, 171 Idaho, at 437–438, 522 P. 3d, at 1195–1196. By requiring Idaho hospitals to strike a different balance, the preliminary injunction thwarts the will of the people of Idaho as expressed in law by their elected representatives.

B

I now turn to Idaho's claim that the Government's reading of EMTALA would authorize abortions for mental-health reasons. My colleagues dismiss this concern because at argument, the Solicitor General "emphatically disavowed the notion that an abortion is ever required as stabilizing treatment for mental health conditions." *Ante*, at 5

ALITO, J., dissenting

(BARRETT, J., concurring). But it is hard to see how the Government could reach that conclusion. At oral argument, the Solicitor General conceded that the term "health" in EMTALA includes mental health, Tr. of Oral Arg. 77–78, and if that is so, it is not difficult to imagine a situation in which the Government's interpretation of EMTALA could require an abortion.

Suppose, for example, that a woman in the 10th week of gestation experiences serious depression due to her pregnancy. If she asks emergency medical professionals for treatment, her medical care providers might conclude that her continued pregnancy could "reasonably be expected" to seriously jeopardize the woman's mental health. §1395dd(e)(1)(A). Under the Government's reading of EMTALA, the woman would then have the right to "make an informed decision" about the treatment she received. Brief for United States 41. If the woman preferred to abort rather than manage her depression alongside her pregnancy, it is not apparent why the Government's reading of EMTALA would not require that abortion.

We have seen where a rule permitting abortions to protect the psychological health of pregnant women may lead. In *Roe*, the Court held that a woman had the right to obtain a post-viability abortion that was deemed "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Roe* v. *Wade*, 410 U. S. 113, 165 (1973). In the companion case *Doe* v. *Bolton*, 410 U. S. 179 (1973), the Court wrote that a doctor, in judging whether an abortion was needed to preserve a pregnant woman's health, could consider "all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient." *Id.*, at 192. That decision was viewed by many as essentially preventing States from restricting post-viability abortions.[25] As Harvard

---

[25]See, *e.g.*, J. Ely, The Wages of Crying Wolf: A Comment on *Roe* v.

ALITO, J., dissenting

Law School Professor Mary Ann Glendon put it: "[W]hen *Roe* is read with *Doe*, third-trimester restrictions are effectively ruled out as well—for *Roe*'s dictum that such restrictions might be permissible if they did not interfere with the mother's health was negated by *Doe*'s definition of 'health' as 'well-being.'" The Women of *Roe* v. *Wade* (2003).

The Solicitor General tried to explain why the Government's interpretation would not lead down this path, but her explanation is hard to understand. She said that mental-health emergencies "could never lead to pregnancy termination" because abortion "is not the accepted standard of practice to treat any mental health emergency." Tr. of Oral Arg. 77–78; accord, Brief for United States 26, n. 5.

That assertion appears to be inconsistent with the position taken by prominent medical associations that endorse abortion for mental-health reasons as an accepted standard of practice. See, *e.g.*, American Psychiatric Association, Position Statement on Abortion and Women's Reproductive Healthcare Rights (Mar. 2023) ("Freedom to act to interrupt pregnancy must be considered a mental health imperative"); American Psychological Association, Resolution Affirming and Building on APA's History of Support for Reproductive Rights (Feb. 2022).

For these reasons, there is a real potential for conflict between the Idaho law and the Government's interpretation of EMTALA, and in my judgment, the Court seriously errs by vacating the stay we issued earlier this year.

————————

*Wade*, 82 Yale L. J. 920, 921, and n. 19 (1973); J. Dellapenna, Dispelling the Myths of Abortion History 695 (2006) ("Blackmun's definition of a woman's 'health' in *Doe* as encompassing anything affecting her 'well-being' virtually precluded any possible regulation of abortion during the entire months of pregnancy"); R. Ponnuru, The Party of Death 10 (2006) ("*Roe* required that any ban on late-term abortion include an exception allowing abortion to protect a woman's health; *Doe* defined that exception so broadly that it swallowed up any possibility of a ban").

ALITO, J., dissenting

\*      \*      \*

Today's decision is puzzling. Having taken the unusual step of granting certiorari before Idaho's appeal could be heard by the Ninth Circuit, the Court decides it does not want to tackle this case after all and thus returns the appeal to the Ninth Circuit, which will have to decide the issue that this Court now ducks. What is more, the Court vacates the stay it issued earlier this year even though the majority fails to provide any facially plausible explanation for doing so.

I cannot endorse this turn of events and therefore respectfully dissent.